CA3PMER1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                  v.                        11 CR 576 (WHP)

5   JOSHUA MEREGILDO, MELVIN
    COLON, EARL PIERCE, and
6   NOLBERT MIRANDA,

7                  Defendants.

8   ------------------------------x

9                                           New York, N.Y.
                                            October 3, 2012
10                                          9:51 a.m.

11

    Before:
12
                        HON. WILLIAM H. PAULEY III,
13
                                            District Judge
14

15                          APPEARANCES

16   PREET BHARARA
          United States Attorney for the
17        Southern District of New York
     NOLA HELLER
18   ADAM FEE
     SANTOSH ARAVIND
19        Assistant United States Attorneys

20   WINSTON LEE
     YING STAFFORD
21        Attorneys for Defendant Meregildo

22   MITCHELL DINNERSTEIN
     ANTHONY CECUTTI
23        Attorneys for Defendant Colon

24   FLORIAN MIEDEL
     AARON MYSLIWIEC
25        Attorneys for Defendant Pierce

CA3PMER1

                        APPEARANCES (Continued)


GARY BECKER
ALEX LESMAN
     Attorneys for Defendant Miranda

ALSO PRESENT:
Special Agent Patrick Collins, ATF
Paralegal Specialist Darci Brady

CA3PMER1

1          THE COURT:  Good morning, counsel.  Please be seated.

2     Let's bring in the defendants.

3          (Defendants enter)

4          All right.  Good morning, again.  I'd like to turn

5     first to Mr. Pierce's motion with respect to some of the

6     photographs depicting the crime scene, Government

7     Exhibits 110.06 through 110.13 and 110.23 through 110.33.

8          First, and this is a question for the government.

9     What is the probative value of Government Exhibit 110.28?

10          MR. ARAVIND:  Your Honor, we've already agreed that we

11     don't intend to admit this particular photograph in evidence.

12          THE COURT:  All right.  Look, I've had a chance to

13     review these photographs, and I'm prepared to rule.  The

14     defendant Pierce moves to exclude Government Exhibits 110.06

15     through 110.13 and 110.23 through 110.33 arguing that the

16     depiction of the murder victim in crime scene photographs will

17     inflame the passions of the jury and result in substantial

18     unfair prejudice to him.

19          "Photographs of the victim's body are admissible as

20     long, as they have some probative value and are not intended

21     solely to inflame the jury," *United States v. Clark,* 767

22     F.Supp. 2d 12, 74 (BDC 2011) citing *Harriet v. United States*,

23     389 F.2d 281, 287 (DC Cir. 1967).

24          Here, the probative value of the photographs is high

25     because they will corroborate the testimony of law enforcement

CA3PMER1

1    officers and cooperating witnesses, show the location of

2    evidence in relation to the body and show the number and

3    location of the wounds, but Exhibits 110.26 and 27 are the most

4    graphic and may tend to inflame the jury; therefore, this Court

5    excludes them.  While they depict the discovery, preservation

6    and handling of evidence, other photographs fairly represent

7    the crime scene.

8         However, if any of the defendants challenge the

9    handling of the evidence at the scene, including the shell

10   casing found underneath the body or the preservation of any

11   evidence related to those photographs, this Court will revisit

12   its ruling relating to Exhibits 110.26 and 27.  And the record

13   should reflect that this Court would also exclude 110.28, had

14   the government not wisely decided to withdraw it.

15        Now, I've also received additional submissions

16   regarding the Bruton issue relating to Miranda's statement.

17   Does any counsel wish to be heard further with respect to that

18   matter?

19        MR. DINNERSTEIN:  Your Honor, I do, just briefly.  The

20   government cites the Chen case, which is the Second Circuit

21   case.  The distinction between Chen and this case, I believe,

22   your Honor, is that in Chen, what the Second Circuit indicated

23   was the statement by the non-testifying defendant, I guess, was

24   a statement regarding his state of mind.  That was a case that

25   dealt with a fraud, a bank, a board and members of the board of

CA3PMER1

1    directors.

2              It's unclear to me from reading the decision whether

3    the two defendants who challenged the statements on Bruton

4    issues were the only members of the board, apparently, that

5    were not; so the comment was to the board of directors.

6              Here, Miranda's statement doesn't go to his state of

7    mind.  We actually don't know what it's based upon, whether or

8    not he observed shootings by GCF members or not, or whether or

9    not it was simply a rumor that he had heard.  So it really

10   isn't going to his state of mind.  It's going to something

11   that, in fact, we don't know.

12             It's the government's position, apparently, that they

13   should be able to introduce that statement to implicate my

14   client, and also Mr. Meregildo, since he did make the motion on

15   behalf of both defendants.  So I think, your Honor, that a

16   different situation than the general rule in Bruton should

17   apply and that the statements -- and that that portion of the

18   statement needs to be redacted.

19             THE COURT:  Anything further from the government?

20             MR. FEE:  Your Honor, I think the papers stand for

21   themselves.  The distinction suggested by Mr. Dinnerstein is

22   not a distinction drawn by the Second Circuit.  I think this

23   case falls squarely within the Chen holding, your Honor.

24             THE COURT:  All right.  I've had the opportunity to

25   consider the matter, and I think it's important that I rule

CA3PMER1

1  now.  A statement is admissible without violating the Bruton

2  rule if "the statement standing alone does not otherwise

3  connect co-defendants to the crimes."  United States versus

4  Williams, 936 F.2d 698700 (Second Circuit 1991).  "In certain

5  instances, evidence that does not directly name a co-defendant

6  can implicate Bruton," United States versus Chen 393 F.3d 139

7  at 150 (Second Circuit 2004).  But statements that require

8  other testimony in order to directly inculpate co-defendants do

9  not violate Bruton.  Chen, 393 F.3d at 150.  Thus, a statement

10  that refers to any one of a large number of people, such as the

11  statement here, referring only to GFC, does not violate Bruton.

12  CEG, United States versus Guzman, 2001 WL 290508 at Star 51

13  (Second Circuit 2010).

14          And so, during his opening, Miranda's counsel may

15  discuss the statement, especially because the government has

16  made reference to it in its opening statement, but, obviously,

17  Mr. Becker, you are not to attempt during your opening to

18  connect that statement to any co-defendant in this case.

19          MR. BECKER:  Of course, your Honor.

20          THE COURT:  All right.  I'm informed that the jury is

21  all here.  Is there any issue that needs to be addressed before

22  we continue with opening statements?

23          MR. ARAVIND:  Not from the government, your Honor.

24          THE COURT:  All right.

25          MR. LEE:  Nothing, your Honor.

CA3PMER1

```
1           THE COURT:  No one has been bashful about jumping up
2      if you have an issue, so let's bring in the jury, and I remind
3      Mr. Mysliwiec and Mr. Becker that each of you have up to 30
4      minutes for your opening statements, and that when you have
5      five minutes left, I will interject to ask you to begin to
6      conclude your opening statement.  And everyone will remain
7      seated when the jury enters.
8           THE DEPUTY CLERK:  Come to order.  Jury entering.
9           (Jury enters)
10          THE COURT:  Good morning, members of the jury.
11     Members of the jury, thank you for your punctuality this
12     morning.  I know that you were all here a few minutes early.
13     In the future, if you're all here a few minutes early, we're
14     going to try to start a few minutes early so that we can make
15     the best use of your time.
16          Now, we're going to continue now with further opening
17     statements.  Remember what I told you yesterday.  The
18     defendants are under no obligation to do anything.  They could
19     sit on their hands throughout this trial and do nothing, and
20     you cannot consider that against them in any way in your
21     deliberations.  But I also told you that each of the defendants
22     in this case has decided to make an opening statement, and so
23     we're going to resume now those opening statements.  And I ask
24     you, members of the jury, to give your undivided attention to
25     Aaron Mysliwiec, Esquire, as he delivers his opening statement
```

CA3PMER1

1    on behalf of the defendant Earl Pierce.

2            MR. MYSLIWIEC:  Good morning.  The government's case

3    against Earl Pierce all comes down to a few people who have

4    motives to lie.  They are people who have admitted to being

5    involved with drug dealing, shooting, robbing, murdering,

6    racketeering.  Those people are the government's key witnesses

7    in this case against Earl Pierce, and you're going to hear

8    about why these people would lie about Earl Pierce, because

9    they were facing spending the rest of their lives in jail.

10            Those people include Bernard Folks, Devon Parsons,

11   Aubrey Pemberton.  Folks, Parsons Pemberton and others, if they

12   didn't tell the story that fit what the government believed, if

13   they didn't tell the story that had some value for the

14   government, if they didn't tell a story that was consistent in

15   almost every way with what the government told you yesterday,

16   they'd have no value, they'd have no meaning.  And if they

17   didn't tell the story that included lies about Earl Pierce,

18   they wouldn't be able to avoid spending the rest of their lives

19   in jail.

20            And let's talk about that for a minute.  Let's talk

21   about what that really means at an emotional level.  You know,

22   we've heard "spending the rest of their lives in jail" a couple

23   of times yesterday, both from the other people -- both from the

24   government and the other people who spoke to you, but what does

25   that really mean?  It means that Folks, Parsons, Pemberton and

CA3PMER1

1    some of the other people you're going to hear from would spend

2    their lives behind a concrete wall in a federal jail.  They'd

3    never be able to have a meal with their parents, in their

4    parents' homes again.  They'd never be able to have families of

5    their own.  They'd never be able to enjoy life's intimate

6    moments and simple pleasures.  They'd never be able to do

7    things like have a drink on a hot day outside a concrete jail

8    cell.  That's what it meant to people like Folks, Parsons and

9    Pemberton.  At the end of the day, the government's entire case

10   against this man, Earl Pierce, comes down to people like those

11   three young men and other witnesses you're going to hear from.

12         Now, Earl Pierce is not guilty of these charged

13   crimes.  He didn't shoot anyone in this case.  He didn't help

14   or plan or carry out any of the murders.  He wasn't part of a

15   conspiracy with any so-called gangs that the government says

16   were involved in these crimes.  He didn't participate or

17   associate with any kind of racketeering enterprise.  Earl

18   Pierce isn't even from the same generation as people like

19   Bernard Folks.  He's 27 years old.  He grew up, by and large,

20   in the Melrose Houses.  Bernard Folks is just out of his

21   teenage years, and I think that you can understand that those

22   are dramatic age differences in this population.  27 versus

23   just out of your teenage years is a completely different place

24   to be.

25         Why do I say that the government's whole case comes

CA3PMER1

1    down to people who had to tell lies like Folks, Pemberton and

2    Parsons?  It's because there's no other objective evidence in

3    this case against Earl Pierce, the kind of evidence that can't

4    lie, the kind of evidence that can't be mistaken.

5           Now, the government yesterday outlined a list of those

6    kinds of evidence, and at the end of that list, they said, oh,

7    by the way, we have some people who had inside knowledge.  That

8    was the last thing they said.  That's really the only thing

9    they have against Earl Pierce.  Just covering some of the

10   things they told you about yesterday.

11          They said that they have police officers who

12   investigated the crimes in this case, police officers who

13   recovered six guns, police officers who recovered crack

14   cocaine.  They have 911 calls.  They have expert witnesses on

15   fingerprints and ballistics, ballistics evidence where they

16   say -- probably most of you are familiar with this from your

17   favorite TV shows, but you're going to hear about it in detail

18   in this case -- most likely, ballistics evidence matching a

19   shell casing from one scene to a gun found somewhere else.

20          And the government focused on the fact that they have

21   all these kinds of evidence, independent, objective, scientific

22   evidence, but there's none of that evidence against Earl

23   Pierce, nothing like that.  There's no fingerprints of his on a

24   gun.  There's no DNA of his found at a crime scene.  There's no

25   ballistics evidence that matches to Earl Pierce in something

1    found in his apartment.  There's no fingerprints of his found

2    on any crack cocaine.  There's no undercover, marked buy money

3    found in his apartment.  There's no drugs seized from him as

4    part of an arrest.

5        All those things that sound like strong, independent,

6    objective evidence that the government talked about yesterday,

7    aren't here in the case against Earl Pierce.  And he doesn't --

8    they don't have any recorded conversations of Earl Pierce

9    talking to people who the government says are involved in the

10    gang.  There's nothing like that.  There's just no objective

11    evidence.

12        Now, you may see a video that the government will show

13    you in which they say shows Earl Pierce involved in planning

14    and participating in a murder, but that video won't show Earl

15    Pierce shooting anyone, and it won't show Earl Pierce carrying

16    a gun or putting a gun somewhere else after a shooting occurs.

17    The government's interpretation of what that video shows you is

18    based on people like Folks, Parsons and Pemberton.  Without the

19    testimony and stories and lies of those people, the video means

20    nothing.

21        Since so much of this case, in fact, the government's

22    entire case against Earl Pierce, comes down to those three

23    people and others like them, let's talk a little bit about the

24    world that Folks, Pemberton, Parsons and others are from.

25    Mr. Dinnerstein covered some of this yesterday, but I'd like to

CA3PMER1

1    make a couple additional points.

2        For one thing, and as many of you know, places like

3    the Melrose and Jackson Houses are chaos.  People who live

4    there know people who sell drugs.  People who live there know

5    people who commit acts of violence.  You can't grow up in the

6    Melrose projects without knowing those kinds of things.  It's a

7    tough neighborhood.  But growing up in a tough neighborhood

8    doesn't make you guilty of the charged crimes in this case.

9    Growing up in the Melrose projects doesn't make you guilty of

10    being in a gang.  Merely knowing people who are in gangs

11    doesn't make you guilty of being in the gang.

12        And let's talk about one other really important thing

13    about this world.  In the world of the Melrose and Jackson

14    houses and other places that you're going to hear about in this

15    case, the government is an always present, always powerful

16    force.  The government provides housing for people.  The

17    government provides food for people.  Through its police, it

18    stops people, it frisks people, it arrests people.  The

19    government can arrest without discrimination, lumping many

20    people together for the actions of only a few, and the

21    government can throw countless resources at just one man who

22    they believe has committed a crime.

23        I raise that point because that's the world that the

24    key witnesses the government relies on come from.  The

25    government isn't some abstract power that's out there.  It's a

1     force that can crush or provide people like Folks -- provide

2     for people like Folks, Pemberton and Parsons.  It's not some

3     theoretical concept.  It's an overwhelming force that smacks

4     people in the face, and that's what Folks, Pemberton and

5     Parsons had experienced throughout their lives.  It's a force

6     where if you're on the wrong side of it, you need to do

7     anything you can to get in the government's good graces.

8          So let's talk about the real choice that people like

9     Folks, Pemberton and Parsons faced.  Just like we talked a

10    little bit earlier, about what it means to spend the rest of

11    your life in jail.  You're going to hear about each of these

12    young men, and others that the government will rely on to try

13    to prove its case against Earl Pierce, were arrested and

14    confronted with this power, a power which searched through

15    every part of their lives, investigated them, confronted them,

16    threatened to take away their freedom forever.

17         And at some point, each of those young men found

18    themselves in a room where the choice was clear, where it was

19    stark, where they had people advising them about what the

20    consequences of not telling a story that the government

21    believed would be.  And you've seen, you know, what those rooms

22    look like.  It's comparable to what happened in this case.

23    Just by naming your favorite TV shows, you know at a gut,

24    emotional level what it's like.

25         When you see people confronted with losing their

CA3PMER1

1    liberty for the rest of their lives, it's not just a rational

2    response.  It's a physical response.  The sweat beads on young

3    men's foreheads just when they're arrested, the tension, the

4    stress.  It is an incredibly physical reaction when someone

5    threatens to put you behind a concrete wall, and you're in your

6    young 20s or late teens.  We're talking about decades.  That's

7    what these young men, Folks, Pemberton and Parsons, thought

8    about, and that's the choice they were confronted with.  And

9    they knew that if they told a story that matched up with the

10   story that the government told you yesterday, that was their

11   ticket out of their future.

12        So we've talked a little bit about who these young men

13   are who the government relies on, what their backgrounds are

14   like, what their choices were, and we talked about the

15   government's power.  But that power isn't just in the Melrose

16   Jackson Housing, it's right here in this courtroom.  The

17   overwhelming power of the federal government, and there's only

18   one check on it, really, here, and that's you, the jury.

19        It's an extremely serious case.  As I think some of

20   you said, it's intimidating, and it is intimidating and it has

21   serious consequences.  And what that means is that you, the

22   jurors, have an awesome responsibility in this case.  You have

23   the life and future of Earl Pierce in your hands, and I simply

24   ask you to take that responsibility seriously.

25        Now, what do I mean by taking it seriously?  What we

CA3PMER1

1   know, the government believes that Mr. Pierce is guilty, but

2   that's not really the question that you have to answer in terms

3   of what the government believes.  It's not what they believe,

4   it's simply whether they can prove beyond a reasonable doubt

5   their version of the facts.

6        Your job is to determine whether their belief is based

7   on real and actual proof, proof that goes beyond a reasonable

8   doubt.  And beyond a reasonable doubt doesn't mean maybe,

9   probably.  It means proof beyond a reasonable doubt, and the

10  judge will give you an instruction describing that more at the

11  end of the case.  Now, we all depend on you to be careful about

12  the evidence, to keep your minds open, to take the presumption

13  of innocence and the government's burden of proof seriously.

14       And there's one other thing I'd like to talk to you

15  about in terms of what it means to take that seriously.  As one

16  person said yesterday, this is four cases, not one case.  And I

17  think what's meant by that is, taking it seriously, means it

18  paying attention to the separate types of evidence, the

19  separate stories that are told in this case about Earl Pierce

20  as opposed to what's told about the other three people.  We ask

21  you to pay specific attention to the kinds of so-called

22  evidence against Earl Pierce.

23       Earl Pierce has waited more than a year for you, a

24  group of citizens from the community who will take a hard look

25  at the so-called evidence and the lack of evidence in this

CA3PMER1

1    case, a group of citizens who will see there's no objective

2    evidence at all against Earl Pierce, no telephone recordings,

3    no documents, no scientific evidence, and at the end of this

4    trial, we will ask you to recognize that the government's case

5    against Earl Pierce all comes down to people who lie to save

6    themselves.

7            We're going to ask you to decide that the government

8    cannot prove beyond a reasonable doubt that those lies are

9    true, and we're going to ask you to reach a verdict that Earl

10   Pierce is not guilty of all of those charges.

11           THE COURT:  Members of the jury, at this time, I ask

12   that you give your undivided attention to Gary Becker, Esquire,

13   as he delivers his opening statement on behalf of the

14   defendant, Nolbert Miranda.

15           MR. BECKER:  Thank you, Judge Pauley.

16           Good morning.  Contrary to what the prosecutor told

17   you yesterday, there is not a single allegation in this case

18   that Nolbert Miranda, the bearded gentlemen in the white shirt,

19   ever engaged in a single act of violence against anyone.  Let

20   me say that again.  Contrary to what this prosecutor told you

21   yesterday, there is not so much as a single allegation, let

22   alone proof, in this case that Nolbert Miranda ever engaged in

23   a single act of violence against anyone.  There is not an

24   allegation in this case, contrary to what the prosecutor told

25   you yesterday, that Nolbert Miranda was a member of any gang.

CA3PMER1

1          May it please the Court, counsel on both sides,

2     Mr. Miranda, ladies and gentlemen.  As the Court told you, my

3     name is Gary Becker, and it is my privilege and my

4     responsibility to represent Mr. Miranda in this case.  I am

5     assisted by the gentleman sitting to the left of Mr. Miranda,

6     whose name is Alex Lesman, and he is going to assist me in this

7     case.  There may be days when he's not in court, but he's been

8     in court, and you will see him too.

9          Now, you may be thinking, after hearing now from, I

10     guess, four lawyers who have spoken to you and the three

11     defense lawyers, why is it necessary to listen to another

12     defense lawyer?  I'm glad that I have you in the morning rather

13     than last night, when we were all so tired, but I do think it's

14     worthwhile to take just a brief moment to talk about why it's

15     important that you hear from me, and I am grateful for your

16     attention and I value it greatly.

17          As other defense lawyers have said, there really are

18     four separate trials going on here, and I just want to

19     emphasize what that means.  What that means is that even though

20     the government has been permitted to try all of these

21     defendants in one courtroom at one time, that fact provides you

22     with no basis to judge the evidence against Mr. Miranda on

23     anything other than the evidence that is admitted against him

24     and the lack of evidence against him only.  The fact that

25     they're all on trial together doesn't change that.  You look at

CA3PMER1

1    him as if he's alone in this courtroom when you consider the

2    case against him and the evidence against him and him only.

3    And the Court will tell you that.

4          He is entitled to your separate consideration.  I

5    think you all asked about that in jury selection, and you all

6    said that you understood that, you can follow the Court's

7    instructions, and that's part of the reason why you were all

8    selected to be jurors.

9          So now, in the time that I have, I would like to talk

10   about the issues and the case of Nolbert Miranda.  Let me start

11   by talking a little bit about who Nolbert Miranda is.  Nolbert

12   Miranda is 25 years old.  He was born in the Bronx, and when he

13   was just a baby, he was sent to live with his grandmother in

14   Honduras, in Central America.  He was sent to live with his

15   grandmother in Honduras, in Central America, because his mother

16   was unable to care for him because the father had abandoned the

17   family.  The mother had to work.  There was no one to take care

18   of Nolbert.  He went to Honduras, as I said.

19         He's had a very difficult life.  Came back to the

20   Bronx when he was, I think, about six years old and was

21   troubled as a youth.  His mother couldn't care for him.  He was

22   diagnosed with mental problems.  He was on certain psychotropic

23   drugs, and he spent a good portion of his childhood in and out

24   of group foster homes, both in New York and, I believe, also in

25   Westchester County.  At age --

CA3PMER1

1              MR. ARAVIND:  Objection, your Honor.

2              THE COURT:  I'm going to overrule it at this time, but

3     proceed, Mr. Becker.

4              MR. BECKER:  As early as age ten he thought of

5     suicide.

6              MR. ARAVIND:  Objection, your Honor.

7              THE COURT:  Yes, sustained.

8              MR. BECKER:  Now, there's no allegation in this case,

9     as I said, that Mr. Miranda ever committed a single act of

10    violence against anyone, but in his very difficult life, he has

11    been the victim of violence on numerous occasions.  A victim of

12    violence.  He did grow up near the area that you've heard so

13    much about, and there were shootings and people got caught in

14    the crossfire.  He was one of those people.  He was last

15    shot -- He was shot on three separate occasions.  He was last

16    shot September of 2010, while he was holding his three-year-old

17    little girl in his arms.  He has a three-year-old little girl,

18    and a baby that's younger than that, and he lives with his aunt

19    now in the Bronx.

20             Now, I want to talk about the charges against

21    Mr. Miranda and some of the evidence you may hear.  You've

22    heard a lot of allegations about gangs and criminal enterprises

23    and murders and attempted murders, and as I've already told

24    you, there's no allegation that he engaged in any violence or

25    was a member of any gang.  You'll hear no evidence in this

CA3PMER1

1    trial that he was a member of a gang or of a criminal

2    enterprise.  No one ever asked him to engage in violence.

3            You'll hear no evidence, and there's no allegation,

4    that in his entire life he ever held a gun in his hand and

5    pointed it at anyone.  The indictment in this case is 39 pages

6    long.  It names four defendants variously in 22 counts.

7    Mr. Miranda's name does not appear until Page 14.  He is

8    charged in only three of the 22 counts.  And you'll recall that

9    when Judge Pauley gave you a summary of the indictment, he told

10   you that Mr. Miranda was charged in a conspiracy with these

11   other people and others to sell crack cocaine.  He was charged

12   with possession or use of a gun, and possession or use is the

13   statutory language.

14           The most you'll hear is evidence of possession of a

15   gun with respect to Mr. Miranda, and I'll get to that in a

16   moment.  And he's charged with agreeing with someone, not to

17   murder anybody, not to hurt anybody, but to participate in the

18   affairs of this enterprise that the government has spoken

19   about.  And the judge will give you detailed instructions about

20   that, but suffice it to say there's no basis to those

21   allegations, and the government will not be able to prove those

22   allegations.  And I will talk about that more in a minute, and

23   you'll see why.

24           Now, there's going to be substantial portions in this

25   case, I anticipate, in which I may not be speaking too much.  I

CA3PMER1

1     may not be cross-examining witnesses, some of them, because, as

2     I told you, of the 22 counts, he's named in only three.  And a

3     count is a charge.  He's named in only three.  A lot of

4     allegations in this case had nothing to do with him.  You're

5     going to hear evidence today about a charged murder, a

6     homicide.  You're not going to hear his name mentioned today, I

7     don't think, with respect to that.

8            So again, as the Court has said, the fact that the

9     defense presents no evidence or the fact that we don't make an

10    opening statement is something that you may never hold against

11    Mr. Miranda.  And if anything, if I'm sitting here quietly,

12    suggests that I'm sitting here quietly because they haven't

13    mentioned Nolbert Miranda's name.

14           Now, everyone has talked a little bit about who the

15    witnesses are going to be, and I won't belabor the point, but

16    I'll add a few points.  The people who are going to get on the

17    stand, Bernard Folks is going to testify today, there's Aubrey

18    Pemberton, Devon Parsons and others.  When you learn what they

19    have done with their lives, you are going to conclude that

20    these are some of the most vial human beings you have ever been

21    in the same room with.  You are going to feel the need to take

22    a shower when you see and hear these people.

23           They're going to be cleaned up.  They're going to -- I

24    don't know how they're going to be dressed necessarily, but

25    they're going to be cleaned up and they're going to be on the

witness stand and they're going to come off like gentlemen.
They're going to say, yes, sir; no, sir.  They're going to be
very respectful because they have been preparing for this
longer and harder, by far, than either President Obama and
Governor Romney have been preparing for tonight's Presidential
debate.  Today's New York Times said President Obama has been
locked up outside Las Vegas for three days preparing for the
debate tonight.  These gentlemen have had hours and hours over
days, going through questions and answers, questions and
answers to support the government's case.

            Let me tell you about some of these people.  Aubrey
Pemberton will tell -- who, by the way, is facing -- We heard
about mandatory minimums.  I believe he's the cooperator who is
facing mandatory life imprisonment plus 25 years, mandatory
life imprisonment, plus 25 years.  My 14 year old --

            MR. ARAVIND:  Objection, your Honor.

            THE COURT:  Sustained.

            MR. BECKER:  One of the defendants, one of the
cooperators who will be testifying in this trial has a plea
agreement that says he is facing a mandatory minimum sentence
of life imprisonment, plus 25 years, and you know what, my son
asks, how can they give you 25 years on top of life?  Well, let
me tell you what life imprisonment in the federal system means.
Fellow counsel here spoke a little bit about it.  What he
didn't tell you -- he said how you stay behind concrete walls,

CA3PMER1

1    et cetera -- you come out of jail in a box.

2            There's no parole in the federal system.  So that life

3    imprisonment means life.  It means you die in jail, and the

4    only time you get to leave is when you're in a box, in a

5    coffin.  And the cooperators in this case know that.  They know

6    that.  Aubrey Pemberton, on several occasions, would just go

7    out, take a gun and shoot into a crowd of people, just didn't

8    care.  These are people that have no regard, no regard for

9    life.  They did things that no civilized person would ever do.

10           One witness will tell you that for a period of about

11   two years, three or four times a week, he'd go out and mug

12   somebody.  Three or four times a week for two years, go out and

13   mug and terrorize an innocent person, terrorize an innocent

14   person.

15           Mr. Aravind said yesterday these defendants terrorized

16   the neighborhood.  Again, grossly misleading.  No allegation

17   that Mr. Miranda terrorized anyone.  But you will conclude way

18   beyond a reasonable doubt that the government witnesses

19   terrorized, terrorized this neighborhood.  They did things that

20   no one in this world could do, except if they cared about only

21   one thing, themselves.  They have no empathy.  Empathy, the

22   ability to feel for something another person is feeling, they

23   are lacking.  Something is wrong, they are lacking.

24           All they care about is their self-interest.  They are

25   narcissistic beyond compare.  And as Mr. Dinnerstein said to

CA3PMER1

you yesterday, someone who could do something like this, do you

think they could lie to help themselves?  Do you think that by

telling the government what the government wants to hear and

that could mean not having to die in jail and come out in a

box, do you think they'd say, oh, well, wait a minute, I'm not

going to do that?  Yeah, I'll shoot into a crowd of people.  I

don't care if I hit a woman, a baby.  I'll murder, I'll mug,

I'll sell drugs, but lie?  Oh, no, I'm not going to do that.

You'll be the judge.  You'll be the judge.  I'm trying to just

give you an introduction to who these people are.

        Now, why are they doing this?  They're doing it

because they've all entered what we call cooperation

agreements.  These will be in evidence, but I'm holding one up,

and this is Mr. Pemberton's.  And what the cooperation

agreement says is that if they cooperate with the government

and testify in this trial and the government is satisfied with

the testimony that they gave -- not if the Court is satisfied,

not if the defense lawyers are satisfied, but only if the

people at this table are satisfied -- they will do something

for him.

        They will ask the Court that eventually sentences him,

because none of these people have been sentenced yesterday yet,

to reduce his sentence based on his cooperation with the

government.  And by reduce the sentence, the witness'

expectation is not instead of getting life imprisonment,

CA3PMER1

1    they'll get 50 years or they'll get 40 years.  No, no, no.

2    Their expectation is that they'll go home.

3        You are going to hear evidence, I believe, that one of

4    the witnesses, Devon Parsons, actually made a public statement

5    that he thinks, based on his testimony, he may go home in two

6    years.  This is a man facing the possibility of life

7    imprisonment.

8        Now, what happens, I want to talk about the power of

9    the government.  Suppose the government is not satisfied with

10    some of these cooperators' testimony, but the Court that's

11    going to sentence him is.  Suppose the Court that's going to

12    sentence these people looks at their testimony and said, I

13    think they really did a great job, and I know you, the

14    government, don't agree.  I think they did a great job, and I

15    think that they should get a reduced sentence.  Do you know

16    that under the law, the Court can't do that?  The Court doesn't

17    have the power.  The government has more power than the Court.

18    The government has more power than the Court.  The only way

19    that the Court can reduce a sentence for one of these people is

20    if the government says it's okay, you can do it.  Astonishing.

21    I mean, it's astonishing, but it's true.  There will be no

22    dispute of that, I guarantee you.

23        Look, I've been bashing them a little bit because they

24    bashed my client yesterday improperly.  These are fine people.

25    They're fine people, I respect them, and they do their job, and

CA3PMER1

1    they do it better than any prosecutors I have ever encountered

2    in my career, but, you know what, they weren't there.  They

3    weren't there.  They didn't see any of this.  They have no

4    personal knowledge.  They only know what they're told and what

5    they decide to believe.

6         I want to talk about some of the evidence you will

7    hear about, and I'll be very candid with you.  I was talking

8    with you before about how he grew up.  He had a tough life.

9    His mother couldn't care for him, and he basically grew up on

10   the streets.  He never went further than the ninth grade and,

11   you know what, he became a hustler.  He hustled, and like

12   thousands of poor men from that neighborhood before him and

13   thousands after him, there were times, and you will hear

14   evidence, he sold small amounts of cocaine in little bags.

15        I want to be clear, he's not charged -- if you find

16   that he sold small amounts of little cocaine in bags at times,

17   that doesn't make him guilty of the charges against him.  He's

18   not charged with selling little bags of cocaine over time.  He

19   is charged with conspiring, with making an agreement with other

20   people to collectively work together to sell substantial

21   quantities of drugs and other things, and there's no proof, I

22   submit, that you can rely on in this case that, to the extent

23   that Mr. Miranda ever engaged in any activities involving the

24   sale of drugs, he did so other than in his sole capacity, by

25   himself, hustling, hustling.

CA3PMER1

1          If you've ever walked in Washington Square Park or

2   other neighborhoods and somebody says "loose joints, loose

3   joints," maybe you've heard that, that doesn't mean they're

4   part of a conspiracy.  It means they're hustling, and they're

5   trying to support their family, and that's all they're doing.

6   And when Mr. Miranda was arrested in this case, you know what

7   he said to the arresting agent?  You can hear it from the

8   witness stand.  He said, I hustled to support my family, but I

9   had nothing to do with GFC.  I had nothing to do with any gang.

10  I'm not -- I'm not guilty of that.

11          And do you know what?  The government doesn't have

12  evidence that you can rely on that what Nolbert Miranda said

13  that was anything but the truth.  You know what's funny, the

14  government is going to introduce the evidence that when he was

15  arrested, he confessed that he sold drugs, and of course they

16  want you to believe that.  That's why Mr. Aravind told you

17  that.  But what he didn't tell you, that I sold drugs for

18  myself, I sold to support my family.  I wasn't part of a gang.

19  He doesn't have any tattoos that say GFC.  He's 25 years old.

20  The people who are alleged to be GFC people are five years

21  younger than him.  You're going to hear evidence that he was

22  independent, out there on his own.

23          And there is going to be allegations regarding the

24  gun, and I think the government told you yesterday we've

25  recovered the guns from these shootings, and you're going to

CA3PMER1

1    see the guns.  Well, there's a phantom gun, a phantom gun in

2    that they say it exists, but you're not going to see it.  They

3    don't have it, and what they say is that, on one occasion,

4    somebody went to Nolbert and took a gun from him that he had.

5    This is what you're going to hear a witness or witnesses say,

6    took a gun from him that he had and left, unbeknownst to

7    Nolbert.

8          The government will say that that gun was subsequently

9    used in a shooting.  Mr. Miranda is not charged in the

10   shooting.  He's not charged with conspiracy to do the shooting,

11   no allegation he had any foreknowledge of any shooting, no

12   allegation he gave the gun so that it could be used in a

13   shooting.  In fact, not even the fact that he gave the gun,

14   somebody took the gun, and you're going to hear this, by the

15   way.  I'm raising the evidence.  The fact that I'm discussing

16   this doesn't mean you should credit it.

17         But do you know who's going to provide the evidence?

18   Who do you think is going to provide evidence that Nolbert

19   Miranda once had a gun?  Do you think it's going to be law

20   enforcement?  No.  It's going to be Folks, Pemberton.  You

21   know, it's going to be the people who you need to take a shower

22   after you hear their testimony.  That's who's going to say he

23   had a gun.  They don't have the gun.  It's just they can get on

24   the stand, get on the stand and say it, say it, and the

25   government is going to ask you to rely on something that

CA3PMER1

1    somebody said when there's no evidence that Mr. Miranda ever

2    actually owned any gun, and they don't have a gun.

3        You know, it's perfectly okay, and the court's going

4    to tell you it's okay for the government to rely on the likes

5    of Pemberton and Folks and Parsons as witnesses.  The law

6    permits it.  The law permits it, but, you know what else the

7    law permits, in fact, the law requires, it requires you to

8    scrutinize the testimony of persons like that very carefully

9    because of the benefits that they stand to gain from their

10   testimony.  It requires that.

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BECKER:  It requires it.  While the government is

2    permitted to do that, what the government is doing in this case

3    is they are taking people who were the worst of the worst --

4    murderers, drug dealers of the worst kind, violent people --

5    and they are using these people, they are dangling a get out of

6    jail card to convict a guy who has been shot three times and

7    who was, at worst, at worst, a dime bag seller of cocaine.

8    There was lots of time he wasn't even in the area and you'll

9    hear about that.

10          So, look, I'm not a babe in the woods.  When I was

11   listening to the prosecutor's argument yesterday, I said, man,

12   it's hard to be fair in a drug case.  It's hard to be fair in a

13   case that involves these kinds of allegations.  Because it's

14   chilling, this stuff.

15          But, you know, as Judge Pauley I believe said to you,

16   a federal trial in criminal court, it's different from any

17   other life experience that you've had.  It's not like any TV

18   show.  Mr. Miranda's life is in your hands.  The decision that

19   you make in this case will have the most profound consequences

20   for him and for his family you can ever imagine.  I mean, just

21   think about it.

22          And so, I know it's hard to be fair in a case that has

23   these kinds of allegations.  But you know what?  You must be

24   fair.  You must be fair.  You took an oath to be fair.  The law

25   requires you to be fair.  You were selected because you said

CA33MER2                    Opening – Mr. Becker

1    you could be fair.

2         What does to be fair mean?  Be fair means that you

3    presume him innocent.  He is as innocent right now of these

4    charges presumptively as any of you in this box.  He's no more

5    guilty than any of you in this jury.  No more guilty than

6    anyone in this courtroom.  He is presumed innocent.  And that

7    presumption of innocence remains with him throughout this trial

8    unless and until the government proves to you beyond all

9    reasonable doubts that he's in fact guilty.

10        MR. ARAVIND:  Objection.

11        THE COURT:  Overruled.

12        MR. BECKER:  These principles that we all hear so much

13   about, presumption of innocence, beyond a reasonable doubt,

14   they sound great.  You can say it, but, you know, there is a

15   lot of things we can say but it doesn't mean anything to say it

16   unless you mean it.  Unless you apply it.  Unless you live by

17   it while you are jurors.

18        If you don't hold the government to its burden of

19   proof in this case, if you don't presume Mr. Miranda innocent,

20   then those sacred constitutional principles don't exist.  They

21   don't exist.  It's like ripping up the Constitution, as far as

22   the rights of a citizen of America is concerned.  You don't

23   want to do that.  I know that you don't want to do that.

24        You know, sometimes the government just gets it wrong.

25   Sometimes the government is not fair.  Sometimes they charge

1    people with things far more serious than those people may have

2    done.  And that's why you have to be fair.  That's why you have

3    to safeguard his rights.  If you do, I'm confident you will

4    find many reasons to doubt the government's case against him.

5            The government in this case will not be able to offer

6    you solid, reliable evidence that Mr. Miranda conspired with

7    people as charged in the indictment to sell crack cocaine.  The

8    government will not be able to prove to you with solid,

9    reliable evidence that you can count on that he used or

10   possessed a gun in connection with any drug conspiracy.  And

11   the government will not be able to offer you solid, reliable

12   proof that he conspired with anyone in GFC or some criminal

13   gang to do anything, let alone to engage in a pattern of

14   racketeering.  And the reason that the government won't be able

15   to do any of these things, the reason they won't be able to do

16   any of these things is very simple.  It's because he's not

17   guilty.  Thank you.

18           THE COURT:  Members of the jury, we have concluded the

19   first phase in any trial, opening statements.  Remember what I

20   told you:  Opening statements are not evidence.  They are not

21   argument.  They are just an outline or preview of what lies

22   ahead in the course of the trial.

23           Now we are going to turn to the taking of evidence in

24   this case.  And I remind you that throughout the trial, the

25   burden is on the government to prove each of the defendants

CA33MER2

1    guilty beyond a reasonable doubt by competent evidence.  So at

2    this time, I ask that the government call its first witness.

3          MR. ARAVIND:  The government calls Officer Pawel

4    Dziewiecki, your Honor.

5          THE DEPUTY CLERK:  Please stand and raise your right

6    hand.

7          (Witness sworn)

8          THE DEPUTY CLERK:  Please stake a seat.  State your

9    name and spell your last name for the record.

10          THE WITNESS:  It's Pawel Dziewiecki.

11    D-Z-I-E-W-I-E-C-K-I.

12          THE COURT:  Would you spell your first name also.

13          THE WITNESS:  P-A-W-E-L.

14          THE COURT:  You may inquire, Mr. Aravind.

15     PAWEL DZIEWIECKI,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MR. ARAVIND:

20    Q.  Good morning.

21    A.  Good morning.

22    Q.  You can take the mike over in front of you, Officer

23    Dziewiecki.

24          What do you do for a living?

25    A.  I am a police officer.

CA33MER2                          Dziewiecki - direct

1  Q.  With the New York City Police Department?

2  A.  Yes.

3  Q.  Again, if you can speak into the mike.

4  A.  Okay.

5  Q.  Where do you work with the New York City Police Department?

6  A.  At Police Service Area Number 7.

7  Q.  What is your title?

8  A.  Police officer.

9  Q.  What is Police Service Area 7?

10  A.  It's a police precinct that primary patrols housing

11  developments within the Housing Bureau.

12  Q.  What areas are covered by Police Service Area 7?

13  A.  Well, there's numerous areas covered.  We cover the confine

14  of the 40 Precinct as well as the 42 Precinct.

15  Q.  Where are those precincts located, Officer Dziewiecki?

16  A.  In the South Bronx.

17  Q.  Can you describe for us where those locations are in the

18  South Bronx?

19  A.  Well, it's geographically -- it's near the Yankee Stadium,

20  the Major Deegan, 149th, Grand Concourse, that area.

21  Q.  How long have you been a police officer with the New York

22  City Police Department?

23  A.  For 12 and a half years.

24  Q.  How long have you worked with the P.S.A. 7?

25  A.  Seven and a half years.

1      MR. ARAVIND:  Your Honor, may I approach?

2      THE COURT:  You may, and you need not ask permission.

3  Q.  Officer Dziewiecki, I'm showing you what has been marked

4  for identification as Government Exhibit 1200, 1201, and 1202.

5  Do you recognize those items?

6  A.  Yes, I do.

7  Q.  What are they?

8  A.  Those are photos of the geographical area that P.S.A. 7

9  covers.

10 Q.  Are you familiar with the areas depicted in those

11 photographs?

12 A.  Yes, I am.

13 Q.  Do those maps fairly depict and accurately depict that

14 area?

15 A.  Yes, they do.

16     MR. ARAVIND:  Your Honor, the government offers

17 Government Exhibits 1200, 1201 and 1202.

18     THE COURT:  Any objection?

19     MR. MIEDEL:  No, your Honor.

20     MR. DINNERSTEIN:  No objection.

21     THE COURT:  Mr. Becker, any objection?

22     MR. BECKER:  No, your Honor.

23     THE COURT:  Government Exhibits 1200, 1201 and 1202

24 are received in evidence.

25     (Government's Exhibit 1200, 1201, 1202 received in

CA33MER2                        Dziewiecki – direct

1    evidence)

2              MR. ARAVIND:  Your Honor, may I publish Government

3    Exhibit 1200?

4              THE COURT:  You may publish Government Exhibit 1200,

5    Mr. Aravind.

6    Q.  I'm handing you, Officer Dziewiecki, a laser pointer.

7    Could you just press the button right there.  Thank you.

8              Can you again show us on that map where P.S.A. 7

9    covers.

10   A.  Pretty much right this area right here.

11   Q.  You're referring to the top portion of Government Exhibit

12   1200?

13   A.  Yes.

14   Q.  Are there particular streets that intersect and intersect

15   the area around P.S.A. 7?

16   A.  155th Street, 156th Street, that's where the precinct is

17   located right here.  I'm sorry.  Right here.  56th and 55th on

18   Melrose.

19             MR. ARAVIND:  Let's show Government Exhibit 1201.

20             THE COURT:  Do you want to publish it?

21             MR. ARAVIND:  Yes, your Honor.

22             THE COURT:  All right.  You may.

23   Q.  Can you tell us what this picture map depicts?

24   A.  It's one of the housing developments that's in the confines

25   of the P.S.A. 7.

CA33MER2                      Dziewiecki – direct

1   Q.  Are these the Melrose Houses?

2   A.  Yes.

3   Q.  Is that one of the areas that you conduct patrol in?

4   A.  Yes, it is.

5         MR. ARAVIND:  May I publish Government Exhibit 1202?

6         THE COURT:  You may, Mr. Aravind.

7   Q.  Describe to us what's shown in this photograph.

8   A.  Well, this is another set of developments that we cover.

9   Q.  Are these the Jackson Houses?

10  A.  These are Jackson Houses, yes.

11  Q.  Officer Dziewiecki, what are your duties and

12  responsibilities as a police officer in P.S.A. 7?

13  A.  I'm currently assigned to patrol duties.  So, pretty much I

14  respond to emergency radio runs and 911 calls.

15  Q.  What is an emergency radio run?

16  A.  It's an emergency radio run, it's a 911 call that requires

17  immediate attention.

18  Q.  When you conduct patrol, do you do that in uniform or out

19  of uniform?

20  A.  In uniform.

21  Q.  Are you on foot or in a vehicle?

22  A.  In a vehicle.

23  Q.  Are you alone or with a partner?

24  A.  With a partner.

25  Q.  Officer Dziewiecki, directing your attention to July 25,

1   2010.  Were you working that day?

2   A.  Yes, I was.

3   Q.  Where were you working?

4   A.  I was working in the confines of the 40 Precinct.

5   Q.  What was your tour that day?

6   A.  My tour of duty was 3 p.m. to 11:30 p.m.

7   Q.  Were you in a car or on foot that day?

8   A.  I was in a car.

9   Q.  With whom?

10  A.  With my partner.

11  Q.  Who was your partner?

12  A.  Officer DeJesus.

13  Q.  Directing your attention to approximately 9 p.m., did you

14  respond to a radio run at that time?

15  A.  Yes, I did.

16  Q.  What was that radio run about?

17  A.  The 911 call was about shots fired.

18  Q.  Did the 911 call indicate what location the shots were

19  fired?

20  A.  Yes, it did.  It gave us a location of 681 Courtlandt, the

21  first floor.

22          MR. ARAVIND:  Can we publish Government Exhibit 1202

23  again, Ms. Brady.

24  Q.  Can you tell us where you were set up that day, if you can

25  describe it on this map.

CA33MER2                    Dziewiecki - direct

1   A.  Yeah, absolutely.  Around the time the call came over, I

2   was on one -- actually it's on the other exhibit.

3        MR. ARAVIND:  Let's look at Government Exhibit 1200,

4   Ms. Brady.

5   A.  Yes.  On that demo, on that day, we were set up right here.

6   We were actually on the corner of Morris Avenue and 153rd

7   Street.

8   Q.  Can you show us on that map where is 681 Courtlandt.

9   A.  It's right here.  The first building on the corner.

10  Q.  What did you do after you heard that radio run?

11  A.  When we received that radio run, I made a u-turn, so 153rd

12  Street is a one-way street.  So I made a u-turn, came up the

13  wrong way because that was the fastest way to get there.

14  Q.  Which way is 153rd Street a one-way?

15  A.  It's facing westbound.

16  Q.  If you can show us using the laser pointer which way did

17  you go.

18  A.  I was at that corner.  I made a u-turn and came up

19  eastbound on 153rd Street to the corner of Courtlandt.

20  Q.  Did you go to 681 Courtlandt Avenue?

21  A.  Yes, I did.

22  Q.  How long did that take?

23  A.  Approximately two minutes.

24  Q.  Did you have your lights and sirens on?

25  A.  I did have my lights and sirens on, yes.

CA33MER2                          Dziewiecki – direct

1   Q.  What is the first thing you did when you arrived at 681

2   Courtlandt Avenue?

3   A.  We entered the building.

4   Q.  What type of building is 681 Courtlandt Avenue?

5   A.  It's a residential dwelling.

6   Q.  A single home?

7   A.  No, it is a multifamily.

8   Q.  An apartment building?

9   A.  It's an apartment building, yes.

10  Q.  Did you notice anyone when you entered 681 Courtlandt

11  Avenue?

12  A.  I did.  There was a couple of people outside in front of

13  the lobby.  In front of the entrance.

14  Q.  When you entered the lobby, what did you do?

15  A.  I went to the right side of the lobby.  My partner went to

16  the left side of the lobby.

17          MR. DINNERSTEIN:  May we find out who his partner is?

18          THE COURT:  Yes.  Would you make that inquiry now,

19  Mr. Aravind?

20          MR. ARAVIND:  I think he already said.

21  Q.  But who was your partner that day?

22  A.  My partner was Officer DeJesus.

23  Q.  What's his first name?

24  A.  Angel.

25  Q.  Officer Dziewiecki, I am showing you what has been marked

CA33MER2                    Dziewiecki – direct

1    for identification as Government Exhibit 135, 136, 137, 138,

2    139, and 140.  Do you recognize these items?

3    A.  Yes, I do.

4    Q.  Generally speaking, what are these items depicting?

5    A.  135 is a photo of the entrance to the building.  136 is the

6    photo of a lobby.  As well as 137.

7    Q.  What about the other ones?

8    A.  138 is a photo of a hallway.  139 is a photo of a hallway.

9    And 140 is a photo of a stairwell entrance.

10   Q.  Do you recognize those photographs from the building 681

11   Courtlandt Avenue?

12   A.  Yes, I do.

13   Q.  Are those photos a fair and accurate depiction of the area

14   in and around 681 Courtlandt Avenue?

15   A.  Yes, they are.

16          MR. ARAVIND:  Your Honor, the government offers

17   Government Exhibit 135 through 140.

18          THE COURT:  Any objection.

19          MR. MIEDEL:  No objection.

20          MR. BECKER:  No objection, your Honor.

21          MR. DINNERSTEIN:  No objection, your Honor.

22          THE COURT:  Mr. Lee, any objection?

23          MR. LEE:  Sorry.  No objection, your Honor.

24          THE COURT:  Government Exhibits 135, 136, 137, 138,

25   139 and 140 are received in evidence.

1              (Government's Exhibit 135 through 140 received in

2      evidence)

3      Q.  Officer Dziewiecki, let's take a look at those photos.

4              MR. ARAVIND:  Ms. Brady, can we see 135.

5              THE COURT:  Do you wish to publish it?

6              MR. ARAVIND:  I do, your Honor.  I'm sorry.

7              THE COURT:  All right.  You may publish it.

8      Q.  What is this?

9      A.  This is the entrance to the building.

10     Q.  Which way did you go?

11     A.  We came up from this way.

12     Q.  Referring to the left of the photograph?

13     A.  To the left of the photo, yes.  It is a walkway.

14     Q.  That building is maybe difficult for the jury to see.

15     That's 681 Courtlandt Avenue?

16     A.  Yes, that is 681 Courtlandt.

17             MR. ARAVIND:  May I publish Government Exhibit 136?

18             THE COURT:  You may.

19     Q.  Officer Dziewiecki, please tell the jury what this is.

20     A.  This is the main lobby of the building.

21     Q.  As you entered this lobby, where did you go?

22     A.  As I entered the lobby, I went to the right.

23             MR. ARAVIND:  May I publish government Exhibit 137,

24     your Honor?

25             THE COURT:  You may, Mr. Aravind.

CA33MER2                    Dziewiecki – direct

1   Q.  Is that the way that you proceeded on Government Exhibit

2   137?

3   A.  Yes, that is the way I proceeded in the hallway.

4   Q.  Turn to Government Exhibit 138.

5           MR. ARAVIND:  May I publish, your Honor?

6           THE COURT:  You may.

7   Q.  Please describe to us, Officer Dziewiecki, what we're

8   looking at.

9   A.  Well, it is a hallway that leads to the stairwells and

10  apartments on the first floor.

11          MR. ARAVIND:  May I publish the next photograph, your

12  Honor?

13          THE COURT:  You may publish 139.

14  Q.  Officer Dziewiecki, is that the stairwell that we're

15  referring to, the entrance door?

16  A.  Yes, that is.  That is it.

17          MR. ARAVIND:  May I publish Government Exhibit 140?

18          THE COURT:  You may, Mr. Aravind.

19  Q.  Tell us what this is, Officer Dziewiecki.

20  A.  Well, this is an entrance to the stairwell.

21  Q.  Is that the stairwell that you went to when you entered 681

22  Courtlandt Avenue?

23  A.  Yes, that is the one.

24  Q.  Is that photograph how you saw that stairwell on the day

25  that you arrived there on July 25, 2010?

1   A.   No.

2   Q.   What is different about it?

3   A.   On July 25 when I responded to that location, and I opened

4   the door to the stairwell, I observed a male Hispanic laying on

5   the floor of the stairwell.

6   Q.   Can you describe to us what you saw.

7   A.   Well, like I said, when I opened the door, I saw a male

8   laying out on the stomach on the ground right here.   Right

9   here.   Okay.   I attempted to lift him up, and that's when I

10  noticed a substantiated amount of blood coming from his chest.

11  Q.   Did you see anything else?

12  A.   Yes, I did.   I observed shell casings.

13  Q.   Anything else?

14  A.   Not to my knowledge, not to my knowledge at this time.

15  Q.   What did you do after seeing that body there?

16  A.   I notified the patrol supervisor to respond as well as EMS.

17  The paramedics.

18  Q.   Did EMS arrive?

19  A.   Yes, they did.

20  Q.   After you contacted EMS, what, if anything, did you do

21  next?

22  A.   Well, my job at that point was to preserve the crime scene.

23  Q.   What does it mean, to preserve the crime scene?

24  A.   Well, you pretty much in charge of it.   Can't let nobody

25  disturb the body in this case, the evidence that were around

CA33MER2                          Dziewiecki - direct

1   it, and couldn't let anybody in or out through the stairwell.

2   Q.  How do you prevent people from coming in and out of the

3   stairwell?

4   A.  Well, in this case, we post officers on the top, on the

5   top, the first floor, preventing residents from coming down, as

6   well as officers right here at the entrance.

7   Q.  Did any other New York City Police Department personnel

8   arrive?

9   A.  Yes.

10  Q.  Who arrived if you remember?

11  A.  I don't remember by names, but numerous, numerous officers

12  responded to the scene.

13  Q.  Did you speak to any of those officers?

14  A.  No, I did not.

15  Q.  How long were you securing the crime scene at 681

16  Courtlandt Avenue?

17  A.  Until about 2 a.m.

18  Q.  Did you have any further involvement in this case after

19  that?

20  A.  No, I did not.

21  Q.  Just one final question.  You said that you lifted the body

22  up when you first saw it.  Why did you do that?

23  A.  By the shoulder.  By the shoulder blade.

24  Q.  Why did you do that, Officer Dziewiecki?

25  A.  To see if -- well, the person seemed to be unresponsive.  I

CA33MER2                          Dziewiecki – direct

 1   wanted to see if he was alive.

 2            MR. ARAVIND:  May I have a moment, your Honor?

 3            THE COURT:  Take your time.

 4   Q.  Officer Dziewiecki, when you were securing the crime scene,

 5   did anyone approach that crime scene?

 6   A.  Well, at a later time we had our Crime Scene Unit respond.

 7   Q.  Did any other people who were not affiliated with the New

 8   York City Police Department arrive at that area that you

 9   remember?

10   A.  No.  I don't remember.

11            MR. ARAVIND:  No further questions, your Honor.

12            THE COURT:  Cross-examination?

13            MR. MIEDEL:  We didn't alert you in advance, but I

14   would like to go first.

15            THE COURT:  By all means, Mr. Miedel.  You may

16   proceed.

17   CROSS-EXAMINATION

18   BY MR. MIEDEL:

19   Q.  Good morning, Officer.

20   A.  Good morning.

21   Q.  I just have a couple questions for you.  When you were

22   sitting in your police car on Melrose, did you hear any shots?

23   A.  No, I did not.

24   Q.  Okay.  As you just testified, you personally found the body

25   of the male Hispanic in the stairwell, correct?

CA33MER2                    Dziewiecki — cross — Mr. Miedel

1   A.  Yes, I did.

2   Q.  You didn't interview any potential witnesses, correct?

3   A.  No, I did not.

4   Q.  You did not participate in any kind of investigation of

5   this shooting, correct?

6   A.  No, I did not.

7   Q.  You have no idea who did this shooting, correct?

8   A.  No.

9           MR. MIEDEL:  I have nothing further.

10          MR. DINNERSTEIN:  Your Honor, I have some questions.

11          THE COURT:  Certainly, Mr. Dinnerstein, you may

12  proceed.

13  CROSS-EXAMINATION

14  BY MR. DINNERSTEIN:

15  Q.  Could I have picture 1200 up.

16          You identified that photograph earlier.  Is that

17  correct?  Do you see it?

18  A.  Yes, I did.

19  Q.  You indicated where 681 Courtlandt Avenue is, is that

20  correct?

21  A.  I'm sorry?

22  Q.  681 Courtlandt Avenue, are you able to identify that

23  building in that photograph?

24  A.  Yes.

25  Q.  Where is it?

1   A.  It's right here.

2   Q.  How tall is that building?

3   A.  Not really sure.  It's got to be at least 12, 14 floors.

4   Q.  How many people live in that building?

5   A.  I would say a thousand.

6   Q.  A thousand people in that building.  Now, there is a

7   building next to 681.  That also has a red top.  Do you see

8   that building?

9   A.  This one right here?

10  Q.  Right.  Is that also part of that housing project?

11  A.  Yes, it is.

12  Q.  Is that Melrose Housing?

13  A.  Yes, it is.

14  Q.  How many buildings are in that housing project?

15  A.  Around eight.

16  Q.  Around eight.  Could you just show us where the eight

17  buildings are.  Just quickly.

18  A.  It's right here.  One, two, three, four, five, six, seven,

19  eight.

20  Q.  Each one has about a thousand people living in them?

21  A.  I'm -- I don't know exactly.

22  Q.  Approximately?

23  A.  Approximately.  I mean, it's going to be a couple hundred,

24  yes.

25  Q.  If you go across the street on east -- you see where East

CA33MER2                        Dziewiecki – cross – Mr. Dinnerstein

1   156th is?

2   A.   Yes.

3   Q.   There are also buildings there, is that correct?

4   A.   Yes.

5   Q.   What is that?

6   A.   Those are the Jackson Houses.  Another set of housing

7   developments.

8   Q.   How many buildings are in the Jackson Housing?

9   A.   Around seven.

10  Q.   Are they also about 12, 14 stories high?

11  A.   Approximately, yes.

12  Q.   There is about a thousand people in each one of those

13  buildings too?

14  A.   Approximately.

15  Q.   Now, on the other side of Courtlandt Avenue, not on the

16  Morris Avenue side, the side closer to Melrose Avenue.  You see

17  that?

18  A.   I'm sorry, where again?

19  Q.   You see between Courtlandt and Melrose, sir?

20  A.   Yes.

21  Q.   Are there buildings over there too?

22  A.   Yes.

23  Q.   Are they also part of this housing project?

24  A.   You talking about the ones on 154th and 155th Street?

25  Q.   Right.

CA33MER2                        Dziewiecki - cross - Mr. Dinnerstein

1    A.  Most of them are privately owned houses.

2    Q.  Are there other projects, other than the projects that you

3    mentioned, between Courtlandt and Morris?

4    A.  There was one senior home on 152nd Street.

5    Q.  Can you show us where that is?

6    A.  Yes, it's located around here.

7    Q.  How many people would live in that building?

8    A.  I have -- to be exactly, I don't know.  It's got to be --

9    Q.  You say, sir, that Jackson Houses and the Melrose Houses,

10   we're talking about 20,000 people living in those two sets of

11   buildings?

12   A.  More or less.

13   Q.  What?

14   A.  I said more or less.

15   Q.  More or less.  And you've been working at P.S.A. 7 for

16   about seven and a half years, is that correct?

17   A.  Yes.

18   Q.  Where is P.S.A. 7 located?  Is that on that map also?

19   A.  Yes.  P.S.A. 7 is on Melrose Avenue between 156th Street

20   and 155th.  It's right here.

21   Q.  Would it be fair to say, sir, that in the seven and a half

22   years you've worked there, it's a very dangerous neighborhood,

23   is that correct?

24   A.  Is it very dangerous?  I mean, it could be dangerous

25   anywhere.  You know.  You can't really --

CA33MER2                        Dziewiecki – cross – Mr. Dinnerstein

1   Q.  So it's like, it's no more dangerous than Park Avenue in

2   Manhattan?  Is that your testimony, sir?

3   A.  Is it no more dangerous than Park Avenue.  Well,

4   crime-wise, probably is more dangerous than Park Avenue.

5   Q.  You think it might be a little more dangerous than Park

6   Avenue in Manhattan; is that your testimony, sir?

7   A.  Yes, yes.

8            MR. DINNERSTEIN:  I have nothing further.

9            MR. LEE:  Judge, I do have some questions, your Honor.

10           THE COURT:  Go ahead, Mr. Lee.

11           MR. LEE:  Thank you.

12  CROSS-EXAMINATION

13  BY MR. LEE:

14  Q.  Good morning, Officer.

15  A.  Good morning.

16  Q.  I'd like to keep Government Exhibit 1200 up there for now.

17  During your seven years, working at P.S.A. I believe you said

18  it was 7?

19  A.  Yes.

20  Q.  Were your duties patrolling in a car?

21  A.  Yes.

22  Q.  What hour shifts would you patrol?

23  A.  Well, my primary shift is 3 o'clock, 3 p.m. to 11:30 p.m.

24  Q.  Did you ever also patrol on foot?

25  A.  Yes, I did.

CA33MER2                    Dziewiecki - cross - Mr. Lee

1   Q.  You're very familiar with this area that's on map 1200,

2   correct?

3   A.  Yes.

4   Q.  You've walked through it, around it, in the buildings, on

5   many occasions, correct?

6   A.  Yes.

7   Q.  During your time in P.S.A. 7, would your hours include all

8   different hours of the day?

9   A.  Yes.

10  Q.  Sometimes your shift would include daytime hours?

11  A.  Yes.

12  Q.  And sometimes they would include nighttime hours?

13  A.  Yes.

14  Q.  Now, you remember Mr. Dinnerstein asking you questions

15  about how many people actually live in that area.  Would it be

16  a fair statement by me that there is a lot of people moving

17  around in that area of the Melrose Jackson Projects?  Foot

18  traffic is what I mean.

19  A.  Yes.

20  Q.  A lot of people coming and going, right?

21  A.  Yes.

22  Q.  A lot of people of all different ages, adults and young

23  women, young men, walking back and forth all the time, correct?

24  A.  Yes.

25  Q.  Within that area, are there also public areas?

CA33MER2                    Dziewiecki – cross – Mr. Lee

1              Public areas?

2    A.   Yeah, of course, yes.

3    Q.   Basketball courts, right?

4    A.   Yes, basketball courts, playground areas.

5    Q.   Playgrounds, right?

6    A.   Yes.

7    Q.   Benches for people to sit in.  Right?

8    A.   Hmm-hmm, yes.

9    Q.   And during your years patrolling, have you observed that

10   oftentimes there are people just relaxing, socializing in these

11   different areas, right?

12   A.   Yes.

13   Q.   You'd see groups of people sitting on the benches together,

14   right?

15   A.   Yes.

16   Q.   Would it be fair to say that on a nice summer evening, it

17   would be not unusual to have people sitting around trying to

18   cool off on the benches, right?

19   A.   Yes.

20   Q.   And people perhaps young men on the courts playing

21   basketball, is that correct?  You'd observe that all the time?

22   A.   Yes, I did.

23   Q.   Groups of people, right?

24   A.   Excuse me?

25   Q.   Groups of people?

CA33MER2                          Dziewiecki – cross – Mr. Lee

1    A.  Groups of people, yes.

2    Q.  Groups of people on the benches, correct?

3    A.  Correct.

4    Q.  All different types of people, right?

5    A.  Yes.

6    Q.  On the basketball courts maybe different groups of people,

7    maybe young children, 10, 12 years old, trying to play

8    basketball, and also young men playing basketball, correct?

9    A.  Yes, that's correct.

10            MR. LEE:  I have no further questions, your Honor.

11            THE COURT:  Mr. Becker, any questions?

12            MR. BECKER:  No, I have no questions, your Honor.

13   Thank you.

14            THE COURT:  Redirect examination?

15            MR. ARAVIND:  Just a few, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. ARAVIND:

18   Q.  Officer Dziewiecki.

19   A.  Yes.

20   Q.  When you arrived or were at the crime scene at 681

21   Courtlandt Avenue, did you know the victim's identity at that

22   time?

23   A.  No, I did not.

24   Q.  Did anyone from the victim's family show up to the crime

25   scene?

CA33MER2                         Dziewiecki – redirect

1            MR. MIEDEL:  Objection.

2            THE COURT:  Overruled.

3    A.  At the time I was there, no, I don't believe so.

4            MR. ARAVIND:  No further questions, your Honor.

5            THE COURT:  All right.  Any recross examination,

6    Mr. Miedel?

7            MR. MIEDEL:  No, your Honor.

8            THE COURT:  Any?

9            MR. LEE:  Nothing, your Honor.

10           MR. DINNERSTEIN:  No, your Honor.

11           THE COURT:  Mr. Becker?

12           MR. BECKER:  No, your Honor.

13           THE COURT:  All right.  Officer Dziewiecki, you are

14   excused as a witness, sir.  You may step down.

15           (Witness excused)

16           THE COURT:  Would the government call its next

17   witness.

18           MR. ARAVIND:  The government calls Officer Angel

19   DeJesus, your Honor.

20           (Witness sworn)

21           THE DEPUTY CLERK:  Please take a seat.

22           MR. ARAVIND:  May I just retrieve those exhibits in

23   front of the officer.

24           THE COURT:  Of course.

25           THE DEPUTY CLERK:  Please state your name and spell

CA33MER2                      Dziewiecki – redirect

1   your last name for the record.

2              THE WITNESS:  Angel DeJesus, D-E-J-E-S-U-S.

3    ANGEL DEJESUS,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6   DIRECT EXAMINATION

7   BY MR. ARAVIND:

8   Q.  Good morning.

9   A.  Good morning.

10  Q.  What do you do for a living?

11  A.  I'm a New York City police officer.

12  Q.  Where do you work with the New York City Police Department?

13  A.  I work at Police Service Area 7 in the South Bronx.  It's

14  in the confines of the 40 and 42 Precincts.

15             MR. DINNERSTEIN:  Your Honor, could you ask him to

16  keep his voice up, please.

17             THE COURT:  If you pull your chair a little closer to

18  the microphone, Officer DeJesus.

19  Q.  Can you please explain again where P.S.A. 7 is.

20  A.  It's in the confines of the 40 Precinct in the South Bronx.

21  Q.  How is P.S.A. 7 different from the 40 Precinct?

22  A.  P.S.A. 7 covers the housing developments in the confines of

23  the 40 Precinct and the 42nd Precinct.

24  Q.  How long have you been a police officer with the New York

25  City Police Department?

CA33MER2                          DeJesus - direct

1   A.  Eight years.

2   Q.  How long have you been with the police department at P.S.A.

3   7?

4   A.  Seven and a half.

5   Q.  What are your duties and responsibilities as an officer

6   with the New York City Police Department?

7   A.  I am a patrol officer.  I ride around in a marked RMP in

8   uniform, and I answer 911 and radio calls that come over the

9   radio.

10  Q.  Do you do that alone or with a partner?

11  A.  With a partner.

12  Q.  Who is your partner?

13  A.  Officer Dziewiecki.

14  Q.  Officer DeJesus, directing your attention to July 25, 2010.

15  Were you working that day?

16  A.  Yes.

17  Q.  Where were you working?

18  A.  I was working in the confines of the 40 Precinct.

19  Q.  What happened that day?

20  A.  At around 9 o'clock, we received a radio call of shots

21  fired inside 681 Courtlandt.

22  Q.  What did you do in response to that call?

23  A.  We were parked right around the corner, so we turned our

24  patrol car around, went up the street, parked in front of the

25  building.  As we approached, we saw some people on the

CA33MER2                         DeJesus - direct

1    sidewalk.

2             We entered into the lobby, the lobby was empty.  I

3    went to the left stairwell, my partner went to the right.  When

4    I went to the left stairwell, it was empty.  But I heard my

5    partner call out.  When I went to meet him at the right

6    stairwell, I saw the victim laying face down.

7    Q.  Can you describe to the jury what you saw when you got to

8    that right stairwell.

9    A.  Sure.  The victim was laying face down, and was a large

10   amount blood, and I noticed some shell casings on the floor.

11   Q.  Did you notice anything else?

12   A.  I noticed he wasn't breathing.  He seemed like -- he -- it

13   seemed like he was dead.

14   Q.  Other than the shell casings that you observed, did you

15   observe anything else?

16   A.  There was no one else in the stairwell at that time.  No

17   one else was around at the time.

18   Q.  Did you notice any other pieces of evidence around the

19   body?

20   A.  Yes.  We -- there was also some sunglasses, a lighter, and

21   the victim had on his person a bottle of pills.

22   Q.  What did you do after you observed the body?

23   A.  I went over the radio, asked to make sure EMS was

24   responding.  And I also asked for my sergeant to respond.  My

25   supervisor.  And I also put over the radio that it was

CA33MER2                          DeJesus - direct

1   confirmed that there was a male shot in the lobby.

2   Q.  What did you do after making that call?

3   A.  After that, we secured -- well, we began to secure the

4   crime scene.

5   Q.  What does that mean?

6   A.  It means we safeguard the area, make sure no one enters or

7   comes down the stairs and disturbs the victim or the shell

8   casings or the evidence.

9   Q.  Did anything happen as you were trying to secure the crime

10  scene?

11  A.  Not right away.  I do recall victim's family trying to gain

12  access to the victim through the lobby.  We had to keep them

13  from coming inside.

14  Q.  Did other New York City Police Department subsequently

15  arrive?

16  A.  Yes.

17  Q.  Who arrived from the New York City Police Department?

18  A.  My supervisor that night, and several other bosses,

19  supervisors.  Crime Scene.

20  Q.  Did you speak to any of those officers?

21  A.  Yes, I informed my supervisor pretty much of what had just

22  happened.  And I don't really recall what I said to the other

23  officers.

24  Q.  How long were you at the crime scene?

25  A.  Close to five hours.

CA33MER2                              DeJesus – direct

1   Q.  What did you do after you left the crime scene?

2   A.  After I left the crime scene, I went to the 40th Precinct

3   with Crime Scene to voucher the evidence that they collected.

4   Q.  How did you do that?

5   A.  Crime Scene collected the evidence, I went by my marked

6   patrol car to the 40th Precinct and began to voucher the

7   evidence.

8   Q.  What does it mean to voucher evidence?

9   A.  Basically, you take into custody the evidence that Crime

10  Scene gives you, and they give you a list, and I just type it

11  up and make out a list of the items that they collected.

12  Q.  Do you remember what evidence you vouchered that evening on

13  July 25, 2010?

14  A.  I remembered five shell casings, the sunglasses, a lighter,

15  bloody clothes, and a bottle of pills.

16  Q.  You mentioned shell casings.  What is a shell casing?

17  A.  Shell casing is -- it's basically a bullet with the bullet

18  leaves the -- it's kind of hard to describe.  It's -- the shell

19  casing contains the powder.  And when it ignites, it comes out

20  of the handgun and the bullet goes forward.  So it is a small

21  brass like.

22  Q.  Do you remember how many shell casings you recovered from

23  that crime scene?

24  A.  Five.

25  Q.  Do you remember the voucher number that you used for those

CA33MER2                          DeJesus - direct

1    shell casings that you recovered?

2    A.  No, not exactly.

3    Q.  Is there a document that you prepared in connection with

4    this case that would help you refresh your recollection?

5    A.  Yes.

6    Q.  What is that document?

7    A.  The complaint report.

8    Q.  I'm showing you what has been marked for identification as

9    3507-A.  Please look at this and read it to yourself.  And

10   directing you to the second page.  I'm showing you now the

11   second page of 3507-A.  I'm sorry.

12   A.  Thank you.

13   Q.  Do you recognize that document?

14   A.  Yes, I do.

15   Q.  What is that?

16   A.  It is the complaint report along with the voucher numbers.

17   Q.  Does that refresh your recollection as to the voucher

18   number that you used for the ballistics?

19   A.  Yes.

20   Q.  Can I have that.

21       Do you remember that number now?

22   A.  Yes.

23   Q.  What was it?

24   A.  507676.

25   Q.  I'm showing you what has been marked for identification as

CA33MER2                          DeJesus - direct

1    Government Exhibit 130-A.  Do you recognize that item, Officer

2    DeJesus?

3    A.  Yes.

4    Q.  What is that item?

5    A.  It's the packaging containing the shell casings that I

6    vouchered.

7    Q.  How do you recognize that document or that item, I'm sorry.

8    A.  The voucher number is on it along with my name.

9    Q.  Can you read off that voucher number?

10   A.  R 507676.

11           MR. ARAVIND:  Government offers Government Exhibit

12   130-A.

13           THE COURT:  Any objection?

14           MR. MIEDEL:  No objection.

15           MR. LEE:  No objection, your Honor.

16           MR. BECKER:  No objection.

17           MR. DINNERSTEIN:  No objection.

18           THE COURT:  Government Exhibit 130-A is received in

19   evidence.

20           (Government's Exhibit 130-A received in evidence)

21   Q.  Officer DeJesus, after you vouchered evidence at the 40th

22   Precinct, what did you do next?

23   A.  After that, I proceeded to the Bronx morgue at Jacobi

24   Hospital to identify the victim.

25   Q.  Did you know the victim's identity at the time?

CA33MER2                          DeJesus - direct

1    A.   I had his pedigree information, yes.

2    Q.   Do you know the name of the victim?

3    A.   Jason Correa.

4    Q.   What did you do to identify the body?

5    A.   When I arrived at the morgue, they showed me the body and

6    asked me if this was the same body I had seen at the crime

7    scene.

8    Q.   What did you tell them?

9    A.   Yes.  That it was.

10   Q.   Officer DeJesus, did you have any further involvement in

11   this case after that?

12   A.   No.

13   Q.   Did you prepare any paperwork other than the complaint as

14   part of this case?

15   A.   No.

16            MR. ARAVIND:  Your Honor, may I have a moment?

17            THE COURT:  Take your time.

18            MR. ARAVIND:  No further questions, your Honor.

19            THE COURT:  All right.

20            Members of the jury, we're going to take a short

21   midmorning break at this time.  Keep an open mind.  Come to no

22   conclusions.  Don't discuss the case among yourselves during

23   the break.  And we're going to return to the courtroom in just

24   a few minutes.  So, everyone should remain seated.

25            You may stand.  I think you know the way.

CA33MER2                          DeJesus - direct

1           (Jury excused)

2           THE COURT:  Officer DeJesus, you may step down

3    briefly, sir.  Be careful of the wires.

4           (Witness not present)

5           THE COURT:  Are there any issues that counsel wish to

6    raise?

7           MR. LEE:  No, your Honor.

8           MR. MIEDEL:  No, your Honor.

9           MR. BECKER:  No, your Honor.

10          MR. DINNERSTEIN:  No, your Honor.

11          MR. FEE:  Nothing, your Honor.

12          THE COURT:  Just two observations, and I understand

13   obviously it's at the beginning of a trial and some counsel

14   need to familiarize themselves with the practices of this

15   Court.

16          But, first, when the oath is administered to a

17   witness, I expect all counsel to be seated.  Everyone in the

18   courtroom is to be seated.  The oath is a sacred undertaking.

19          Second, when any counsel wishes to publish an exhibit

20   to the jury for the first time, they're to request permission

21   of the Court to do so.  But you need not do so thereafter, as

22   long as you reveal on the record that you're showing something.

23          And third, when it comes to the Court inquiring of

24   defense counsel whether defense counsel have any objection, and

25   you have no objection, just like if you have an objection, you

CA33MER2

1    stand up and say "no objection."  And when it comes to that,

2    let's do it in order, in defendant order.  So that I don't have

3    to be asking you each time whether some straggler is objecting.

4    Everybody is going to address every exhibit as it comes in with

5    either an objection or no objection.

6              And these are things that I'm not faulting anyone

7    with.  I should have discussed them with you before the trial

8    started.  There will probably be other things that come up, but

9    I just want to alert you to that.  All right?

10             Everyone is going to remain seated.  The defendants

11   will be escorted back and then we'll take our recess.

12             We'll reconvene in about 10 minutes.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

CA33MER2

```
1              THE COURT:  Please be seated, let's bring in the
2    defendants.  And Officer DeJesus can come back up on the stand.
3              (Defendants enter)
4              THE DEPUTY CLERK:  Come to order.  Jury entering.
5              (Jury enters)
6              THE COURT:  All right.  Members of the jury, we're
7    going to turn now to cross-examination of Officer DeJesus.
8    Mr. Miedel.
9              MR. MIEDEL:  Thank you.
10   CROSS-EXAMINATION
11   BY MR. MIEDEL:
12   Q.  Good morning, Officer.
13   A.  Morning.
14             MR. MIEDEL:  Could you put up government Exhibit 1201,
15   please.
16   Q.  Officer DeJesus, would you take a look at that exhibit?
17   What does that show?
18   A.  It's the Melrose Jackson Houses housing complex.
19   Q.  Okay.  And at the bottom right of the exhibit is building
20   681; is that correct?
21   A.  Yes.
22   Q.  Okay.  Do you have the laser pointer up there?  Is there a
23   laser pointer up there?  Yes.  Could you show us on the exhibit
24   where the entrance is to 681, on the big screen?
25   A.  Oh, sorry.
```

CA3PMER3                     DeJesus - cross - Mr. Miedel

1   Q.  Okay.  That's the entrance to the building, correct?

2   A.  Yes.

3   Q.  And the entrance faces Courtlandt Avenue, right?

4   A.  Yes.

5   Q.  Okay.

6           MR. MIEDEL:  Now, could you put up Exhibit 135,

7   please.

8   Q.  Officer, that's the actual entrance to the building 681

9   Courtlandt Avenue, correct?

10  A.  Yes.

11  Q.  And as we saw from the previous exhibits, the entrance is

12  set back from the street a certain ways, correct?

13  A.  Yes.

14  Q.  Would you say that the entrance of the building is back

15  from the sidewalk about 50 feet or so; is that fair to say?

16  A.  About so, yes.

17  Q.  Okay.  And as you can see in this exhibit, there's a

18  stairway that goes up to the front of the building, correct,

19  coming from the right, yes?

20  A.  Yes.

21  Q.  And you're familiar with this building, obviously, correct?

22  A.  Yes.

23  Q.  There's also a ramp that goes down to the left toward the

24  sidewalk, correct?

25  A.  Yes.

1    Q.  All right.

2              THE COURT:  Want to just come a little closer to the

3    microphone, Officer DeJesus.  We've replaced it during the

4    recess so that I think it will function better, and perhaps,

5    counsel, you could also get a little closer to the microphone

6    so that we can all hear each other.

7              MR. MIEDEL:  All right.

8              THE COURT:  Thank you.

9    Q.  Officer, you didn't interview any potential witnesses to

10   this crime, correct?

11   A.  No.

12   Q.  You didn't conduct an investigation, right?

13   A.  No, I didn't interview anyone, no.

14   Q.  Well, did you conduct an investigation?

15   A.  No.

16   Q.  Okay.  And so that means you have no idea who did the

17   shooting, correct?

18   A.  No.  Yes, that's correct.

19   Q.  That's correct.  Okay.  By the way, you said that you

20   recovered evidence.  In fact, other police officers recovered

21   the evidence and you vouchered it, correct?

22   A.  Yes.

23   Q.  And you have no clue who committed this crime, correct?

24   A.  No clue.

25             MR. MIEDEL:  Thank you.

CA3PMER3                         DeJesus - cross - Mr. Miedel

1          THE COURT:  Mr. Dinnerstein?

2          MR. DINNERSTEIN:  Yes, thank you.

3   CROSS-EXAMINATION

4   BY MR. DINNERSTEIN:

5   Q.  Now, sir, you indicated you reported to PSA 7 for

6   seven-and-a-half years; is that correct?

7   A.  Yes.

8   Q.  And the officer -- And you were a police officer; is that

9   correct?

10  A.  Yes.

11  Q.  And you -- And in that neighborhood where you work is

12  generally in the Jackson and Melrose Houses; is that correct?

13  A.  Well, that's part of --

14  Q.  Part of it?

15  A.  Part of it.

16  Q.  Do you also work in other housing projects?

17  A.  Yes.

18  Q.  And what are the names of the other housing projects in

19  that community?

20  A.  In the 40 precinct?

21  Q.  In the PSA7 area.

22  A.  Mitchell Houses, Patterson Houses, Millbrook Houses,

23  Webster Houses.  There's quite a few.

24  Q.  And are they generally also all in the south Bronx area?

25  A.  Yes.

CA3PMER3                    DeJesus - cross - Mr. Dinnerstein

1   Q.  And are they comparable in size to these -- to the Melrose

2   and Jackson Houses?

3   A.  Yes.

4   Q.  Now, sir, is this the first homicide investigation that

5   you've done in this seven-and-a-half years you've worked at

6   PSA7?

7   A.  No.

8   Q.  Could you approximate the number of homicide investigations

9   you've done in the seven-and-a-half years you've worked there?

10  A.  Where I was the first responder?  I guess maybe three or

11  four.  I'm not exactly sure of the number.

12  Q.  How about when you were not the first responder, but you

13  came onto the scene where there was a homicide?

14  A.  It's probably about double that number.

15  Q.  Are homicides a fairly regular thing that occurs within the

16  Melrose and Jackson Houses?

17  A.  I mean, it occurs frequently enough.

18  Q.  Too frequently?

19  A.  Yes.

20  Q.  And in the seven-and-a-half years, have you seen ebbs and

21  flows of the number of homicides within the Melrose and Jackson

22  Houses?

23  A.  Yes.  Some years there's more than others.

24  Q.  And you said you started working in that area around

25  seven-and-a-half years ago.  So that means about 2005, 2006; is

CA3PMER3                    DeJesus – cross – Mr. Dinnerstein

1    that correct?

2    A.  Yeah, about 2005, I believe.

3            MR. DINNERSTEIN:  Thank you very much.  I have nothing

4    further.

5            MR. LEE:  Your Honor, I have no questions, your Honor.

6            MR. BECKER:  No questions, your Honor, on behalf of

7    Mr. Miranda.

8            THE COURT:  Thank you.  Redirect examination?

9            MR. ARAVIND:  No, your Honor.

10           THE COURT:  All right.  Officer DeJesus, you're

11   excused as a witness, sir, you may step down.

12           THE WITNESS:  Thank you.

13           (Witness excused)

14           THE COURT:  Would the government calls its next

15   witness.

16           MR. ARAVIND:  The government calls Detective Steven

17   Markoski.

18           (Witness called)

19    STEVEN MARKOSKI,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22           THE DEPUTY CLERK:  Please state your name and spell

23   your last name for the record.

24           THE WITNESS:  Detective Steven Markoski,

25   M-a-r-k-o-s-k-i.

1            THE COURT:  You may inquire, Mr. Aravind.

2            MR. ARAVIND:  Thank you, your Honor.

3    DIRECT EXAMINATION

4    BY MR. ARAVIND:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Where do you work?

8    A.  I work at the New York City Police Department.

9    Q.  What's your title?

10   A.  Detective.

11   Q.  What unit are you assigned to, Detective Markoski?

12   A.  Crime scene unit.

13   Q.  How long have you worked as a member of the crime scene

14   unit?

15   A.  I'm in my fifth year.

16   Q.  How long have you been with the New York City Police

17   Department?

18   A.  I'm in my 21st year.

19   Q.  Before working in the crime scene unit, what did you do?

20   A.  I worked for the Brooklyn North evidence collection team.

21   Q.  For how long?

22   A.  Approximately five years.

23   Q.  And before that, what did you do?

24   A.  I was patrol officer in the 84th precinct for 12 years.

25   Q.  Where is the 84th precinct?

CA3PMER3                         Markoski - direct

1   A.   It's in downtown Brooklyn.

2   Q.   Turning your -- Turning to your time as a detective in the

3   crime scene unit, what do you do as a detective in the crime

4   scene unit?

5   A.   The function of the crime scene unit is to respond to major

6   crimes, to assist the precinct detective squad in gathering

7   evidence to help them to enhance their cases.

8   Q.   When you say major crimes, what do you mean by that?

9   A.   We respond to all homicides, all sexual crimes,

10  police-involved shootings.

11  Q.   During your career as a CSU detective, approximately how

12  many crime scenes have you worked on?

13  A.   I would say -- As a detective you said?

14  Q.   As a detective.

15  A.   As a detective, probably close to a hundred.  Overall, I'd

16  say more than 200.

17  Q.   Speaking generally, as a detective in the crime scene unit,

18  what do you do when you arrive at a crime scene?

19  A.   The first thing that we do when we arrive at a crime scene

20  is we generally try to get an overview of what the crime screen

21  looks like, how big it is.  And then, ideally, we like to meet

22  up with the precinct detective squad, the catching detective,

23  to find out what kind of evidence he has identified, what kind

24  of evidence he would like us to help him to gather, any other

25  information he might have, such as video surveillance or

1   witnesses.

2   Q.  When you say the catching detective, what do you mean by

3   that?

4   A.  Each crime in a precinct is assigned a detective to

5   investigate that case.

6   Q.  After you speak to the catching detective, as you call it,

7   what are the next steps that you do at a crime scene?

8   A.  Ideally, we like to identify the evidence.  The first thing

9   you usually do is photograph the scene before any of the

10  evidence has been moved or anything has been marked.  Then we

11  will put down evidence markers to identify the evidence that is

12  at the scene, photograph the scene with markers, do overview

13  photos, mid-view photos, closeups.

14          If there's a body on the scene, we assist the medical

15  examiner with examining the body.  We do a sketch of the area,

16  a rough sketch.  We take measurements.

17  Q.  Do you collect evidence, as well, as part of your duties?

18  A.  We do, yes.

19  Q.  Detective Markoski, directing your attention to July 25th,

20  2010, were you working that day?

21  A.  Yes.

22  Q.  Where were you assigned that day?

23  A.  Crime scene unit.

24  Q.  What was your tour that day?

25  A.  I worked from 2:00 in the afternoon on the 25th until 8:00

CA3PMER3                          Markoski - direct

1    in the morning on the 26th.

2    Q.  Did you respond to any crime scenes that day?

3    A.  Yes.

4    Q.  Detective Markoski, when you respond to a crime scene,

5    typically, are you the only crime scene detective there?

6    A.  No.

7    Q.  Who else is there from crime scene unit?

8    A.  On a case such as this, it would be myself and a partner.

9    Q.  Who was your partner on July 25th, 2010?

10   A.  Detective Robin Steneck.

11   Q.  And when you arrive at a crime scene to do your analysis,

12   are you working as partners, or does someone take the lead?

13   A.  One of the detectives is the lead investigator.

14   Q.  Who was lead on July 25th, 2010?

15   A.  Detective Steneck.

16   Q.  What does it mean to be a lead CSU detective?

17   A.  The lead detective is basically in charge of the

18   investigation.  The other detective is an assistant, basically.

19   The lead dictates what type of evidence they want to take, how

20   they want the crime scene to be processed.

21   Q.  And your role that day, on July 25th, 2010, what was that?

22   A.  I was the assistant.

23   Q.  As the assistant, what do you do?

24   A.  When Detective Steneck would take photographs I would take

25   the information down.  Anything that she wanted written down, I

CA3PMER3                         Markoski - direct

1    would write for her.  I would assist with examining the body.

2    Usually when we're examining the body, one person has to move

3    the body around while the other person takes photographs,

4    things like that.

5    Q.  Incidentally, do you know if Detective Steneck was

6    available to testify today?

7    A.  No.  She's out with a broken ankle.

8    Q.  Turning back to July 25th, 2010, did you respond to a crime

9    scene?

10   A.  Yes.

11   Q.  Where?

12   A.  681 Courtlandt Avenue in the confines of the 40th precinct

13   in the Bronx.

14   Q.  What kind of location is 681 Courtlandt Avenue?

15   A.  It's a public housing project.

16   Q.  Approximately what time did you arrive there?

17   A.  It was about ten minutes to 11:00 at night.

18   Q.  What was the first thing that you did when you arrived?

19   A.  The first thing, like I said, we usually try to get an

20   overview of the crime scene, how big it is, what evidence is

21   visible at first.

22        We met up with the 40th precinct detective, Detective

23   Espara (phonetic), conferred with him, asked him what he wanted

24   done as far as helping him to enhance his case, and from there,

25   we started taking our pictures.

CA3PMER3                        Markoski - direct

1   Q.  Where was the crime scene at that particular location?

2   A.  The crime scene was in the lobby located at the bottom of a

3   stairwell.

4   Q.  What did you do first when you got to the stairwell?

5   A.  Just observed what was there, saw what type of evidence was

6   there.  It was a small location; so we were wondering whether

7   the evidence was underneath the victim's body.

8   Q.  Could you describe the body as you saw it when you got

9   there?

10  A.  When we got there, the body was laying, I guess, kind of

11  face down to the side at the bottom of the stairwell.  There

12  was a pool of blood.  Obviously, the victim was deceased.

13  Q.  After you took in the crime screen, what did you do next?

14  A.  I'm sorry?

15  Q.  After you took in the crime scene, what did you do next?

16  A.  Our first order of business is usually to take photographs

17  of the general scene of the body before it is examined by the

18  medical examiner, just to give an idea of what the scene looked

19  like when we got there.

20  Q.  Why do you take photographs?

21  A.  Just to, like I said, to show what the area looked like

22  prior to any of the evidence or the victim's being moved.  You

23  know, just the area, what it looked like before any of the

24  Police Department or medical examiner disturbed the scene.

25          MR. ARAVIND:  May I approach, your Honor?

CA3PMER3                        Markoski – direct

1            THE COURT:  You may.

2   Q.  Detective Markoski, I'm showing you a number of photographs

3   that have been marked for identification as government

4   Exhibit 110.1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15,

5   16, 17, 18, 19, 20, 21, 22, 23, 24, 25 and 29, 30, 31, 32, 33,

6   34, 35, 36, 37.

7   A.  Okay.

8   Q.  Do you recognize those photographs?

9   A.  Yes.

10  Q.  What are they?

11  A.  These are photographs taken from the crime scene at 681

12  Courtlandt Avenue on July 25th, 2010.

13  Q.  Were you present when those photographs were taken?

14  A.  I was.

15            MR. ARAVIND:  Your Honor, the government offers

16  Government Exhibit 110.1 through 110.37, except for 110.26, 27

17  and 28.

18            THE COURT:  Any objection?

19            MR. LEE:  I have no objection, your Honor.

20            MR. DINNERSTEIN:  No objection, your Honor.

21            MR. MYSLIWIEC:  Nothing beyond the previous objection,

22  your Honor.

23            MR. BECKER:  No objection, your Honor.

24            THE COURT:  All right.  Government Exhibits 110.1

25  through 25 and 110.29 through 37 are received in evidence.

CA3PMER3                         Markoski - direct

1                (Government's Exhibits 110.1-25, 110.29-37 received in

2      evidence)

3      Q.  Detective Markoski, we're going to look at those

4      photographs together.

5      A.  Okay.

6      Q.  I just want you to explain to the jury what we're looking

7      at?

8      A.  Okay.

9                MR. ARAVIND:  May I publish 110.1?

10               THE COURT:  You may.

11     Q.  What is that?

12     A.  Each crime screen run has a run number, and that is the

13     crime scene envelope, which is the finalized package at the end

14     where we put our paperwork.

15     Q.  Is your name on this envelope anywhere?

16     A.  Yes, it is.

17     Q.  And the location there?

18     A.  Yes, it is.

19     Q.  And the date of occurrence?

20     A.  Yes.

21     Q.  Can you just read out what the location and the date of

22     occurrence is?

23     A.  The date of occurrence is July 25th, 2010.  The location is

24     681 Courtlandt Avenue.

25               MR. ARAVIND:  May I publish 110.2?

CA3PMER3                        Markoski - direct

```
1              THE COURT:  You may.
2    Q.  What are we looking at, Detective Markoski?
3    A.  This is an overview of the outside of the location from the
4    outside stairway, towards the front lobby door.
5    Q.  When you arrived at 681 Courtlandt Avenue, did it look like
6    this, with the tape?
7    A.  Yes, it did.
8    Q.  Let's turn to 110.3.
9              MR. ARAVIND:  May I publish 110.3?  I'm sorry.
10             THE COURT:  You may.
11   Q.  What are we looking at, Detective Markoski?
12   A.  This is a view from the doorway that we just looked at into
13   the lobby, towards the elevators.
14   Q.  Turn to 110.5.
15             MR. ARAVIND:  May I publish, your Honor?
16             THE COURT:  You may.
17   Q.  And this photograph, Detective Markoski?
18   A.  Did you say five?
19   Q.  I'm sorry.  I meant four.
20             MR. ARAVIND:  May I publish?
21             THE COURT:  You may publish 110.4.
22   A.  Okay.  This is a view from the elevator bank area towards
23   the right, showing the stairway, which is on the left side of
24   that hallway.
25   Q.  So just to be clear, as you entered the lobby, do you turn
```

CA3PMER3                    Markoski – direct

 1    right or left?

 2    A.   Turn right.

 3             MR. ARAVIND:  May I publish 110.5?

 4             THE COURT:  You may.

 5    Q.   What is that, Detective Markoski?

 6    A.   That's just an opposite view of the previous photograph.

 7             MR. ARAVIND:  May I publish 110.6?

 8             THE COURT:  You may.

 9    Q.   What is that, Detective Markoski?

10    A.   That is inside the stairwell, showing the door from the

11    previous photo, showing the victim inside the bottom of the

12    stairwell on the stairs.

13    Q.   Is that the victim, as you saw it that day, on July 25th,

14    2010?

15    A.   Yes, it is.

16    Q.   Turn to --

17             MR. ARAVIND:  May I publish 110.7?

18             THE COURT:  You may.

19    Q.   What is that?

20    A.   Just another view of the victim from a different angle.

21             MR. ARAVIND:  May I publish 110.8?

22             THE COURT:  You may.

23    Q.   What angle are we looking at now, Detective Markoski?

24    A.   This is a view of the victim going up the same stairway,

25    looking down at the victim.

CA3PMER3                          Markoski - direct

1          MR. ARAVIND:  May I publish 110.9?

2          THE COURT:  You may.

3          MR. ARAVIND:  May I publish 110.10?

4          THE COURT:  You may.

5    Q.   What are we looking at now, Detective Markoski?

6    A.   That's a closeup view of the victim.  It appears to be a

7    bullet hole in the upper left shoulder of his shirt.

8    Q.   Is there any significance about that yellow marking on that

9    shirt?

10   A.   In my experience, I would say that that means that that --

11   the victim was shot at close range due to the fact that his

12   shirt was discolored, which means the muzzle flash or the

13   actual fire that comes out of the handgun discolored his shirt.

14         MR. ARAVIND:  May I publish 110.11?

15         THE COURT:  You may.

16   Q.   What are those -- Why don't you describe what we're looking

17   at, Detective Markoski, at 110.11?

18   A.   This is a photo of the victim where he was found.  Photo

19   markers have been placed down indicating types of evidence.

20   Q.   What's the significance of the marker?

21   A.   Each number indicates an individual piece of evidence.

22         MR. ARAVIND:  May I publish 110.12?

23         THE COURT:  You may.

24   Q.   Again, describe to us what we're looking at, Detective?

25   A.   Well, this is like a midrange photograph of evidence that

CA3PMER3                    Markoski - direct

```
 1  was recovered at the scene.  Each individual piece of evidence
 2  has its own number.
 3  Q.  Can you tell us what evidence you observed in this
 4  particular photograph?
 5  A.  No. 7 appears to be a shell casing, No. 4 seems to be a
 6  deformed bullet.  I'd have to look at the closer photographs to
 7  give you an exact definition of each one of them.
 8  Q.  We'll do that.  Let's --
 9         MR. ARAVIND:  May I publish 110.13?
10         THE COURT:  You may.
11         MR. ARAVIND:  May I publish 110.14?
12         THE COURT:  You may.
13  Q.  Tell us what we're looking at, Detective Markoski?
14  A.  This is a shell casing that was recovered at the crime
15  scene.  The photo marker is -- the yellow photo markers, this
16  would have been No. 1 of the photo markers of the previous
17  pictures.
18  Q.  And what are we looking at at the bottom?  That blue card,
19  what is that?
20  A.  That is what we call a scale.  It helps to identify the
21  measurement of the actual piece of ballistics.  It has the
22  date, the crime scene run number, and RS is my partners
23  initials, Robin Stenek, and No. 1 means the first piece of
24  evidence she recovered that day.
25  Q.  And we see one, two, three, four, five, six, what is that
```

CA3PMER3                          Markoski - direct

1    measurement?

2    A.   Those are inches.

3    Q.   You've mentioned a shell casing, what's a shell casing?

4    A.   A shell casing is the discharged piece of the bullet that

5    comes out an automatic firearm when it is fired.

6         MR. ARAVIND:   May I publish 110.15?

7         THE COURT:   You may.

8    Q.   What is that, Detective Markoski?

9    A.   That's a deformed piece of copper.

10   Q.   And what is a deformed piece of copper?

11   A.   Many of the firearms, many of the bullets that we recover

12   are coated with copper.  This looks like a piece of the bullet

13   that fragmented when it was shot.

14        MR. ARAVIND:   May I publish 110.16?

15        THE COURT:   You may.

16   Q.   Can you tell us what that is, Detective Markoski?

17   A.   That's another shell casing, which is a third piece of

18   evidence.

19        MR. ARAVIND:   May I publish 110.17?

20        THE COURT:   You may.

21   Q.   What is depicted in 110.17, Detective Markoski?

22   A.   This is -- Again, it's a discharged -- it's a bullet.  It's

23   a deformed bullet.  This one has some copper and some lead.

24   The bullet is also made of lead; so these two are mixed

25   together.  They've kind of been lumped together.

CA3PMER3                        Markoski - direct

1   Q.  How can you tell that, Detective Markoski?

2   A.  Just from looking at the photo, my experience.

3             MR. ARAVIND:  May I publish 110.18?

4             THE COURT:  You may, Mr. Aravind.

5   Q.  What are we looking at, Detective Markoski, in 110.18?

6   A.  This is a different piece of evidence.  This is another

7   bullet.  This one is in pretty good condition.  The copper has

8   not really come apart from the lead at all.  So it's, as far as

9   bullets go, this is in actually pretty good condition.

10  Q.  And can you draw any conclusions -- you mentioned the

11  condition of a bullet -- from a bullet like this in 110.18

12  compared to one of the deformed bullets that we've seen

13  already?

14  A.  Well, from my experience, I would say that the previous

15  bullets that were shown probably hit something hard that made

16  them deformed as they were.  This doesn't look like it was

17  deformed much.  It might have hit something soft or just hit a

18  soft part of a piece of concrete and just pretty much held

19  itself intact.

20            MR. ARAVIND:  May I publish 110.19?

21            THE COURT:  You may.

22  Q.  What are we looking at here, Detective Markoski?

23  A.  This is another projectile, a bullet, which this one is in

24  really, really good condition.  It hasn't been deformed.  You

25  can see the outside.  It's covered with copper; inside, that

CA3PMER3                        Markoski – direct

1   would be lead.

2           MR. ARAVIND:  May I publish 110.20?

3           THE COURT:  You may.

4   Q.  What are we looking at here, Detective?

5   A.  This is the 7th piece of evidence.  It's a shell casing.

6           MR. ARAVIND:  May I publish 110.21?

7           THE COURT:  Yes.

8   A.  It's No. 8, it's a shell casing.

9           MR. ARAVIND:  May I publish 110.22?

10          THE COURT:  You may.

11  Q.  What is that item depicted in 110.22?

12  A.  This is the ninth piece of evidence.  It's a pair of

13  sunglasses, which was found located very close to the victim's

14  body.

15          MR. ARAVIND:  May I publish 110.23?

16          THE COURT:  You may.

17  Q.  What does this picture depict?

18  A.  This photo appears to show a bullet hole to the victim's

19  upper left shoulder.  It's -- The previous photo showed the

20  T-shirt which had been discolored.  This is just a T-shirt on

21  the back showing the wound on the victim's shoulder.

22  Q.  Whose hands are depicted in that photo?

23  A.  That probably would be me.

24          MR. ARAVIND:  May I publish 110.24?

25          THE COURT:  You may.

CA3PMER3                         Markoski - direct

1    A.  This is a photograph of the previous one, with the shirt

2    being pulled back up.  It's just a scale depicting the size of

3    the wound, the size of the hole.

4    Q.  The area around the bullet hole, and there's a laser

5    pointer in front of you, Detective Markoski, if you want to use

6    it.

7    A.  This?

8    Q.  If you could put it on the big screen?

9    A.  I don't know if this is a laser pointer.  Is it?  Okay.

10   Q.  That discoloration around that area, what is the

11   significance of that?

12   A.  Again, I'd say from my experience it looks like it was

13   discolored by muzzle flash, meaning that the firearm was

14   relatively close to the victim's clothing when it was fired.

15           MR. ARAVIND:  May I publish 110.25?

16           THE COURT:  You may.

17   Q.  What are we looking at here, Detective?

18   A.  This is, the victim's outer shirt has been pulled back.  It

19   looks like he has a tank top underneath, which also has a hole,

20   possibly from a bullet.

21           MR. ARAVIND:  May I publish 110.29?

22           THE COURT:  You may.

23   A.  This appears to be a graze wound on the victim's -- I think

24   it's his right forearm.

25           MR. ARAVIND:  May I publish 110.30?

CA3PMER3                        Markoski - direct

1        THE COURT:  You may.

2   A.   This is a closeup photograph of a possible bullet wound to

3   the victim's stomach with the scale.

4   Q.   110.13.

5        MR. ARAVIND:  May I publish 110.31?  I'm sorry.

6        THE COURT:  You may.

7   A.   This photo appears to be a bullet hole in the victim's -- I

8   think it's his upper bicep area with the scale.

9        MR. ARAVIND:  May I publish 110.32?

10        THE COURT:  You may.

11   A.   This appears to be two more bullet holes in the victim's

12   torso area.

13        MR. ARAVIND:  May I publish 110.33?

14        THE COURT:  You may.

15   A.   This is 33 you said?

16   Q.   Yes.

17   A.   This is just another -- the same as 32.  Maybe she thought

18   that she didn't get a clear enough shot; so she took a second

19   one.

20        MR. ARAVIND:  May I publish 110.34?

21        THE COURT:  You may.

22   A.   This is a shell casing that was recovered, seeing it's No.

23   10 in the evidence markers.  It appears to have some possible

24   blood on it.

25   Q.   Why would this shell casing be shown in this sequence,

CA3PMER3                      Markoski - direct

1   compared to the other shell casings we saw?

2   A.  I'm not positive, but this might have been recovered

3   underneath the victim's body.

4            MR. ARAVIND:  May I publish 110.35?

5            THE COURT:  You may.

6   A.  That's just the same photo, just a little clearer.

7            MR. ARAVIND:  May I publish 110.36?

8            THE COURT:  You may.

9   A.  No. 36 is a baseball cap, which was recovered close to the

10  victim's body at the bottom of the stairwell that was held as a

11  piece of evidence we recovered.

12           MR. ARAVIND:  May I publish 110.37?

13           THE COURT:  You may.

14  A.  No. 12 is the 12th piece of evidence we recovered.  It's a

15  lighter that appears to have some possible blood stains on it.

16  It was also recovered in the bottom of the stairwell, where the

17  victim was found.

18  Q.  You can take it off the screen.  Thank you.

19           Detective Markoski, turning to the evidence that you

20  collected, you mentioned a ballistics, shell casings and so

21  forth.  What did you do with those items?

22  A.  Those items were measured as to where they were recovered.

23  They were photographed, they were properly packaged and then

24  they were given to Police Officer DeJesus of PSA7 to voucher.

25  Q.  Do you know what Officer DeJesus did with those items?

CA3PMER3                           Markoski - direct

1    A.  We instructed him to voucher them, and then have them sent

2    to the ballistics labs for analysis.

3    Q.  Turning to the other items that you said you recovered, the

4    Yankees hat, the sunglasses, the lighter, what did you do with

5    those items?

6    A.  They were also photographed, measured as to where they were

7    recovered and packaged.  They were sent to the property clerk

8    for possible future recall.

9    Q.  What does possible future recall mean?

10   A.  If the precinct detective finds out that -- in his

11   investigation that any of these items might have belonged to

12   one of the suspects, he will send this to the police lab for

13   testing, for DNA testing or fingerprint testing.

14   Q.  After you photograph the evidence, what did you and

15   Detective Steneck next do at the crime scene?

16   A.  After we photographed it?

17   Q.  That's correct.

18   A.  After the evidence was photographed, it was measured.  Like

19   I said, it was packaged.  Detective Stenek then did a rough

20   sketch of the crime scene.  The crime scene was measured.  I

21   also assisted the medical examiner in examining the body.

22   Q.  Detective Markoski, I'm showing you what's been marked for

23   identification as Government Exhibit 105A and 105B.

24   A.  Okay.

25   Q.  Do you recognize those items?

CA3PMER3                          Markoski - direct

1    A.  Yes.

2    Q.  What are they?

3    A.  105A is a rough sketch, which was prepared by Detective

4    Stenek at the crime scene.  It's a hand-drawn sketch.  It's not

5    to scale, and it basically just shows what the crime scene

6    looked like, where the evidence was and the measurements of the

7    scene.

8    Q.  And what about 105B?

9    A.  That's the same exact sketch, just we have a computer

10   program which allows you to make it a little clearer.  Again,

11   shows the measurements of the scene, where the evidence was

12   recovered, where the victim was recovered.

13   Q.  Did you assist at all in the preparation of these sketches?

14   A.  I did.

15          MR. ARAVIND:  Government offers Government Exhibit

16   105A and 105B.

17          THE COURT:  Any objection?

18          MR. LEE:  No objection, your Honor.

19          MR. DINNERSTEIN:  No objection, your Honor.

20          MR. MYSLIWIEC:  No objection, your Honor.

21          MR. BECKER:  No objection, your Honor.

22          THE COURT:  All right.  Government Exhibits 105A and

23   105B are received in evidence.

24          (Government's Exhibits 105A and 105B received in

25   evidence)

CA3PMER3                    Markoski - direct

1          MR. ARAVIND:  May I publish 105A?

2          THE COURT:  You may, Mr. Aravind.

3   Q.  And I apologize for the quality of this photograph, but can

4   you just briefly describe to us what this is?

5   A.  This is the rough handwritten sketch that Detective Stenek

6   prepared at the crime scene as measurements.  It shows where

7   the evidence was recovered and has measurements.

8   Q.  Probably better to look at computer sketch.

9          MR. ARAVIND:  May I publish 105B, your Honor?

10         THE COURT:  You may.

11  A.  This is the same sketch, which has been done with a

12  computer program to make it a little clearer.  It's also not to

13  scale, but it shows where the evidence was recovered, where the

14  victim was recovered and the measurements at the crime screen.

15  Q.  Let's just take a moment.

16         MR. ARAVIND:  Miss Brady, can you blow up the part on

17  the left-hand side.

18  Q.  And, again, Detective Markoski, can you just explain what

19  we're looking at to the jury?

20  A.  The bottom is -- obviously, at the bottom, it's at the

21  bottom of the stairwell.  Where it says "up," that's the

22  staircase coming down.  RS1 through 11 are the different pieces

23  of evidence which Detective Steneck recovered, packaged and

24  vouchered.

25         MR. ARAVIND:  Miss Brady, can we just look at the

CA3PMER3                         Markoski - direct

1   legend at the bottom, if you can blow it up.

2   Q.  What does that refer to, Detective Markoski?

3   A.  These are the different pieces of evidence, 11 pieces of

4   evidence that were recovered.  You know, they're pretty

5   self-explanatory.  No. 1 was a shell casing; No. 2 was a

6   bullet; No. 3 was casing; 4, 5, and 6 were bullets; 7, 8 were

7   casings; 9 were the sunglasses; 10 was the baseball cap; and 11

8   was the lighter.

9           MR. ARAVIND:  Thank you, Miss Brady.

10  Q.  Detective Markoski, what is forensic evidence?

11  A.  Forensic evidence is any evidence that could be collected

12  that could be tested for possible DNA or fingerprint evidence.

13  Q.  Did you do any forensic examination of the evidence

14  collected at the crime scene at 681 Courtlandt Avenue?

15  A.  No.

16  Q.  Why not?

17  A.  The ballistic evidence is sent to the ballistic NYPD

18  ballistic unit.  They do the testing in their own laboratory

19  there; so that's just a standard procedure.  When we conferred

20  with Detective Espara (phonetic) from the 40th precinct, he

21  could not give us any places that any evidence of anybody, of

22  the suspects, touching any areas that could possibly have been

23  tested for DNA.  There was no video surveillance of where these

24  suspects had been, had touched; so there was really nothing to

25  do as far as finding any forensic evidence on that date.

CA3PMER3                        Markoski - direct

1   Q.  When you're at a crime screen, are you able to make a

2   preliminary determination about whether forensic evidence is

3   going to be present?

4   A.  Yes.

5   Q.  And what factors do you look at, did you look at?

6   A.  In a situation like this, it's a public area; so a lot of

7   people are, obviously, going in and out of there.  The weather

8   is a concern when you're trying to get fingerprints, and also,

9   the cleanliness of the area.  You know, normally housing

10  projects aren't the cleanest areas to get any type of forensic

11  evidence, unless you know exactly where you're looking for it.

12  Q.  What time did you leave the crime screen at 681 Courtlandt

13  Avenue?

14  A.  We left about 2:00 in the morning.

15  Q.  That would be the following day?

16  A.  Yes.

17  Q.  The 26th.  What did you do after you left the crime screen?

18  A.  After we left the crime scene, we go back to the precinct

19  detective squad with the evidence that we recovered.  We do our

20  own crime scene paperwork, and we also fill out vouchers for

21  the invoicing officers to tell them how to properly send the

22  evidence for testing.

23  Q.  And again, the invoicing officer in this case was who?

24  A.  Police Officer DeJesus from PSA7.

25  Q.  What time did you leave the 40th precinct?

CA3PMER3                    Markoski - direct

1    A.  I'd say approximately 5:30 a.m.

2    Q.  What did you do after you left the 40th precinct?

3    A.  After leaving the precinct, we go back to our office.  We

4    make -- we finish up our paperwork.  It's put onto a computer

5    program.  The photographs are then downloaded into the

6    computer, disks are made, and we tie up any loose ends.

7              MR. ARAVIND:  Your Honor, may I have a moment?

8              THE COURT:  Take your time.

9              MR. ARAVIND:  No further questions, your Honor.

10             THE COURT:  Cross-examination?

11             MR. MYSLIWIEC:  May I inquire?

12             THE COURT:  You may, Mr. Mysliwiec.

13   CROSS-EXAMINATION

14   BY MR. MYSLIWIEC:

15   Q.  Good morning, Officer Markoski.

16   A.  Good morning.

17             THE COURT:  Just pull the microphone a little closer.

18   I'm having a little difficulty hearing all defense counsel.  So

19   I want you to talk into the microphone, please.

20             MR. MYSLIWIEC:  Yes.

21   Q.  Now, crime scene collection is a very thorough process as

22   practiced by you, correct?

23   A.  Mmm, hmm; yes.

24   Q.  You can take as much time as you want at a crime scene,

25   right?

1    A.  Yes.

2    Q.  You take, as you've shown, several photographs, right?

3    A.  Yes.

4    Q.  How many hours did you spend at this crime scene?

5    A.  I'd say three-and-a-half, around.  Give or take.

6    Q.  And that was as much time as you wanted and thought was

7    necessary to collect all relevant evidence from the scene,

8    right?

9    A.  Well, like I said earlier, I wasn't the lead in this case.

10   So the lead detective is the one that dictates how much

11   evidence they take how long they want to take.

12   Q.  Did you disagree with any of the decisions the lead made?

13   A.  Not that I remember.

14   Q.  Now, you collected evidence.  Some of that evidence was a

15   lighter, right?

16   A.  Yes.

17   Q.  A New York Yankees baseball hat, right?

18   A.  Yes.

19   Q.  Sunglasses?

20   A.  Yes.

21   Q.  Some shell casings?

22   A.  Yes.

23   Q.  Some slugs?

24   A.  Yes.

25   Q.  Also a bottle of pills, correct?

1   A.  No.

2   Q.  You didn't collect a bottle of pills?

3   A.  Did not.

4   Q.  Was there a bottle of pills recovered from the scene?

5   A.  Not that I know of.

6   Q.  Now, after the collection process and thorough examination,

7   everything gets bagged, right?

8   A.  Everything gets bagged or boxed, yes.

9   Q.  And that's part of the collection process, right?

10  A.  Yes, it is.

11  Q.  It's also for the purposes of preservation, correct?

12  A.  Correct.

13  Q.  Because after you've collected, the evidence goes different

14  places, as you testified, correct?

15  A.  Correct.

16  Q.  And you want to make sure that evidence is carefully

17  preserved because it can be tested later on, right?

18  A.  Correct.

19  Q.  I mean, that day there was a decision to test the

20  ballistics evidence, right?

21  A.  Normally the ballistic is tested in just about every case

22  we go on.

23  Q.  And that decision was made this day as well, correct?

24  A.  Yes.

25  Q.  So the ballistics evidence went to the ballistics lab?

1    A.  Correct.

2    Q.  Eventually, right?

3    A.  Mmm, hmm.

4    Q.  Now, just for the purposes of informing the jury, the

5    ballistics lab is with the New York Police Department, right?

6    A.  It is.

7    Q.  As is the fingerprint lab, right?

8    A.  Correct.

9    Q.  And then there's a DNA lab that's part of the office of the

10   chief medical examiner, correct?

11   A.  Right.

12   Q.  And both of those operations have incredible resources to

13   test and examine forensic evidence, right?

14   A.  I would think so.

15   Q.  Now, you're not assigned to some of those things, but

16   you're familiar with the fact that forensic evidence can be

17   collected and tested as part of your job, right?

18   A.  Right.

19   Q.  And when that evidence is preserved, it can be tested at

20   any time?  It can be tested the week you collected it, right?

21   A.  Sure.

22   Q.  It could be tested a year later, correct?

23   A.  Yes.

24   Q.  And it could be tested even two weeks ago, right?

25   A.  I would think so, yeah.

1   Q.  So the Police Department's capable of testing that

2   evidence, for example, to find out whether it's consistent or

3   inconsistent with a story that somebody's telling, right?

4   A.  Yes.

5   Q.  And, to your knowledge, the sunglasses were never tested in

6   this case, correct?

7   A.  To my knowledge, no.

8   Q.  And the New York Yankees hat was never tested in this case,

9   right?

10  A.  I don't know.

11  Q.  Nor was the lighter, correct?

12  A.  I don't know.

13  Q.  And, obviously, you came to the crime scene sometime after

14  the shooting occurred, right?

15  A.  Yes.

16  Q.  So you didn't see who did the shooting, right?

17  A.  No, I didn't.

18          MR. MYSLIWIEC:  I have nothing further, your Honor.

19          MR. DINNERSTEIN:  Your Honor, I have no questions.

20          THE COURT:  Mr. Lee?

21          MR. LEE:  Your Honor, I have no questions.

22          THE COURT:  Mr. Becker?

23          MR. BECKER:  Your Honor, I have no questions for this

24  witness.

25          THE COURT:  Redirect?

1          MR. ARAVIND:  Very, very briefly.

2          THE COURT:  Go ahead, Mr. Aravind.

3    REDIRECT EXAMINATION

4    BY MR. ARAVIND:

5    Q.  Detective Markoski, in your experience, what happens to the

6    clothes that a victim is wearing at a homicide scene?

7    A.  In this particular case, the clothes go with the body to

8    the morgue.

9    Q.  Do you know if they're invoiced in any way?

10   A.  I believe, I'm not really sure about this, but I believe

11   the medical examiner does an examination of the clothes during

12   autopsy.  What happens to them after that, I really couldn't

13   tell you.

14   Q.  Do you know what happened in this case?

15   A.  I do not.

16   Q.  Have you had any involvement in this case, other than

17   testifying today, since the day or day after the homicide?

18   A.  No, I haven't.

19          MR. ARAVIND:  No further questions, your Honor.

20          THE COURT:  Anything further?

21          MR. MYSLIWIEC:  No, your Honor.

22          MR. DINNERSTEIN:  No, your Honor.

23          MR. LEE:  I have nothing, your Honor.

24          MR. BECKER:  No, thank you, your Honor.

25          THE COURT:  All right.  Detective Markoski, you're

 1    excused as a witness.  You may step down.

 2                 (Witness excused)

 3                 Will the government call its next witness.

 4                 MR. ARAVIND:  Your Honor, the government calls as its

 5    next witness Bernard Folks.  However, the marshals have told us

 6    that it will take him a couple of minutes to arrive in the

 7    courtroom.  In the meantime, we'd like to read some

 8    stipulations that have been entered by the parties.

 9                 THE COURT:  That's fine.  In the meantime, if the

10    marshals can pass the word to bring Mr. Folks up, that will be

11    fine.

12                 Let me first explain to the jury.  Remember I told you

13    that there are different ways in which evidence can come in.

14    It can be offered here in a document, in a photograph, in a

15    plan and received.  You can hear it from the witness stand or

16    counsel may agree by way of a stipulation.  That is an

17    agreement concerning certain matters.  The government's about

18    to read a stipulation to you.  You may accept this stipulation

19    as evidence in the case.  Mr. Fee, you may proceed.

20                 MR. FEE:  Thank you, your Honor.  I'm just showing the

21    defense counsel.  Your Honor, the first stipulation is marked

22    as Government's Exhibit 1010, and it is captioned with the

23    caption of this case.  Your Honor, it reads as follows:

24                 "It is hereby stipulated and agreed by and between the

25    United States of America by Preet Bahara, United States

Attorney, Nola B. Heller, Adam Fee, Santosh Aravind, Assistant

United States Attorneys, and the defendants Joshua Meregildo,

a/k/a "Killa," by and with the consent of his counsel, Winston

Lee, Esq., Melvin Colon, a/k/a "Melly," by and with the consent

of his counsel, Mitchell Dinnerstein, Esq., Earl Pierce, a/k/a

"Ski Box," by and with the consent of his counsel, Florian

Miedel, Esq. and Nolbert Miranda, a/k/a "Pay Day," by and with

the consent of his counsel, Gary Becker, Esq., the defendants,

that:

            "1.  If called to testify, a custodian of records from

the New York City Police Department, the NYPD, would testify as

follows:

            a.  He or she is familiar with the recordkeeping

practices of the NYPD, in particular with respect to the 911

Emergency Call System;

            b.  Government Exhibit 120 is a compact disc

containing true and correct recordings of a telephone call

placed to the 911 Emergency Call System from a telephone

located in the vicinity of 681 Courtlandt Avenue on July 25th,

2010;

            c.  Government Exhibit 410 is a compact disc

containing true and correct recordings of telephone calls

placed to the 911 Emergency Call System from certain telephones

located in the vicinity of 321 East 153rd Street on

September 13th, 2010;

CA3PMER3                           Markoski - redirect

         d.   Government Exhibit 505 is also a compact disc

containing true and correct recordings of telephone calls

placed to the 911 Emergency Call System from certain telephones

located in the vicinity of Morris Avenue and East 151 Street on

September 8th, 2011;

         e.   The recordings contained in Government Exhibits

120, 410 and 505 are records of regularly conducted activity

within the meaning of Federal Rule of Evidence 803(6).

         Finally, it is further stipulated and agreed that

Government Exhibits 120, 410, 505 and this stipulation, as

Government Exhibit 1010, may be received into evidence as

government exhibits at trial."

         It is dated October 2nd, 2012.  It is signed by the

government and counsel for each defendant.  Your Honor, we

would move to admit into evidence Government Exhibit 1010.

         THE COURT:  Any objection?

         MR. LEE:  I have no objection, your Honor.

         MR. DINNERSTEIN:  No objection, your Honor.

         MR. MIEDEL:  No objection, your Honor.

         MR. BECKER:  No objection, your Honor.

         THE COURT:  Government Exhibit 1010 and the exhibits

referred to therein are received in evidence.

         (Government's Exhibit 1010 received in evidence)

         MR. FEE:  Thank you, your Honor.  Just one moment.

And, your Honor, my colleague reminded me if I could also move

CA3PMER3                          Markoski – redirect

1    in each of the exhibits referenced therein as Government

2    Exhibits 120, 410 and 505.  I'm going to have to make them get

3    up again, your Honor.

4            MR. LEE:  I have no objection, your Honor.

5            MR. DINNERSTEIN:  It's okay, Judge.

6            MR. MIEDEL:  No objection.

7            MR. BECKER:  No objection, your Honor.

8            THE COURT:  Everyone gets some exercise, members of

9    the jury.  Government Exhibits 120, 410 and 505 are received in

10   evidence.

11           (Government's Exhibits 120, 410 and 505 received in

12   evidence)

13           MR. FEE:  And if I may, your Honor, I have one more

14   stipulation to read at this time.

15           THE COURT:  Please proceed.

16           MR. FEE:  It's marked as government's Exhibit 1020.

17   It is again captioned with the caption of this case, and it

18   reads as follows:

19           "It is hereby stipulated by and between the United

20   States of America by Preet Bahara, the United States Attorney,

21   Nola B. Heller, Adam Fee and Santosh Aravind, Assistant United

22   States Attorneys, and the defendants Joshua Meregildo, a/k/a

23   "Killa," by and with the consent of his counsel, Winston Lee,

24   Esq., Melvin Colon, a/k/a "Melly," by and with the consent of

25   his counsel, Mitchell Dinnerstein, Esq., Earl Pierce, a/k/a

CA3PMER3                         Markoski - redirect

"Ski Box," by and with the consent of his counsel, Florian

Miedel, Esq., and Nolbert Miranda, a/k/a "Pay Day," by and with

the consent of his counsel, Gary Becker, Esq., the defendants

that:

"1. Government Exhibit 510A is a compact disc

containing a true and correct video copy of surveillance

footage of the area in and around a church located at 276 East

151 Street, Bronx, New York, taken on September 8th, 2012;

Government Exhibit 510B is a compact disc containing a

true and correct video copy of surveillance footage of the area

in and around a market located at East 151 Street and Morris

Avenue, Bronx, New York, taken on or about September 8th, 2012;

Government Exhibit 510C is a compact disc containing a

true and correct video copy of surveillance footage of the area

in and around the market located at 588 Morris Avenue, Bronx,

New York, taken on or about September 8th, 2012;

4.  The recordings contained in Government Exhibits

510A, 510B and 510C were made by the proprietors of the

respective businesses and the church listed above, and kept in

the course of the businesses' and church's regularly conducted

business activities; and it was the regular practice of these

businesses and church to make these records.

Finally, it is further stipulated and agreed that

Government Exhibits 510A, 510B and 510BC in this stipulation as

Government Exhibit 1020 is admissible as government exhibits at

CA3PMER3                    Markoski - redirect

1    trial."

2            It is signed by representatives for the government and

3    by counsel for each defendant.  If I may have one moment, your

4    Honor, sorry.  Your Honor, I'm not going to move to admit

5    government Exhibit 1020 because I noticed a typo, but if I may

6    read a separate stipulation at this time, your Honor.

7            THE COURT:  Well, is the witness here?

8            MR. FEE:  We can direct it to the marshals to see if

9    he's up, your Honor.  He's here, your Honor.

10            THE COURT:  All right.  Let's bring in the witness.

11            MR. FEE:  Thank you, your Honor.

12            (Witness called.)

13    BERNARD FOLKS,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16            THE DEPUTY CLERK:  Please take a seat.  State your

17    full name spell your last name for the record.

18            THE WITNESS:  Bernard Folks, B-e-r-n-a-r-d, F-o-l-k-s.

19            THE COURT:  All right.  Mr. Folks, just pull your

20    chair forward so that you can speak into the microphone.

21            Mr. Aravind, you may inquire.

22            MR. ARAVIND:  Thank you, your Honor.  Before I

23    proceed, with the Court's permission, we would like to use a

24    demonstrative, a blackboard here, which we have set up --

25            THE COURT:  That's fine.

CA3PMER3                          Markoski – redirect

1          MR. ARAVIND:  -- next to Mr. Folks.  Thank you.

2          THE COURT:  You may inquire.

3          MR. ARAVIND:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MR. ARAVIND:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  What nicknames do you have, Mr. Folks?

9    A.  Akon, Mr. 44.

10   Q.  How old are you, Mr. Folks?

11   A.  19.

12   Q.  Where were you born?

13   A.  Manhattan.

14   Q.  Where in Manhattan were you born?

15   A.  Metropolitan Hospital.

16   Q.  Where do you live now?

17   A.  In Queens.

18   Q.  Where in Queens?

19   A.  GO.

20   Q.  What is GO?

21   A.  A correctional facility.

22   Q.  How long have you been in GO?

23   A.  Two weeks.

24   Q.  Before moving to GO, where were you?

25   A.  MCC.

CA3PMER3                    Folks - direct

1   Q.  What is the MCC?

2   A.  Federal prison.

3   Q.  Do you know what the MCC stands for, Mr. Folks?

4   A.  Metropolitan Correctional Center.

5   Q.  Before the MCC, where were you living?

6   A.  Rikers Island.

7   Q.  What is Rikers Island?

8   A.  It's a city -- city jail.

9   Q.  How long were you in Rikers Island?

10  A.  12 months.

11  Q.  What caused you to be in jail at Rikers Island?

12  A.  Possession of a firearm.

13  Q.  After you were arrested for possession of a firearm, were

14  you later arrested on federal charges?

15  A.  Yes.

16  Q.  Have you pled guilty to those charges?

17  A.  Yes.

18  Q.  Mr. Folks, I'm going to ask you some questions about your

19  background.  When you were younger, where did you grow up?

20  A.  From ages -- From when I was born, up until I was 10, 11, I

21  was living in Manhattan with my grandmother.  So 11 and up, I

22  was raised in the Bronx with my foster mother.

23          (Continued on next page)

24

25

CA33MER4                        Folks - direct

1  BY MR. ARAVIND:

2  Q.  Again, if you could just take the microphone and put it

3  right in front of your face, Mr. Folks.  Thank you.

4           How long did you live with your foster mother?

5  A.  When -- from ages 11 all the way to I'd say 16, 17.

6  Q.  Where did she live?

7  A.  350 Park Avenue.

8  Q.  Other than your foster mother, who did you live with when

9  you lived in the Bronx?

10  A.  I was bouncing around from her house to a couple friends'

11  house, Dante Barber and Melvin Colon to my mother's, my

12  grandmother's, and my aunt's in Harlem.

13  Q.  Where did your friends Dante Barber and Melvin Colon, where

14  did they live?

15  A.  Dante Barber lived in 321 and Melvin lived in 161.

16  Q.  Did you know the street addresses?

17  A.  161 Morris Avenue.

18  Q.  What about Mr. Barber?

19  A.  321 East 153rd Street.

20  Q.  Mr. Folks, did you go to school?

21  A.  Yes.

22  Q.  What school did you go to?

23  A.  Taft High School.

24  Q.  Did you graduate from Taft High School?

25  A.  No.

CA33MER4                        Folks - direct

1    Q.   What year did you leave Taft High School?

2    A.   10th grade was the last grade I completed.

3    Q.   Why did you leave Taft High School?

4    A.   It was too much problems, I could not focus on my -- my

5    schoolwork.

6    Q.   When you say problems, what do you mean by that?

7    A.   Beefs with other people.

8    Q.   When you say beefs, what do you mean by that?

9    A.   Conflicts just -- for me being in GFC, from me being from

10   Courtlandt.

11   Q.   I'm going to ask you about GFC in a moment.

12            Who were you having problems with while you were a

13   student at Taft?

14   A.   Other crews, people from other neighborhoods.

15            THE COURT:  Mr. Aravind, I am going to ask you also to

16   get a little closer to the microphone.

17            MR. ARAVIND:  I'm sorry, your Honor.

18            THE COURT:  Okay.

19   Q.   Mr. Folks, when you lived in the Bronx, were you ever a

20   member of a gang?

21   A.   Yes.

22   Q.   What gang was that?

23   A.   GFC, I was YG, and I was Blood.

24   Q.   I am going to first ask you questions about GFC.  What does

25   GFC stand for?

CA33MER4                         Folks - direct

1    A.  God's Favorite Children.

2    Q.  When did you become a member of GFC?

3    A.  When I was around 15 or 16.

4    Q.  What was GFC to you, Mr. Folks?

5    A.  To me, when I first joined, it was like family.

6    Q.  What do you mean by that?

7    A.  They was doing things for me that family wasn't even doing.

8    Providing for me, taking care of me, protecting me.

9    Q.  What types of things were members of GFC providing that you

10   weren't getting from your family?

11   A.  Like, it was a different kind of love.

12   Q.  Were people sheltering you?

13   A.  Yeah, clothing me, put money in my pockets at times.

14           MR. LEE:  Excuse me, your Honor.  May I ask the

15   witness to either speak into the microphone or adjust it so we

16   can hear him more clearly.  Thank you, your Honor.

17           THE COURT:  Go ahead.  Talk right into it, Mr. Folks.

18   Just like this.

19           MR. LEE:  Thank you, your Honor.

20   Q.  Mr. Folks --

21           THE COURT:  We are going to get Mr. Aravind to do the

22   same thing and all the other lawyers here.

23   Q.  Mr. Folks, can you tell the jury how someone becomes a

24   member of GFC.

25   A.  It depends who you go to.  Some people won't have you do

CA33MER4                          Folks - direct

1   anything.  If some people have relation with you, they just put

2   you GFC like that.  Other people will have you do things.

3   Q.  Like what types of things?

4   A.  It depends.  Like I said, depends who you go to some people

5   might have you do something a little, rob a phone.  Just --

6   Q.  How did you become a member of GFC?

7   A.  I didn't have to do anything.

8   Q.  How did you become a member of GFC if you didn't have to do

9   anything?

10  A.  I guess they just liked how I carried myself because I -- I

11  was a standup guy, I never let anybody do anything to me, not

12  say anything to me.

13  Q.  Did any particular member of GFC invite you into that gang?

14  A.  Yeah.

15  Q.  Who invited you?

16  A.  The first time I denied by some kid named Hiro and a little

17  while after that some kid named Au Dog.  He asked me again and

18  I just joined.

19  Q.  Do you know Au Dog's real name?

20  A.  Aubrey Pemberton.

21  Q.  Mr. Folks, do you have anything that signified your

22  membership in GFC?

23  A.  Yeah, I have a GFC tattoo on my right forearm.

24          MR. ARAVIND:  With the Court's permission, can he show

25  that tattoo to the jury?

CA33MER4                          Folks - direct

1                    THE COURT:  Yes, he may.

2                    MR. ARAVIND:  We'll show a picture of that later on,

3          your Honor.

4                    THE COURT:  Fine.

5          Q.  Where did you get that tattoo, Mr. Folks?

6          A.  Some guy in the neighborhood, he used to do everybody

7          tattoos.

8          Q.  Why did you get tattoo?

9          A.  Just 'cause I was in love with GFC, and it was a sign of

10         loyalty.

11         Q.  Did every member of GFC have a tattoo?

12         A.  Majority.

13         Q.  Did GFC members have meetings?

14         A.  Yes, sometimes.

15         Q.  Where did those meetings take place?

16         A.  In the basketball court in Jackson in --

17                   MR. DINNERSTEIN:  Can we have a timeframe of when

18         these things happened?

19                   THE COURT:  Yes.  Would you establish a timeframe,

20         Mr. Aravind.

21                   MR. ARAVIND:  I will, your Honor.

22         Q.  You said you became a member of GFC when you were 15 years

23         old?

24         A.  Yes.

25                   MR. DINNERSTEIN:  Objection, your Honor.

CA33MER4                        Folks - direct

1          THE COURT:  Sustained.  Don't lead the witness.

2          MR. ARAVIND:  I'm sorry, your Honor.

3          THE COURT:  The last answer is stricken.

4    Q.  Mr. Folks, how old were you when you became a member of

5    GFC?

6    A.  It was around 15 or 16.  I'm not sure exactly sure.

7    Q.  How old are you now?

8    A.  19.

9    Q.  When you became a member of GFC, approximately three years

10   ago, three or four years ago, did GFC members have meetings?

11   A.  Yes.

12   Q.  Where did those meetings take place?

13   A.  In Jackson basketball court, we call the bird cage.  And

14   Melrose basketball court, the big park, in any house that was

15   available like 13 house, Melly house.

16         MR. ARAVIND:  May I publish Government Exhibit 1200?

17         THE COURT:  You may.

18   Q.  Mr. Folks, there is a laser pointer, it should be right

19   before you.  You just need to press the button and point it at

20   the big screen.  There you go.

21         Show us on this map where the Jackson projects are.

22   A.  Right here.

23   Q.  Show us where the Melrose projects are.

24         MR. ARAVIND:  May I publish Government Exhibit 1201?

25   A.  You may.

1   Q.  What is this, Mr. Folks?

2   A.  Melrose.

3   Q.  Let's turn to 1202 please, Ms. Brady.

4           You mentioned the bird cage.  What are you referring

5   to?

6   A.  This park right here.

7   Q.  You're indicating what appears to be a basketball court?

8   A.  Yes.

9   Q.  In the middle of the Jackson housing projects?  Where else

10  did people have GFC meetings when you started being a GFC

11  member?

12  A.  13 building, and 161 is not shown on the map.

13  Q.  You mentioned 13.  Who is 13?

14  A.  Enrique Brito.

15  Q.  Ms. Brady, can we go to 1200 again, please.

16          You mentioned Melly's house.  Who is Melly?

17  A.  Melvin Colon.

18  Q.  Can you show us on the map where Melvin Colon lived.

19  A.  It's not shown on the map.

20  Q.  It's not shown on this map?

21  A.  Nah.

22  Q.  Can you generally describe to us where Mr. Colon lived.

23  A.  161 and Morris.  It would be up this way.

24  Q.  So, Morris Avenue is turning on the left-hand side.  If you

25  go all way up to 161st Street?

1    A.  Yes.

2    Q.  Who else were members of GFC when you joined when you were

3    approximately 15 or 16 years old?

4    A.  Me, Melly, Killa, Dev, Walt, Juntao, there is a lot of

5    people the list goes on and on.

6    Q.  You mentioned a bunch of members of GFC.  Let's start with

7    who you said is Killa.  When did you first meet Killa?

8    A.  When I first started coming outside playing basketball.

9    Q.  When was that?

10   A.  I was 14, 15 years old.

11   Q.  Do you see Killa in the courtroom today?

12   A.  Yes.

13   Q.  Can you identify him by an article of clothing and where

14   he's sitting?

15   A.  With the -- the tan -- right there.

16   Q.  Which row is he in, Mr. Folks?

17   A.  Second row.

18          THE COURT:  The record should reflect that Mr. Folks

19   has identified Mr. Meregildo.

20   Q.  I'm showing what you has been marked as Government Exhibit

21   1, 1A and 1B.  Do you recognize those items?

22   A.  Yes.

23   Q.  Who is that?

24   A.  Killa.

25          MR. ARAVIND:  The government offers Government Exhibit

1     1, 1A, and 1B.

2                MR. LEE:  No objection.

3                MR. DINNERSTEIN:  No objection.

4                MR. MIEDEL:  No objection.

5                MR. BECKER:  No objection.

6                THE COURT:  Government Exhibits 1, 1A and 1B are

7     received.

8                (Government's Exhibit 1, 1A, 1B received in evidence)

9                MR. ARAVIND:  May I publish, your Honor?

10               THE COURT:  You may.

11    Q.  You mentioned Melly.  Who is Melly?

12    A.  Melvin Colon.

13    Q.  Do you see Melly in the courtroom today?

14    A.  Yes.

15    Q.  Can you identify him by an article of clothing that he's

16    wearing and where he's sitting?

17    A.  White shirt.  Second row.

18               THE COURT:  The record should reflect that Mr. Folks

19    has identified the defendant Melvin Colon.

20    Q.  I'm showing you what has been marked as Government Exhibit

21    2, 2A and 2B.  Do you recognize that individual?

22    A.  Yes.

23    Q.  Who is he?

24    A.  Melly.

25               MR. ARAVIND:  The government offers Government Exhibit

CA33MER4                          Folks – direct

```
 1   2, 2A, and 2B, your Honor.

 2              THE COURT:  Any objection?

 3              MR. DINNERSTEIN:  No objection.

 4              MR. LEE:  I have no objection.

 5              MR. MIEDEL:  No objection.

 6              MR. BECKER:  No objection.

 7              THE COURT:  Government Exhibits 2, 2A and 2B are

 8   received.

 9              (Government's Exhibit 2, 2A, 2B received in evidence)

10              MR. ARAVIND:  Thank you, your Honor.  May I publish?

11              THE COURT:  Yes.

12   Q.  You mentioned a number of other names who were members of

13   GFC when you joined when you were approximately 15 or 16 years

14   old.  You mentioned Dante.  Who is Dante?

15   A.  Dante Barber.

16   Q.  What is his nickname?

17   A.  Tay.

18   Q.  You mentioned Au.  Who is Au?

19   A.  Aubrey Pemberton.

20   Q.  You mentioned Walt.  Who is Walt?

21   A.  Walter Aponte.

22   Q.  You mentioned Juntao.  Who is Juntao?

23   A.  I don't know his name.

24   Q.  You mentioned Dev, who is Dev?

25   A.  Dev, and I'm not sure his last name.
```

CA33MER4                     Folks - direct

1   Q.  I'm showing you, Mr. Folks, what has been marked as

2   Government Exhibit 9, 9A, and 9B, Government Exhibit 6, 6A and

3   6B, and Government Exhibit 18, A and B.

4              Do you recognize those individuals?

5   A.  Yes.

6   Q.  Let's start with Government Exhibit 9.  Who is that

7   individual?

8   A.  Tay.

9   Q.  Government Exhibit 6, who is that individual?

10  A.  Au.

11  Q.  Government Exhibit 18, who is that individual?

12  A.  Walt.

13             MR. ARAVIND:  Your Honor, the government offers

14  Government Exhibits 9, 9A, 9B, 6, 6A, 6B, 18, 18A and 18B.

15             THE COURT:  Any objection?

16             MR. LEE:  No objection, your Honor.

17             MR. DINNERSTEIN:  No objection.

18             MR. MIEDEL:  No objection.

19             MR. BECKER:  No objection, your Honor.

20             THE COURT:  Government Exhibits 9, 9A and 9B, 6, 6A

21  and 6B, and 18, 18A and 18B are received in evidence.

22             (Government's Exhibit 6, 6A, 6B, 9, 9A, 9B, 18, 18A,

23  18B received in evidence)

24             MR. ARAVIND:  May I publish these exhibits, your

25  Honor?

CA33MER4                          Folks - direct

1           THE COURT:  You may.

2     Q.  I'm showing you now, Mr. Folks, what has been marked as

3     Government Exhibit 17, 17A, 10, 10A.  Do you recognize these

4     individuals?

5     A.  Yes.

6     Q.  Who are they?

7     A.  Juntao and Dev.

8           MR. ARAVIND:  Your Honor, the government offers

9     Government Exhibits 10, 10B, 17 and 17B.

10          MR. LEE:  No objection, your Honor.

11          MR. DINNERSTEIN:  No objection.

12          MR. MIEDEL:  No objection.

13          MR. BECKER:  No objection.

14          THE COURT:  Government Exhibits 10 and 10B and 17 and

15    17B are received in evidence.

16          (Government's Exhibit 10, 10B, 17, 17B received in

17    evidence)

18          MR. ARAVIND:  May I publish, your Honor?

19          THE COURT:  You may.

20    Q.  Mr. Folks, other than the five individuals we've mentioned,

21    who else was a member of GFC when you joined that gang when you

22    were 15 or 16?

23          MR. DINNERSTEIN:  Objection to that characterization,

24    your Honor.

25          THE COURT:  Sustained.

CA33MER4                      Folks - direct

1              Is this a convenient time to take our luncheon recess?

2              MR. ARAVIND:  It is, your Honor.

3              THE COURT:  First, I'm going to ask that the marshals

4       escort Mr. Folks out.

5              Members of the jury, we're going to take our luncheon

6       recess now.  We're going to reconvene at 2 o'clock.  Keep an

7       open mind.  Come to no conclusions.  Don't discuss the case

8       among yourselves or with anyone else.

9              Have a great lunch and we'll see you at 2 o'clock.

10      Please recess the jury.  Everyone is to remain seated in the

11      courtroom.

12             Members of the jury, you are excused.  Please escort

13      them.

14             (Jury excused)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

CA33MER4

1          THE COURT:  Are there any matters that counsel wish to

2     raise?

3          MR. BECKER:  No, your Honor.

4          MR. MIEDEL:  Your Honor, just to alert you, since we

5     failed to do so before the first witnesses, that the plan is,

6     at least, for me to go first in terms of cross-examining

7     Mr. Folks.

8          THE COURT:  Thank you, counsel.

9          MR. FEE:  Nothing from the government.

10         MR. ARAVIND:  Actually, your Honor, one item.  We

11    intend to offer Mr. Folks' cooperation agreement into evidence

12    in the afternoon, which is Government Exhibit I believe 900.

13         THE COURT:  All right.  Is there any objection to

14    that?

15         MR. BECKER:  Your Honor, can we let the Court know

16    that prior --

17         THE COURT:  Yes, that's fine.

18         MR. BECKER:  Thank you.

19         THE COURT:  Just one other observation.  We'll make

20    sure the witness is speaking into the mike.  But it's really

21    important that counsel speak into the mike as well.  Maybe I'm

22    just getting old, but, like Mr. Becker, I'm having difficulty

23    hearing some people, and I have an amplifier that allows me to

24    know whether people are speaking into the mike and you're not

25    doing it.  So, and it goes for all sides.  So, you make sure

CA33MER4

1    that you're speaking into the mike and don't wander from the

2    podium.  All right?  Speak into the microphone so that everyone

3    can hear, including all of the people who are very interested

4    in this case who are sitting in the gallery of the courtroom.

5          So, at this time I'm going to ask the marshals to

6    escort the defendants from the courtroom.  Everyone else is to

7    remain seated.

8          I'll see you all at 2 o'clock.  Have a good lunch.

9          (Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CA33MER4

                          AFTERNOON SESSION

                              2:00 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Are there any issues that the parties want

 5   to raise before we bring the jury out?  They're all here.

 6          MR. BECKER:  I do have a couple of issues, which

 7   pertain to what we're going to hear from the government this

 8   afternoon, and that's why I want to address it now.

 9          I anticipate that the government will be attempting to

10   be offering through Mr. Folks Government Exhibit 4, which is a

11   color head shot of Nolbert Miranda in prison garb, which the

12   government will then want to put up on that board along with

13   those other characters whose head shots are on that board.

14          THE COURT:  You mean "individuals."

15          MR. BECKER:  Individuals, your Honor.  Individuals.

16          I respectfully submit that that evidence is more

17   unfairly prejudicial than probative for a number of reasons.

18   There is not going to be a dispute that Mr. Folks can identify

19   Mr. Miranda.  He can point him out.  The jury sees Mr. Miranda

20   sitting here.

21          I respectfully submit that the reason the government

22   wants to put it up there on that board with those other

23   individuals is to implicitly group Mr. Miranda with individuals

24   who engaged in horrible offenses that he had nothing to do

25   with.  And every time the jury looks over, they will see his

CA33MER4

1    face next to theirs, and it will be sending a message, a

2    picture is a thousand words, a picture is a thousand words.

3    That's even independent of the fact that he's in prison garb,

4    which is another reason why it's more prejudicial than

5    probative.

6          My primary argument identity is it is not in dispute

7    and he's sitting here, your Honor.

8          THE COURT:  Okay.

9          MR. BECKER:  That's it.  I'm sure the government wants

10   to respond.

11         THE COURT:  Right.  Let's take them one at a time.

12   Mr. Aravind.

13         MR. ARAVIND:  Your Honor, the defendant's motion to

14   sever was denied by this Court.

15         THE COURT:  Right.  He just wants to keep remaking the

16   motion for severance.  Yesterday it was the motion for a bill

17   of particulars.  They're denied.  They will remain denied.

18         So, the fact is he's charged with conspiracy.  All

19   right, Mr. Becker?  He's charged with various conspiracies, and

20   I'm not going to interfere if the government wants to present

21   that evidence.

22         However, if the picture depicts him in prison garb,

23   crop the picture and eliminate the prison garb.

24         MR. ARAVIND:  Your Honor, there is going to be

25   testimony from Mr. Folks as well as other cooperating witnesses

CA33MER4

1   that they spoke to Mr. Miranda while he was incarcerated.  We

2   think that it is appropriate to have that face plate.  There

3   are a number of other face plates of defendants and other

4   individuals similarly dressed.  And as your Honor can see from

5   Government Exhibit 4 --

6         THE COURT:  There is going to be that kind of

7   testimony, fine.  He's named in two conspiracies.  It's not

8   unfair.  And if the government's going to be offering testimony

9   of conversations with him in prison --

10        MR. BECKER:  He is -- I'm not going to dispute they

11   were in prison.  It's just cumulative.

12        THE COURT:  What is the next point?

13        MR. BECKER:  When your Honor denied my motion for a

14   curative instruction, your Honor assured the parties that you

15   would cabin evidence and be thoughtful of it.  And most

16   respectfully, they have not offered any evidence -- any

17   argument as to why it's probative.  What is it probative of?

18   That they can put his photograph on a board next to other

19   people.  They're creating evidence.  That is in fact creating

20   evidence, your Honor.

21        THE COURT:  It is a demonstrative.

22        MR. BECKER:  Okay.  The Court has ruled.  I

23   understand.

24        The second issue, your Honor, is when Mr. Folks

25   testified this morning, he testified that he got a GFC tattoo

CA33MER4

1    on his arm.  And while I certainly don't doubt that that

2    evidence is admissible against Mr. Folks, I would ask

3    respectfully for an instruction that it's not admissible

4    against Mr. Miranda and I suggest any other defendant.  It was

5    made at a time -- it is an out-of-court statement, namely that

6    he is a member of GFC.  It is on his arm.  It was made before

7    the conspiracy is alleged to have been formed.  It is not a

8    statement by a co-conspirator in furtherance of an enterprise.

9    It's not relevant as to Mr. Miranda that when Mr. Folks was 14

10   he got a tattoo on his arm.  And so, I would ask for a limiting

11   instruction, your Honor.

12            MR. DINNERSTEIN:  I'll join in Mr. Becker's

13   application.

14            MR. ARAVIND:  Your Honor, the fact that Mr. Folks has

15   a GFC tattoo is admissible for several reasons.  It is not

16   hearsay.  It's an actual physical act that he is showing to the

17   jury.  It is also admissible as background evidence.  We

18   haven't even gotten to the substance of his testimony.

19            THE COURT:  It may be admissible as background

20   evidence, but it doesn't relate to the conspiracies which

21   weren't formed until later, according to the indictment.  I'm

22   inclined to think about giving a limiting instruction on that,

23   but I think that I won't do it now.  Because the government

24   said that they were going to offer a photograph of the tattoo.

25   And I'll do it then.

CA33MER4

```
 1              MR. ARAVIND:  Okay.

 2              THE COURT:  If you want to propose something, I'm glad

 3    to listen to it.  But not this moment.

 4              MR. BECKER:  Thank you, your Honor.

 5              MR. MIEDEL:  Your Honor, before the break, the

 6    government mentioned that they were seeking to introduce the

 7    cooperation agreement.

 8              THE COURT:  Yes.

 9              MR. MIEDEL:  We don't have an objection to the

10    introduction of the cooperation agreement.  However, we do ask

11    that one of the paragraphs in the cooperation agreement, which

12    is on page five of the cooperation agreement --

13              THE COURT:  Could you give me an exhibit number?

14              MR. MIEDEL:  I'm sorry.  I don't have -- is it 900?

15              MR. ARAVIND:  3507 --

16              MR. MIEDEL:  3532-Y.

17              THE COURT:  What is the paragraph that's the problem?

18              MR. MIEDEL:  The paragraph that's a problem is the

19    paragraph about witness protection.  And that if the

20    cooperation is likely to reveal --

21              THE COURT:  You want it redacted?

22              MR. MIEDEL:  I do.

23              THE COURT:  Any objection?

24              MR. LEE:  No objection, your Honor.

25              THE COURT:  It is directed at the government.
```

CA33MER4

1          MR. MIEDEL:  The pages aren't numbered, but it is the

2     fifth page, middle of the page.

3          THE COURT:  You said 3532?

4          MR. MIEDEL:  3532-Y.  That's what I have.

5          MR. ARAVIND:  Your Honor, there may be some testimony

6     from this witness and other cooperating witnesses about this

7     particular benefit that they received from the government.

8     And, given events in this case, we believe that this paragraph

9     is appropriate.  There shouldn't be a redaction because there

10    may be some testimony about it.

11         THE COURT:  All right.  Well, I guess now we'll take

12    it up when the testimony comes.  I can't imagine how the

13    defendant's going to testify about the benefit that he got from

14    witness protection unless he's already in witness protection in

15    the prison system.  That would be a new one on me though.

16         MS. HELLER:  Your Honor, just if I may make a little

17    more clear.  That paragraph also says that we will keep any of

18    the witnesses families' safe, or relocate them and protect them

19    if need be, and for many of the cooperating witnesses in this

20    case we have done that.  So we don't intend to elicit it on

21    direct for any of those witnesses, but if they are asked if

22    they've received -- what benefits they've received --

23         THE COURT:  If they open it up on cross.

24         MS. HELLER:  Yes.

25         THE COURT:  Then I'm going to allow it.  Okay.  But

CA33MER4

1    for now, I think the government should redact that paragraph

2    because it only spells trouble.

3            MR. MIEDEL:  Your Honor, I certainly don't intend

4    to --

5            THE COURT:  I got it.  Okay.

6            Let's bring in Mr. Folks and let's bring in the jury.

7            By the way, I don't like to keep the jury waiting when

8    they're ready to go.  So, in the future, you certainly knew

9    that there were these issues at the luncheon recess that you

10   were going to raise.  You didn't just dream them up in the last

11   hour.  Raise them then.  And we'll just take into your luncheon

12   recess or I'm going to start to shorten your luncheon recesses

13   and you'll come here.  You'll have a 30 minute lunch recess,

14   and then you'll come here and you can all make your

15   applications.  And Mr. Becker can make another application for

16   severance at every lunchtime.  Let's bring in the jury.

17   Everyone remain seated.

18            (Continued on next page)

19

20

21

22

23

24

25

CA33MER4

1        (Jury present)

2        THE COURT:  Good afternoon, members of the jury.

3   Members of the jury, thanks again for your punctuality.  I know

4   you were all here on time.  I'm sorry that I've kept you

5   waiting.  Don't blame any of the attorneys here, don't blame

6   the parties or anybody else.  Just blame me.  All right?  We'll

7   try to make sure that it doesn't happen again.

8        But, we're going to resume now with Mr. Aravind's

9   continued direct examination of Mr. Folks.  You may proceed.

10       MR. ARAVIND:  Your Honor, before I do that, I would

11  just have AUSA Heller read another stipulation into the record

12  that's going to be useful for Mr. Folks' testimony.

13       THE COURT:  That's fine.  Remember what I told you,

14  members of the jury, about stipulations.

15       MS. HELLER:  This is in the case of United States --

16       THE COURT:  Go to the podium, please, and use the

17  microphone so that we can all hear you.

18       MS. HELLER:  Of course, your Honor.

19       THE COURT:  Thank you.

20       MS. HELLER:  This is in the case of United States of

21  America v. Joshua Meregildo, Melvin Colon, Earl Pierce and

22  Nolbert Miranda.

23       It is hereby stipulated and agreed by the parties, and

24  Mr. Fee already read the parties' names before so I won't read

25  them again.  That, one, if called to testify, a custodian of

CA33MER4

records from the New York City Police Department would testify
as follows:

He or she is familiar with the recordkeeping practices
of the NYPD, in particular with respect to the Technical
Assistance Response Unit.

Government Exhibits 125A and 125B are compact discs
containing video footage downloaded by NYPD TARU, or technical
assistance response unit, officers from surveillance cameras
located in the vicinity of 681 Courtlandt Avenue on July 25,
2010, in the Bronx, New York.

The recordings contained in Government Exhibits 125A
and 125B were made by the NYPD TARU and are records of
regularly conducted activity within the meaning of Federal Rule
of Evidence 803(6).

It's further stipulated and agreed that Government
Exhibits 125A and 125B and this stipulation, as Government
Exhibit 1,005, are admissible in evidence as government
exhibits at trial.

And the stipulation is dated October 2, 2012, signed a
representative from the government and by each defense attorney
for each defendant in this case.

Your Honor, the government would offer Exhibits 125A,
125B, and 1005.

THE COURT:  Any objection?

MR. LEE:  No objection, your Honor.

CA33MER4

1              MR. DINNERSTEIN:  No objection.

2              MR. MIEDEL:  No objection.

3              MR. BECKER:  No objection, your Honor.

4              THE COURT:  Government Exhibits 1005, 125A, and 125B

5    are received in evidence.

6              Mr. Aravind, you may resume your inquiry of Mr. Folks.

7              (Government's Exhibit 1005, 125A, 125B received in

8    evidence)

9              MR. ARAVIND:  Thank you, your Honor.

10   BY MR. ARAVIND:

11   Q.  Mr. Folks, where we left off before the lunch break, we

12   were talking about members of GFC.  Who else was a member of

13   GFC when you joined?

14   A.  K Wolf, Young Mel, Vic, Baby, there's a lot.

15   Q.  Approximately how many members were there when you joined?

16   A.  25 to 30.

17   Q.  I'm showing you, Mr. Folks, what has been marked as

18   Government Exhibit 13, A, B, 14, A and B, and 7, A and B.  Do

19   you recognize these individuals?

20   A.  Yes.

21   Q.  Who are they?

22   A.  Me, 13 and Hump.

23   Q.  Do you know 13's real name?

24   A.  Enrique Brito.

25   Q.  Do you know Hump's real name?

CA33MER4                        Folks - direct

```
 1   A.  Felipe.
 2            MR. ARAVIND:  Government offers Government Exhibit 15,
 3   A and B, 14, A and B, and 7B, your Honor.
 4            THE COURT:  Any objection?
 5            MR. LEE:  No objection.
 6            MR. DINNERSTEIN:  No objection, your Honor.
 7            MR. MIEDEL:  No objection.
 8            MR. BECKER:  No objection, your Honor.
 9            THE COURT:  Government Exhibits 15 and 15A and B, 14
10   and 14A and B, and 7 and 7B are received in evidence.
11            (Government's Exhibit 15, 15A, 15B, 14, 14A, 14B, 7,
12   7B received in evidence)
13            MR. ARAVIND:  May I publish, your Honor?
14            THE COURT:  You may.
15   Q.  I'm going to show you what has been marked as Government
16   Exhibit 15, 15A and 15B.  Do you recognize that individual?
17   A.  Yeah.  12.
18   Q.  Do you know 12's real name?
19   A.  Hassen Brito.
20            MR. ARAVIND:  The government offers Government Exhibit
21   15, A and B.
22            THE COURT:  You just offered them and they were
23   received without objection.
24            MR. ARAVIND:  I may have missed one, your Honor.  The
25   government offers Government Exhibit 14, A and B.
```

CA33MER4                     Folks - direct

1         THE COURT:  Yes, and they were received.

2         MR. ARAVIND:  May I publish, your Honor?

3         THE COURT:  You may.

4    Q.  Mr. Folks, when you joined GFC, were GFC members committing

5    any crimes?

6    A.  Yeah.

7    Q.  What crimes were those?

8    A.  Some were selling drugs, some were robbing, and some was

9    shooting.

10   Q.  Let's first talk about those robberies.  Did you commit any

11   robberies, Mr. Folks?

12   A.  Yes.

13   Q.  Who did you commit those robberies with?

14   A.  Some -- it was some little kid named Lloyd.

15   Q.  Any of the defendants or any of the individuals that are

16   listed on that blackboard, did you commit any robberies with

17   them?

18   A.  No.

19   Q.  Tell us how you committed those robberies.

20   A.  I used to, like, if I see somebody with a phone hanging out

21   their back pocket, I used to snatch it and run.  If they left

22   it, put it down, I snatch it and run.  Like that.

23   Q.  What items would you take from people that you robbed?

24   A.  Like, cell phones.

25   Q.  Did you ever use any weapons when you committed those

CA33MER4                         Folks - direct

1    robberies?

2    A.   No.

3    Q.   How often did you commit those robberies?

4    A.   Like, every week for, like, two months.

5    Q.   Did you ever get arrested for committing a robbery?

6    A.   No.

7    Q.   Where did you commit these robberies?

8    A.   Mostly 161 mall.

9         MR. ARAVIND:  Ms. Brady, can we put up 1200.

10   Q.   Again, Mr. Folks, you have that laser pointer in front of

11   you.  Can you show us approximately where that mall is.

12   A.   It's not shown.

13   Q.   Can you show us in the direction on this map where it would

14   be.

15        So you're indicating on the top of the photo, to the

16   left-hand side?

17   A.   Yes.

18   Q.   Approximately what is the address or the intersection for

19   that mall that you are talking about?

20   A.   161.  Grand Concourse.

21   Q.   Mr. Folks, were you ever arrested for any type of robberies

22   or stealing any items when you were younger?

23   A.   No.

24   Q.   You mentioned shootings.  At this time when you joined GFC,

25   who were GFC members shooting at?

CA33MER4                         Folks - direct

1    A.  Patterson.  Patterson projects.

2    Q.  Again, Ms. Brady, if we can look at 1200.

3          Can you show to us where the Patterson projects are,

4    Mr. Folks?

5    A.  The front of those Lincoln Hospital over there.

6    Q.  Which hospital are you referring to?

7    A.  Lincoln.

8    Q.  Can you again show us using the laser pointer.

9          You're referring to the bottom-left-hand corner of

10   Government Exhibit 1200?

11   A.  Yes.

12   Q.  Did you know why these shootings occurred, Mr. Folks?

13   A.  No.

14   Q.  Did anyone ever tell you why they occurred?

15   A.  Nah.  It was just a thing that was going on between

16   Courtlandt and Patterson projects for years.

17   Q.  You said for years?

18   A.  Yes.

19   Q.  Were you ever present when GFC members shot at the

20   Patterson Houses?

21   A.  Yes.

22   Q.  How many times?

23   A.  Twice.

24   Q.  How old were you when that happened?

25   A.  Like, 16.

1   Q.  Can you briefly tell us about those two incidents.

2   A.  One time when I came from the surgery getting my appendix

3   removed, I don't know what the real reason was, I think they

4   had came to Courtlandt and shot.  And we went back immediately,

5   we walked over there.  And we got in front of Lincoln Hospital,

6   I stood right there 'cause we was talking with some older guy

7   from that neighborhood.  Then, after we was done talking to

8   him, he started running like trying to warn them that we was

9   about to go in there to shoot.  So they started running, the

10  people that I was with started running.  They ran inside.  I

11  couldn't run, so I walked back to Courtlandt.  And that was the

12  one time.

13  Q.  Tell us about the other time.

14  A.  The second time was when I went, some kid named S Dot and E

15  Weeze, we went over there.  And we just stood in the park.  It

16  was -- it was a late night.  We stood in the park.  And we was

17  standing behind the gate for the basketball court.  And the kid

18  that we went to go shoot at named Keefy, he was on the other

19  side playing dominoes with some older guys.  They ain't see us.

20  We waited there for a couple of minutes.  And I S Dot shot a

21  couple of times and passed the gun to his girl and we went back

22  to Courtlandt Avenue.

23  Q.  That first time you described, when you described the

24  shooting at Patterson, who were you with?

25  A.  Me, E Weeze, Hiro, it was a lot of others.  I don't want to

CA33MER4                    Folks - direct

1   say no names I'm not sure about.

2   Q.  Mr. Folks, after you joined GFC, who else joined?

3   A.  A lot of people.  14, Capo, Moses.

4   Q.  I'm showing you, Mr. Folks, what has been marked as

5   Government Exhibit 19, A and B, 8, A and B, and 21, A and B.

6   Do you recognize these individuals?

7   A.  Yes.

8   Q.  Who are they?

9   A.  14, Capo and Moses.

10  Q.  What's 14's real name if you know it?

11  A.  Anthony Crocker.

12  Q.  What is Capo's real name?

13  A.  Javon Jones.

14  Q.  What is Moses' real name if you know it?

15  A.  I don't even know.

16          MR. ARAVIND:  Your Honor, the government offers

17  Government Exhibits 19, A and B, 8, A and B, and 21 -- just 21,

18  your Honor.

19          THE COURT:  Any objection?

20          MR. LEE:  Your Honor, brief voir dire, please.

21          THE COURT:  Yes.

22  BY MR. LEE:

23  Q.  Mr. Folks.

24  A.  Yes.

25  Q.  Those two names in front of you 19A, 19B, 21A and 21B, is

1   this the first time you've ever seen those exhibits?

2   A.  No.

3   Q.  They've been shown to you before, right?

4   A.  Yes.

5   Q.  Where was that?

6   A.  In proffers.

7   Q.  In other words, a proffer -- what do you mean by that?

8            MR. ARAVIND:  Objection, your Honor.

9            THE COURT:  Yes.  Sustained.  Anything further on voir

10  dire?

11  Q.  This is not the first time you're seeing it you said,

12  right?

13  A.  Yes.

14  Q.  And you've been shown it before, right?

15  A.  Yes.

16  Q.  Who showed it to you before?

17           MR. ARAVIND:  Objection, your Honor.

18           THE COURT:  Overruled.

19  Q.  Did you understand my question, Mr. Folks?

20  A.  Repeat it again, please.

21  Q.  You said you've seen those exhibits before?

22  A.  Yes.

23  Q.  They've been shown to you before?

24  A.  Yes.

25  Q.  For purposes of asking you if you could identify those

CA33MER4                          Folks – direct

1    exhibits, right?

2    A.   Yes.

3    Q.   Who showed that to you before today?

4    A.   The government.

5    Q.   Who?  Can you give me a name or indicate who?

6    A.   The DA.

7    Q.   And do you see the DA who showed it to you here in court

8    today?

9    A.   Yes.

10   Q.   Huh?

11   A.   Yes.

12   Q.   Can you indicate or describe who that person is?

13   A.   Standing up.

14   Q.   So you've gone through this before?

15   A.   Yes.

16   Q.   Even as you were shown -- you did the same thing with other

17   photos too, correct?

18   A.   Yes.

19   Q.   And you were shown a lot of photos, correct?

20   A.   Yes.

21   Q.   Some you recognized and some you did not?

22   A.   Yes.

23   Q.   Those that you did not, later on, was your memory refreshed

24   and you then did recognize those people?

25   A.   Yes.

CA33MER4                           Folks - direct

1    Q.  These people whose photos you saw, if you didn't know their

2    name or who they were, how did you find out what their name was

3    or who they were?

4    A.  It was -- the names that I didn't know, I said the names I

5    didn't know, I still ain't know them, so I didn't say nothing

6    about them.

7    Q.  After you said you didn't know the name, did someone tell

8    you what the name was?

9    A.  No.

10   Q.  How did you find out what the name was if you didn't know

11   what the name was?

12   A.  Like I said before, the people who I knew, I said they

13   names.  The people I didn't know, I didn't.

14           MR. LEE:  Judge, I'll lodge my objection.

15           MR. DINNERSTEIN:  I have no objection, your Honor.

16           MR. MIEDEL:  No objection.

17           MR. BECKER:  No objection, your Honor.

18           THE COURT:  Did I understand you to lodge an

19   objection?

20           MR. LEE:  Your Honor, I withdraw the objection.

21           THE COURT:  Okay.  Government Exhibits 19, A and B, 8,

22   A and B, and 21 are received.

23           (Government's Exhibit 19, 19A, 19B, 8, 8A, 8B, 21

24   received in evidence)

25           MR. ARAVIND:  Your Honor, may I publish?

CA33MER4                              Folks – direct

1                    THE COURT:  You may.

2    Q.  Mr. Folks, did there come a time when you began selling

3    drugs?

4    A.  Yes.

5    Q.  When did you start selling drugs?

6    A.  Around when I was 16.

7    Q.  What types of drugs did you sell?

8    A.  Heroin, crack and marijuana.

9    Q.  What type of drug did you sell first?

10   A.  Heroin.

11   Q.  Who did you sell heroin with?

12   A.  E Weeze.

13   Q.  Do you know E Weezey's real name?

14   A.  No.

15   Q.  How long did you sell heroin with E Weezey?

16   A.  A couple months.

17   Q.  Why did you stop selling heroin with E Weezey?

18   A.  He got indicted.

19   Q.  Where would you sell heroin?

20   A.  In Melrose projects.

21   Q.  How often would you sell?

22   A.  Every day.

23   Q.  After you stopped selling heroin, what did you sell?

24   A.  Crack.

25   Q.  Who did you sell crack cocaine with?

CA33MER4                          Folks – direct

1    A.   Satan.

2    Q.   Do you know Satan's real name?

3    A.   No.

4    Q.   How long did you sell crack cocaine?

5    A.   Couple months.

6    Q.   Where did you sell?

7    A.   Melrose from 152 all the way to 158.

8    Q.   How often would you sell crack cocaine?

9    A.   Every day.

10   Q.   Why did you stop selling crack cocaine?

11   A.   I don't even remember the reason.

12   Q.   After you stopped selling crack cocaine, what drug did you

13   sell?

14   A.   Marijuana.

15   Q.   Who supplied you with marijuana to sell?

16   A.   T-Money.

17   Q.   Do you know who T-Money is?

18   A.   Terry Harrison.

19   Q.   Who was Terry Harrison?

20   A.   Older guy from the neighborhood.

21   Q.   I'm showing you what has been marked as Government Exhibit

22   25, A and B.  Do you recognize that individual?

23   A.   Yeah.

24        MR. DINNERSTEIN:  Your Honor, the objection I have to

25   this is, can we get a timeframe of when he sold heroin and

CA33MER4                        Folks - direct

1   crack and marijuana?  Is it possible?

2            THE COURT:  Yes.  Can you fix the timeframe for the

3   marijuana.  He did fix a timeframe for the crack.

4   Q.  When did you start selling marijuana, Mr. Folks?

5   A.  I don't remember the -- the date.

6   Q.  Approximately how old were you?

7   A.  16.

8   Q.  Do you recognize who is depicted in Government Exhibit 25?

9   A.  Yes.

10  Q.  Who is that?

11  A.  T-Money.

12           MR. ARAVIND:  Your Honor, the government offers

13  Government Exhibit 25, A and B.

14           MR. LEE:  No objection, your Honor.

15           MR. DINNERSTEIN:  No objection.

16           MR. MIEDEL:  No objection.

17           MR. BECKER:  No objection, your Honor.

18           THE COURT:  Government Exhibits 25 and 25A and B are

19  received in evidence.

20           (Government's Exhibit 25, 25A, 25B received in

21  evidence)

22           MR. ARAVIND:  May I publish, your Honor?

23           THE COURT:  You may.

24  Q.  Mr. Folks, when did you first meet T-Money, Terry Harrison?

25  A.  2010.

CA33MER4                        Folks - direct

1   Q.  How did you meet him?

2   A.  From a friend.

3   Q.  Who was that friend?

4   A.  A young kid named Aaron.

5   Q.  Tell us about how you met T-Money.

6   A.  I used to always see him around, so, I used to see him with

7   this kid in particular, Aaron.  So I told him to send word that

8   I want to get money like that.

9   Q.  What do you mean, send word?

10  A.  Like, tell him about me.

11  Q.  You wanted Aaron to talk to T-Money?

12  A.  Yes.

13  Q.  You said T-Money had money.  What do you mean by that?

14  A.  He was hustling, so he had -- he had money.

15  Q.  When you say hustling, what do you mean by that?

16  A.  He was selling drugs.

17  Q.  Did you subsequently meet with T-Money?

18  A.  Yes.

19  Q.  What was the nature of your relationship with T-Money?

20  A.  It was good.  We had a good relationship, real good.

21  Q.  Tell the jury about that relationship with T-Money.

22  A.  I first met him, I don't remember what the exact date.  I

23  had a conversation with him.  I met him, it was strictly like

24  business at first.  I used to -- he used to take me everywhere

25  with him.  Then, getting deep inside the relationship, we

CA33MER4                         Folks - direct

1   started figuring each other out, like we speak about each other

2   to each other.  And from there, that was it.

3   Q.  Did T-Money ever give you money?

4   A.  Yes.

5   Q.  How often did he do that?

6   A.  Any time I asked, and sometimes when I don't even ask.

7   Q.  How often would you see him?

8   A.  Every day.

9   Q.  You mentioned that you sold drugs for T-Money.

10  A.  Yes.

11  Q.  How did that come about?

12  A.  Yeah, I got tired of getting handouts from him.  Always

13  accepting.  So I asked him at a point, I told him, like, I

14  wanted to make my own money.  I don't want to continue taking

15  money from you.

16  Q.  How were you going to make your money?

17  A.  By selling drugs.

18  Q.  Did you have a conversation with T-Money about what

19  particular drug you were going to sell?

20  A.  Yes, he asked me.  After I told him that I want to make my

21  own money, he asked me what did I want.  And I told him crack

22  at first.

23  Q.  What did he say in response to that?

24  A.  No, he didn't want me messing with it.

25  Q.  What drug did you end up selling for T-Money?

CA33MER4                        Folks - direct

1    A.   Weed.

2    Q.   Did T-Money tell you anything about his background when you

3    had those conversations with him?

4    A.   Like, not really.  The only thing I knew from him, like, he

5    just came out of jail.  And he used to be part of a gang called

6    GMC.

7    Q.   What did GMC stand for?

8    A.   Get Money Crew.

9    Q.   Mr. Folks, where did you sell weed for T-Money?

10   A.   Everywhere I went.

11   Q.   Ms. Brady, can we put up Government Exhibit 1200.

12           Show us, Mr. Folks, using that laser pointer, where

13   you sold marijuana for T-Money.

14   A.   Everywhere.  Courtlandt, up around.

15   Q.   You were indicating on the map, Government Exhibit 1200, or

16   rather the aerial photo, Courtlandt Avenue which goes north and

17   south, and then the Jackson and Melrose projects?

18   A.   Yes.

19   Q.   Can you describe to the jury how you sold weed for T-Money.

20   A.   T-Money used to -- he used to buy ounces of weed and give

21   me it.  I used to bag it up, dime bags, weigh like .4, .3 on

22   the scale.  And when I'm done bagging it up, I used to call him

23   up and tell him that I was finished.  And he would tell me, all

24   right, just go do whatever I do.  I used to go and go to the

25   basketball court.  Just do what I do on a regular basis.  I was

1   smoking at the time.  My friends, they were the customers, they

2   used to always come to me.

3   Q.  You mentioned dime bags.  What is a dime bag?

4   A.  $10 bag of weed.

5   Q.  You mentioned that you would weigh the weed in .3 and .4.

6   Do you know what measurement that is?

7   A.  I'm not sure.

8   Q.  Where would you bag up the weed for T-Money?

9   A.  Any available house.  Like 13 house.

10  Q.  Can you show us again on the map, 1200, where 13's house

11  was.

12         You're referring to 3050?

13  A.  Right in front of 3050.

14  Q.  Right in front, so that's to the left of the building

15  that's got marked 3050.  Is that correct, Mr. Folks?

16  A.  Yes.

17  Q.  How did you split the proceeds of the weed that you sold

18  with T-Money?

19  A.  I took a lot of shorts.  Since it was my friends I was

20  really selling it to.  Giving them bags for cheap, whatever

21  they had, whatever.  An ounce would come up to like 700 and

22  change and a little more.  So I used to, when it was all done,

23  I tell him I finished.  He asked me how much.  Whatever the

24  amount was, I give it to him, and he gave me like close to 200.

25  After all the shorts and everything.

CA33MER4                    Folks – direct

1   Q.  How often would you get 200?

2   A.  Like two, three times a week.

3   Q.  When you say shorts, what do you mean by that?

4   A.  Shorts meaning like since a bag was like $10 and it was my

5   friends, they would come to me with like seven, six, and I

6   would give it to them for being my friends.

7   Q.  At this time when you started selling drugs for T-Money, in

8   or about 2010, who else was selling drugs for T-Money?

9   A.  14, Dev, Hump, Capo, 12, 13, Au.

10  Q.  Where did those individuals sell drugs?

11  A.  On Courtlandt, 152 -- 152 all the way to 158.

12  Q.  Can you show us on the map, Mr. Folks.

13       Did you ever spend time with those individuals when

14  they sold crack cocaine?

15  A.  Yes.

16  Q.  How often would you spend time on that area of Courtlandt

17  Avenue with them when they sold crack cocaine?

18  A.  If not every day, every other day.

19  Q.  Did you know where those individuals bagged up the crack?

20  A.  Any place they had available, I guess.

21  Q.  Did you ever see anyone from GFC bag up crack?

22  A.  No.

23  Q.  Other than GFC members, did you know who else sold drugs

24  with T-Money?

25  A.  Yeah.  Earl.

CA33MER4                           Folks - direct

1  Q.  Do you know Earl's full name?

2  A.  Earl Pierce.  His name is Ski Box.

3  Q.  I'm showing you, Mr. Folks -- Mr. Folks, do you recognize

4  Mr. Pierce in the courtroom today?

5  A.  Yes.

6  Q.  Can you identify him by an article of clothing that he is

7  wearing and where he's sitting?

8  A.  Blue shirt in the third row.

9         THE COURT:  All right.  The record should reflect that

10  Mr. Folks has identified the defendant Earl Pierce.

11  Q.  I'm showing you what has been marked as Government Exhibit

12  3, 3A and 3B.  Do you recognize that individual?

13  A.  Yes.

14  Q.  Who is that?

15  A.  Ski Box.

16         MR. ARAVIND:  Government offers Government Exhibit 3,

17  3A and 3B.

18         THE COURT:  Any objection?

19         MR. LEE:  No objection, your Honor.

20         MR. DINNERSTEIN:  No objection, Judge.

21         MR. MIEDEL:  No objection.

22         MR. BECKER:  No objection, your Honor.

23         THE COURT:  Government Exhibits 3, 3A and 3B are

24  received in evidence.

25         (Government's Exhibit 3, 3A, 3B received in evidence)

1    MR. ARAVIND:  May I publish, your Honor?

2    THE COURT:  You may.

3  Q.  Mr. Folks, what was Ski Box, his role in the drug dealing

4  operation that T-Money had?

5    MR. MIEDEL:  Objection.  There is no foundation at

6  this point.

7    THE COURT:  Sustained.

8  Q.  Mr. Folks, did you ever see Ski Box sell drugs?

9  A.  Yes.

10  Q.  Where did he sell drugs?

11  A.  Courtlandt Avenue.

12  Q.  How often would you see Mr. Pierce, Ski Box, sell crack

13  cocaine on Courtlandt Avenue?

14    MR. MIEDEL:  Objection, leading.

15    THE COURT:  Sustained.

16  Q.  Where did you see Mr. Pierce sell crack cocaine?

17  A.  15 --

18    MR. MIEDEL:  Objection as to crack cocaine.

19    THE COURT:  Sustained.

20    MR. ARAVIND:  I'm sorry, your Honor.

21  Q.  What drug did Mr. Pierce sell?

22  A.  Crack.

23  Q.  Where did he sell crack cocaine?

24  A.  152 all the way to 158, Courtlandt.

25  Q.  Did you ever see Ski Box bag up crack cocaine?

CA33MER4                          Folks - direct

1   A.  Yes.

2   Q.  Where did you see that?

3   A.  13 house.

4   Q.  Who was in the room at that time that you saw Mr. Pierce

5   bag up crack cocaine in 13's house?

6            MR. MIEDEL:  Could we have a time when that occurred?

7            THE COURT:  Can you establish a time?

8            MR. ARAVIND:  I will try to do so.

9   Q.  Mr. Folks, do you remember when that was?

10  A.  I was 16, 17.

11           MR. MIEDEL:  Your Honor, I'm going to object.

12           THE COURT:  Overruled.  You're objecting to the

13  answer?

14           MR. MIEDEL:  It is outside the scope of the charged

15  conspiracy.

16           THE COURT:  Overruled.

17           (Continued on next page)

18

19

20

21

22

23

24

25

CA3PMER5                         Folks - direct

1   BY MR. ARAVIND:

2   Q.  Mr. Folks, that time that you saw Ski Box bag up crack in

3   13's apartment, who else was in the room with you?

4   A.  Me, him, T-money, 13, Au Dog, Hump.

5   Q.  Did you ever have a conversation with either Ski Box or

6   T-money about them selling drugs?

7            MR. LEE:  Objection, outside evidence 801, your Honor.

8            THE COURT:  Overruled.

9   Q.  You can answer the question, Mr. Folks.

10           MR. MIEDEL:  Objection, called for leading.

11           THE COURT:  Overruled.

12  Q.  You can answer the question.

13  A.  Can you repeat it, please?

14  Q.  Sure.  Did you ever have a conversation with either T-money

15  or Ski Box about selling drugs?

16  A.  Yeah, we used to talk about it.

17  Q.  Did you ever have a conversation with T-money about Ski

18  Box?

19  A.  No.

20  Q.  Did you ever have a conversation with T-money --

21           MR. ARAVIND:  Sorry, your Honor.

22  Q.  Other than the time that you saw Ski Box bag up crack, did

23  you ever observe Ski Box selling with other GFC members?

24  A.  Yeah.

25  Q.  On Courtlandt Avenue?

CA3PMER5                        Folks – direct

1   A.  Yes.

2   Q.  How often did you see that?

3   A.  Every time, every day.

4   Q.  And for what period of time did you see Mr. Pierce selling

5   drugs -- selling crack cocaine on Courtlandt Avenue?

6   A.  It was never a set time.  Any time of the day.

7   Q.  Do you know if Ski Box and T-money were working together?

8   A.  Yes.

9           MR. MIEDEL:  Objection.

10          THE COURT:  Overruled.

11  Q.  You can answer the question.

12  A.  Yes.

13          THE COURT:  He did.

14  Q.  And, Mr. Folks, how do you know that?

15  A.  From observation.  At the time, when I was with T-money

16  every day, like in the beginning of meeting him, he used to

17  like -- I used to be with him all day.  I used to be at Ski Box

18  house at a point when after me and T-money just came from

19  picking up product, we used to go in the house.  They would put

20  it on the table.  They would separate.  I guess they put money

21  together to get that amount.  They used to split it up between

22  both of them, and they both go on about they business after

23  that until the next shipment.

24  Q.  When you say product, what do you mean by that?

25  A.  Crack.

CA3PMER5                    Folks - direct

1    Q.  Mr. Folks, do you know what year that was when you saw

2    that?

3    A.  I was around 16 or 17.  I'm not sure.  I'm not good with

4    dates.

5    Q.  When did you meet T-money, what year?

6    A.  2010.

7    Q.  So how long after you initially met T-money do you remember

8    that conversation, or do you remember seeing that happen

9    between T-money and Ski Box?

10   A.  Weeks after.

11   Q.  I'm showing you now what has been marked as government

12   Exhibit 4, 4A and 4B.  Do you recognize this individual?

13   A.  Yes.

14   Q.  Who is that?

15   A.  Pay Day.

16   Q.  Do you know Pay Day's real name?

17   A.  No.

18            MR. ARAVIND:  Your Honor, the government offers

19   Exhibit 4 and 4B.

20            THE COURT:  Any objection?

21            MR. LEE:  No objection.

22            MR. DINNERSTEIN:  No objection, your Honor.

23            MR. MIEDEL:  No objection.

24            MR. BECKER:  Only the objection previously stated,

25   your Honor.

1          THE COURT:  All right.  Government Exhibit 4 and 4B

2     are received in evidence.

3          (Government's Exhibits 4 and 4B received in evidence)

4          MR. ARAVIND:  May I publish, your Honor?

5          THE COURT:  You may.

6     Q.  Mr. Folks, do you see Pay Day in the courtroom today?

7     A.  Yes.

8     Q.  Can you identify him by an article of clothing he's wearing

9     and where he's sitting?

10    A.  I can't see what he wearing, but he's in the third row,

11    white shirt.

12         THE COURT:  The record should reflect that Mr. Folks

13    has identified the defendant Nolbert Miranda.

14    Q.  Mr. Folks, I'm going to ask you a couple of questions about

15    Pay Day.  How do you know Pay Day?

16    A.  From selling drugs.

17    Q.  Can you explain to the jury what you mean by that?

18    A.  When I used to sell drugs, he used to be out there selling

19    drugs with me on Courtlandt Avenue.

20    Q.  What drugs would he sell?

21    A.  Crack.

22    Q.  Approximately when did you see Pay Day selling drugs on

23    Courtlandt Avenue?

24    A.  Once I started going to Melrose.

25    Q.  And when did you first start going to Melrose?

CA3PMER5                          Folks - direct

1    A.   When I first started coming outside.

2    Q.   When you say coming outside, what do you mean by that?

3    A.   When I first started coming outside.

4    Q.   How old were you?

5    A.   I was about 16.  15, 16.

6    Q.   And what were you doing outside?

7    A.   Playing basketball.

8    Q.   Did you ever have a conversation with Pay Day about him

9    selling crack cocaine?

10            MR. BECKER:  Objection, leading.

11            THE COURT:  Sustained.

12   Q.   Have you spoken to Pay Day in the past?

13   A.   Yes.

14   Q.   Would you speak to Pay Day when you were out on Courtlandt

15   Avenue?

16   A.   Yes.

17   Q.   Did you ever have a conversation at that time about selling

18   drugs?

19   A.   Yes.

20   Q.   What would you talk about?

21   A.   When is he gonna give me some.

22   Q.   What do you mean by that?

23   A.   When he was gonna supply me.

24   Q.   Supply you with what?

25   A.   Crack.

CA3PMER5                          Folks - direct

1    Q.  Why did you want to get crack cocaine from Pay Day?

2    A.  So I could have more money.

3    Q.  I'm sorry?

4    A.  So I could have more money.

5           MR. BECKER:  Could we get a time frame for this

6    conversation?

7           THE COURT:  No.

8           MR. ARAVIND:  I will, your Honor.

9           THE COURT:  Thank you, Mr. Aravind.

10   Q.  Approximately when, if you know, did that conversation take

11   place?

12   A.  I'd say I was 17.

13   Q.  Again, how old are you today?

14   A.  19.

15   Q.  So it was approximately two years ago?

16   A.  Yes.

17   Q.  Did you ever have a conversation with Pay Day in jail --

18   A.  Yes.

19   Q.  -- about selling drugs?  What did he tell you?

20   A.  He was feeling, speaking about how, basically, he was mad

21   at T-money and Ski Box because he felt they wasn't loyal to

22   him.  When T-money first came out of jail --

23           MR. MIEDEL:  Objection, your Honor, as to the

24   reference to my client.

25           THE COURT:  Come on up to the sidebar for a moment.

CA3PMER5                         Folks - direct

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. MIEDEL:  Your Honor, we raised this issue a couple

3      of days ago, about jailhouse conversations that postdate the

4      conspiracy, which I assume this is, which --

5              THE COURT:  Well, first, no time frame has been

6      established for this.

7              MR. MIEDEL:  Okay.  But he said it was in jail.

8              THE COURT:  Well, I don't know.

9              MR. ARAVIND:  Your Honor, what we expect him to say is

10     that it took place at the end of May or early June of this year

11     and that there was a conversation that he had with Pay Day

12     about him selling drugs with Ski Box.

13             We think it is admissible.  It's admissible as a party

14     admission.  It also describes the background of this conspiracy

15     and it's certainly relevant.  I don't understand what the

16     objection is.

17             MR. MIEDEL:  Well, the objection is that he's talking

18     about a statement that Mr. Miranda made, which is a party

19     admission, but he's talking about something that Mr. Miranda

20     said about my client, and I can't cross-examine Mr. Miranda

21     about it.  It's a Bruton hearsay problem.  I can't challenge

22     the accuracy of that statement.

23             MR. ARAVIND:  Your Honor, I mean, we're happy to avoid

24     the reference to Ski Box and just have Mr. Folks discuss what

25     T-money told him about his interaction with -- or rather, what

CA3PMER5                         Folks - direct

1    Mr. Miranda told him about his interaction with T-money.

2              THE COURT:  All right.  I'm going to sustain

3    Mr. Miedel's objection, and you can put another question to the

4    witness.

5              MR. BECKER:  Your Honor, could Mr. Aravind, when he

6    asks the witness about events and conversations, try to give a

7    time frame so that we don't have to keep raising it.

8              THE COURT:  I agree completely with you, Mr. Becker.

9    Look, I recognize the witness you're dealing with, but let's

10   try to get a time frame so that the lawyers will be able to

11   effectively figure out the time frame and cross-examine in the

12   case, all right?

13             MR. ARAVIND:  I will try to do so, your Honor.

14             THE COURT:  Thank you.

15             MR. MIEDEL:  Thank you.

16             (Continued on next page)

CA3PMER5                         Folks - direct

1           (In open court)

2           THE COURT:  All right, first, members of the jury, the

3     objection is sustained.  Second, I told you early on that I try

4     to dissolve some of the mysteries about a trial.  We just had a

5     sidebar discussion about a matter that you need not be

6     concerned about, an issue of law, but it's simply a time saver

7     for me to have the attorneys come up and have a brief

8     discussion rather than to have you stand up and exit the

9     courtroom, only to have to turn around and do an about face and

10    come back out.

11          So don't be concerned about it.  From time to time

12    during the course of the trial, I will have sidebars.  When I

13    think that something, that a discussion with the lawyers, is

14    going to be longer, then I'm going to excuse you from the

15    courtroom so that I can talk with them.  But now, we're going

16    to resume, and Mr. Aravind, you may put a new question to the

17    witness.

18    BY MR. ARAVIND:

19    Q.  Mr. Folks, turning back to the last question I asked you.

20    Without making reference to Mr. Pierce, what did Mr. Miranda

21    tell you in prison about selling drugs with T-money?

22    A.  He just was saying how he had gave T-money that money for

23    him to get on his feet, and T-money took the money and started

24    some -- started selling drugs.  He felt he owed him something.

25    Q.  When did that conversation take place?

CA3PMER5                         Folks – direct

1    A.  It was May 31st or June 1st, one of those days.

2    Q.  Of what year?

3    A.  2012.

4    Q.  When you were selling drugs on Courtlandt Avenue, did you

5    ever receive drugs from Pay Day?

6    A.  No.

7    Q.  Mr. Folks, how did T-money and other GFC members protect

8    their drug-selling operation?

9             MR. LEE:  Objection, your Honor.

10            THE COURT:  Sustained.

11   Q.  Mr. Folks, did you ever see any GFC members with guns?

12   A.  Yes.

13   Q.  How many guns did GFC members collectively have that you

14   saw?

15   A.  More than ten.

16   Q.  Who supplied the guns?

17   A.  T-money and Melly.

18   Q.  You're referring to Melvin Colon, the defendant?

19   A.  Yes.

20   Q.  Where were the guns kept, Mr. Folks?

21   A.  Anywhere they had access and scattered around the projects,

22   made it look like garbage, like in bushes and bags, in the

23   grass, in pizza boxes, on top of car tires.

24   Q.  Were guns ever kept in any apartments?

25   A.  Yes.

CA3PMER5                          Folks - direct

1   Q.   Which apartments were those?

2   A.   Dante's house, 13 house, Melly house, any house that had

3   access.

4   Q.   When you say access, what do you mean by that?

5   A.   Where any one of us could just go and receive it.

6   Q.   Why did the crew need guns?

7   A.   To protect us from our beefs, our problems with other

8   neighborhoods and other crews.

9   Q.   When you were selling drugs on Courtlandt Avenue in 2009,

10  2010, 2011, did you ever see guns in Melly's house?

11  A.   Yes.

12  Q.   Can you describe to the jury what you saw?

13  A.   More than ten guns.

14  Q.   Did you see more than ten guns on one occasion?

15  A.   No.

16  Q.   Or multiple occasions?

17  A.   Multiple occasions.

18  Q.   How often would you go to Melly's house?

19  A.   Like every day.

20          MR. DINNERSTEIN:  Your Honor, can we have a time frame

21  for this?

22          THE COURT:  Yes.

23  Q.   Mr. Folks, approximately when would you be going to Melly's

24  house on an everyday basis?  Either how old were you or what

25  year?

CA3PMER5                        Folks – direct

1   A.  I was 17, right before I got locked up and went to Rikers

2   Island.  May 20th, May 21st, one of those days.

3   Q.  What year was that again?

4   A.  2011.

5   Q.  Again, you mentioned beefs.  Who were GFC members having

6   beefs with at that time?

7   A.  Before I got arrested, it wasn't really a more beef.  It

8   was mainly YG.

9   Q.  What are YGs?

10  A.  Young Guns.

11  Q.  Is that a gang?

12  A.  Yes.

13  Q.  Where do YGs operate?

14  A.  Everywhere.

15  Q.  After you met T-money, did he tell you about any violence

16  that he had committed?

17  A.  Just one thing he spoke of.  He spoke of one incident, like

18  the reason he got arrested.  He said something about him --

19  him -- he was with some guy named Bingo and Bingo was getting

20  arrested, and T-money tried to shoot the cop.

21  Q.  Other than that experience, after you began to meet with

22  T-money, did he ever tell you about any other acts of violence

23  that he tried to commit?

24  A.  Yes.

25          MR. MIEDEL:  Objection, unless it's an act in

CA3PMER5                          Folks - direct

1    furtherance of the conspiracy.

2              MR. ARAVIND:  Your Honor, I think his testimony will

3    bear that out.

4              THE COURT:  All right.  Overruled.

5    Q.  What did he tell you, Mr. Folks?

6    A.  That he tried to kill some guy named O.

7    Q.  Do you know who O is?

8    A.  I just heard of him.  Some older guy from Melrose.

9              MR. LEE:  Judge, may we have again, a time?

10              THE COURT:  A time?

11              MR. LEE:  Please.

12              THE COURT:  About when was this?

13              MR. ARAVIND:  I apologize, your Honor.

14    Q.  Mr. Folks, approximately when was this conversation that

15    you had with T-money?

16    A.  In 2010.

17    Q.  Early 2010, summer, winter?

18    A.  Early.

19              MR. LEE:  Judge, I do object, outside the scope and

20    it's not a party admission, outside the scope of 801 rules of

21    evidence.  It's not in furtherance or during the time of the

22    charged conspiracy.

23              THE COURT:  Overruled.

24    Q.  Mr. Folks, tell us about that conversation that you had

25    with T-money in early 2010.

CA3PMER5                         Folks - direct

1   A.  He told me how he was selling drugs on the Avenue in

2   Courtlandt, and how O came up to him, tell him he can't sell no

3   more drugs anymore over there unless he was selling for him.

4   Q.  Where did O sell drugs?

5   A.  Like in Melrose.

6   Q.  Do you remember -- Do you know where he sold drugs in

7   Melrose?

8   A.  No, I just -- like, it wasn't even said that he -- like,

9   that he sold drugs.  Like, that's his -- like, he run that

10  area.

11  Q.  And what time frame did O run that area in Melrose?

12  A.  Since before I got locked up, as long as I can remember.

13  Q.  So we were getting to the violent act that you were about

14  to describe.  Please tell us what happened?

15  A.  At the -- O told T-money that he can't sell drugs over

16  there unless he's selling for him.  T-money told him all right.

17  Wait right here.  I'm gonna go get everything I have to bring

18  to you.  He walked away, but he tell me in the back of his mind

19  he going to come back and get a gun and come back and shoot

20  him.

21          He said when he came back, O was gone.  Later on that

22  day, he went into a building, and he seen O in the elevator

23  trying to go upstairs.  So he pulls out his gun and aims it and

24  tries to shoot him, and the gun jammed, and O closed the

25  elevator door and he left.  Shortly after that, it was rumored

CA3PMER5                         Folks - direct

1   around about money being on T-money head.

2            MR. MIEDEL:  Objection as to rumors.

3            THE COURT:  Sustained.  The last portion of the

4   witness' answer, members of the jury, is stricken about there

5   were rumors around.  That's stricken.  Don't consider it.

6   Q.  Did T-money tell you after that incident -- Withdrawn.

7            Did there come a time when some harm came to T-money?

8   A.  Yes.

9   Q.  After that incident that you described?

10  A.  Yes.  There was two incidents.  One was an attempt on his

11  life, and the second one was the one that got him killed.

12  Q.  Let's talk about the attempt.

13  A.  The attempt, it was, I don't remember the day.  I just know

14  it was -- it was like sweater weather, and it was late --

15  Q.  What year are we talking about, Mr. Folks?

16  A.  2010.

17  Q.  What happened?

18  A.  It was like 1:00, 2:00, around that time, in the morning.

19  Q.  I'm sorry to interrupt you, Mr. Folks.  Are you describing

20  a conversation that you had with T-money, or were you present

21  for these events?

22  A.  I was present.

23  Q.  Where were you?

24  A.  On the side of 681, that's -- yeah, 681.  It was me, 14,

25  T-money and Au Dog.  Me and 14 were sitting on top of a car.

CA3PMER5                           Folks - direct

We talking to T-money.  He's in front of us, standing up.  We
just talking, just laughing about things that was going on, and
T-money, he just backs up, out of nowhere.  We didn't think
nothing of it, me and 14.  We kept on talking.

         Then some guy walks up to him.  He get feet away from
T-money, a couple feet away pulls out a gun and pointed at his
head and try to shoot.  The gun didn't fire.  T-money jumped on
him.  They started wrestling for the gun.  They ended up
between cars.  Then I ran over, me and 14 ran over.  While we
ran over, shots was coming from in our direction from 681.

         Then Au Dog got into the tussle with T-money and the
guy.  They started fighting.  T-money took the gun from the
person, hit him in the head with it a couple times, pointed the
gun back on him a couple times, tried to shoot.

Q.  Who tried to shoot who?

A.  T-money tried to shoot the guy who tried to shoot him.

Q.  What happened?

A.  The gun didn't fire.  T-money ran away and Au Dog ran away,
and it was over.  The guy ran away.

Q.  Mr. Folks, I'm showing you what's been marked for
identification as Government Exhibit 1210 and 1206.  Mr. Folks,
do you recognize those items?

A.  Yes.

Q.  What are they?

A.  Mikes, that's 155 Courtlandt and Moon Leg, it's a 154 in

CA3PMER5                        Folks - direct

1   Courtlandt.

2   Q.  Are those photographs you're looking at?

3   A.  Yes.

4   Q.  Does that depict the area that we're describing?

5   A.  Yes.  155 right here, the first, 1210, that was.

6            Later on, T-money had told me that the reason he

7   backed up while we was talking to him was because he saw this

8   guy come out of the store, come out of Mike's.

9            MR. ARAVIND:  Your Honor, at this time, the government

10  moves to admit government's Exhibits 1210 and 1206.

11           THE COURT:  Any objection?

12           MR. LEE:  No objection.

13           MR. DINNERSTEIN:  No objection.

14           MR. MIEDEL:  No objection.

15           MR. BECKER:  No objection, your Honor.

16           THE COURT:  Government Exhibit 1210 and 1206 are

17  received in evidence.

18           (Government's Exhibits 1210 and 1206 received in

19  evidence)

20  Q.  And, Mr. Folks, you're helping me.  What exhibit are you

21  referring to?

22  A.  1210.

23           MR. ARAVIND:  Can we publish 1210?

24           THE COURT:  You may.

25  A.  T-money told me he saw the guy come out from this store and

CA3PMER5                          Folks - direct

1    walk across the street to the projects, where the basketball

2    courts and building was with.  He turned left and walked

3    towards our direction.

4    Q.  What do you refer to this store as?

5    A.  Mike's.

6    Q.  You're talking about the store in 1210?

7    A.  Mike's.

8    Q.  You call it Mike's even though it's named Tony's?

9    A.  Yes.

10   Q.  So describe to us what happened at this particular

11   location?

12   A.  That was where the person tried to kill T-money came out

13   of.

14           MR. ARAVIND:  Ms. Brady, can we see 1206, please.  May

15   I publish, your Honor?

16           THE COURT:  You may.

17   Q.  Mr. Folks, does this photograph depict any of the events

18   that happened that day?

19   A.  Yes, it was.  It happened right across the street from that

20   store right there.

21   Q.  Can you show us by using the laser pointer.

22           After that incident, did you talk to T-money about

23   that attempted murder?

24   A.  No.

25   Q.  Did that incident change how you operated when you sold

CA3PMER5                          Folks - direct

1    drugs on the block?

2    A.  Yeah, it just, I was more cautious, more on point, more

3    aware.

4    Q.  Did you ever have a conversation with T-money about that?

5    A.  He just said, like, just to be more aware of my

6    surroundings, pay more attention to what was going on around.

7    Q.  Mr. Folks, did there come a time when you participated in a

8    murder?

9    A.  Yes.

10   Q.  Do you remember when that happened?

11   A.  July 2010.

12   Q.  What were you doing that day?

13   A.  Me and T-money, we was in front of Mike's.

14   Q.  So could we put up again 1210.  What were you doing outside

15   of Mike's?

16   A.  Just sitting in front of the store, me and T-money just

17   talking.  We were sitting there talking for a while, just about

18   stuff that was going on, and Ski Box had came up.

19   Q.  Was anyone else there with you?

20   A.  For what I remember, it was just me and T-money before Ski

21   Box came.

22   Q.  What happened when Ski Box came?

23   A.  When he came, they stepped a little bit away from me, a

24   couple of feet away from me and talking.  I heard the

25   conversation, but I wasn't really paying attention, only to

CA3PMER5                    Folks - direct

1    certain things.

2    Q.  Do you remember certain things from that conversation?

3    A.  Yes.  Ski Box had told him, like, he just said:  My cousin

4    wouldn't have let him live.

5    Q.  What was he referring to?

6    A.  At the time, I didn't know.

7              MR. MIEDEL:  Your Honor --

8    Q.  Approximately what time was this?

9    A.  Say early afternoon.

10   Q.  You said that you heard some of that conversation?

11   A.  Yes.

12   Q.  What else do you remember Ski Box saying, if anything?

13   A.  At that point?  That's -- that was all I really paid

14   attention to.

15   Q.  What did you do next?

16   A.  Ski Box walked off.  T-money walked off.  Then he told me

17   to walk with him, come with him.  So not thinking, I just

18   walked with him.

19   Q.  Where did you go?

20   A.  We walked to 681.

21   Q.  At that time, did you know what was going to happen?

22   A.  I knew something bad was going to happen, but I ain't know

23   what.

24   Q.  Was there any further discussion between you, T-money and

25   Ski Box about what was going to happen?

CA3PMER5                        Folks - direct

1    A.  When we got into the lobby of 681, we stood on the left

2    side by the mailboxes, and once again, Ski Box and T-money was

3    talking.  T-money, Ski Box had told him, I'mma be waiting for

4    you to finish.  When you come out, I'm gonna be there.

5    Q.  Who said that?

6    A.  Ski Box had told T-money.

7    Q.  You mentioned before that you thought something bad was

8    going to happen.  Why did you think that at the time?

9    A.  It was just from his words, that "my cousin wouldn't let

10   him live."

11   Q.  Did you enter 681 Courtlandt Avenue?

12   A.  Yes.

13   Q.  Who entered first, if you remember?

14   A.  Ski Box.

15   Q.  And then?

16   A.  T-money.

17   Q.  How long were you waiting in the lobby?

18   A.  Altogether, probably like ten minutes.

19   Q.  What happened next?

20   A.  After Ski Box told T-money that, he went upstairs.  He went

21   to the left exit, and whatever steps.

22   Q.  Which stairwell did he use?

23   A.  The stairwell on the left.

24   Q.  What did you do?

25   A.  Me and T-money stood there.  We waited for a while.  There

1  was a lot of traffic in the building.  Like four, five minutes

2  after that, T-money walked to the exit on the right, told me to

3  follow him.  I followed him.  He opened the door, closed it

4  quietly so you won't hear a squeak.

5          As we got in the exit, he put his hand to his mouth,

6  like saying like don't say nothing, be quiet.  We was just

7  listening, and we hear like people sniffing, like sniffing

8  something.

9  Q.  When you say people, could you tell how many people there

10 were?

11 A.  No, I couldn't tell.

12 Q.  What happened next?

13 A.  Almost right after that, after we hear that, two people

14 come down the steps.  The first person was dark-skin type,

15 tall, a little heavyset.  T-money let him walk right out.

16         When the second person came down, some Spanish guy,

17 T-money put his forearm out and the gun was already out.

18 Q.  Do you know where the gun was before he pulled it out?

19 A.  No, I didn't even see him pull it out.

20 Q.  Where did he pull it out from, if you know?

21 A.  I'm not sure.  At that moment, I knew now one of two things

22 was gonna happen, either he was going to get shot or he was

23 going to get killed.

24 Q.  What happened next?

25 A.  First thing T-money asked him was, "Who sent you?"  When he

CA3PMER5                          Folks - direct

1    asked him that, the guy was frozen.  Like, he ain't have

2    nothing to say.  He just pulled out money from his left pocket.

3    He had a stack of money and a box of cigarettes.

4    Q.  What happened to the money and cigarettes?

5    A.  T-money just said it was more.  He told him there was more

6    money, and he told him to dig in his pocket.  He went in

7    another pocket pulled out another stack of money.  He put it in

8    my pocket.  After that, T-money asked him again, "Who sent

9    you?"  He was still frozen, and T-money shot him three times in

10   the body area.

11   Q.  How far away was T-money when he shot that person?

12   A.  Directly.  He was in front of him.

13   Q.  How far away from you -- How far away were you from the

14   body when you saw that?

15   A.  He was in front of me, but like to the right-hand side.

16   Q.  How many times did T-money shoot that victim at the time?

17   A.  The first time, it was like three shots I could remember.

18   Q.  Do you know where T-money shot him?

19   A.  Somewhere in the body.

20   Q.  Do you know what gun T-money was using at that time?

21   A.  A .380.

22   Q.  After T-money shot the victim three times, what happened?

23   A.  Now, we're walking up the stairs.  As we walking up the

24   stairs, we hear him snoring on the floor; so we looked at each

25   other.  T-money shot him a couple more times, and the snoring

1    stopped.  We got upstairs and the second or third floor, I

2    can't remember which one it was, Ski Box was right there like

3    he said he would be.

4    Q.  Where was he exactly?

5    A.  Once we got out the exit, he was right there.

6    Q.  You're referring to the exit of the stairwell?

7    A.  Yes.

8    Q.  What did you see next?

9    A.  T-money passed him the gun, and we kept walking.  We didn't

10   stop.  We kept walking.  We went to the opposite exit, the one

11   that Ski Box went up.  We went down.  We didn't leave from the

12   lobby.  They had another lobby to go down.  We winded up in the

13   basement.  We left out there and came out the side of the

14   building.

15   Q.  Did you see what Ski Box did with the gun?

16   A.  No.

17   Q.  After you left 681 Courtlandt, where did you go?

18   A.  I remember we walked down, made the left and walked down

19   Courtlandt like towards Mike's.

20   Q.  That .380, whose gun was that?

21           MR. MIEDEL:  Objection.

22           THE COURT:  Sustained.

23   Q.  Had you ever seen that .380 before, Mr. Folks?

24   A.  Yes.

25   Q.  Where did you see that .380?

CA3PMER5                          Folks - direct

1    A.  Around us, GFC, amongst each other.

2    Q.  Do you know who owned that gun?

3    A.  No.

4    Q.  Where would you see that .380 specifically?

5    A.  13 house.

6    Q.  Who had access to that particular gun?

7    A.  Everybody.

8    Q.  After you got out of 681 Courtlandt, what did you do next?

9    A.  I remember making a left, going up Courtlandt like towards

10   55, 56.  Then me and T-money separated ways, part ways.

11   Q.  Did you have a conversation with T-money before you

12   separated?

13   A.  Yes.  I tried to give him the money, but he was like, naw,

14   just count it for me.  Call me and tell me how much is there,

15   and we'll see each other tomorrow.

16          MR. ARAVIND:  Your Honor, may I just have a moment?

17          THE COURT:  Yes.

18   Q.  Mr. Folks, I'm showing you a number of photographs that are

19   marked -- that are admitted as Government Exhibit 135, 136,

20   137, 138, 139, and 140.  I'm also showing you what has been

21   marked for identification as Government Exhibits 141, 142, 143,

22   144 and 145.  Mr. Folks, I ask you to take a minute to just

23   look at those photos.  Do you recognize those photos?

24   A.  Yes.

25   Q.  What are they?

CA3PMER5                        Folks - direct

1    A.  681, pictures of 681.

2            MR. ARAVIND:  Your Honor, the government offers

3    Government Exhibits 143, 144, 145.

4            THE COURT:  Any objection?

5            MR. ARAVIND:  And 142, I'm sorry.

6            MR. LEE:  I have no objection, your Honor.

7            MR. DINNERSTEIN:  I'm sorry, your Honor.  142 through

8    145?

9            THE COURT:  142 through 145.  He's not offering 141.

10           MR. ARAVIND:  Let me make sure of that, your Honor.

11   I'm sorry.  I apologize, your Honor.  The government seeks to

12   offer 141, 143, 144 and 145.

13           MR. DINNERSTEIN:  Okay.  I have no objection.

14           MR. MIEDEL:  No objection, your Honor.

15           MR. BECKER:  No objection, your Honor.

16           THE COURT:  All right.  Government Exhibits 142 and

17   143, 144 and 145 are received in evidence.

18           (Government's Exhibits 142 and 143, 144 and 14

19   received in evidence)

20           MR. ARAVIND:  May I publish 135?  I think that's

21   already been admitted.

22           THE COURT:  Yes, you may publish 135.

23   Q.  Mr. Folks, what is this?

24   A.  681.

25   Q.  Tell us what you did when you entered 681 that day?

CA3PMER5                          Folks - direct

1   A.   I walked up those steps.

2   Q.   Which ones, the ones on the left or the ones on the right

3   in Government Exhibit 135?

4   A.   On the right.

5   Q.   I'm sorry?

6   A.   On the right-hand.

7   Q.   Let's turn to 136.  Mr. Folks, which way did Mr. Pierce go?

8   A.   To the left.

9   Q.   Which way did you go?

10  A.   To the right.

11  Q.   Which way did Mr. Harrison go?

12  A.   Right.

13  Q.   Let's turn to 137.  138.  139.  Is that the entrance to the

14  stairwell, Mr. Folks?

15  A.   Yes.

16  Q.   Turn to 140.  Now, Mr. Folks, you can use that laser

17  pointer that's in front of you.  When Mr. -- when T-money shot

18  the victim, can you describe to the jury, using that laser

19  pointer, where you, where T-money and where the victim were?

20  A.   I was right here.  T-money was over here.  The victim was

21  over here.

22  Q.   Was T-money on the step, or was he off the step?

23  A.   Off the step.

24       MR. ARAVIND:  For the record, let the record reflect

25  that Mr. Folks has shown that he was at the bottom of

CA3PMER5                          Folks - direct

1    Government Exhibit 140, that Mr. -- that T-money was on the --

2    at the end of that stairwell landing on the right-hand side,

3    and the victim was on the left-hand side.  Let's turn to 141.

4            THE COURT:  Would you like to publish 141?

5            MR. ARAVIND:  I would like to publish 141.

6            THE COURT:  Go ahead.

7    Q.  What's that, Mr. Folks?

8    A.  Up the steps.

9    Q.  Let's turn to 143.

10           MR. ARAVIND:  May I publish 143?

11           THE COURT:  You may.

12   Q.  What are we looking at here, Mr. Folks?

13   A.  The basement level.

14   Q.  So is this the same right stairwell that you were in or was

15   this the left?

16   A.  The left.

17   Q.  And, again, describe for the jury what you did once you got

18   off the exit to the right stairwell; what did you do?

19   A.  Crossed over to the left, went down, ain't stop at the

20   lobby level, ain't leave that way.  Went another level down,

21   which would be there.

22   Q.  And this is the exit to the left stairwell in Government

23   Exhibit 143?

24   A.  Yes.

25   Q.  Let's turn to 144.

1          MR. ARAVIND:  May I publish?

2          THE COURT:  You may.

3    A.  That's leaving the exit.

4          MR. MIEDEL:  Your Honor, I'm sorry, but if the witness

5    could just speak into the microphone?

6          THE COURT:  Yes, you've got to lean forward,

7    Mr. Folks, and speak into the microphone.

8    Q.  Repeat your answer, Mr. Folks?

9    A.  This is leaving the exit.

10         MR. ARAVIND:  And may I publish 145, your Honor?

11         THE COURT:  You may.

12   Q.  What is that, Mr. Folks?

13   A.  Coming up the ramp.

14   Q.  Which way did you go -- and what street is that on,

15   Government Exhibit 145?

16   A.  That's closer to 153.

17   Q.  Mr. Folks, did you know the victim?

18   A.  No.

19   Q.  Was that the first time that you had had -- that you had

20   ever seen someone be shot?

21   A.  Yes.

22   Q.  Did you have a conversation with Ski Box after that

23   shooting?

24   A.  No.

25   Q.  Did you have a conversation with T-money after that

CA3PMER5                         Folks - direct

1    shooting?

2    A.   No.

3    Q.   Did you speak to anyone about that shooting?

4    A.   Yes.

5    Q.   Who did you speak to?

6              MR. MIEDEL:  Objection as to the time frame.

7              THE COURT:  Please fix a time.

8    Q.   I was getting to that, your Honor.  After the shooting, did

9    you ever have a conversation -- After July of 2010, did you

10   have a conversation with anyone about the events that took

11   place that day?

12   A.   Just Dev.

13   Q.   When did you have the conversation with Dev?

14   A.   A couple of days after.

15   Q.   When you referring to Dev, are you referring to the Dev

16   that's the second row -- rather, the third row, I guess, second

17   person from the right?

18   A.   Yes.

19   Q.   What did you and Dev talk about?

20   A.   I told him how what happened.

21   Q.   And did you tell him exactly what you told us today?

22   A.   Yes.

23             MR. ARAVIND:  Your Honor, we're about to show a

24   surveillance video that may take a few minutes to load up.

25   This may be a good time to take a break, if the Court is

CA3PMER5                          Folks - direct

1    willing to do that.

2              THE COURT:  All right.  Members of the jury, we're

3    going to take a short mid-afternoon recess.  Keep an open mind.

4    Don't discuss the case.  Please recess the jury.  Everyone

5    remain seated.

6              THE DEPUTY CLERK:  Come to order.  Jury exiting.

7              (Jury exits)

8              THE COURT:  Mr. Folks may be escorted out.

9              (Witness exits)

10             THE COURT:  Are there any issues that counsel want to

11   raise?

12             MR. DINNERSTEIN:  I have an issue, your Honor.

13             THE COURT:  Go ahead, Mr. Dinnerstein.

14             MR. DINNERSTEIN:  Thank you.  I'm surprised, your

15   Honor, Mr. Folks indicated that he spent a great deal of time

16   in Mr. Colon's home.  I'm not exactly sure of when that

17   actually happened, but Miss Quian, if it happened at that home,

18   would testify that Mr. Folks certainly was not there.

19             So she's been present.  I think she's still here.

20   Yeah, she's still present at the trial.  Obviously, it's very

21   important for her to be present, but I am concerned that she

22   may -- I may need to call her as a witness to rebut what

23   Mr. Folks had said.  So I wanted to bring it to the Court's

24   attention.

25             THE COURT:  All right.  Let me think about it.  The

CA3PMER5                          Folks - direct

1  government can think about it, as well, during the recess.

2  I'll take it up.  Anything else?

3              MR. BECKER:  No, your Honor.

4              THE COURT:  How long is this -- Yes, Mr. Becker?

5              MR. BECKER:  I said "no, your Honor."

6              THE COURT:  How long is this surveillance?

7              MR. ARAVIND:  We're going to show approximately four

8  clips that are all about 20 seconds to a minute long.

9              THE COURT:  Okay.  Load them up so we'll be ready to

10  go.  And any sense how much more you have on direct?

11             MR. ARAVIND:  I would say, your Honor, about an hour

12  and a half.

13             THE COURT:  All right.  Take a short recess.  We'll

14  reconvene in ten minutes.

15             THE DEPUTY CLERK:  Remain seated while the defendants

16  are being excused.

17             (Defendants exit)

18             (Recess taken)

19             (Continued on next page)

20

21

22

23

24

25

CA33MER6

1           (In open court; jury not present)

2           THE COURT:  Does the government, Mr. Fee, have any

3     view with respect to the issue raised by Mr. Dinnerstein?

4           MR. FEE:  Your Honor, perhaps if he expects he's going

5     to call her, she should be sequestered at this point.  Any

6     further application we leave to him.

7           THE COURT:  I think, Mr. Dinnerstein, at least for

8     Mr. Folks' testimony, that now having revealed this, that she

9     should be excluded from the courtroom.

10          MR. DINNERSTEIN:  During his testimony.

11          THE COURT:  Just during his testimony.  I'm not

12    excluding her from the trial, unless the government has reason

13    to believe this is going to come up with another witness and

14    then they can give us an alert and I will have her excused for

15    that witness.

16          MR. DINNERSTEIN:  Okay.  Can I go just into the hall

17    just to tell her because I don't see her in the courtroom.

18          THE COURT:  You go tell her that she's excluded for

19    the balance of Mr. Folks' testimony.

20          MR. FEE:  Your Honor, perhaps before Mr. Dinnerstein

21    leaves, we do expect if this refers to the subject of visits to

22    Mr. Colon's home and what, who was there and what was seen

23    there, then the answer is yes, it will come up with multiple

24    cooperating witnesses during the course of the trial.

25          THE COURT:  You'll tell us specifically which ones.

CA33MER6

1     And the marshals can bring out Mr. Folks.

2              MR. FEE:  Your Honor, this will require

3     Mr. Dinnerstein's presence.  Before the jury comes out I would

4     ask for a side bar to discuss something with the Court.

5              THE COURT:  All right.  Hold him for one second.  I'm

6     sorry they want to raise an issue.

7              (Pause)

8              THE COURT:  Mr. Dinnerstein's back in the courtroom.

9     The government says they have an issue they want to raise.

10             MR. FEE:  At the side bar.  If you may indulge us,

11    your Honor, if you give me a moment there I think you'll

12    understand why.

13             THE COURT:  All right.  In the meantime you can bring

14    in Mr. Folks.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

CA33MER6

1          (At the side bar)

2          MR. FEE:  I'm sorry to bring this at the side bar.

3     During the break, one of our agents told me they've been

4     contact by a family member of one of the victims who indicated

5     that individuals in the courtroom right now, during the course

6     of this morning's testimony, were discussing that they were

7     here to see who was testifying, they were going to take care of

8     them, in sum and substance.  This is according to the family

9     members.  Those family members then left the courtroom because

10    they felt uncomfortable, and were followed by these young men

11    to the subway station.  They informed us they're never coming

12    back to court.

13          This is troubling for many reasons, your Honor.  I

14    don't know precisely what the best course is.  We would ask at

15    a minimum that an instruction be issued to people in the

16    audience that no one should contact others outside of this

17    courtroom, based on what they hear or what they think the

18    relations might be to parties in this case.  Because the

19    government is obviously concerned.

20          THE COURT:  At the conclusion of today's proceedings,

21    I will make an announcement.

22          MR. FEE:  Thank you, your Honor.

23          THE COURT:  Because I close the courtroom at the

24    conclusion of the proceeding so that the jury can leave.  I'll

25    make the announcement at that time.

CA33MER6

1          MR. FEE:  Thank you, your Honor.

2          MR. BECKER:  May I just inquire if the government has

3    any indication at all of whether or not these individuals were

4    followed, the family members of the victims, are the relatives

5    of any defendant in this case?

6          MR. FEE:  Quite honestly, I don't know who they are.

7    I see many people in the courtroom.

8          MR. BECKER:  Okay, I'm just asking.

9          THE COURT:  People having coming and going.

10          MR. BECKER:  Okay.

11          THE COURT:  All right.

12          MR. FEE:  Just to be clear, I did not want to exclude

13    it from the defendants' earshot, but obviously from the people

14    in the courtroom.

15          THE COURT:  Understood.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

CA33MER6

1           (In open court)

2           THE COURT:  Let's bring in the jury.

3           (Jury present)

4           THE COURT:  Members of the jury, we'll resume with

5    Mr. Aravind's continued direct examination of Mr. Folks.  You

6    may proceed.

7           MR. ARAVIND:  Thank you, your Honor.  May I publish

8    Government Exhibit 125A?

9           THE COURT:  You may.

10          MR. ARAVIND:  Ms. Brady, let's turn to 20:39 on this

11   clip.

12          (Video playing)

13   Q.  Mr. Folks, if you can look at the screen and I want to

14   direct your attention to the top of the screen.  Tell us who

15   you see.

16   A.  Correa and Ski Box cousin.

17   Q.  Where do you see that?  Can you take out your laser

18   pointer?

19          Mr. Folks, what street is this?

20   A.  Closer to the middle of 153, 154.

21   Q.  Which way is 681 Courtlandt Avenue?

22   A.  The way they walking right now.

23   Q.  Which one is -- you mentioned two individuals.  Who are

24   these two individuals?  Can you repeat that to the jury.

25   A.  Correa and Ski Box cousin.

CA33MER6                         Folks - direct

1          MR. MIEDEL:  Objection, your Honor.  There is no

2     foundation as to Ski Box cousin.

3          THE COURT:  Yes.  Do you want to lay a foundation.

4     Q.  Sure.  Earlier, Mr. Folks, you testified that Ski Box said

5     that he's with my cousin.  Do you know who that cousin refers

6     to?

7          MR. MIEDEL:  Objection, your Honor.  I don't think

8     that states correctly the testimony.

9          THE COURT:  Why don't you try again, Mr. Aravind.

10          MR. ARAVIND:  Your Honor, I think it does accurately

11     state the testimony.  Mr. Folks testified that he's with my

12     cousin, let him live.

13          THE COURT:  You're correct.  Okay.  The objection is

14     overruled.  Put the question to the witness again.

15     Q.  Mr. Folks, do you know the cousin who was referred to --

16     A.  Yes.

17     Q.  -- in that statement?

18          I'm sorry?

19     A.  Yes.

20     Q.  Who is that person?  Do you know his name?

21     A.  Oh no, I don't know his name.

22     Q.  Which of those two individuals, if, again, use your laser

23     pointer, who are you referring to?

24     A.  Dark skin heavy-set one.

25     Q.  So that's Mr. Pierce's cousin?

CA33MER6                         Folks – direct

1    A.  Yes.

2    Q.  Who is the other individual?

3    A.  Correa.

4            MR. ARAVIND:  Ms. Brady, let's turn to the second

5    clip.  This is the first clip is at 20:39.  Let's go to the

6    second clip at 20:44:20.

7            THE COURT:  For the benefit of the jury, do you want

8    to explain whether that is a 24 hour clock and what time that

9    is.

10           MR. ARAVIND:  I will, your Honor.

11           THE COURT:  Thank you.

12           MR. ARAVIND:  This witness certainly wouldn't know

13   that, but it is a 24 hour clock.

14           THE COURT:  All right.

15           (Video playing)

16   Q.  Ms. Brady, you can continue.

17           Mr. Folks, who is that individual walking in the

18   building?

19   A.  Ski Box.

20           MR. ARAVIND:  Ms. Brady, can we do that again real

21   quick.

22           (Video playing)

23   Q.  That individual entering the building now, who is that

24   again?

25   A.  Ski Box.

CA33MER6                    Folks - direct

1          MR. ARAVIND:  All right.  Let's let the clip run,

2     Ms. Brady.

3              (Video playing)

4     Q.  Directing your attention to the right-hand side of this

5     exhibit.  Do you see that individual walking across the street?

6     A.  Yes.

7     Q.  Who is that?

8     A.  T-Money.

9     Q.  You're referring to the individual in the white T-shirt as

10    he approaches 681 Courtlandt?

11    A.  Yes.

12    Q.  There are two people following him.

13              Can you pause it, Ms. Brady.

14              Those two individuals that are now on the left side of

15    that screen, who are those two individuals?

16    A.  That's me on the far left and that's Au Dog on the right

17    side.

18    Q.  How do you recognize them, Mr. Folks?

19    A.  From our walks.

20    Q.  Are you familiar with their walks?

21    A.  Yes.

22          MR. ARAVIND:  Ms. Brady, let's turn to the third clip,

23    which is at 20:58:15 approximately 14 minutes later.

24    Q.  Before we go, Mr. Folks, tell us what view we're looking at

25    right now.  If you know it.

CA33MER6                    Folks - direct

1    A.  The left-hand side of 681 going towards 153.

2    Q.  So the left-hand side of this sidewalk is 681 -- is

3    Courtlandt Avenue?

4    A.  Yes.

5    Q.  And if you were to go up the sidewalk, on the screen, what

6    street would you go to?

7    A.  Which way?  Up that way would be 153.

8    Q.  Okay.

9              (Video playing)

10             MR. ARAVIND:  Let's go to 28:58:15, Ms. Brady.  I

11   think we went a little too far.  20:58:15, I'm sorry.  Just

12   back up.  There you go.

13   Q.  I want to direct your attention, Mr. Folks, to the

14   right-hand side of that dark area.

15             (Video playing)

16             MR. ARAVIND:  Can we go back, Ms. Brady.

17   Q.  Mr. Folks, there are two people coming out of that tree

18   area in that video.  Can you recognize their walks?

19   A.  Me being in the front, T-Money in back of me.

20             MR. ARAVIND:  Let's finally look at the last clip,

21   Ms. Brady.

22             (Video playing)

23   Q.  You'll see individuals walking down the sidewalk.  Rather,

24   a person turning to the right.  Exiting that exit.  Who are

25   those two individuals?

CA33MER6                         Folks - direct

1    A.  Ski Box and Levi.

2              MR. ARAVIND:  May I have a moment, your Honor.

3              THE COURT:  Yes.

4    Q.  Mr. Folks, you said you recognized certain individuals'

5    walks.  Out of these individuals that you've just identified,

6    whose walk do you recognize?

7    A.  Ski Box and Levi.

8    Q.  Before that, you mentioned your own walk and Au Dog.  What

9    about T-Money?

10   A.  Yeah.  Everybody walk.

11   Q.  Let's look at the photograph of the Melrose Houses.  Now,

12   Mr. Folks, can you tell us, we just looked at two surveillance

13   videos with two different views.  Can you show us on this photo

14   where those views were coming from or what they depicted

15   rather?

16   A.  The one that showed us entering the building, was like over

17   here.  And the second one was -- y'all got to make that

18   smaller.  On 155.

19   Q.  Do you want us to blow it out when you say 155?

20   A.  Both of the views were from right there.

21   Q.  In the second view, which showed individuals leaving 681

22   Courtlandt, where was that on the map?

23   A.  Over here.

24   Q.  When you enter Courtlandt Avenue, when you enter 681, you

25   entering the lobby.  That exit, is it to the left or the right

1    of the lobby?

2    A.  To the left.

3          MR. ARAVIND:  Thank you, Ms. Brady.

4    Q.  After that murder, Mr. Folks, did you learn about another

5    murder committed by anyone affiliated with GFC?

6    A.  Yeah.

7    Q.  When was that?

8    A.  I don't remember the time, but it's a couple -- it was -- I

9    would say before.

10   Q.  Before what?

11   A.  The Correa.

12   Q.  Did you learn about another murder that took place before

13   that homicide that we just discussed?

14   A.  Yes.

15   Q.  Who committed that murder?

16   A.  Melly.

17   Q.  Are you referring to Melvin Colon?

18   A.  Yes.

19          MR. DINNERSTEIN:  Objection, your Honor.  Is this

20   based on personal knowledge or what?

21          MR. ARAVIND:  This witness just said he heard about a

22   conversation involving a homicide with Melvin Colon.  I'm about

23   to get to how he learned that conversation.

24          Before I do that, your Honor.

25   Q.  Turning back to what we just discussed.  You mention a

CA33MER6                    Folks - direct

1   person named Levi.  Who is Levi?

2   A.  Just a guy from the neighborhood.

3   Q.  Do you know Levi's last name?

4   A.  Nah.  No.

5   Q.  Was Levi a member of GFC?

6   A.  No.

7   Q.  I'm showing you what has been marked as Government Exhibit

8   5.  Do you recognize this individual?

9   A.  Yes.

10  Q.  Who is that?

11  A.  Levi.

12          MR. ARAVIND:  Your Honor, the government offers

13  Government Exhibit 5 and 5B.

14          THE COURT:  Any objection?

15          MR. LEE:  Can I see that?  I have no objection, your

16  Honor.

17          MR. DINNERSTEIN:  No objection, your Honor.

18          MR. MIEDEL:  No objection.

19          MR. BECKER:  No objection.

20          THE COURT:  Government Exhibit 5 and 5B are received

21  in evidence.

22          (Government's Exhibit 5, 5B received in evidence)

23          MR. ARAVIND:  May I publish?

24          THE COURT:  You may.

25  Q.  Mr. Folks, did you have a conversation with Mr. Colon about

CA33MER6                        Folks - direct

1    a murder that he committed?

2    A.   Yes.

3    Q.   When did that conversation take place, if you remember?

4    A.   I don't remember the exact date, but it was a little while

5    after it happened.

6    Q.   What happened?

7    A.   After he killed Black.

8    Q.   What year are we talking about?

9    A.   2010.

10   Q.   Do you remember if it was the spring, summer, winter?

11            MR. DINNERSTEIN:   Objection, your Honor.  Asked and

12   answered.

13            THE COURT:   Overruled.

14   Q.   Mr. Folks, do you remember approximately what time of the

15   year it was in 2010, if you remember?

16   A.   No, I don't remember.

17   Q.   You mentioned you mentioned an individual named Black.  Who

18   is that?

19   A.   A kid from the neighborhood.

20   Q.   Do you know if Black sold drugs?

21   A.   Yeah.

22   Q.   If you know, who did he sell drugs for?

23   A.   Satan.

24   Q.   What was your relationship with Black?

25   A.   Drug relationship.  We was cool.  We used to drink, smoke,

1    we used to sell drugs together.

2    Q.  Where would you sell drugs?

3    A.  On Courtlandt.

4    Q.  When you say smoke and drink, what were you smoking?

5    A.  Weed.

6    Q.  What did Melvin Colon tell you about Black's murder?

7    A.  That Black was running around the neighborhood saying he

8    was broke.  He needed to come up.

9    Q.  What does the come up -- what does that mean?

10   A.  He need money.

11   Q.  What else did Mr. Colon tell you?

12   A.  That was -- that was around the same time that money was on

13   T-Money had.  So Melly told me that.  He took it as Black

14   saying he was going to kill T-Money to get that money.

15   Q.  Did Colon tell you where that murder took place?

16   A.  Yes.

17            MR. LEE:  Objection to leading, your Honor.

18            THE COURT:  Overruled.

19   Q.  Mr. Folks, why don't you just tell us what Melly told you

20   about that murder.

21   A.  He said he got him drunk, 'cause he knew he was going to

22   have to use the bathroom.  He kept giving him drinks.  When

23   Black went to go use the bathroom, he came from behind him,

24   shot him in his head a couple of times, he flipped over the

25   gate, he shot him some more, passed the gun to Dev, Dev shot

CA33MER6                            Folks - direct

1   him.

2   Q.  Did Mr. Colon tell you where that murder took place?

3   A.  Yes.  On the left.

4   Q.  Where is that?

5   A.  The left-hand side of the bird cage by -- I'm not sure the

6   building number.  But -- in back of 3050.

7           MR. ARAVIND:  Ms. Brady, can we look at Government

8   Exhibit 1202 I believe.

9   Q.  Again, Mr. Folks, where is the bird cage?

10  A.  Between building 300 and 301 right there.

11  Q.  Did Mr. Colon tell you how he shot or what weapon he used

12  to shoot Black?

13          MR. DINNERSTEIN:  Objection to the leading form of the

14  question, your Honor.

15          THE COURT:  Sustained.

16  Q.  Did you have a conversation with Mr. Colon about how Black

17  was murdered?

18  A.  Yes.

19  Q.  What did Mr. Colon tell you about a weapon that he used, if

20  any?

21  A.  He told me he shot him.  I'm not sure if he told me which

22  gun he did it with.

23  Q.  Did there come a time, Mr. Folks, that you learned about

24  another murder that was committed by a GFC member?

25  A.  Yes.

CA33MER6                         Folks – direct

1   Q.   Who committed that murder?

2   A.   Killa.

3   Q.   Who did you have the conversation with where you learned

4   about that murder?

5   A.   Him personally.

6   Q.   When did that conversation take place?

7   A.   A couple days after.

8   Q.   Couple days after what?

9   A.   After he killed him.

10  Q.   After who killed who?

11  A.   After Killa killed -- I don't know the man name.  I just

12  know how he looked.

13  Q.   What did Killa tell you about that murder?

14  A.   He say he killed him 'cause he said he felt he was moving

15  funny.

16  Q.   Did Killa tell you anything more about that, what that

17  meant?

18  A.   Just he was moving funny.

19  Q.   Did you know that person?

20  A.   Nah.  I seen him around, I don't know him.

21  Q.   Tell us about what you knew about the victim.

22  A.   That he was a dust head.

23  Q.   What is a dust head?

24  A.   He smoked dust.  That's weed dipped in embalming fluid.

25  Q.   What did Killa tell you about that murder?

1    A.  He was with Dev and Walt and he shot him.  He caught him in

2    his old building, 300.  He shot him in the building somewhere.

3    Some way he made it out of the building, the victim.  When you

4    exit the back of the building, it's like a little play area.

5    He made it past there and ran in towards the direction of the

6    right side of the bird cage, back in front of the building.

7    And he -- that's when he killed him at, going up that path.

8    Q.  When you say 300, what does that refer to?

9    A.  A building.

10           MR. ARAVIND:  Ms. Brady, can we look at 1201.  I'm

11   sorry.  1202.

12   Q.  So that's 300.  Can you read what street that is at the

13   top, Mr. Folks?

14   A.  300 East 158th Street.

15   Q.  That's in the Jackson Houses?

16   A.  Yes.

17   Q.  Did Killa tell you why he killed that victim?

18   A.  Because he was moving funny.

19   Q.  What was your understanding of what "moving funny" meant?

20   A.  He ain't know what he was thinking, what the victim was

21   thinking.

22           MR. LEE:  Objection, your Honor, as to state of mind

23   of another person.

24           THE COURT:  Sustained.  The witness's last answer is

25   stricken, but you can put the question to him again if you

CA33MER6                    Folks - direct

1   wish.

2   Q.  Mr. Folks, in your experience, what does "moving funny"

3   mean?

4           MR. LEE:  Objection, your Honor.

5   A.  A person --

6           THE COURT:  Overruled.

7   Q.  Please continue.

8           THE COURT:  Go ahead.  You can answer the question.

9   A.  A person who just move out of ordinary.  Like they doing,

10  they -- they reactions is weird.  You can't never tell what

11  they thinking.  They don't speak.  Stuff like that.

12  Q.  Did you have any interaction with the victim before he

13  died?

14  A.  No.

15  Q.  Did you have a conversation with him?

16  A.  No.

17  Q.  Did you ever see him?

18  A.  Yes.

19  Q.  Based on your interactions with the victim, what were your

20  observations of the victim before he died?

21  A.  He was just always by hisself.  He was quiet.  He used to

22  always grin, like he would stare at each person if we was in a

23  group, and his eyes put on the face.  Move around.  He never

24  speak.  Only come around at nighttime.  That's about it.

25  Q.  Did Killa tell you who he was with when he shot the victim?

CA33MER6                        Folks - direct

1    A.   It was Dev and Walt.

2    Q.   Mr. Folks, did there come a time when you learned that

3    Terry Harrison, T-Money, had been murdered?

4    A.   Yes.

5    Q.   Do you remember the date of that murder?

6    A.   September 10, 2010.

7    Q.   Were you present when T-Money was murdered?

8    A.   No.

9    Q.   How did you know about it; how did you hear about it?

10   A.   I was in 321 in Dante house.  I was on the computer.

11   Q.   Tell us what happened.

12   A.   I was on the computer.  I heard a couple shots.  After I

13   heard the first two, I got up, sat back down, I was

14   procrastinating, should I go out or not.  Then, I was thinking,

15   like, could be somebody I know.  So at the time, it used to be

16   bags hanging on the back of the Tay bedroom door.  So that's

17   where his .40 was kept.  So I jumped up, I went to go get the

18   gun, I put it in my waist.  Put it back.  Did that a couple of

19   times.  Back and forth.  I left the gun.  Went downstairs.

20   Went to the avenue.

21   Q.   Which avenue are you talking about?

22   A.   In between 153 and 154.  And I seen a crowd of people

23   surrounding somebody.  I went over there.  I saw it was

24   T-Money.

25   Q.   Could you describe where T-Money was.

CA33MER6                        Folks - direct

1    A.  He was, from my memory when I was home, it was just a

2    barber shop, a Chinese store and hair salon on the left-hand

3    side.  He was in, like, in between in the streets.  In the

4    sidewalk in between two cars.

5    Q.  I'm showing you, Mr. Folks, what has been marked for

6    identification as Government Exhibit 1205 and 1211.  Do you

7    recognize those items?

8    A.  Yeah, that grocery store wasn't there.  That was the

9    Chinese restaurant.

10            MR. ARAVIND:  Your Honor, the government offers

11   Government Exhibit 1206 and 1211.

12            MR. LEE:  I have no objection.

13            THE COURT:  You just showed him 1205 and 1211.

14            MR. ARAVIND:  I'm sorry.  I meant 1205 and 1211.  I

15   apologize, your Honor.

16            THE COURT:  All right.  Any objection?

17            MR. LEE:  No objection, your Honor.

18            MR. DINNERSTEIN:  No objection.

19            MR. MIEDEL:  Your Honor, if I understand correctly,

20   the location that's shown in that photograph no longer -- the

21   photograph doesn't depict what actually was the location at the

22   time.  Then I would object.

23            THE COURT:  Sustained.

24            MR. ARAVIND:  Your Honor, we would use these two

25   photographs not for the storefront, but for the general

CA33MER6                          Folks – direct

1   location in which this individual observed Mr. Harrison's body.

2            THE COURT:  But the general location is different.

3   The witness just testified it's not what it was.  So if you put

4   the question to him does it fairly and accurately represent the

5   scene at the time that T-Money was murdered, the answer is no.

6   So the objection is sustained.  Next question.

7   Q.  When you saw T-Money's body, what did you see?

8   A.  Him laying in the street between these two stores.  The

9   beauty salon and the barber shop.

10  Q.  Was anyone else there?

11  A.  There was a lot of people.

12  Q.  Do you remember seeing anyone else when you were there?

13  A.  Killa.

14  Q.  What do you remember about Killa that day?

15  A.  He was leaning over him, holding him, trying to get medical

16  attention for him.

17  Q.  What was Killa dressed like?

18  A.  He really wasn't dressed.

19  Q.  What do you mean by that?

20  A.  He ain't have on a lot of clothes.  I guess he was in the

21  shower or something.

22  Q.  What was your reaction when T-Money died?

23  A.  When I seen him, I was -- I was mad about the situation.

24  Q.  Why were you mad about the situation?

25  A.  'Cause he got killed.

CA33MER6                    Folks - direct

1   Q.  Do you remember other people's reaction around that scene?

2   A.  Yeah.  The people from 321, the people, they was -- they

3   ain't usually be on the avenue.  They kept walking back and

4   forth, up and down, smoking, drinking.

5   Q.  You mentioned people from 321.  What are you referring to?

6   A.  The building.

7   Q.  Who were those individuals, 321, did you recognize anyone?

8   A.  Just Doughboy.

9   Q.  Who is Doughboy?

10  A.  Some, some kid from over there.  Some older guy.

11  Q.  Were those members of GFC?

12  A.  No, from 321.

13  Q.  You've been saying 321.  What do you mean by that?

14  A.  That's like O people.

15  Q.  I am not sure I understand.

16  A.  O.  The person who T-Money tried to kill.  And the person

17  that put money on T-Money's head.

18  Q.  So O's people?

19  A.  Yes.

20  Q.  When you saw O's people on the street drinking, what did

21  you do?

22  A.  I got mad.  One of my friends that came, Dante, he had

23  came, so I told him, I said -- pulled him to the side, told him

24  to go get the gun.

25  Q.  What gun are you referring to?

CA33MER6                          Folks - direct

1   A.  The .40.

2   Q.  Is that the gun that was in the apartment that you just

3   talked about?

4   A.  Yes.

5   Q.  Whose apartment was that?

6   A.  Tay's.

7   Q.  You are mentioning Dante.  Is that Tay?

8   A.  Yes.

9   Q.  Did you go get the .40?

10  A.  He went to go get it.  He brought it back to me.

11  Q.  What did you do with the .40?

12  A.  I put it on my waist.  And -- nothing happened that night.

13  Q.  After that murder, did you or any other GFC members seek

14  revenge?

15  A.  It wasn't planned, but something did happen.

16  Q.  When did that happen?

17  A.  September 13.

18  Q.  You're talking about three days later?

19  A.  Yes.

20  Q.  What happened on September 13, 2010?

21  A.  I was in Dante house.  Me, him, and Dev.  I'm laying on the

22  bed, my phone ring.  It rung once, I didn't pick it up.  Then

23  it rang again.  I picked it up.  It was Killa, he called.

24  Asking me to bring a gun downstairs.

25  Q.  Did you know what gun he was referring to?

1    A.  It was only one in the apartment at the time, so it had to

2    be that one.

3    Q.  What gun was that?

4    A.  The .40.

5    Q.  Is that the same .40 that you took on September 10, three

6    days earlier?

7    A.  Yes.

8    Q.  Is there anything particular about that .40 caliber gun?

9    A.  It got an infrared beam on it.

10   Q.  What did Killa tell you to do with the .40?

11   A.  He just said bring it downstairs.

12   Q.  Did you do that?

13   A.  Yes.  Me and Dev.

14   Q.  Who held the gun, if you remember?

15   A.  I had put it in the shoe box, and I don't remember what

16   type of bag.  I think it was a sneaker bag.  And brought it

17   downstairs.

18   Q.  What happened when you went downstairs?

19   A.  I tried to give him the bag.  He was like, nah.  Come with

20   me.  I ain't think much about it.  I told Dev I was going with

21   him and Dev left.  I went back in the exit.  Threw the shoe box

22   and the bag and put the gun on my hip.  And he told me go to

23   the cab.  There was a cab right on the side of the building,

24   side of 321.

25   Q.  Who told you?

CA33MER6                    Folks – direct

1   A.  Killa.

2   Q.  Did you go inside the cab?

3   A.  Yes.

4   Q.  Mr. Folks, I'm going to show you what has been marked for

5   identification as Government Exhibits 430, 434, 435, and 436.

6   Do you recognize these items?

7   A.  Yes.

8   Q.  What are they?

9   A.  Showing building 321.

10          MR. ARAVIND:  Government offers 430, 434, 435 and 436.

11          MR. LEE:  No objection.

12          MR. DINNERSTEIN:  No objection.

13          MR. MIEDEL:  No objection.

14          MR. BECKER:  No objection.

15          THE COURT:  Government Exhibits 430, 434, 435 and 436

16   are received in evidence.

17          (Government's Exhibit 430, 434, 435, 436 received in

18   evidence)

19          MR. ARAVIND:  May I publish 430, your Honor?

20          THE COURT:  You may.

21   Q.  What building is that?

22   A.  321.

23   Q.  Tell us when you went down the stairs at 321, where did you

24   go?

25   A.  I came out that exit.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CA33MER6                          Folks - direct

1    Q.   Where did you go from there?

2    A.   From there I met Killa like right where this man is.

3    Q.   Where did you go from there?

4    A.   From there I went back into the building.

5    Q.   What did you do when you went back in the building?

6    A.   Threw the bag and box away.

7    Q.   Where did you keep the gun on you?

8    A.   On my waist.

9    Q.   Where did you go from there?

10   A.   I went back out the building and over there to the cab.

11   Q.   Did you enter the cab?

12   A.   Yes.

13   Q.   Who entered the cab with you?

14   A.   When I entered Ski Box was already in there and Killa came

15   in next.

16   Q.   Where did you go?

17   A.   I asked him where he was going.  He said to speak to

18   T-Money uncle.  We winded up going to Harlem.

19   Q.   What happened in Harlem?

20   A.   He spoke to his uncle while me and Ski Box stood outside

21   the store.

22   Q.   You're referring to Killa?

23   A.   Yeah.

24   Q.   Referring to Joshua Meregildo the defendant?

25   A.   Yes.

CA33MER6                          Folks - direct

1    Q.  Did you hear that conversation between Meregildo and

2    T-Money's uncle?

3    A.  No.

4    Q.  What happened next?

5    A.  After like 10, 15 minutes, they was done talking and

6    they -- Killa called a cab and we came to the exact where we

7    left from.

8    Q.  Where did you arrive on Government Exhibit 430?

9    A.  Over here on the sidewalk.

10   Q.  When you arrived outside 321 East 153rd Street, what did

11   you see?

12   A.  It was couple people right here on this bench.  It was -- I

13   forgot the two brothers' names that was right there.  String

14   Bean and T.

15   Q.  You're referring to the green bench that's in the middle of

16   Government Exhibit 430 which is in front of 321 East 153rd

17   Street?

18   A.  Yes.

19   Q.  And the farthest left bench?

20   A.  Yes.

21   Q.  How many individuals were there?

22   A.  Four.

23   Q.  Were those individuals members of a gang if you knew?

24   A.  I don't know.  I just knew they was 321, that's it.

25   Q.  Did those people sell drugs?

CA33MER6                          Folks - direct

1    A.  Yes.

2    Q.  Who did they sell drugs for?

3              MR. MIEDEL:  Objection.

4              THE COURT:  If he knows.  Overruled.

5    Q.  If you know, Mr. Folks, who do they sell drugs for?

6    A.  I don't know for sure, but that's Au area.

7    Q.  What happened as you got out of the cab?

8    A.  Now we got out of the cab, Ski Box got tough.  He walked

9    ahead of everybody, started talking out the mouth.

10   Q.  What did he say?

11   A.  All hyped up.  He going to make it rain 40 days, 40 nights.

12   This was unusual.

13   Q.  What does that mean, going to rain 40 days, 40 nights?

14   A.  I take it as meaning he going to shoot 40 days, 40 nights.

15   Q.  What was his emotional state that you observed?

16   A.  He was -- he wasn't the same person I knew.

17   Q.  How was he different?

18   A.  'Cause he was -- he was rowdy.  And he was -- he was ready

19   to do something.

20             MR. MIEDEL:  Objection, your Honor.

21             THE COURT:  Overruled.

22   Q.  What happened next?

23   A.  Next, T stood there, while everybody else went in the

24   building.  The three -- the two brothers and String Bean, T

25   came from right here to in the middle.  He stood right there.

CA33MER6                          Folks - direct

1    When Ski Box got to him, he pulled off his hoody, pulled out

2    his gun, and shot him.  I don't know if he connected or not,

3    but he was right in front of him.  He shot a couple times.

4    Q.   Did you know if -- did you know that Ski Box was carrying a

5    gun that day?

6    A.   When we was -- when Killa was talking to his uncle, me and

7    Ski Box was talking.  He told me he had a gun on him and I told

8    him I had one too.

9    Q.   What gun did Ski Box have?

10   A.   A 9.

11   Q.   What is a 9?

12   A.   A 9 millimeter.

13   Q.   What color was it?

14   A.   Black and silver.

15   Q.   Do you know whose gun that was?

16            MR. MIEDEL:  Objection.

17            MR. BECKER:  Objection.  Foundation.

18            THE COURT:  Sustained.  If you want to try to lay a

19   foundation.

20            MR. ARAVIND:  Yes, your Honor.

21   Q.   Had you ever seen that gun before?

22   A.   Not until then.

23   Q.   What did you do while Ski Box was shooting at T?

24   A.   I was slowly coming, like I just stepped on the sidewalk

25   and I -- slowly came up.

CA33MER6                      Folks - direct

1    Q.   What did you do?

2    A.   I stood right there.  I was slowly -- I stood over here.

3    After Ski Box shot him, he was holding his stomach, running

4    towards my direction now.

5    Q.   Who is "he"?  Who are you referring to?

6    A.   T.

7    Q.   What did you do?

8    A.   I watched him.  I watched him.  He ran past me.  I could

9    have been shooting while he was running in my direction, but I

10   wasn't.  He got past me.  And then Killa and Ski Box was

11   yelling shoot him, shoot him.  So I started shooting.

12   Q.   How many times did you shoot at T?

13   A.   I don't even remember.

14   Q.   Did you know if you hit T with any of your shots?

15   A.   I'm not sure.  I think I did.  'Cause he dropped.

16          MR. ARAVIND:  Just one moment, your Honor.

17   Q.   Which way did you go from there, Mr. Folks -- well, what

18   happened -- what happened next after you shot T?

19   A.   After he fell, I turned around, I ran.  I ran towards this

20   direction.  Going down 153, 154.  But before I even made it

21   past that building I fell.  When I fell -- just before I fell,

22   String Bean came out of the building.  He started shooting.  So

23   when I fell, I guess he thought he shot me.  He stopped

24   shooting.  When I fell, I dropped the gun and the house keys,

25   because I thought I was going right back upstairs.  I picked up

CA33MER6                         Folks - direct

1  the gun, left the keys, and ran straight down to 156 next to --

2  I am not sure what was the building number.

3  Q.  You have a number of photographs in front you, Mr. Folks.

4  Can you show us on one of those photographs which way you went.

5  A.  436.

6           MR. ARAVIND:  May we publish 436?

7           THE COURT:  You may.

8  A.  Over here.  Down there.  Down that path.

9  Q.  What did you do with the gun?

10 A.  Threw it in the garbage.

11 Q.  Why did you do that?

12 A.  Because I ain't know what to do with it.

13 Q.  After you threw the gun, what did you go?

14 A.  I ran to a friend house.  To Young Mel house.

15 Q.  Where does Young Mel live?

16 A.  Vietnam.

17 Q.  Where was the garbage can that you threw the gun in?

18 A.  In front of Capo building.

19 Q.  When you say Capo, are you referring to Javon Jones?

20 A.  Yes.

21 Q.  Where does Javon Jones live?

22 A.  In Melrose.  I am not sure the building.  I don't know the

23 number.

24 Q.  Were any of those reflected on the photos you have in front

25 of you?

CA33MER6                        Folks – direct

1    A.   Nah.

2    Q.   After you dropped the gun in the garbage can, what happened

3    next?

4    A.   I dug behind the car.  Ski Box came back and threw his gun

5    in the same garbage.

6    Q.   Which gun was that?

7    A.   The 9.

8    Q.   What happened next?

9    A.   We dug behind the car, because on the side of the street we

10   was, it was cops coming in our direction.  But they were

11   walking slow, like they ain't even see us.  And the left-hand

12   side of us, 156 and Park, a paddy wagon was coming around the

13   corner by the center.  Once it passed, we ran through Jackson

14   and back 3050 towards 158 and to Young Mel building.  We went

15   to his house.

16   Q.   Show us where you ran on the map.  Ms. Brady, let's look at

17   1201.

18        Where did the shooting take place?

19   A.   Right here.

20   Q.   Where did you run to?

21   A.   Right here.

22   Q.   Where was the garbage can?

23   A.   Right on the side.

24   Q.   After you dropped it off in the garbage can, did you

25   continue to go north?

CA33MER6                      Folks – direct

1  A.  Yes.

2          MR. ARAVIND:  Let's look at Government Exhibit 1202,

3  Ms. Brady.  Thank you.

4  A.  Ran through the back 3050, cut through the parking lot.

5          MR. MIEDEL:  I couldn't hear that.

6  Q.  Can you repeat that?

7  A.  We ran in the back of 3050, cut through the parking lot,

8  ended up going into this building, in front of 3080.

9  Q.  Again you're referring to 380, which is the apartment

10 building sort of in the center of Government Exhibit 1202.

11 A.  Yes.

12         THE COURT:  It's 3080.

13         MR. ARAVIND:  I'm sorry.  I misspoke.

14 Q.  Mr. Folks, you mentioned that Pierce was using a silver and

15 Black 9 millimeter.  After that event took place, did you ever

16 have a conversation with anyone about that gun?

17 A.  Yes.  I spoke to PayDay.

18 Q.  When did you have that conversation with PayDay?

19 A.  In the pens downstairs.

20 Q.  Now, without talking about --

21         MR. ARAVIND:  Your Honor, may I have one moment to

22 confer with counsel.

23         THE COURT:  Yes.

24         MR. MIEDEL:  Could we approach for a second before we

25 go on?

CA33MER6                        Folks - direct

1              THE COURT:  I don't see the need at this moment.

2              MR. MIEDEL:  All right.

3              THE COURT:  Let Mr. Aravind put a question to the

4    witness.

5    BY MR. ARAVIND:

6    Q.  Mr. Folks, without telling us who took the gun, did you

7    have a conversation with PayDay about that particular gun?

8    A.  Yes.

9              MR. BECKER:  Can we get a timeframe, your Honor?

10             THE COURT:  Yen.

11   Q.  When did this conversation take place?

12   A.  It was either May 31 or June 1st.

13   Q.  Of what year?

14   A.  2012.

15   Q.  Again, without telling us who took the gun from him, what

16   did PayDay tell you about that gun?

17   A.  He had gave the gun -- he had loaned the gun to somebody.

18   Q.  After PayDay loaned that gun to somebody, did PayDay tell

19   you that he took any steps to --

20             MR. BECKER:  Objection.  Leading.

21             THE COURT:  Let counsel finish the question.  Go

22   ahead, Mr. Aravind.

23   Q.  Did PayDay tell you about any efforts he took to recover

24   the gun?

25             MR. BECKER:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CA33MER6                          Folks - direct

1          THE COURT:  Overruled.

2   Q.  You can answer the question.  Again, without referring to

3   who took the gun from him.

4   A.  Repeat that question again?

5   Q.  When you had that conversation with PayDay, in either

6   May 31 or June 1st of this year, did PayDay tell you about any

7   efforts he took to recover that gun from anyone?

8   A.  Yes.

9   Q.  Again, without telling us the identity of the person he

10  gave the gun to, what did he say?  What did PayDay tell you

11  about it?

12  A.  He said the person asked him for the gun like he needed it.

13  He gave it to him.

14          MR. BECKER:  Objection.  Non-responsive, your Honor.

15          THE COURT:  He hasn't finished.  Overruled.

16          Continue your answer.

17  A.  Weeks passed.  Now he call to receive the gun back.  The

18  person denying his calls.  Switch his number on him.

19  Q.  You mentioned --

20          MR. BECKER:  Your Honor, now that he's finished, I

21  object as non-responsive the first part of his answer.

22          THE COURT:  Overruled.

23  Q.  You mentioned T, the individual who you shot at that day.

24  Did you know T from the neighborhood?

25  A.  Yeah, I saw him around.

CA33MER6                    Folks - direct

1    Q.  I'm showing you what has been marked as Government Exhibit

2    28.  Do you know T's real name?

3    A.  No.

4    Q.  Do you recognize this individual?

5    A.  Yes.

6    Q.  Who is that?

7    A.  T.

8            MR. ARAVIND:  The government offers 28 and 28A.

9            THE COURT:  Any objection?

10           MR. LEE:  No objection, your Honor.

11           MR. DINNERSTEIN:  No objection.

12           MR. MIEDEL:  No objection.

13           MR. BECKER:  No objection.

14           THE COURT:  Government Exhibit 28 and 28A are

15   received.

16           (Government's Exhibit 28, 28A received in evidence)

17           MR. ARAVIND:  May I publish, your Honor?

18           THE COURT:  You may.

19   Q.  Mr. Folks, when was the first time you shot a gun?

20   A.  In Maria Lo.

21   Q.  What year was that?

22   A.  I don't remember the year but I was -- like 16, 17.  One of

23   those.

24   Q.  When you say Maria Lo, what are you referring to?

25   A.  600 Morris Avenue.

CA33MER6                        Folks - direct

1    Q.  What is Maria Lo?

2    A.  The YG area.

3    Q.  You mentioned the YGs before.  Is that a gang?

4    A.  Yes.

5    Q.  Do you know how that conflict began with the YGs?

6    A.  We used to be YG at a point, we used to be cool with them.

7    It was off and on a little tension, but it got serious after

8    Hump got shot.

9    Q.  When you say Hump, are you referring to another GFC member?

10   A.  Yes.

11   Q.  That's Government Exhibit 7.  Is that correct?

12   A.  Yes.

13   Q.  How did you learn of Hump being shot?

14   A.  I didn't hear you.

15   Q.  How did you learn about Hump being shot?

16   A.  I don't know where I was at, at the time.  I was out, I was

17   outside the borough.  When I came back --

18              MR. LEE:  Can we have a timeframe, your Honor.

19              MR. ARAVIND:  I think the witness indicated he first

20   shot at the Maria Lopez Houses when he was 16 or 17.

21   Q.  Mr. Folks, let's start with the first time that you shot at

22   Maria Lo, okay.  What happened on that particular occasion?

23   A.  I guess Maria Lo had came -- they had came up to Courtlandt

24   and shot.

25              MR. LEE:  Objection.  "Guess."

CA33MER6                          Folks – direct

1       THE COURT:  Overruled.

2  A.  They had came and shot, and we went down there later on.

3  Q.  When you say "we," who are you referring to?

4  A.  It was a lot of people.  It was me, E Weeze, Mud, Papers,

5  and a lot of others.  I don't want to mix any names I'm not

6  sure of.  But I went down --

7  Q.  Sorry.  Did you have a gun that day?

8  A.  Mud had gave me the gun later on.

9  Q.  What gun was that?

10  A.  A .44.

11  Q.  Did you shoot that gun that day?

12  A.  Yes.

13  Q.  Did you hit anything?

14  A.  No.

15  Q.  Do you remember who you were shooting at?

16  A.  Yes.

17  Q.  Who?

18  A.  Some kid named Light Eyes Chris.

19  Q.  The second time that you shot at Maria Lo, when did that

20  take place?

21  A.  That was 2011.  A couple -- I say, a couple months before I

22  was arrested.

23  Q.  You were arrested again in March of 2011?

24  A.  May.

25  Q.  May 2011.  I'm sorry.  You mentioned Hump getting shot.

CA33MER6                      Folks - direct

1   Did Hump -- how did you learn about Hump's shooting?

2   A.   I don't know where I was at.   When I came back to the

3   Bronx, everybody was telling me.   Everybody know about it.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. ARAVIND:

2   Q.  What did you or other GFC members do in response?

3   A.  We -- the shootings that I committed when I went down

4   there, it wasn't for that reason.  It was for our own reason

5   because that was just a rival, but we ain't -- I ain't do no --

6   I ain't retaliate for Hump because he the one who got shot, and

7   I felt before I jump out the window for him, he got to do

8   something himself.

9   Q.  So why did you -- Did you go shooting?

10  A.  Yes.

11  Q.  Why did you do that?

12  A.  Because that was a rival.

13  Q.  And tell us about what happened that day that you went

14  shooting at the Maria Lopez House?

15  A.  I went down there, me, Melly, Sookie, Deandre and somebody

16  else, I don't remember.  We walked down there and we spreaded

17  out.

18  Q.  What do you mean --

19  A.  It was on 151 and Morris.  We spreaded out in the street,

20  on the sidewalk, I mean.  So we was all lined up next to each

21  other.  I'm on the far right, Melly on the side of me, on the

22  left-hand side of me, then it's Deandre and Sookie.  We was --

23  it was about, I'd say, 3:00, 4:00 in the afternoon.

24  Q.  Who had guns?

25  A.  Deandre and Sookie.

CA3PMER7                    Folks - direct

1   Q.  What guns did they have?

2   A.  .357 and .380.

3   Q.  Showing you again what has been marked as government's

4   Exhibit 516 and 526, do you recognized those items?

5   A.  Yes.

6   Q.  What are they?

7   A.  Pictures of Maria Lo, that area.

8   Q.  Let's turn to 516 first.

9           MR. ARAVIND:  Sorry, the government offers 516 and

10  526, your Honor.

11          THE COURT:  Any objection?

12          MR. LEE:  No objection, your Honor.

13          MR. DINNERSTEIN:  No objection.

14          MR. MIEDEL:  No objection.

15          MR. BECKER:  No objection.

16          THE COURT:  All right.  Government Exhibits 516 and

17  526 are received in evidence.

18          (Government's Exhibits 516 and 526 received in

19  evidence)

20          MR. ARAVIND:  May I publish 516, your Honor?

21          THE COURT:  You may.

22  Q.  Tell us what we're looking at, Mr. Folks?

23  A.  151 and Morris.

24  Q.  What way are we looking in this particular photograph?

25  A.  What is shooting the curb.

CA3PMER7                    Folks – direct

1  Q.  And what street is this on the left-hand side of Government

2  Exhibit 516?

3  A.  Morris.

4  Q.  Okay.  So describe to us where you were in this particular

5  photograph?

6  A.  I was right here.

7  Q.  And the other people that you were with, where were they

8  standing?

9  A.  Melly was right next to me, on the left-hand side.

10  Q.  Can you show us using the laser pointer?

11  A.  I'm right here.  Melly right here.  I don't know the

12  sequence, but it was right here, but this other person was

13  here.

14  Q.  And were you facing towards us in this picture, Government

15  Exhibit 516, or were you facing --

16  A.  Facing down, towards 140 -- 149th.

17  Q.  Okay.  When you went down there, what did you observe?

18  A.  A couple of them standing around, not paying attention to

19  they surroundings.

20  Q.  Who are you referring to?

21  A.  YG.

22  Q.  Do you know their names?

23  A.  Only one I noticed was some kid named Johnnie 0 or some kid

24  named White Mike.

25  Q.  Let's take a look at Government Exhibit 526.

CA3PMER7                      Folks - direct

1            MR. ARAVIND:  Can I publish, your Honor?

2            THE COURT:  You may.

3    Q.  Mr. Folks, tell us what we're looking at?

4    A.  Across the street from where the shooting was taking.

5    Q.  Were any of the people that you just described in the area

6    around this picture where this picture was taken?

7    A.  They was around here, around this ramp area.

8    Q.  Okay.  So tell us what happened that day?

9    A.  After we all spreaded out, we watched them for a little

10   while to see if they was gonna see that we was there.  They

11   didn't.  I guess I got tired of waiting around.  So I got the

12   gun from Deandre, the .380, and Melly took the .357 from his

13   brother.

14   Q.  What happened?

15   A.  I started shooting first.  I shot -- like, I shot like the

16   first three shots, and Melly started shooting.  I shot a couple

17   more.  Then I started to finish the -- I wanted to shoot the

18   whole clip.

19   Q.  How many bullets were in the clip?

20   A.  Eight.

21   Q.  Please continue.

22   A.  While I was finishing the last couple of shots and Melly

23   was shooting at the same time, he ran in my direction.  Like,

24   he crossed me.  I stood in one spot.  He crossed right in front

25   of me and got --

CA3PMER7                    Folks - direct

1   Q.  Please speak into the microphone.

2   A.  He crossed directly in front of me, and I made a mistake

3   and I shot him.

4   Q.  Where did you shoot him?

5   A.  In his back.

6   Q.  Do you know if you hit any of the YG members that you were

7   shooting at that day?

8   A.  No.

9   Q.  Did they shoot back?

10  A.  No.

11  Q.  After you shot Melly in the back, what happened?

12  A.  He shot -- He only had like five shots.  He shot one more,

13  I believe, grabbed his back, told me I shot him.  He started

14  smiling, we laughed it off, and we just ran, ran back to

15  Courtlandt.

16  Q.  What happened to the clothes that he was wearing?

17  A.  He -- I don't know how many shirts he had on.  He took one

18  off.  He threw it on the floor, and we kept running.  Later on,

19  somebody came and picked that shirt up.  I'm not sure who all.

20  Q.  Where did you go after that shooting?

21  A.  To 700.  We ran all the way to 700.

22  Q.  And who was at 700?

23  A.  Some lady.  My friend mother.  My friend Jamal mother.

24  Q.  What did you do at 700?

25  A.  We went up there.  She patched Melly up.  He got a new

1   shirt, and we went right back outside like.

2   Q.  Mr. Folks, other than the numerous shootings that we've

3   already discussed, have you shot at any other times?

4   A.  The one that led to my arrest.

5   Q.  Tell us what happened.

6   A.  I was getting off a party bus like 2:00 in the morning,

7   maybe a little after that.

8   Q.  When did this take place?

9   A.  May.  May 20, May 21st.

10  Q.  Of what year?

11  A.  2011.

12  Q.  When you say a party bus, what are you referring to?

13  A.  A party -- We could order a bus for a certain amount of

14  money.  They come pick us up for a certain amount of people,

15  limited people.

16  Q.  What happens on party bus?

17  A.  Smoking and drinking and dance, just party, have a good

18  time.

19  Q.  Who was on the party bus with you that day?

20  A.  Me, Melly, a lot of people and a lot of females.

21  Q.  What happened?

22  A.  When we got off the bus around 2:00 in the morning, a

23  little while maybe after that, everybody -- when we left, was

24  in front of 161 where the bus picked us up at.  One of the

25  little kids, Jamal, he had the gun on him.  I took the gun from

CA3PMER7                         Folks - direct

1    him.

2    Q.  What gun was that?

3    A.  A different .40.

4    Q.  What did you do with the gun?

5    A.  I put it in my -- At first, I put it in my pocket at first,

6    went upstairs with some female.  Came right back down a little

7    while after that.  When I came back downstairs, I was walking

8    with another girl to her house, going up that way, up 66, 166.

9    I put the gun in her purse.  I'm walking with her now.  I made

10   it to 152, close to 153, and that's when one of my friends, Au

11   Dog, he came around the corner started shooting in the air.

12   Q.  When you say Au Dog were you referring to Aubrey Pemberton?

13   A.  Yes.

14   Q.  Was he shooting at anyone?

15   A.  He was shooting in the air.  I ain't know at the time.  I

16   found out after.

17   Q.  What did you do in response to him shooting in the air?

18   A.  I turned around and started shooting in his direction.

19   Q.  Did you know that you were shooting at Aubrey Pemberton at

20   the time?

21   A.  No.

22   Q.  What happened after you shot at Mr. Pemberton?

23   A.  The girl left.  He left.  I walked back in front of the

24   building with a bunch where the bus dropped us off at.  Once I

25   got in front the building to get the attention off me, and

1    everybody that just got off the party bus was drunk, high.  All

2    of them asked me like, "Who's shooting?"  To get the attention

3    off me because I was by myself.  I said it was them.  All the

4    time they was saying it was me.  It went back and forth a

5    couple times.  Before I could move, I got grabbed.

6    Q.  By who?

7    A.  DT.

8    Q.  Who's DT?

9    A.  Detective.

10   Q.  Is that what led to your arrest in the State case?

11   A.  Yes.

12          MR. ARAVIND:  Your Honor, may I have just a moment?

13          THE COURT:  Yes.

14   Q.  Mr. Folks, the time that you went shooting with

15   Mr. Meregildo and Mr. Pierce at 321, you mentioned that you

16   threw your gun in the garbage.  Do you know what happened to

17   that gun?

18   A.  No.  I figured the cops had got it because --

19          MR. LEE:  Objection, your Honor.

20          THE COURT:  Overruled.

21   A.  I figured the cops had it because I remember calling Capo,

22   since it was in front of his building, I told him to come pick

23   it up where I had placed it.  He told me he couldn't find it.

24   Then I told him to check again at a different time.  He told me

25   he couldn't because there was this big cop, like the NYPD big

CA3PMER7                          Folks - direct

1   light in that area.  So he said he couldn't.  So I thought they

2   found it.

3   Q.  What about the other gun that you remember was thrown in

4   the garbage?

5   A.  We had came back and when we came back, Ski Box picked his

6   gun up and left the other one.

7            MR. MIEDEL:  Objection.  Are they --

8            THE COURT:  Do you want to lay a foundation for that?

9   I'm striking the testimony, but you can lay a foundation for

10  it.

11           MR. ARAVIND:  I will, your Honor.

12  Q.  After you returned to 321, did you personally look for the

13  gun that you had left in the garbage can?

14  A.  No.

15  Q.  Did you direct anyone to look for the gun in the garbage

16  can?

17  A.  Yes.

18  Q.  You mentioned that you asked Capo to look for the .40

19  caliber?

20  A.  Yes.

21  Q.  Did he get the .40 caliber?

22  A.  No.

23  Q.  Did you or Ski Box ask him to recover the nine millimeter?

24           MR. MIEDEL:  Objection.

25           THE COURT:  Sustained.

CA3PMER7                        Folks - direct

1   Q.  Were you -- Did you tell Javon Jones to recover the nine

2   millimeter?

3   A.  No.

4   Q.  Mr. Folks, you mentioned that you were remembers -- you

5   were a member of a number of gangs.  Can you tell us a little

6   bit more about your membership in the YGs?

7              THE COURT:  I think perhaps before you move into this

8   area, is this an appropriate time for us to recess for the

9   evening, Mr. Aravind?

10              MR. ARAVIND:  It is, your Honor.

11              THE COURT:  Very well.  Why don't you take a seat.

12  Members of the jury, we're going to recess now until tomorrow.

13  Tomorrow, because of some other matters that need to be

14  attended to, we're going to start promptly at 10:45 instead of

15  10:00 tomorrow.  So please report at 10:45 and be ready to go,

16  and we'll work an otherwise full day, until 5:00.

17              Keep an open mind.  Come to no conclusions.  Don't

18  discuss the case among yourselves or with anyone else

19  overnight.  I'm sure that there'll be more inquiries at home.

20  Ignore them.  Don't discuss the case with other people and keep

21  an open mind.  Have a great evening and a safe trip home.

22  Please recess the jury.  Everyone remain seated.

23              THE DEPUTY CLERK:  Come to order.  The jury exiting.

24              (Jury exits)

25              THE COURT:  The marshals may escort Mr. Folks out.

CA3PMER7                          Folks - direct

1          (Witness exits)

2          All right.  First, everyone in the courtroom is going

3  to be held in the courtroom for ten minutes so that the jury

4  can exit the courthouse, and I want to advise everyone who's

5  assembled here that the right to a public trial is enshrined in

6  the Sixth Amendment to the Constitution.  But the fundamental

7  fairness of a trial is undermined if audience members attempt

8  to threaten or harass anyone involved in the trial, including

9  jurors, other audience members or witnesses.

10         Accordingly, I'm telling all who are assembled here,

11 and they can tell their relatives and friends, that they are

12 not to attempt to communicate with any juror, any witness or

13 anyone else who happens to be present in the courtroom.  This

14 includes, among many things, gesturing at witnesses, reacting

15 to any testimony, or following any audience member or juror out

16 of the courthouse.  Anybody who disobeys this direct order of

17 the Court will not only be barred from the courtroom, but

18 they'll be subject to arrest by the U.S. marshal at my

19 direction.  I cannot make myself any clearer than that.

20         Now, what issues would counsel like to take up?

21 Ms. Heller?

22         MS. HELLER:  Your Honor, our only issue is regarding

23 the scheduling of our witnesses for tomorrow, and we would just

24 ask if the Court could inquire of defense counsel how long they

25 each expect, just roughly, to be on cross-examination so we can

1    know how many witnesses to bring to the courthouse.  We expect

2    Mr. Folks' direct to last no more than about 20 more minutes or

3    so.

4              THE COURT:  All right.  Mr. Miedel, since you're

5    taking the laboring war, want to give me some general sense?

6              MR. MIEDEL:  I would say two, three hours.

7              THE COURT:  All right.

8              MR. LEE:  Your Honor, based upon the fact that what

9    I've heard that my client and Mr. Folks testified about what's

10    in particular attempted murder, I would say the same time.

11              THE COURT:  Mr. Dinnerstein?

12              MR. DINNERSTEIN:  Well, I would anticipate probably

13    about an hour, hour and a half.

14              MR. BECKER:  Your Honor, I'd be very surprised if I

15    went more than 45 minutes and perhaps quite less.  It will

16    depend in part on what the other lawyers have.  I suspect it

17    will be less.

18              THE COURT:  At the end of the day, there are no

19    guarantees about this and, of course, counsel can take longer

20    or shorter.  So the government can be guided accordingly.  Just

21    don't run out of witnesses.

22              MS. HELLER:  Yes, your Honor.  Given those

23    representations, we have two or perhaps three witnesses that

24    have traveled on vacation arrangements such that they need to

25    testify tomorrow; so we may ask to take several witnesses out

1    of order.  Those witnesses I can now talk about who they would

2    be.

3             The first would be a custodian from Facebook, who

4    would simply authenticate those records.  We propose taking

5    that witness immediately after Mr. Folks, Mr. Folks' direct or

6    before Mr. Folks assumes the stand, whichever the Court

7    prefers.

8             We also have Officer Catherine Guzman from PSA7, who

9    is a first responder in the homicide of Carrel Ogarro.  She is

10   on vacation starting Friday for quite some time; so we do need

11   to get her in as well.  It doesn't matter what time of day, but

12   we do need to get her in.  Those two witnesses for sure.  There

13   may be a third.  We'll check with that witness to see if he or

14   she, is a civilian witness, has any flexibility, but those two

15   are relatively short witnesses and we would ask to call them

16   out of order.

17            If we finish with Mr. Folks and those two witnesses,

18   we have also Dr. Landi from the medical examiner's office, who

19   will be available, as it looks, after the morning, like we

20   might get to her, and then there is a civilian witness.  As per

21   your Honor's order, it seems like she will testify tomorrow.

22   This evening, we will provide 3500 for that -- material for

23   that witness to defense counsel by e-mail.

24            MR. DINNERSTEIN:  Your Honor, I have one concern about

25   the witness order.  One of the people that Ms. Heller mentioned

CA3PMER7                        Folks - direct

 1    was the Facebook custodian.  My cross-examination of that

 2    witness may be affected by your ruling regarding the Facebook

 3    issue.  So I would like to have a ruling regarding the Facebook

 4    issue prior to that witness testifying.  If that person is

 5    going to testify tomorrow --

 6              THE COURT:  The briefing on that is only being

 7    completed today, right?

 8              MR. DINNERSTEIN:  The briefing's been done, I believe,

 9    your Honor.

10              THE COURT:  Facebook is submitting briefing.  It's due

11    today.

12              MR. DINNERSTEIN:  Okay.  I was unaware.  I just

13    thought that --

14              THE COURT:  So --

15              MR. DINNERSTEIN:  I guess it's not a problem.

16              THE COURT:  But what -- If my ruling effects your

17    examination, the government's just going to have to bring that

18    Facebook person back.  It just strikes me that I don't

19    understand why this Facebook person has to be taken out of

20    turn.

21              MS. HELLER:  I can explain that, your Honor, if you'd

22    like.

23              THE COURT:  Yeah, sure.

24              MS. HELLER:  Well, up until 48 hours ago,

25    Mr. Dinnerstein said he would stipulate to that witness'

CA3PMER7                        Folks - direct

testimony, and so we didn't know until 48 hours ago that we

needed such a witness.  The intent is to use evidence from

Facebook in witnesses' testimony that we thought we'd be

putting on as early as Friday; so we knew we wanted to get the

Facebook evidence in on Thursday, and so we made travel

arrangement for the Facebook witness to come in in incredibly

short order to testify tomorrow.  Those plane tickets have

since been purchased, and they would be arriving this evening

and leaving tomorrow evening.

          THE COURT:  Are we flying somebody in from Cupertino,

California, for this?

          MS. HELLER:  Unfortunately, your Honor, yes.

          THE COURT:  All right.  Maybe they'll get two trips

out of the trial.  My sense would be that we should then just

take the Facebook witness first thing tomorrow morning, and

then have the government complete Mr. Folks.  Does any defense

counsel object to that?

          MR. LEE:  I have no objection, your Honor.

          MR. DINNERSTEIN:  I have no objection, Judge.

          MR. MIEDEL:  No objection.

          MR. BECKER:  I have no objection, your Honor.

          THE COURT:  All right.

          MS. HELLER:  One more comment, your Honor.  The direct

testimony, we expect simply to concern the authenticity and

admissibility of those records; so I don't know what

1   Mr. Dinnerstein is intending on questioning the witness about,

2   but I think we would object to anything that would get into

3   anything beyond that, of it being beyond the scope of direct.

4   And I believe that this witness we're calling is not going to

5   be in a sufficient position to testify about any of that.

6            THE COURT:  Okay.  First of all, as a rule of thumb, I

7   do not limit cross-examination to the scope of direct.  So

8   cross-examination is wide open in the first instance, subject

9   to all the other rules of evidence, of course.  It's only

10  after -- it's only the redirect and recross that are cabined.

11           MS. HELLER:  To the second point, I am not -- I think

12  this witness is solely qualified to testify about

13  admissibility; so just to put everyone on notice, I'm not sure

14  that she will be qualified to testify about anything other than

15  that.

16           MR. DINNERSTEIN:  Well, I appreciate that flying

17  somebody from California for this is problematic, what I would

18  do, your Honor, is I would limit the stipulation to the

19  admissibility of this particular item.  I would like, though,

20  this witness to be available if I feel it's necessary, based

21  upon your ruling regarding the Facebook issue, but at this

22  point, your Honor, I would -- and I don't know -- I don't know.

23  I just -- or someone --

24           THE COURT:  Work it out.  It sounds like this witness

25  is probably, my bags are packed, I'm on my way, right?

1              MS. HELLER:  The witness is in the air right now.

2              THE COURT:  How does the song go, traveling on a jet

3     plane at government -- You remember that song, Mr. Dinnerstein.

4              MR. DINNERSTEIN:  Judge, I remember it well.  Even

5     though --

6              THE COURT:  Okay.  So you'll just have to work it out,

7     but we'll take that witness first.

8              MR. MIEDEL:  Your Honor, in terms of just the

9     witnesses that Miss Heller mentioned, she mentioned a civilian

10    witness who, if there's time tomorrow, will testify.

11    Obviously, we're not going to know whether that witness will

12    testify tomorrow or not until tomorrow.  So I think the Court's

13    ruling about the civilian witnesses, we should be entitled to

14    the name and then the 3500 material 24 hours in advance, which

15    would be now.

16             THE COURT:  It seems to me that the government is

17    awfully optimistic that we're going to reach that witness

18    tomorrow; so I am not going to require the government at this

19    time to disclose that 3500 material.

20             MR. MIEDEL:  How about the name, your Honor?

21             THE COURT:  No, precisely for the same reason.  Okay?

22             MR. BECKER:  Your Honor, a couple of days ago the

23    government disclosed to defense a CD-ROM containing phone call

24    recordings that Mr. Folks made from wherever he's incarcerated,

25    I think it's MCC.  Other defense counsel focused on this, and

CA3PMER7                      Folks - direct

1    my understanding is this may have been produced as Giglio

2    material as opposed to 3500 material.

3            And if, in fact, it is Giglio material, my request is

4    that the government explain, say so, and tell us why, what

5    about it makes it Brady/Giglio because the recording is hard to

6    decipher what they're saying exactly, but if the government has

7    information about that that falls under Giglio, I would ask

8    that they give the source.

9            THE COURT:  What light can you shed on that?

10           MR. ARAVIND:  Your Honor, we're happy to have these

11   conversations with defense counsel if they bring it to our

12   attention ahead of airing it in open court.  The issue is that

13   we -- the calls that he's referring to with respect to

14   Mr. Folks are Rikers calls that were obtained and had been only

15   reviewed as of this past weekend.  As soon as we finished a

16   review of those calls, your Honor, we turned them over.

17           THE COURT:  All right.  Is there anything that you

18   want to direct the defense counsel's attention to regarding

19   exculpatory information?

20           MR. ARAVIND:  Your Honor, there is no exculpatory

21   information on any of those calls.  There is Giglio material,

22   which we have disclosed once we were able to review the calls.

23           MR. BECKER:  Your Honor, giving me, if the government

24   has --

25           THE COURT:  Just hold on one second.

CA3PMER7                         Folks - direct

1          MR. BECKER:  I'm sorry.

2          THE COURT:  It's now 5:15, and I'm authorizing the

3     CSOs to allow anyone who wishes to leave the courtroom to leave

4     the courtroom.  The courtroom is now open to come and go as

5     individuals please.  Go ahead, Mr. Becker.

6          MR. BECKER:  Thank you, your Honor.  Giglio is, of

7     course, a subset of Brady and it goes not necessarily to

8     exculpatory information because it proves that or supports the

9     defendant's claim of being not guilty, but rather, each, as the

10    Court and the government knows.  But because it falls under

11    Brady, if they have Brady information, even if it's not

12    recorded, even if it's not written down, they have a duty to

13    tell me what it is, to disclose it by telling me, not by saying

14    here's a CD-ROM, which when I listen to, I don't know what it

15    means because if you would listen to it, your Honor, the person

16    talking, when it says Bernard Folks, and I'm sure it is, sounds

17    very different from the person on this witness stand in every

18    aspect of his speech, and so I'd like to know why is it Giglio.

19         MR. ARAVIND:  Your Honor, there are different

20    cooperators who are on that CD.  We're happy to have

21    conversations with the defense lawyers as to the substance of

22    any particular Giglio materials in those calls.  There's

23    approximately 20 calls and we provided that to defense counsel.

24         THE COURT:  Good.  Have that discussion with

25    Mr. Becker and other defense counsel about what is Giglio

CA3PMER7                          Folks - direct

1    material on that CD.  Anything else?  All right then.  Because

2    of Mr. Dinnerstein's commitment tomorrow morning, we're going

3    to -- I want all counsel here at 10:30 so that we can bring the

4    jury out and get started at 10:45.  Mr. Dinnerstein, you'll do

5    your best to hustle here from the ninth floor?

6              MR. DINNERSTEIN:  I certainly will, your Honor.

7              THE COURT:  Everyone is to remain seated while the

8    defendants are escorted from the courtroom.

9              (Defendants exit)

10             All right.  Have a good evening.

11             MR. FEE:  Thank you, your Honor.

12             MR. ARAVIND:  Thank you, Judge.

13             (Adjourned to October 4, 2012, at 10:45 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2   Examination of:                                    Page

3   PAWEL DZIEWIECKI

4   Direct By Mr. Aravind . . . . . . . . . . . . 505

5   Cross By Mr. Miedel . . . . . . . . . . . . 518

6   Cross By Mr. Dinnerstein . . . . . . . . . . 519

7   Cross By Mr. Lee . . . . . . . . . . . . . . 523

8   Redirect By Mr. Aravind . . . . . . . . . . 526

9   ANGEL DEJESUS

10  Direct By Mr. Aravind . . . . . . . . . . . . 528

11  Cross By Mr. Miedel . . . . . . . . . . . . 538

12  Cross By Mr. Dinnerstein . . . . . . . . . . 541

13  STEVEN MARKOSKI

14  Direct By Mr. Aravind . . . . . . . . . . . . 544

15  Cross By Mr. Mysliwiec . . . . . . . . . . . 567

16  Redirect By Mr. Aravind . . . . . . . . . . 572

17  BERNARD FOLKS

18  Direct By Mr. Aravind . . . . . . . . . . . . 579

19                          GOVERNMENT EXHIBITS

20  Exhibit No.                                    Received

21   1200, 1201, 1202  . . . . . . . . . . . . 507

22   135 through 140  . . . . . . . . . . . . . 514

23   130-A  . . . . . . . . . . . . . . . . . . 534

24   110.1-25, 110.29-37 . . . . . . . . . . . 551

25   105A and 105B  . . . . . . . . . . . . . . 563

1    1010    . . . . . . . . . . . . . . . . . 575

2    120, 410 and 505  . . . . . . . . . . . . . 576

3    1, 1A, 1B  . . . . . . . . . . . . . . . 589

4    2, 2A, 2B  . . . . . . . . . . . . . . . 590

5    6, 6A, 6B, 9, 9A, 9B, 18, 18A, 18B    . . . . 591

6    10, 10B, 17, 17B  . . . . . . . . . . . . 592

7    1005, 125A, 125B    . . . . . . . . . . . . 605

8    15, 15A, 15B, 14, 14A, 14B, 7, 7B    . . . . . 606

9    19, 19A, 19B, 8, 8A, 8B, 21    . . . . . . . . 614

10   25, 25A, 25B    . . . . . . . . . . . . . 617

11   3, 3A, 3B    . . . . . . . . . . . . . . 623

12   4 and 4B  . . . . . . . . . . . . . . . 629

13   1210 and 1206    . . . . . . . . . . . . . 643

14   142 and 143, 144 and 14    . . . . . . . . . 652

15   5, 5B    . . . . . . . . . . . . . . . . 670

16   430, 434, 435, 436    . . . . . . . . . . . 683

17   28, 28A    . . . . . . . . . . . . . . . 694

18   516 and 526    . . . . . . . . . . . . . . 699

19

20

21

22

23

24

25