Cbq1mer1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        11 CR 576 (WHP)

5   JOSHUA MEREGILDO, MELVIN
    COLON, EARL PIERCE, and
6   NOLBERT MIRANDA,

7              Defendants.

8   ------------------------------x

9                                       New York, N.Y.
                                        November 26, 2012
10                                      9:48 a.m.

11

    Before:
12
                       HON. WILLIAM H. PAULEY III,
13
                                        District Judge
14

15                     APPEARANCES

16  PREET BHARARA
         United States Attorney for the
17       Southern District of New York
    NOLA HELLER
18  ADAM FEE
    SANTOSH ARAVIND
19       Assistant United States Attorneys

20

    WINSTON LEE
21  YING STAFFORD
         Attorneys for Defendant Meregildo
22
    MITCHELL DINNERSTEIN
23  ANTHONY CECUTTI
         Attorneys for Defendant Colon
24
    FLORIAN MIEDEL
25  AARON MYSLIWIEC
         Attorneys for Defendant Pierce

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Cbq1mer1

APPEARANCES (Continued)


GARY BECKER
ALEX LESMAN
        Attorneys for Defendant Miranda

ALSO PRESENT:
Special Agent Patrick Collins, ATF
Paralegal Specialist Darci Brady

Cbq1mer1

1         (Trial resumed)

2         (In open court; jury not present)

3         THE COURT:  Good morning, once again, to everyone.

4    Are there any issues that counsel wish to raise?

5         MS. HELLER:  Your Honor, we only have one issue.  We

6    were handed this morning two demonstratives, exhibits that

7    Mr. Lee I believe intends on using in his summation, and so we

8    could certainly wait until the lunch break to address those,

9    but we did have objections to those.

10         THE COURT:  All right.  Well, let's see if we can deal

11    with what's coming up.  I haven't seen Mr. Lee's

12    demonstratives, so -- Mr. Miedel?

13         MR. MIEDEL:  Yes, your Honor.  I have a matter that,

14    unfortunately, only occurred to me about 1:00 last night.  And

15    it concerns charges, particularly the Count One, the

16    substantive RICO count.  It occurred to me that under the

17    evidence, at least the evidence that came -- the way it came in

18    at this trial, one would seem to have to be -- conviction on

19    Count One would have to be a prerequisite for a conviction of

20    the counts involving Mr. Pierce that are the murder in aid of

21    racketeering and attempted murder in aid of racketeering.  The

22    reason is that, theoretically, it's possible that the jury

23    could find Mr. Pierce not guilty of the RICO count, either --

24    well, if it found Mr. Pierce not guilty of the RICO count

25    because it didn't find an enterprise, then it seems to me that

Cbq1mer1

1    it would have to also find him guilty -- not guilty of the

2    substantive acts in aid of racketeering.  If it found him not

3    guilty because they didn't think he was a member, the same

4    result.  And if they found that he hadn't committed at least

5    two pattern acts, I guess it's theoretically possible they

6    could find him guilty of the substantive acts but not both,

7    because he's charged with the, you know, the murder in aid of

8    racketeering and then the attempted murder in aid of

9    racketeering of the killing of -- I mean, the attempted

10   shooting of Tarean Joseph.  They would not be able to find both

11   of those and still acquit him of the RICO charge.  This could

12   lead to a -- an inconsistent result, where the jury could find

13   him not guilty of RICO and yet find him guilty of the

14   substantive acts in aid of racketeering.  And I think that the

15   jury needs to have an instruction on that.  And the way it's

16   set up in the verdict sheet, you know, it starts at this point

17   now with the substantive acts.  They could go -- if they go in

18   order, let's say they find him guilty of the substantive acts

19   and they eventually get down to RICO and they find him not

20   guilty, it would be an inconsistent verdict.

21           Now there is a theoretical way that somebody can not

22   be a member of the enterprise and still commit acts in

23   furtherance of that enterprise by, for example, trying to gain

24   entry into the enterprise.  I understand that.  But there is no

25   reasonable view of the evidence in this case that anybody

Cbq1mer1

1     committed any acts in an attempt to gain entry into the

2     so-called Courtlandt Avenue Crew.  The government's theory has

3     been consistent throughout and not a single witness ever

4     testified that you could gain -- that any of these acts were

5     committed in order to get into the group.  They were all

6     committed by -- allegedly by members of the group.  So I don't

7     think that that works as an avenue for suggesting that you

8     could be not guilty of the RICO but guilty of the substantive

9     acts.

10          Now as I said, this occurred to me last night for the

11    first time, unfortunately.  I haven't had a chance to research

12    it, but it seems to me that I wanted to put that on the record

13    because I think that there might be a problem here in terms of

14    how the jury considers these counts and, in particular, the

15    question of the substantive RICO count and the substantive

16    acts.

17          THE COURT:  Well, obviously I want to think about what

18    you're saying, but what do you propose?

19          MR. MIEDEL:  Well, for one, I propose that because

20    there's no reasonable view of the evidence that anybody

21    committed any acts in order to gain entry into the enterprise,

22    that language should be struck from wherever it occurs in the

23    jury instructions; and secondly, I think -- and again, I'll

24    have to think about this more too, but -- I think the jury

25    probably should be instructed that it cannot find Mr. Pierce,

Cbq1mer1

1    at least, guilty of Count Three, or Count Four, murder of Jason

2    Correa in aid of racketeering, unless it first finds him guilty

3    of Count One, and the same thing for I believe it's Count Ten,

4    attempted murder in aid of racketeering, that Count One serves

5    essentially as the prerequisite for those substantive counts.

6        MS. HELLER:  Your Honor, just briefly, it's our view

7    that that's a completely incorrect statement of the law.  The

8    elements of the substantive crimes do not require by any means

9    proof that a defendant is a member of -- is guilty of a

10   racketeering offense, a substantive racketeering offense.  We

11   charge them alone all the time in this courthouse, and that's

12   permissible.  So they don't need to be contingent.  It's just

13   not the law.

14       And the way that the verdict form is structured is

15   actually totally perfect -- it's perfect, and I think it

16   obviates the need for any changes because the substantive

17   crimes are first and they can be evaluated on their own, and

18   then it makes clear that they can't find Mr. Pierce guilty of

19   the -- of Count One unless they find him guilty of two

20   racketeering acts, and that is the law, of course, and that is

21   the way the verdict form is structured.  But Mr. Miedel is

22   arguing for the reverse, but that's not the law, and I

23   understand that he hasn't had a chance to research it, but I

24   believe if he does, he'll find that that's not the law.  And

25   that's certainly our position.

Cbq1mer1

1          MR. MIEDEL:  Well, your Honor, just briefly, I'm just

2    looking at your jury instruction on page 84, which is the

3    instruction for the third element of murder in aid of

4    racketeering, purpose of the murder, and it says that the jury

5    has to consider whether the act was done for the purpose of

6    gaining entrance to, maintaining a position in, or increasing a

7    position in the enterprise, or in consideration for a receipt

8    of money.  It's illogical.  Obviously you can't -- I mean,

9    assuming that the jury doesn't find the act was done to gain

10   entrance into, and then it would make sense that a person is

11   not a member of the enterprise, but both of the other ones,

12   maintain a position in and increasing -- or increasing a

13   position in the enterprise, requires that you are a member or

14   an associate of the enterprise, which is a requirement of the

15   RICO charge.  I don't see how you could be possibly guilty of

16   that count without being a member or associate of the

17   enterprise.

18         MS. HELLER:  Your Honor, you can be legally guilty of

19   a substantive racketeering crime, such as a murder in aid of

20   racketeering, without being legally guilty of the crime charged

21   in Count One.  Again, we charge that all the time.  People who

22   we don't have two predicate acts against but we know they did a

23   murder in aid of racketeering but we don't have a second act,

24   we do that all the time.  It's legally permissible.

25         And in terms of the gaining entry point, we think that

Cbq1mer1

1    should absolutely stay.  Maybe it's not the case as to

2    Mr. Pierce, but there's an argument to be made that Mr. Colon

3    committed the murder of Alston in order to gain entry to the

4    enterprise and curry favor with Mr. Harrison because it was

5    committed so soon after his release from prison.  So we oppose

6    any removal of that language as well.

7           THE COURT:  All right.  We'll obviously have to

8    continue to consider this issue.

9           Any issues relating to the government's closing?

10          MR. BECKER:  Yes, your Honor.  And I advised

11   Mr. Gosnell of this issue.  It concerns the government's

12   demonstrative evidence that they gave notice of last night

13   regarding drug quantities, and I don't know if the court has

14   seen that, but --

15          THE COURT:  I have.

16          MR. BECKER:  All right.  I don't know if it should be

17   marked as an exhibit at this point, but I object to it, and I

18   object to it for the following reasons:  This exhibit is, of

19   course -- or this demonstrative -- demonstrative is, of course,

20   sought to be used by the government to demonstrate that at

21   least 280 grams of cocaine base or crack were distributed

22   during the course of the conspiracy, 280 grams of course being

23   the number to get the government to the (b)(1)(A) drug quantity

24   minimum, and what this demonstrative purports to say, or says,

25   is that one dealer alone, an unknown dealer, not identified,

Cbq1mer1

1    would have sold at least 280 grams of crack cocaine in no more

2    than four months and in as little as two months, and it does so

3    by first suggesting the amount of cocaine that could be found

4    in one bag as either .1 grams or .05 grams, multiplying that by

5    50 bags, suggesting 50 bags a day, multiplying that by 30 days,

6    and just extrapolating to a period sufficient to get to

7    280 grams.

8         The reason this is objectionable, your Honor, is, I

9    don't believe there's any evidence in this case from one dealer

10   that he sold 50 bags of crack cocaine every day for 30 days or,

11   quite frankly, for 120 days, because 30 days would be one

12   month, but to get to 280 grams under the .05 grams scenario, it

13   would be four months.  So you have to have testimony from one

14   witness that he sold 50 bags a day every day for four months.

15   It just -- I just don't believe there is such a witness that

16   testified to that.

17        What the government has done here, I suggest, your

18   Honor, is -- and perhaps that's why the demonstrative just says

19   one dealer without identifying who.  What the government has

20   done here is, there is evidence in the record that people said

21   they sold seven days a week, and that was, of course,

22   challenged on cross, but there's certainly not evidence about

23   quantity like that.  The only evidence in this record that I'm

24   aware of regarding quantity -- and by quantity, I mean how much

25   cocaine would be found in a single bag -- was the analyst

Cbq1mer1

Osorio.  She was the one who I handed the calculator to.  She

analyzed or weighed what was in the -- what was in 22 bags, and

after doing the math, I think that she said it came out to

.06 grams per bag, .06, I believe -- I think it was .0622.  She

rounded it down to .06.  So based on one analyst's weighing 22

bags of cocaine, the government is using that to extrapolate to

the entirety of this conspiracy and saying that:  It's really

very easy, ladies and gentlemen, for you to find 280 grams.

All you have to do is this simple math.  And if the government

could support all of that with evidence in the record, then the

demonstrative might be appropriate, but I submit that the

evidence is not in the record.  It's argument.  It's

extrapolation.  And if it's argument, it shouldn't be a

demonstrative.  A demonstrative is designed to make the

evidence clearer, not to present an argument, your Honor.

          And finally, the government's choice of either .1

grams or .05 grams also I think is not supported by the record

because, as I say, the only evidence in the record as to weight

is .05 -- .06 grams per bag, and that's only with respect to 22

bags.

          So this is a critical issue because it goes to a

ten-year mandatory minimum, and the government is trying,

through this demonstrative, to get there really by taking a

shortcut and saying:  Just do some simple math.  It's very

prejudicial, it's not probative, and it's not an appropriate

Cbq1mer1

1    demonstrative, so I object.

2          MR. FEE:  Your Honor, it is argument, and it sounds to

3    me like the argument is that there's not evidence in the record

4    to support this argument.  There is, and these are very

5    conservative estimates.  There was testimony from Chemist

6    Osorio.  If you recall, that was the testimony where there was

7    this first test, the drugs were processed, and then she did a

8    second test.  And then she said it's .06, after something was

9    processed.  So the .05 estimate is extremely conservative, so

10   that's even after something was processed.

11         And the point -- Anthony Crocker, a prolific crack

12   dealer, he gave an estimate.  He said it was .2 grams, he

13   believed, in each bag of crack.  We took a very conservative

14   view of that.  We put .1 grams of crack in each dime bag,

15   between .1 and .05.  There's evidence to support higher amounts

16   in the record.

17         As far as the frequency, the amount they sold every

18   day, it's in the record.  I don't have the cites right in front

19   of me.  Devin Parsons testified he got a G pack every two or

20   three days, he said.  That's a hundred bags of crack cocaine.

21   Anthony Crocker said he would sell between 32 to a hundred bags

22   in a few hours, and he also testified seven days a week, 24

23   hours a day, he was available to sell.  Aubrey Pemberton also

24   talked about selling 32 bags in an hour or two.  There's

25   evidence in the record.  This is argument.  They're in fact

Cbq1mer1

1    conservative views of the evidence, and that's why we put them

2    there.  So I think it is appropriate at this point.

3        MR. BECKER:  Your Honor, with respect to what Mr. Fee

4    just said, the witness who said that he estimated .2 grams per

5    bag, the court may recall, acknowledged on cross-examination it

6    was a guess, he didn't know how many grams were in an ounce, he

7    didn't know about the --

8        THE COURT:  That all goes to weight.  I remember the

9    testimony of the cooperator who is a human scale.

10       MR. BECKER:  Yes, your Honor.  It goes to weight.  And

11   the government can argue what it wishes to argue, but to put it

12   in a demonstrative like this to say this is -- this is what we

13   have in this case, we simply don't, your Honor.  We don't have

14   anybody saying that he sold 50 bags a day every day from four

15   months.  No one said that, Judge.  If someone said it, it would

16   be one thing.  What they said was there were days where I sold

17   a lot, sometimes it took me a week to sell 30 bags.  It

18   wasn't -- it wasn't what this demonstrative says it was.

19       THE COURT:  All right.  Your application to exclude

20   the government from showing this demonstrative is denied.

21       MR. BECKER:  Very well, your Honor.  Two other issues.

22   I don't know that they need to be resolved right now, but I

23   just want to put it on the record so it's clear.

24       Actually one other issue.  The superseding indictment,

25   the most recently redacted version of the superseding

Cbq1mer1

1    indictment appears to have a paragraph in it that was

2    previously stricken by order of the court and seems to have

3    found its way back in.  I've conferred with the government.  I

4    think we're in agreement on this.  It doesn't have to be taken

5    up before summations.  I don't think it's going to be an issue

6    at all, but I just wanted to point that out.  We'll deal with

7    that as appropriate.

8            THE COURT:  Fine.

9            MR. DINNERSTEIN:  Your Honor, I just have a couple of

10   things that are cosmetic in terms of the indictment.  Page 90

11   of the -- of the charge says "the murder of a member of the

12   Maria Lopez crew."  I believe it should say "the murder of

13   members," which is what the indictment says.

14           And also, on page 109, as to the fourth element,

15   line 14, it says -- talks about Count Eleven, which is the

16   conspiracy to -- I guess to murder people of the Maria Lopez

17   crew.  It says "killing."  It obviously should say "shooting."

18           THE COURT:  All right.  Quite frankly, are there any

19   issues that are going to directly impact on summations?

20           MR. DINNERSTEIN:  That was, your Honor, because I want

21   to make reference to those particular items.  That's why I

22   brought it up now.

23           THE COURT:  Thank you.  Any objection?  Any objection

24   to Mr. Dinnerstein's suggested modifications in the redacted

25   indictment --

Cbq1mer1

1          MS. HELLER:  We don't have any objection --

2          THE COURT:  -- or the charge?

3          MS. HELLER:  We'll double-check at lunch, but -- and

4     let anyone know if there's any change to that, but we don't

5     anticipate any objection.

6          THE COURT:  All right.  Now, Mr. Fee, you're going to

7     present the closing argument for the government?

8          MR. FEE:  That's correct, your Honor.

9          THE COURT:  Okay.  I remind you that you'll be

10    afforded two hours.  I'll ask you gently to begin to conclude

11    your summation when you have ten minutes left, and then I'll

12    give you a one-minute warning.

13         MR. FEE:  Thank you.

14         THE COURT:  The jury is all here.  I want to advise

15    counsel that juror number 7 was hospitalized over the weekend

16    and was just released from the hospital yesterday.

17    Nevertheless, she's here today and ready to go.  However, if

18    she needs a break during summations, she's going to raise her

19    hand and I'm going to promptly interrupt whoever is arguing,

20    and I will give you a little extra time because of that

21    interruption.  If she doesn't raise her hand and just runs out

22    of the courtroom, you'll understand that it's more exigent, and

23    we'll deal with it.  So don't be alarmed that a juror is

24    reacting to what a party is saying in the case.

25         MR. DINNERSTEIN:  Your Honor, have you had any

Cbq1mer1

1      discussion with her about her willingness to continue to sit in

2      the case in view of the health problems?

3                THE COURT:  No.  No, I have not, because she simply

4      sent an e-mail advising, wanting to bring it to our attention,

5      and ensuring us that she intended to be here.

6                MR. DINNERSTEIN:  Do you think it's appropriate for

7      you to have a conversation with her?

8                THE COURT:  I certainly can if the parties desire

9      that.

10               MR. BECKER:  Your Honor, my only question would be, I

11     suppose, whether or not whatever the affliction was that led

12     her to be hospitalized has somehow affected her ability to

13     concentrate or focus or deliberate.  The obvious concerns that

14     all of us would have.  Other -- I do think it might be

15     appropriate to make that inquiry.

16               MR. MIEDEL:  Your Honor, I agree with that.

17               THE COURT:  Let me read the e-mail that my deputy

18     received from her.

19               "Hello, Wayne.  I wanted to inform you that I became

20     ill Thursday morning with acute diverticulitis and was

21     hospitalized from Friday afternoon until noon yesterday to

22     receive IV antibiotics.  My doctor's given me a note to excuse

23     me from jury duty, but I would like to try and remain on the

24     case, and I expect to be at the court later this morning.  I

25     felt I should report my status to you in case a complication

Cbq1mer1

1   were to arise.  Sincerely," juror number 7.

2            It strikes me that in view of this e-mail, and the

3   fact that she's here and ready to go, does not require further

4   inquiry from the court at this time.  I instructed my deputy to

5   let her know if for any reason she needed to take a break that

6   she should simply raise her hand or, if it's more exigent, she

7   should just run into the jury room and we'll deal with it.

8            Now given this, does any counsel still believe that I

9   should conduct a further voir dire?

10           MR. ARAVIND:  Not from the government, your Honor.

11           MR. DINNERSTEIN:  I think -- I think the way you'll

12  handle it will be appropriate.

13           MR. MIEDEL:  Your Honor, I think that in light of the

14  e-mail, I particularly feel it's not necessary at this point,

15  but if she does experience some sort of distress or

16  something --

17           THE COURT:  No question about it, okay?

18           MR. MIEDEL:  Okay.

19           THE COURT:  A trial, even in closing arguments,

20  continues to be a dynamic event.

21           Also, so that we avoid the problem of interrupting

22  someone's summation for lunch, I provided menus to the jurors

23  this morning.  Their lunch will be provided to them in the jury

24  room so that we can take a somewhat abbreviated lunch break.

25  And therefore we'll hear the government's summation first, then

Cbq1mer1

1    we'll take our luncheon recess, and then, as I understand,

2    Mr. Dinnerstein, you're going to present the initial closing

3    argument for defendants?

4              MR. DINNERSTEIN:  That's correct, your Honor.

5              THE COURT:  All right.  So that will be after lunch,

6    but we'll take a shortened luncheon recess, and that way we'll

7    be able to take what I hope would be about a 25-minute break

8    between Mr. Dinnerstein's summation and Mr. Lee's summation so

9    the jurors have an opportunity to refresh.

10             Anything else before we bring the jury out?

11             All right.  And of course during summations, counsel

12   are free to move about the well of the courtroom.

13             Let's bring in the jury.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

CBQ3MER2

```
 1              (In open court; jury present)
 2              THE COURT:  Well good morning, members of the jury.
 3    Thank you for your punctuality.  Thank you for all being here.
 4    I trust that you've all had a relaxing, safe Thanksgiving
 5    holiday.
 6              We're going to return now to one of the concluding
 7    phases in any trial, closing arguments.  Closing arguments are
 8    just that, they are argument by counsel about what counsel
 9    believes has been proven or not proven in the course of the
10    trial.  You're going to hear first from the government, and as
11    I explained to you a week ago, the government also gets the
12    last word, because the burden of proof in a criminal case is
13    always on the government to prove a defendant guilty by
14    competent evidence and beyond a reasonable doubt.  That burden
15    never shifts to a defendant.
16              You'll hear first from the prosecutors for
17    approximately two hours.  And then we will take an abbreviated
18    luncheon recess.  I trust that you've all made your lunch
19    decisions.  And then we will hear two closing arguments in the
20    afternoon from defense counsel.  So, that's what lies ahead
21    today.
22              I ask at this time that you give your undivided
23    attention to Assistant United States Attorney Adam Fee as he
24    delivers his closing argument on behalf of the government.
25              MR. FEE:  Thank you, your Honor.
```

1              At the beginning of this trial, you heard the opening

2      statements of defense counsel.  They told you that you would

3      learn that Joshua Meregildo was a man with a good jump shot who

4      wasn't involved in drugs and violence.  That you would learn

5      that Melvin Colon was just a fan of some rap group called the

6      Get Fresh Crew, and that he never sold drugs or committed any

7      shootings.  That you would learn that Earl Pierce was an older

8      man with no real connection to the real bad guys in this case.

9      That you would learn that Nolbert Miranda was just a solo drug

10     dealer who kept to himself on Courtlandt Avenue.

11             All of those statements were really forms of

12     arguments.  These defense attorneys were and they still are

13     arguing that the evidence in this case simply would not allow

14     these defendants to be revealed for the criminals that they

15     really, truly are.

16             Now, ladies and gentlemen, at this time you have seen

17     a tremendous amount of evidence in this case.  Has anything

18     you've seen during this trial, anything at all, really

19     supported the suggestion that Joshua Meregildo was only

20     interested in basketball while out on Courtlandt Avenue in 2010

21     and 2011?  Or that Melvin Colon thought GFC was just about

22     wearing nice clothes and impressing girls?  Or that Earl Pierce

23     had nothing to do with the drug trade on Courtlandt Avenue?  Or

24     that Nolbert Miranda was a completely independent drug dealer?

25     Of course not.  These men are drug dealers or murderers or

1   both, and they worked together to commit crimes, and that's

2   exactly what the evidence in this case showed.

3          Now, we're almost at the end of this case, and at this

4   point one thing should be clear to you.  And that is that the

5   evidence in this case showed beyond a reasonable doubt that

6   each of these four defendants are guilty of the crimes charged.

7          I'm not going to waste your time today -- it wouldn't

8   be even be possible -- to go through all of the evidence and

9   all the testimony you've heard, but I'm going to spend time

10  talking about some of the evidence today just to highlight how

11  it makes clear that these four defendants are absolutely guilty

12  of the crimes charged.

13         Before I do that, there's a few things we need to do.

14  First I want to step back and give you a bird's eye view of

15  some of the major events you have a heard about in this case.

16  Second, I want to very briefly talk about how you know the

17  witnesses' testimony in this case is true, because it

18  interlocks with the evidence and other testimony.  Third, I

19  want to talk about the charges and evidence in some detail.

20  And throughout this summation what I am going to do is talk

21  about how some of the arguments and theories you heard from

22  defense counsel and arguments I expect you will hear don't make

23  sense and you should reject it.

24         The government has the burden at every stage of this

25  case to prove the defendants guilty beyond a reasonable doubt.

1    We embrace that burden.  And we've met it here.  But when

2    defense counsel makes arguments in openings, summations, or

3    during the questioning of witnesses suggests arguments to you,

4    the government has an obligation and a right to respond.  You

5    have an obligation to scrutinize those arguments.

6          So first, the bird's eye view of this case.  You've

7    heard a lot of evidence in this case.  You don't need me or

8    anyone else to tell you that.  You've been here for eight

9    weeks.  It's been a long ride.  So really the first thing I

10   want to do again is pull back and run through the major events

11   you heard about during this trial.

12         As you know, this case is about the Courtlandt Avenue

13   crew.  That's what it's called in the indictment, but it never

14   had just one name on the streets.  At its core, at its essence,

15   this crew is made up of two parts.  First, it was made up of

16   grown men of Courtlandt Avenue.  Older, more experienced drug

17   dealers.  Men like T-Money, Terry Harrison.  Men like Earl

18   Pierce, and Nolbert Miranda.  These older men supplied drugs to

19   young dealers on Courtlandt Avenue, took back profit from the

20   drug sales, and sometimes got involved in firearms or violence

21   when the business was threatened.

22         The second piece of the Courtlandt Avenue crew was the

23   gang made up of younger men on Courtlandt Avenue.  This was

24   GFC, then it became OGFC or OG as you heard.  First the GFC

25   gang members were the foot soldiers of the crew.  They did the

1    hand-to-hand deals on street of drugs, they committed shootings

2    at rival gang members, and sometimes they committed murders at

3    the request of the older men in this crew.

4         Two of those GFC members, these men, Joshua Meregildo

5    and Melvin Colon, grew out of GFC. They started their own gang

6    you heard about, this OGFC. These two men also became leaders

7    of the crew as a whole. This whole case as you've heard

8    started with Terry Harrison. T-Money. T-Money got out of jail

9    in 2010 and saw an opportunity. The federal government had

10   just arrested dozens of older men who had sold drugs in that

11   area around Courtlandt Avenue just before T-Money got out of

12   jail. T-Money tried to fill that void by selling drugs on

13   Courtlandt Avenue. To do so he enlisted a group young men from

14   the Jackson and Melrose Projects to help him sell drugs. This

15   was GFC. God's Favorite Children. You heard about what GFC

16   was and what it became under T-Money.

17        And the drug business on Courtlandt Avenue flourished.

18   The crew was literally selling crack and marijuana 24/7. Earl

19   Pierce and Nolbert Miranda became critical members of this

20   booming drug business. Both of these men sold crack on the

21   street side by side with the GFC members and with T-Money. And

22   Miranda, you heard, supplied the GFC members with crack cocaine

23   to help keep the crew's drug business humming along.

24        With this booming drug business the crew began to bump

25   up against other dealers in the neighborhood. You heard about

1    these rivals, O, Luchie, older more experienced dealers in the

2    area, and soon things turned violent in and around Courtlandt

3    Avenue.

4            Early in the summer of 2010 you heard somebody tried

5    to kill T-Money, failed.  And after that the crew became

6    obsessed with eliminating threats to the crew, to its drug

7    business, to T-Money.  Eventually there were three murders

8    committed in that summer that you've heard a lot about.  First,

9    on July 25 of 2010, Earl Pierce and T-Money killed Jason Correa

10   because he was close with O, one of the drug rivals.  Second,

11   on July 30 and 31 of 2010, Joshua Meregildo and others stalked

12   and killed Carrel Ogarro because they thought Carrel was

13   snitching.  August 27, 2010, the third murder, Colon shot and

14   killed Delquan Alston because he was viewed as a threat to the

15   health of the crew's drug business.

16           This same summer you also heard about the gang rivalry

17   between the crew and a wild gang, the Young Gunners, and the YG

18   gang, which turned violent, kept going right through

19   September 2011.

20           That's Melvin Colon's hand.  YGK.  That's YG Killa, as

21   he said, he paved the way for that.

22           Then everything changed for the crew going back to

23   2010, in September, when T-Money was killed just outside 681

24   Courtlandt Avenue.  The crew wanted revenge.  You heard what

25   they did just a few days after, Meregildo and Pierce went after

CBQ3MER2                    Summation - Mr. Fee

1    Luchie's crew at the 321 building.  They shot one of Luchie's
2    people several times because they thought Luchie was
3    responsible for T-Money's death.  That was the shooting of
4    Tarean Joseph by Pierce and Meregildo.

5         After T-Money's death, Colon became the man on
6    Courtlandt Avenue for crack and for guns.  The violence kept
7    going as well.  All the way up to September 2011, when Jing Bao
8    Jiang, the man you saw in this courtroom, was shot.

9         Here we are in this courtroom, and in a moment we are
10   going to drill down and talk about how everything I just told
11   you about happened just the way I described based on the
12   evidence you saw here.

13        First I want to briefly touch on a theme you are going
14   to hear from me over and over again during this summation.
15   That's how the testimony of the witnesses in this case is
16   supported by other witnesses' testimony and the physical
17   evidence, the forensic evidence, and your common sense.  When
18   testimony interlocks with other witnesses' testimony, and other
19   evidence, like forensic, physical, ballistics evidence, it's
20   called corroboration, and it helps you to know that those
21   witnesses are absolutely telling you the truth.

22        So let's talk about the charges in this case and how
23   the evidence you saw makes clear that these four defendants are
24   absolutely guilty.  I am going to talk about it in three
25   sections.  First the drug charges, that was at the core of what

CBQ3MER2                    Summation - Mr. Fee

 1   this crew did; second, the gun charges; and the violence that

 2   they used these guns to commit, some of these defendants.

 3           So first, the drug conspiracy charge.  There is two

 4   things I expect Judge Pauley is going to tell you the

 5   government has to prove for this charge.  First, that a

 6   conspiracy existed to distribute crack cocaine and marijuana.

 7   Second, that each of the defendants was a member of that drug

 8   conspiracy.

 9           Now, there is a mountain of evidence in this case that

10   shows beyond a reasonable doubt that this crew ran a

11   large-scale drug operation on Courtlandt Avenue in 2010 and

12   2011, and that each of these four defendants was part of it.

13   So I am going to review only some of that evidence today.

14           Let's talk first about Joshua Meregildo.  You heard

15   over and over again from cooperating witnesses that Joshua

16   Meregildo sold marijuana for T-Money in 2010.  Aubrey Pemberton

17   bought marijuana from Meregildo, so did Anthony Crocker, Carlos

18   Villafranco, Devin Parsons.  And Pemberton, Crocker, and

19   Villafranco also saw with their own eyes, they told you,

20   T-Money supplying Meregildo with marijuana to sell to others.

21           You also know that Meregildo had a role in the crack

22   conspiracy on Courtlandt Avenue even before T-Money died.

23   Crocker told that you when T-Money wasn't available, T-Money

24   told Crocker to go to Meregildo to get crack and to give his

25   drug profits he made from selling T-Money's drugs back to

1   Meregildo.  So it make sense that after T-Money died, it was

2   Meregildo who really took over the drug trade for this crew.

3          Very soon after T-Money was shot, Meregildo summoned

4   Crocker to that meeting in that Dodge Charger that Crocker told

5   you about.  Here's what he said Meregildo told him:  He was

6   telling me he's gonna continue to give me drugs, it's gonna be

7   the same thing T-Money was doing.  The split is going to be

8   60/40.  He keeps 60, I keep 40, and then he asks do I feel safe

9   where I'm at, do I need any guns in my apartment.  This was

10  just after T-Money's death.  Crocker was nearby T-Money when he

11  died.  It's clear that Meregildo was announcing to Crocker he's

12  taking over T-Money's role in this drug conspiracy.

13         That's exactly what happened.  You heard that over and

14  over again.  Crocker got crack from Meregildo, he sold it to

15  the same customers he used to sell for when T-Money was alive.

16  He had the same profit split that he had with T-Money.

17         Pemberton told you the same thing.  Corroborated

18  Crocker in important details.  Pemberton told you that a day or

19  two after T-Money died, Meregildo summoned Pemberton to a

20  meeting and told him again we going to keep getting money.

21  That day Meregildo gave Pemberton dozens of bags of crack, and

22  he gave Pemberton more crack on other days.  Pemberton took

23  those drugs, sold them to the same customers on Courtlandt

24  Avenue that he sold to when T-Money was alive, and had the same

25  split of the profits that he had with T-Money.  This time, with

1    Joshua Meregildo.

2            That's amazing evidence of Meregildo's participation

3    in this drug conspiracy, and it's so clearly truthful because

4    even though Crocker and Pemberton are talking about different

5    meetings at different times, they talk about Joshua Meregildo

6    doing basically the same thing.

7            Another way you know Meregildo was participating in

8    this drug conspiracy is his own words.  You remember those

9    oaths that he had written and distributed to OGFC members?  And

10   there is a portion of it, OGFC oath, written in his own hand.

11   Then he says in there, he pledges to get -- getting money by

12   all means.

13           That's basically what he told Crocker and Pemberton.

14   You know how Joshua Meregildo and the crew got money.  By

15   selling drugs.

16           So the line of leadership for this drug conspiracy

17   went from T-Money to Meregildo.  After Meregildo was arrested

18   by the ATF on bank robbery charges, it was Melvin Colon who

19   took control of this drug conspiracy.  The first way you know

20   that Colon sold drugs with other Courtlandt Avenue crew members

21   is the incredibly detailed testimony you heard from the

22   cooperating witnesses in this case.  Crocker and Pemberton,

23   again, two very active crack dealers you heard from.  They told

24   you about Colon after T-Money's death supplying crack to crew

25   members.  They talked about Colon bagging crack in his own

1   bedroom and in his apartment on 161st Street, and how he set up

2   Crocker with his own supplier in that building, and how Colon

3   supplied several other crew members with crack.

4        You also know that Melvin Colon was involved in this

5   drug conspiracy from his own words.  And the photographs you've

6   seen at this trial.  I'm talking about Colon's own words where

7   he makes clear he is engaged in the business of dealing drugs.

8   I'll show you some of those Facebook posts you saw from Colon's

9   account.  September 2011:  I'm trying to see the man for like

10  600 grams.

11       September 2011 again:  About to play the strip.  I got

12  the key to Courtlandt.  Me and my N words got it on lock.

13  Money, drugs and bitches is all part of the game.

14       I don't need to explain what these men or go through

15  the dozens of other examples because you've seen them, some of

16  them.  But it's clear Colon is talking about dealing drugs on

17  Courtlandt Avenue with this crew.  Look at this last one we

18  have for you.  Free the dick heads Capito and 14 more money for

19  me LOL.

20       That's exactly right.  Capito is Javon Jones, another

21  GFC member you heard about.  14, that's Anthony Crocker, that's

22  his nickname.  If they got out of jail, Colon would make more

23  money.  Because they were selling for Colon out on Courtlandt

24  Avenue.  So that's not just empty words.  That's not bragging

25  by Colon.  That's exactly how he was making money:  Supplying

crack cocaine to dealers in this crew and getting a cut of those profits back.  The pictures that you saw, they tell the same story that you heard from the witnesses.  Colon worked with this crew on Courtlandt Avenue to sell drugs.

Talk about Earl Pierce.  Earl Pierce sold drugs, specifically crack, on Courtlandt Avenue.  It's straightforward.  You heard that over and over again from witnesses like Crocker, Villafranco, Folks.  And Folks, Bernard Folks, saw Pierce bagging up crack that summer in the apartment of another GFC member, Enrique Brito.  Folks was also right there when Pierce and T-Money split up crack that they bought together to sell on Courtlandt Avenue.  Here's what Folks said: I used to be at Ski Box house at a point when after me and T-Money just came from picking up product.  We used to go in the house.  They -- talking about Pierce and T-Money -- would put it on the table, split it up between both of them, and they go on about they business after that until the next shipment.

There is no better example of what this drug conspiracy charge is all about then the image of Pierce and T-Money sitting at Pierce's table and splitting up the crack they bought together to then distribute to other sellers on Courtlandt Avenue.

Devin Parsons confirmed what you already heard from these other witnesses, that Pierce was T-Money's partner in this drug trade.  Pierce -- Parsons told you that T-Money would

CBQ3MER2                      Summation - Mr. Fee

1    tell Parsons if he wasn't around, go to Pierce to give back the

2    profits from the drugs you sold for T-Money.

3            What absolutely confirms that Pierce was a member of

4    this drug conspiracy, the testimony of Maria Ortiz.  You heard

5    that she lived on Courtlandt Avenue in her sister's apartment

6    and her sister dated Pierce.  Maria Ortiz did not have any kind

7    of criminal relationship with T-Money, Pierce, or Miranda.

8    What did Maria Ortiz tell you about Pierce?  That in the summer

9    of 2010, she saw Pierce cutting up crack in that apartment and

10   splitting it into bags.  She saw Pierce pull a bag of crack out

11   of his rear and say he was going outside to sell it.  In fact,

12   Maria Ortiz told that you almost every time she was around

13   Pierce in the summer of 2010, he was talking about making drug

14   sales.

15           And who did Maria Ortiz actually see Pierce bringing

16   in and out of that apartment at 681 Courtlandt?  T-Money, Levi

17   Guzman, Miranda, another GFC member called 12.  That was Hassen

18   Brito.  Members of the Courtlandt Avenue crew.  In fact, on

19   multiple occasions that summer, she told you Maria Ortiz saw

20   Pierce and T-Money dividing up large amounts of cash between

21   them in that apartment.

22           Talk about Miranda.  Many of these witnesses knew him

23   as PayDay.  There is absolutely no serious dispute at this

24   point that Miranda sold crack to make money.  That he sold

25   crack on Courtlandt Avenue in and around the Jackson and

Melrose Projects.  And that he sold crack in that area for
quite some time before his arrest.  No one is going to come in
this courtroom and seriously dispute those facts.

          The issue I expect Miranda is going to dispute is
whether he sold drugs with this crew, as a member of this drug
conspiracy.  He absolutely did, and the evidence really makes
that clear.

          The first reason you know that Miranda was a member of
this drug conspiracy is again what you heard from the members
of this crew who sold side by side with Miranda.  Those
witnesses who were former GFC members told you the same thing.
That they frequently saw Miranda selling crack on Courtlandt
Avenue, side by side with other members of the crew.

          There is overwhelming physical evidence that Miranda
was actually selling crack on Courtlandt Avenue that summer.
Two times NYPD caught him with drugs or paraphernalia.  This is
from June of 2010, these baggies he was caught with.  And this
is from September, these empty baggies he was caught with,
Nolbert Miranda, in and around the Jackson and Melrose
Projects.  The officer who seized these, you remember,
estimated there were about a thousand little baggies in here.

          You heard from witness after witness after witness
about Miranda actually supplying crack to members of this crew
who sold on Courtlandt Avenue.  Pemberton went to Miranda in
2010 for crack, again and again, so he could sell it on

1    Courtlandt to the crew's customers.  Pemberton also saw Miranda

2    supply other crew members with crack that summer.  Crocker also

3    told you he got double ups -- remember that word that he and

4    Pemberton used -- from Miranda, just like Pemberton, so he

5    could maintain a steady flow of crack and cash for the crew's

6    customers on Courtlandt.  Parsons, he regularly split, he told

7    you, customers with Miranda.  Half of the drugs filled by

8    Parsons, half the drugs filled by Miranda.

9           Does any of this evidence even remotely support the

10   suggestion that Miranda was a completely independent drug

11   dealer on Courtlandt Avenue?  Of course not.  And again, Maria

12   Ortiz confirms what these other witnesses told you.  She saw

13   Miranda with T-Money, Pierce, and other crew members in the

14   summer of 2010, and heard Miranda talk about selling crack.

15          Then after his arrest in this case, Miranda admitted

16   what he did to make money.  He told Agent Castillo that he sold

17   crack, that he sold crack in the Courtlandt Avenue area for

18   many years, that he knew T-Money.  Miranda also told Agent

19   Castillo he was willing to plead guilty to 10 years.  Miranda

20   also told Agent Castillo he sold for himself.  And that lines

21   up actually with what you've learned in this case.  Miranda is

22   the guy who goes in on a crack purchase with T-Money.  He

23   doesn't buy from T-Money.

24          MR. BECKER:  Objection.

25          THE COURT:  Overruled.

1            MR. FEE:  Miranda sold for himself in the same way

2    that T-Money sold for himself.  He used the crew's dealers to

3    make money.  The fact that T-Money and Miranda sometimes

4    disagreed about certain things does not mean they were not both

5    part of the same conspiracy.  Jeter and A-Rod don't always get

6    along, but they both still play for the Yankees.  Similarly

7    here, there is no legal requirement that all the participants

8    of the conspiracy get along or that they agree on all of the

9    ins and outs of the details of the conspiracy.

10            Miranda, you learned, was in fact essential to the

11   health of this drug conspiracy on Courtlandt Avenue.  From all

12   the evidence you heard in this case, before T-Money died,

13   September 2010, there were only two sources of supply for this

14   24/7 crack market on Courtlandt Avenue.  T-Money and Nolbert

15   Miranda.  That's it.

16            I expect that Miranda and Pierce's attorneys may argue

17   that those two defendants might have sold drugs on a few

18   occasions, but did not conspire with the rest of the crew, and

19   really you should not spend much time on that argument before

20   you completely reject it.  You have overwhelming evidence in

21   this case that both Pierce and Miranda worked with members of

22   this crew in 2010 to sell crack.  Given everything that we just

23   discussed about this evidence, how can Pierce or Miranda

24   seriously dispute that they were working with the rest of this

25   crew in this drug conspiracy?  In no aspect of your ordinary

1    lives would you accept such a claim.

2              Step back and think about something that might be more

3    easy to digest.  Think about going to see a music show.  A band

4    with a few people playing guitars, a drummer with a big drum

5    set.  Maybe some horn players, backup singers, a lead singer.

6    You watch the show and they are playing some pretty good music.

7    The drummer is keeping time, the guitar players get a few

8    solos, the backup singers are doing their moves; it all sounds

9    pretty good to you.  After the show ends, if someone came to

10   you and told you, hey, you know that drummer, he was not

11   playing music with the rest of that group.  He just happened to

12   be practicing his drums on the stage at the same time that all

13   those other folks, the singer, the horn players, the guitar

14   players, just happened to show up.  I'm telling you that

15   drummer was not even with those other musicians.  They just all

16   happened to be at the same place at the same time.

17             Ladies and gentlemen, you would say that's ridiculous,

18   that's absolutely ridiculous.  Of course the drummer was

19   playing in the band.  He was keeping time with the songs, he

20   was hitting the bass drum on the right notes, he was looking at

21   the other band members and he was smiling.  Everything I saw

22   and heard made absolutely clear that that drummer was a part of

23   the group.

24             And it is the same thing here.  Pierce and Miranda

25   were part of the crew for this drug conspiracy, and everything

1    they did and saw that you learned about in this trial made that

2    absolutely clear.

3            On top of that, you know who did not sell with T-Money

4    and GFC.  The crew's rivals.  The YGs gang.  O's people.

5    Luchie's people.  There is not one piece of evidence in this

6    case, not one line of testimony that any of those groups ever

7    sold where the crew was selling at the same time.  They would

8    have been shot if they tried to sell crack there.  But men like

9    Pierce and Miranda, on the other hand, were on Courtlandt,

10   selling side by side with T-Money and GFC.  Because this was

11   one crew working together in one drug conspiracy.

12           Briefly before I turn to the other charges, I want to

13   briefly talk about the amount of drugs that were sold during

14   this conspiracy, and I expect Judge Pauley is going to tell you

15   if you find the defendants guilty of being involved in this

16   conspiracy, you're going to be asked whether the conspiracy

17   involved more than 280 grams of crack cocaine over the entire

18   life of the conspiracy.

19           This is an easy question, a simple question.  You

20   heard Crocker estimate that the dime bags of crack he used to

21   sell each had about .2 or so grams of crack in each bag.  You

22   also heard from a chemist, Ms. Osorio.  She talked about a

23   sample of drugs she had which was processed and had about .05

24   or 6 grams of crack in each bag.  That's after processing, but

25   she said it was around that amount.  So, you know, let's take

the estimate between .2 and .05 grams in each dime bag.  This

will be the only math I do.  I promise.  So think about that.

Even if Miranda or Pierce or Pemberton or Parsons or whoever

only sold about 50 bags a day, at that extremely low estimate

of .05 grams per bag, that adds up to about 75 grams per month.

That's only for a single crack dealer working one month in this

conspiracy.  This went on for about 18 months from September --

excuse me, from the spring of 2010 through September of 2011.

So based on this low estimate, one dealer for this crew would

have sold 1,350 grams of crack during those 18 months.  That's

based off of what could have been a bad day of sales for

someone like Miranda or Crocker, Parsons.  Because you heard

from Pemberton, Crocker and Parsons they sometimes sold a

hundred bags in a day, 32 bags in a couple of hours.

       Again, using the lowest possible estimate for the

weight of crack in the dime bag, just one single dealer sold

that amount.  So you'd only need four dealers working one month

to sell 280 grams of crack.

       Here's some of that same math.  Using that .05 system

for one dealer, take them less than four months.  And just

using a slightly higher estimate, closer to Crocker's 280

grams, in less than two months.  Again, one dealer, and you

know there were many, many dealers involved in this crew.

       The point, ladies and gentlemen, is that this drug

conspiracy involved hundreds and hundreds of grams of crack

1    being sold every month.  So the question about quantity really

2    should not take much of your time.

3            So the drug trade was the engine that drove this crew,

4    but the guns, all these guns they had were absolutely key for

5    this group to thrive.  You recall Aubrey Pemberton

6    demonstrating the original symbol for GFC.  The one that Colon

7    did with Pemberton the very first time they met.  It was the

8    two guns up symbol.  You saw it in photos as well.

9            Some of these crew members had tattoos reflecting

10   guns.  Nolbert Miranda.  Guns and baggies.

11           And ladies and gentlemen, here are all the guns

12   recovered from this crew.  These are just the ones -- they're

13   falling apart.  These are just the ones recovered by the ATF

14   and the NYPD.  And parts of the guns.  You know they had more

15   guns than just what is recovered and what's falling apart on

16   that table, because you saw in pictures some of these other

17   guns.

18           The first gun charge I want to address relates to all

19   four of these defendants, and it is about them possessing using

20   or carrying guns in connection with the charged drug

21   conspiracy.  All of the witnesses who previously were members

22   of the crew, Folks, Parsons, Pemberton, Villafranco, Crocker,

23   they told you about guns kept in crew members' apartments, in

24   mailboxes, in the lobbies of buildings in the Jackson and

25   Melrose Houses, and on the block itself.  Right there on

Courtlandt Avenue, put in pizza boxes, kept in the grass,
tucked behind the wheels of cars that were parked on the
avenue.  All of these witnesses also told you why these guns
were kept on the block in 2010 and 2011.  To protect the crew's
territory on Courtlandt Avenue from rival gangs and rival drug
dealers.  Folks told you about this.  The reason he said was to
protect us from our beefs, our problems with other
neighborhoods and other crews.

          You also learned that the entire crew had access to
these guns.  You know that because they actually went and
carried and used the guns frequently.  After T-Money's death,
Meregildo took control of these guns.  Remember the meeting in
the car with Crocker, Meregildo asked him do you need a gun.
Do you feel safe.  Meregildo had control of the guns, and
control of the crew's members after T-Money died.  And then
Colon was the man who kept the supply of guns going for the
crew.  You heard about this from several cooperating witnesses.
Melvin Colon had an arsenal of weapons kept at his apartment at
161st Street, in addition to the drugs he kept there.

          Folks, Pemberton, Crocker, they didn't just see these
guns at Colon's apartment once or twice.  In 2011, a steady
supply of guns was a constant at Colon's apartment.  You needed
a gun, go to Melly's.

          You also heard from these witnesses about how Colon
kept buying more guns to keep up the supply for the crew.  And

1    remember, he would ask for money sometimes to get reimbursed

2    for the guns.

3         So what about Earl Pierce and guns.  Now, one

4    remarkable theme in the evidence in this case, something that

5    came up from witness after witness talking about entirely

6    different situations, was Earl Pierce and this gun.  This

7    silver and black .380.  This was Pierce's gun, and there really

8    should not be a serious dispute about that at this point.

9         Early in the summer of 2010, Crocker talked about

10   this.  Just after that failed attempt on T-Money's life,

11   Crocker saw Pierce minutes after the assault out on Courtlandt

12   Avenue carrying this gun.  So you know Pierce had it at the

13   ready.  Parsons saw Pierce again with the silver and black .380

14   on several occasions, and told you that Pierce kept this gun

15   inside of the mailboxes in the lobby of the 681 building where

16   he stayed.

17        Let's look at where that 681 building is.  You've seen

18   this from the bigger map.  Courtlandt Avenue is just next to

19   that building where the crew dealt crack and marijuana 24/7,

20   and where Pierce himself made crack sale after crack sale.  So

21   there really is no question, and common sense tells why you

22   Pierce had that .380 in the summer of 2010.  He kept it around

23   in case he needed it while he was selling drugs on the strip.

24        For Miranda there is overwhelming evidence that he

25   possessed and carried guns while dealing crack and that he

CBQ3MER2                    Summation - Mr. Fee

1    aided and abetted or helped other people carry guns in the

2    summer of 2010.  Parsons gave you amazing proof of this.  In

3    the summer of 2010, Parsons was with Miranda on Courtlandt

4    selling crack.  Remember, Miranda asked Parsons to come down to

5    a building at the Maria Lopez Houses.  There, Miranda gave

6    Parsons a silver 9-millimeter pistol with a black handle.

7    Parsons told you it could hold 17 shots, he was told.  Miranda

8    told Parsons to take the gun back to Parsons' apartment which

9    was in that 681 building, and a few hours later Nolbert Miranda

10   came to Parson's apartment, took the gun, and went down to the

11   second floor.  And you know what was on the second floor of the

12   681 building, Earl Pierce's apartment.  And in fact, Pierce

13   ended up with Miranda's 9-millimeter pistol after that day.

14   You know that because at some point after Parsons spoke with

15   Pierce, Pierce told him he had PayDay's 9-millimeter.  The

16   9-millimeter that could hold 17 shots.  The same gun that

17   Parsons had carried for Miranda to the 681 building.

18          Miranda also left a gun at Pemberton's apartment and

19   he told you about that.  Pemberton described the gun as a

20   silver and black 9-millimeter.  The same description you've

21   heard from witness after witness about the gun that was in

22   Miranda's possession.

23          So this is more of the same conduct for Miranda.  Just

24   like he had Parsons carry the gun, he had another young GFC

25   member store that 9-millimeter in Pemberton's apartment.  More

CBQ3MER2                    Summation - Mr. Fee

1    of the same.

2            In addition, after his arrest, Miranda admitted to

3    possessing a gun on Courtlandt Avenue.  Miranda told Folks in

4    prison, Folks told you, that while he was out on Courtlandt he

5    had a silver and black 9-millimeter gun.  The same gun you

6    heard described by witness after witness.

7            Using your common sense, you know why Miranda wanted

8    to keep these guns close to Courtlandt Avenue.  Because that's

9    where Miranda sold crack, and that's where he supplied crack to

10   members of this crew.  Miranda lived somewhere else, you heard.

11   But he kept his guns on Courtlandt because that's where he sold

12   drugs.

13           There are several additional gun charges that relate

14   to the different acts of violence in this case.  Let's turn to

15   those acts of violence now.  As you've heard from some of these

16   witnesses, the crew on Courtlandt Avenue was the central focus

17   for many of these young people's lives.  It was like their

18   family, some of these witnesses said, especially when T-Money

19   was alive.  So in the summer of 2010, when the crew's rivals

20   began to threaten the crew's drug territory and they tried to

21   kill T-Money on that occasion, some of these defendants became

22   obsessed with protecting the crew, its drug business, and its

23   leader.  This obsession led to the most serious, the most

24   heinous crimes in this case.  Assaults, attempted murders, and

25   murder.

CBQ3MER2                     Summation - Mr. Fee

1             Let's talk about the murder of Jason Correa.  Jason

2      grew up and lived near the Jackson and Melrose Projects where

3      the defendants' group operated.  He was on the opposite side of

4      the crew's war on its rivals.  Maria Ortiz and Iris Perez told

5      you how close Jason was with O, one of the rivals.  Said they

6      were like brothers.

7             On July 25 of 2010, when Earl Pierce's cousin brought

8      Jason to 681 Courtlandt Avenue, again, in the heart of this

9      crew's territory, Pierce and T-Money seized the opportunity to

10     take out someone they viewed as a rival.  You learned about

11     Pierce's role in this vicious murder from multiple witnesses.

12     First, Folks told you a little bit of background about this

13     rivalry, talked about how O had told T-Money early in the

14     summer of 2010 that T-Money could not sell in the area.  Folks

15     also told you about what Pierce did to help murder Jason

16     Correa.

17            On July 25, Folks said he began the day as he often

18     did that summer, selling drugs on Courtlandt Avenue.  And you

19     heard what that meant, moving up and down the block, in and

20     around Courtlandt, sometimes hanging with other members of the

21     crew.  Servicing customers for drugs.  And at some point,

22     Pierce took T-Money aside, and Folks overheard part of that

23     conversation.  He overheard Pierce telling T-Money let him

24     live, he's with my cousin.  Let him live.  My cousin's with

25     him, let him live.  You remember seeing the person on that

CBQ3MER2                    Summation - Mr. Fee

surveillance view who Folks identified as Pierce's cousin.  And

he was walking with Jason Correa into 681 just before Jason

died.  On the right, Pierce's cousin.  On the left, Jason

Correa.  You see Pierce's cousin has the hand to his ear.

        Folks said that after he heard this exchange, Pierce

went into the 681 building, T-Money followed, and Folks and

Pemberton went as well.  In the lobby, Pierce spoke with

T-Money again.  And Folks overheard part of it again.  Pierce

told T-Money I am going to be waiting for you to finish.  When

you come out, I'm gonna be there.

        That's exactly what Pierce did.  Pierce was waiting

for T-Money to shoot and kill Jason Correa, and he took the gun

back after it happened.

        Who else was in that lobby.  Pemberton was there, and

he told you about a separate exchange he had with T-Money and

Pierce.  And Pemberton was very candid with you.  He told you

that he thought they were going to do a robbery, and he wanted

in on it.  So he walked up to T-Money and said let me do it.

And at that point Pierce stepped in, and here's what Pemberton

heard him say.  No.  Pierce told T-Money.  You wanted it, you

do it.

        So let's be clear what was happening just outside of

681 and in that lobby, Pierce and T-Money were planning the

murder of Jason.  And inside the lobby, Pierce made clear that

he wanted T-Money to go forward with the murder.  "You do it"

1    he told T-Money.

2            That's, again, exactly what happened.  T-Money and

3    Folks in that building went inside the stairwell.  Pierce went

4    up the opposite stairwell to wait by his apartment.  T-Money

5    let Pierce's cousin, the heavy-set guy we just saw, pass on

6    through and then he stopped Jason.  Then, T-Money pulled out

7    this .380 gun.  Pierce's gun.  Next, T-Money shot Jason using

8    this gun.  First T-Money shot Jason in his chest, then in his

9    stomach, and in each arm.  After those four shots, T-Money and

10    Folks stepped over Jason's body, started going up the stairs,

11    towards where Pierce was waiting to get the gun.  But when they

12    heard as if it sounded like Jason had a breath of life in him,

13    T-Money turned back around and shot Jason in the back.

14            And that's what Folks told you, and that's exactly

15    what the autopsy and the crime scene photos show.

16            Then T-Money went up the stairs and he handed this gun

17    back to Pierce.  Pierce took the gun on the second floor right

18    outside the apartment where he was staying.  Maria Ortiz took

19    you through the rest of the story at this point.  All of her

20    testimony is really incredibly damning against Pierce.

21            So that same day, Maria told you she was inside of the

22    apartment on the second floor of 681.  And only about

23    20 seconds after she heard the last shot outside her door,

24    Pierce came back walking in the apartment.  He was cool, he was

25    calm, he was collected.  Consider that for a moment.  Think

about your everyday experiences.  If you heard gunshots just
outside the door where your family lived, would you be scared?
Would you at least be worried?  Would you ask if everyone was
okay?  Of course you would.  But Pierce didn't, and he was calm
because he knew exactly who fired those shot, and who was hit
with those shots, because he was in on the murder.

         Then some time later, after Pierce learned that Maria
Ortiz was talking to the police, you heard her tell you that he
threatened to kill her.  Let me say that again.  After Pierce
learned that Maria Ortiz was talking to the police about
Jason's murder, Pierce threatened to assault and to kill her if
she kept snitching.  That's a guilty conscience, and that's
because Pierce is guilty of this murder.

         I want to make a few quick points about some of the
arguments I expect you are going to hear from Pierce's attorney
about this.  I expect they are going to make some point about
the clocks on the surveillance videos not lining up perfectly
with the minute with what you heard.  I am not going to replay
all those videos for you because we don't have time.  Let me be
clear about this.  These surveillance videos absolutely
corroborate the witnesses' testimony about the important events
leading up to this murder.  No one is going to be able to stand
before you and seriously argue that the videos you saw do
anything other than offer remarkable proof that Jason was
brought to that building on that day by Pierce's cousin, that

CBQ3MER2                         Summation – Mr. Fee

1    Pierce was inside of 681 that day, that Folks and T-Money and

2    Pemberton were there, and that T-Money and Folks left, just as

3    Folks said they did.

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. FEE:  And this is in line with another argument I

2     expect you're going to hear.  That is that the testimony of

3     Folks and Pemberton somehow differs on certain details and that

4     means they're not telling the truth.  Now you heard both their

5     testimony and you can evaluate it for yourself, but the

6     differences between their accounts really should –– should give

7     you confidence that they're just telling you what they each

8     remember independently of one another and really their

9     testimony and the other witnesses' testimony corroborates what

10    Folks told you.

11         Pemberton told you what he learned after the shooting

12    from T-Money.  T-Money told him that they used a .380 gun to

13    kill Jason.  T-Money explained why they killed him, because

14    Jason was O's people and it had to get done, T-Money told him.

15         Crocker.  He learned directly from Pierce on the day

16    of Jason's murder that T-Money –– that on the day of Jason's

17    murder, according to Pierce, T-Money knew that Jason was in the

18    building.  Pierce admitted to Crocker that on that day he was

19    waiting to take the gun from T-Money, and that after the

20    murder, Pierce got the .380 from T-Money, and it was being

21    snatched from Pierce's apartment, he told Crocker.  That's

22    exactly what happened, and when Crocker told you that, he could

23    have only learned those details from Pierce himself.

24         Pierce also told Crocker that at some point after the

25    murder, a young GFC member, 12, called Enrique Brito –– named

Cbq1mer3                    Summation - Mr. Fee

Enrique Brito, gave Pierce's .380 to the cops.  That's why it's
here today.  And Pierce told Crocker that he was worried
because this .380 had a body on it.  That's what he told him
after Jason's murder.  And he thought 12, the person who handed
it over, might tell on him.

        Well, you know what happened.  Pierce sits there as a
defendant, and there's overwhelming evidence of his guilt in
this case.  So he was right to be concerned.

        Now finally, Maurice Hagen, that last cooperating
witness you heard from.  He gave remarkable evidence about
Pierce's role in this murder.  While in prison, Pierce told
Hagen that he didn't shoot Jason but that he hid the gun that
was used to kill him and that the person who really did it --
and you know that's T-Money -- was now dead.  That's what
Pierce told him.

        So let me briefly discuss the charges relating to this
murder.  It's charged as a conspiracy to murder members of the
Melrose organization, and that's just a name that was used in
the indictment to describe O's crew.  It's also charged as the
murder of Jason Correa in aid of racketeering, as a murder in
furtherance of a drug conspiracy, and as murder through the use
of a firearm.  They all relate to the same conduct that I just
talked about, and Judge Pauley is going to instruct you on all
the legal requirements.

        Now let's turn to that next homicide.  Let's talk

Cbq1mer3                        Summation - Mr. Fee

about the murder of Carrel Ogarro.  Carrel was a young man from
a caring family who also lived in the Jackson and Melrose
projects.  And after moving there, Carrel developed a drug
problem.  You heard he had used dust, or PCP, and at some point
he was arrested on a drug charge, and rumors started to
circulate throughout the neighborhood that Carrel was
snitching, meaning that he was giving information to law
enforcement.

          Now people in the neighborhood just didn't trust
Carrel because of those rumors.  You heard T-Money, HD, Joshua
Meregildo's older brother.  Even Chris Ogarro, who had nothing
to do with this crew, came here and told you that he heard
these same rumors about Carrel and it concerned him.

          Now those rumors were so persistent and such a threat
to T-Money and his crew who were selling drugs on Courtlandt
Avenue, threatened by what they thought was a snitch, that they
took action.  The first step was T-Money asking Parsons and
Meregildo to kill Carrel and offering them $5,000 each to do
it.  That's what Parsons told you.  Later, on July 30th,
Meregildo and another GFC member, Walter Aponte, waited for
Carrel in the courtyard behind the 300 building that you heard
about in the Court -- in the Jackson-Melrose projects.  Parsons
met Meregildo and Aponte outside, and Meregildo said he had a
.380 pistol with three shots in it.  This same .380 pistol.
Pierce's silver and black gun.

1      Now you also heard from Parsons that Meregildo saw

2  Carrel sitting on a bench.  He walked over and actually tried

3  to shoot Carrel, but the safety was on so the gun didn't go

4  off.  After that the three men -- Meregildo, Parsons, and

5  Aponte -- went to another apartment and picked up another gun,

6  and this was one of the same apartments you've heard about that

7  the crew maintained to hold its drugs and guns.

8      Now there's no serious dispute that after they left

9  that second apartment, Parsons had a .22-caliber revolver and

10 Meregildo had that same .380-caliber pistol.  And Parsons

11 said -- and this is -- becomes important -- that they left that

12 apartment around 5 a.m. to go back out to look for Carrel.  So

13 then they saw Carrel again in that same courtyard, and here's

14 what Parsons described what happened:

15     He, Carrel, came through the path.  He was walking

16 towards us.  We were standing there.  He stopped.  He asked us,

17 he said, what's up.  We said what's up.  He put his hands in

18 like the back of his pants, like, I don't know if he was going

19 to pull out something.  I back up.  Parsons says.  Killa pulled

20 out the gun -- remember he had the .380 -- and fired.  He,

21 Carrel, tried to run.  Killa fired again.  I fired.  And Killa

22 fired again and ran in the back door.  And I then -- Parsons

23 says, I walked up to him, stood over him, and fired about five

24 times.

25     That's horrible.  That's a vicious, nauseating account

of a murder that Parsons gave you, and no one in this room is

ever going to tell you that Devin Parsons is anything other

than a criminal and a murderer.  But the important point for

what you need to do back in that jury room, while deliberating,

is to think about, does that sound like the truth?

        Now there's overwhelming corroboration of Parsons'

testimony.  Other witnesses, other evidence.  And I'm going to

talk about all of that, but let's just talk about what Parsons

told you very briefly.  This, what you just saw, is not what

you would expect to hear if Parsons was making up lies to keep

himself out of trouble and to get others into trouble.  It's

just not.  Parsons told you that after Meregildo shot Carrel a

few times, Meregildo ran away.  Then Parsons walked up to the

dead or dying body of Carrel and shot him five times, including

once in the head, using that .22 pistol he talked about.  So

we're clear, Parsons sat on that witness stand and told you

that Meregildo shot a few times, ran away, Parsons took the gun

and shot Carrel Ogarro five times.  Use your own common sense,

your own judgment.  In that testimony who sounds like a worse

person?  Who comes off as someone willing to do more serious

crimes?  There's no question that that is Parsons.  So once

again, the important question here is not whether Parsons is a

murderer, because you know he pled guilty to those serious

crimes -- to that crime and other serious crimes.  The

important question right now, right now in this case, is, do

Cbq1mer3                          Summation - Mr. Fee

you think Parsons is telling the truth?  And the answer is

clear from his account that for all his extremely serious

crimes, Parsons sat on that stand and laid it all out for you

to the best of his ability.

What happened after they shot Carrel?  Well, Parsons

told you that the three of them ran back to Aponte's apartment,

and there Parsons told you that he had that young lady,

Brittany Brown come and carry a bag with the two guns -- this

.380 and the .22 -- back to Parsons' apartment.  Ms. Brown told

you that she was testifying here pursuant to a subpoena and

immunity order and she didn't want to be here.  But she did

tell you what happened that day, and she corroborated in

important parts what Parsons told you.  She said she went to

Aponte's apartment after the murder, she saw all three of the

people that Parsons told you were involved -- Joshua Meregildo,

Parsons, and Aponte.  And then Ms. Brown and Parsons went back

to Parsons' apartment, 681, and Parsons told her that day, "We

killed Carrel.  Meregildo fired first, and I finished him off."

The same thing he told you in this courtroom.

And there's overwhelming corroboration of what you

learned from Parsons, who also told you, by the way, that he

took those two guns that day down to Harlem to try and get rid

of them, but then he had to go back and later he said because

Pierce wanted his .380 back.  That's what Parsons told you.

Now what else do you know about this murder and how

Cbq1mer3                          Summation - Mr. Fee

1    else do you know Parsons gave you an absolutely accurate

2    account?  First, Folks.  Folks was not there that night, but he

3    was close with Meregildo, and Meregildo told Folks exactly what

4    happened only a couple days after Meregildo had killed Carrel.

5    Here's what Folks said Meregildo told him:

6            He killed him because he said he felt he was moving

7    funny.  He was with Dev and Walt and he shot him.  He caught

8    him in his old building, 300.  He shot him in the building

9    somewhere.  Some way he, Carrel, made it out of the building.

10           And then he talks about where this happened:

11           A little play area.  He made it past there and ran in

12   towards the direction of the right side of the bird cage, back

13   in front of the building.  And that's when he, Meregildo,

14   killed him at, going up that path.

15           That's remarkable.  Think about for a moment all the

16   ways that this admission from Meregildo interlocks exactly with

17   what Parsons told you.  First, moving funny.  That's basically

18   how Parsons said T-Money talked about Carrel.  Folks learned

19   that from Meregildo.  Next, Meregildo said he did it with Dev

20   and Walt.  That's Parsons and Aponte, the same people that

21   Parsons talked about, the same people that Ms. Brown saw in the

22   apartment after the murder.  Next, Meregildo tells Folks that

23   Carrel ran out of the building, crossed the playground, and was

24   shot as he ran up the path.  Now that's basically what Parsons

25   told you.  And that's how it happened, because that's what

Cbq1mer3                          Summation - Mr. Fee

1    Meregildo said as well.

2              Now this testimony from Parsons and Folks is

3    corroborated by other evidence in this case.  Evidence from

4    witnesses that no one is arguing are lying or making things up.

5    Dr. Ely was a medical examiner in this case from the New York

6    City Office of the Chief Medical Examiner.  She did the autopsy

7    on Carrel.  She told you Carrel had seven gunshot wounds.  One

8    of them entered his left chest, and that's where they found

9    that .380 bullet from this gun.  And who had the .380 that

10   night?  Meregildo, according to what you know.

11             And Parsons told you about when the killers confronted

12   Carrel, and I just want to bring this up again because it ties

13   into what Dr. Ely told you.  This is when they first confronted

14   Carrel:

15             We had our hands in our pocket.  He looked at us, he

16   stepped back, and he put his hands behind his back.  Next Killa

17   pulled out the gun and Killa shot.

18             Then he talks about Killa running, again, Killa hit

19   him in his lower back, and again, Killa had the .380, Parsons

20   had the .22.

21             So no one is going to stand before you and argue that

22   Parsons had any idea about what Dr. Ely found in her autopsy,

23   or that he knew what she was planning to tell you in this

24   courtroom.  But Parsons' testimony about Meregildo holding the

25   .380 and shooting first at Carrel as he was facing his killers

Cbq1mer3                        Summation - Mr. Fee

is corroborated exactly by what Dr. Ely told you.

        Meregildo -- Parsons said that Meregildo had this
.380, shot first, Carrel was standing face to face.  Now
according to Dr. Ely, there was one shot in Carrel Ogarro's
body that entered from the front, and that's the shot from the
.380 gun that left .380 bullets in Carrel's chest.  Dr. Ely
told you that every other shot either entered from the back of
Carrel or at an odd angle, like the bullet in the top of
Carrel's head that she talked about.  And this confirms what
you were already told about this murder by Parsons -- that
Meregildo shot first with that .380 while he was facing Carrel.

        Parsons is also corroborated by the ballistics expert,
Detective Fox.  Detective Fox told you that his tests showed
that two guns were used in the murder of Carrel -- two, just as
Parsons told you.  There were two guns there.  Detective Fox's
tests also showed that the bullet recovered from Carrel's skull
did not come from a .380, and again, Parsons told you he shot
Carrel in the head with the .22.

        Finally, the cell site records.  These were the maps
and charts that FBI Agent Perry used to tell you about these
records, and they basically show where Meregildo's phone was at
the night he killed Carrel.  And there's three reasons you know
this was Meregildo's phone and that he was using the phone that
night.  Number one, you heard Agent Castillo that this same 347
phone number was the one listed as Killa's number in Dev's

1    phone, that Meregildo himself listed this number as his own

2    phone and the iPhone that was seized from him at the time of

3    his arrest by the ATF, and as you saw in these charts, before

4    and after the murder, that phone goes back to where Meregildo

5    was living at, 2235 Haviland.  And these records leave really

6    absolutely no doubt that Meregildo was in the area where Carrel

7    was killed before, during, and after that murder.

8            So let's look at one of these.

9            Now those are the areas where Josh Meregildo's

10   cellphone was located during the night Carrel was killed, and

11   you don't need to have the same level of understanding that

12   Agent Perry has to know what this means.  It makes clear that

13   Joshua Meregildo was in and around that area all night.

14           What about when Carrel was killed?  You heard from

15   Parsons that they went out to look for Carrel at around 5 a.m.

16   Then they sat around and waited for some time.  And then

17   eventually they found Carrel and killed him.  That's what

18   Parsons told you.  And Officer Guzman -- she was the woman who

19   found Carrel's body -- she also said that she heard the shots

20   at around 5:45 a.m. and went to find the body seconds later.

21   So again, it corroborates Parsons' time line pretty much that

22   night.

23           Now what did these cell site records and the phone

24   records say about what Meregildo was doing at that time?  Let's

25   look at one of them.

1           That blue fan is the call that Meregildo made at

2     5:01 a.m., and so he was in that area around where Carrel died,

3     300 East 158.  That's where Carrel's body was found.  It's

4     marked with a red dot in the center -- the red dot with the

5     black dot inside of it.  Now that was the last call Meregildo

6     made until about 6:10 a.m., which is the call hitting the area

7     marked with the yellow fan.  So what does that tell you?  That

8     Meregildo stayed in that area between 5 -- excuse me -- 5:01

9     and 6:10 a.m.

10          Now let's go to the phone records as well.

11          So remember on these, the zero-second calls are text

12    messages, you were told.  If you look, there were zero calls,

13    zero texts between 5:04 and 5:25, while they're looking for

14    Carrel.  And then there's a couple more texts and then again

15    silence between 5:30 and 6:08 on the morning Carrel was killed.

16    This is Meregildo's cellphone.  So you know for sure, based on

17    the other evidence, what Meregildo was actually doing at that

18    time.  He was stalking and shooting Carrel.  And these records

19    corroborate that testimony and that other evidence again.

20          And again, this murder is charged in four different

21    ways.  All of them relate to the same conduct that we just

22    talked about on Meregildo, and for the racketeering-related

23    murder counts, it's clear in this evidence that Meregildo

24    committed this murder both to maintain and enhance his position

25    in the crew.  That's something you'll be asked to decide.  And

1    that he also did it for financial gain.  Meregildo did this

2    murder to maintain his position as a leader and as a good

3    soldier in the eyes of T-Money and the other members of this

4    crew.

5              Ladies and gentlemen, this is Young Killa.  Now

6    however he first got that nickname, in 2010, he began to

7    literally live up to that.

8              Let's talk about the third murder you learned about,

9    the murder of Delquan Alston.

10             Delquan Alston was not in GFC, he was not a leader of

11   any group on Courtlandt Avenue.  He was just someone who was in

12   the neighborhood and, as you heard, sold fake drugs on

13   occasion.  He was murdered by Parsons and this man, Melvin

14   Colon, at T-Money's request.

15             Now why did Colon and Parsons kill Delquan?  Two

16   reasons.  First, Delquan asked the wrong questions at the wrong

17   time.  You heard about the -- about all the violence that was

18   going on the summer of 2010, the attempt on T-Money's life, and

19   in the middle of this extremely tense violent situation,

20   Delquan started asking repeatedly about money that was being

21   offered to kill T-Money.  That made Delquan seem like a threat

22   to this crew.

23             Second, you heard that Mel -- that Delquan was selling

24   fake drugs and that crew members thought that was messing up

25   their business.  Crocker and Parsons talked about this.  It was

Cbq1mer3                        Summation - Mr. Fee

1    bad that Delquan sold fake crack to the crew's customers,

2    because people who bought fake crack wouldn't come back a

3    second time.  So T-Money asked Colon and Parsons to commit the

4    murder, and he offered to pay them.  Colon and Parsons did

5    exactly what T-Money asked them to do, and that's what the

6    evidence showed you.  Parsons gave a detailed account of what

7    happened on the night Delquan was murdered, and I submit that

8    it was accurate and you can rely on it.  And again, Parsons has

9    pled guilty to committing this murder and other murders, and

10   he's going to be sentenced for his crimes.  But the important

11   thing, the only important thing here and now, is for you to

12   scrutinize Parsons' testimony and assess whether it was

13   truthful in this case.

14            So what happened that night?  Pemberton is drinking --

15   Aubrey Pemberton -- with Delquan, when Parsons shows up.

16   Pemberton leaves to go to that party he talked about.  Then

17   Parsons and Delquan meet up with Colon.  Again, Delquan talks

18   about needing money and the money being offered to kill

19   T-Money.  Parsons and Colon looked at each other, and Dev goes

20   to get a gun.  Parsons gets a gun from Villafranco's

21   apartment -- Carlos Villafranco -- and he brings it back.  He

22   brings this gun, this big gun, the .40-caliber.

23            Now having this gun, Parsons and Colon walk around

24   some more with Delquan, waiting.  At some point Delquan stops

25   to urinate against the side of 285 East 153.  And that's right

Cbq1mer3                        Summation - Mr. Fee

1    there, behind that black fence, where Delquan stops to use the

2    restroom.  At that point Colon -- and you see he's writing with

3    his right hand right there, ladies and gentlemen.  He pulls out

4    this .40, this gun, and he holds it just next to Delquan's

5    right ear, behind his right ear, about 2 feet away.  And you

6    know that Colon is just about the same height as Delquan, both

7    around 6 feet.  You heard that in testimony.  So Colon's arm is

8    just about level with Delquan's right ear when he's holding

9    that gun.  And then Colon waits.  He's nervous.  He thinks,

10   this is my first murder, my first body.  He hears Parsons tell

11   him to shoot and then he fires.  The first shot spins Delquan

12   around so he's face to face with Colon, and Colon is shocked.

13   He sees Delquan and he fires again, which sends Delquan to the

14   ground face down.  At that point Parsons takes the gun, and for

15   a second time that summer, Devin Parsons fires at a dead or

16   dying victim of the crew's violence.  That's how it happened.

17           And there are literally dozens of points of

18   corroboration for each of the witnesses who talked about --

19   from each of the witnesses who talked about this homicide from

20   what Parsons told you, and at this point, after hearing all of

21   these witnesses and all of this evidence, we need to be

22   straight about this fact:  Colon committed this murder.  And

23   there's overwhelming evidence.

24           Parsons.  He gave you a detailed account of what

25   happened that night and of Colon's role in it.

Cbq1mer3                          Summation - Mr. Fee

1          Villafranco.  Villafranco was holding this gun, this

2     .40-caliber pistol, in his apartment.  Parsons came that night,

3     took the gun from Villafranco, as Villafranco told you, and

4     then later Parsons and Colon brought it back.  And Villafranco

5     told you a detail that you only remember if you're recounting

6     true events.  He said this gun smelled like gunpowder when they

7     handed it back.  And Villafranco told you what happened in

8     between the time the gun left and came back.  Villafranco heard

9     gunshots, he looked out the window, and he saw Parsons and

10    Melly, as he put it, running back towards the building where

11    Villafranco was staying.

12         The third way you know Parsons is telling the truth is

13    what Folks told you.  Folks heard it directly from Colon.  And

14    here's what Colon told Folks about this murder:

15         He said he got him drunk, 'cause he knew he was going

16    to have to use the bathroom.  And this is Colon talking about

17    Delquan.  He kept giving him drinks.  When Black -- that was

18    Delquan's name as you heard, nickname.  When Black went to go

19    use the bathroom, he came from behind him, shot him in his head

20    a couple of times, and then he flipped over the gate, he shot

21    him some more, passed the gun to Dev, Dev shot him.

22         Now you know this was not a story Folks created with

23    Parsons because it's a little different.  Like that detail

24    about Delquan flipping over the gate, Parsons never told you

25    that.  But this is what Folks learned from Colon.  And it

1    corroborates all the important details you heard from Parsons.

2         Now the fourth way you know what happened on that

3    night is the testimony of Pemberton, and again, Pemberton heard

4    it directly from Colon, who admitted all the important details

5    about this murder.  Colon even told Pemberton that after the

6    murder, Colon and Parsons went back to Villafranco's apartment

7    and gave him the gun.  And most recently Colon talked about it

8    in federal prison.

9         Remember this photograph?  Pemberton told you, Colon

10   bragged to Pemberton and others about what he did to Delquan.

11   He told him, he said the .40, this gun, knocked him out of his

12   sneakers.  Pemberton understood that to mean when he shot him,

13   when he shot Delquan, Delquan flew out of his sneakers.

14        Now this is clearly not just boasting or bragging by

15   Colon.  This is nonfiction, ladies and gentlemen.  This is one

16   friend telling another friend about this murder.

17        Crocker also talked to Colon in prison.  And here's

18   what Colon told Crocker:

19        The reason why he had the gun behind his head so long,

20   because he was about to catch his first murder.  Is what Colon

21   was telling Crocker.  And when he shot him in the head, Black

22   turned around and looked at him in the eyes.  And it was -- and

23   it was scary, that he shot him again.  And I believe that's

24   "then he shot him again."

25        Again, not boasting or bragging.  This is one friend

1    telling another what it feels like to shoot and kill a man in

2    cold blood for the first time.  That's Colon saying exactly

3    what he did and how he was scared and nervous, but he did it

4    anyway because he wanted to get his first murder for this crew.

5            Now sixth reason you know what happened that night is

6    what you learned relatively recently from Maurice Hagen.

7    Remember Hagen first learned about this murder when Colon was

8    showing a crowd of inmates some of the discovery, the evidence

9    in this case, and Colon was laughing and bragging about how, as

10   Colon put it, we shot this guy in the dick.  And you also --

11   you heard that Colon confided in Hagen and said that Colon told

12   him that they killed Delquan because Delquan was threatening to

13   kill one of Colon's friends, and you know who he was talking

14   about -- T-Money.  They saw Delquan as a threat.

15           Now even beyond what you learned from these

16   cooperating witnesses, from other people in prison or people

17   who committed crimes with Colon, there's other really

18   remarkable evidence.  Dikeem Hill, that young man told you what

19   happened that night.  He was in his apartment on the third

20   floor of 285 East 156 and he was awakened by shots while he was

21   sleeping.  He said his window was on the third floor just above

22   where Alston's body was laying, so just north of this picture.

23   And then when he looked out his window, Dikeem Hill saw two men

24   running from his building toward the 301 building, and that's

25   the building that Villafranco and Parsons talked -- told you

Cbq1mer3                    Summation - Mr. Fee

1    about where Villafranco was staying.  And you know now that the

2    men Mr. Hill saw were Colon and Parsons.  And this is truly

3    remarkable corroboration.  Mr. Hill told you he saw two men

4    running from the scene of Delquan's murder, two men, just like

5    Parsons told you, just like Villafranco told you, just as the

6    other witnesses told you, and no one, absolutely no one is

7    going to stand before you and argue that Dikeem Hill was making

8    anything up on that witness stand, because Dikeem Hill is like

9    most of the people in the Jackson-Melrose projects -- a good

10   person, hard-working person.  He's a college student, one of

11   the many people there who has to deal with the crimes done by

12   the very few, by men like Melvin Colon --

13              MR. DINNERSTEIN:  Objection, your Honor.

14              THE COURT:  Sustained.

15              MR. FEE:  Another way you know what happened that

16   night and that the cooperating witnesses are telling you the

17   truth is what was recovered by the NYPD Crime Scene Unit.  Now

18   CSU found a series of shell casings there at the scene where

19   Delquan was shot and killed.  And there's a picture of it.  The

20   shell casings, they're in the photo on the left-hand side

21   marked with yellow markers, and you heard that these were all

22   .40-caliber bullets -- again, just like Parsons and the other

23   witnesses told you.  And on the left is -- behind that gate is

24   where Officer McLean found Delquan's body, just like the

25   witnesses told you.

1          And then finally, another reason you know that Parsons

2     and the other witnesses are telling you the truth on this

3     murder is the testimony you heard from Dr. Prial, Margaret

4     Prial, again from the medical examiner's office.  She conducted

5     the autopsy on Carrel -- excuse me -- on Delquan.  And she told

6     you about Delquan, just over 6 feet, otherwise healthy.  He had

7     three gunshot wounds that she found.  First, one gunshot wound

8     to his head, right behind his right ear, and there was a bullet

9     lodged in his brain.  Dr. Prial told you that this wound, as

10    she put it, was without vertical deviation.  And you remember

11    she defined that for you.  It meant the bullet flew straight,

12    someone shot it at the same level as where it entered the body.

13    And you know from all the other evidence that there were two

14    men there that night -- Parsons and Colon.  Agent Castillo told

15    you, Parsons is about 5,6, Colon is about 6 feet.

16         MR. DINNERSTEIN:  Objection, your Honor.  There's no

17    evidence to that.

18         THE COURT:  Overruled.

19         MR. FEE:  Agent Castillo told you that Colon was

20    around 6 feet, around the same height as Delquan Alston.  So

21    here's how someone would point the gun at someone around the

22    same height standing roughly upright.  And here's how's a much

23    shorter man would point the gun at someone who was 6 feet and

24    standing upright.

25         The medical evidence tells you what happened here, and

1    you know a man of about 6 feet did the shooting because Delquan

2    was standing roughly upright.  He was urinating when he got

3    shot.  That makes absolute sense, and it lines up with

4    everything else you've heard about this murder.  Mr. Colon is

5    the man who shot Delquan in the head.

6          Finally, you heard the ballistics evidence from

7    Detective Fox.  He told you that this .40 right here, this gun,

8    was the gun that was used to shoot Delquan in the head.  He

9    also told you that the casings at the scene, all of those

10   casings matched up with this gun.  And again, this murder is

11   charged in the same four ways as the other two murders.  And

12   Judge Pauley again will instruct you on the legal requirements.

13         Let's now turn to the charges relating to the murder

14   conspiracy and the assault and attempted murder that you heard

15   about against members of what is called the 321 organization.

16         That -- that name, the 321 organization, is a name

17   used to describe Luchie's drug crew which you heard operated

18   out of in part the 321 building in the Melrose projects.

19         Now Pierce and Meregildo are charged with this

20   crime -- with these crimes, and there's overwhelming evidence

21   that both of them agreed to kill and actually tried to kill

22   members of Luchie's crew.  After T-Money was murdered you heard

23   that the belief among the crew was that someone from Luchie's

24   group had sent someone to kill T-Money.  Pierce, as you heard

25   over and over again, was extremely close with T-Money, and

Cbq1mer3                        Summation - Mr. Fee

1    Meregildo had held T-Money so dear that he marked his skin with

2    T-Money's name.  He also held photos of T-Money on that little

3    memory stick that he kept in his pants for almost half a year

4    after T-Money was killed.  There's that Mac In Peace T-Money

5    photo that was recovered from Meregildo when he was arrested.

6          And Folks told you what happened on September 13th,

7    2010, just a few days after T-Money was killed.  Folks was at

8    another crew member's apartment, Dante Barber, which was

9    actually in the 321 building.  Meregildo called Folks and asked

10   him to bring down a gun -- this same .40-caliber pistol.  And

11   Parsons told you that same night Pierce, Earl Pierce, called

12   Parsons and also asked Parsons to bring down the gun.  Parsons

13   told you that's what he remembered doing along with Folks.  So

14   both Pierce and Parsons bring down this .40-caliber gun to

15   Meregildo and Pierce.  And as you heard from both Parsons and

16   Folks, three men -- Folks, Meregildo, and Pierce -- then got in

17   a cab and took off.  And in that cab Pierce told Folks that he

18   also had a gun, a second gun, a 9-millimeter pistol.  Folks

19   also told you he was wearing a red hoodie that night.

20         So then all three of them go to Harlem, Folks told

21   you, to go see a member of T-Money's family, and then they come

22   back at 321 to retaliate, retaliate against Luchie's crew, and

23   Folks again told you what happened.  Pierce got out of the cab,

24   pulled out a gun, and shot at Tarean Joseph, a member of

25   Luchie's crew, several times.  Tarean Joseph started to run

 1   away, and Meregildo and Pierce both told Folks what to do as

 2   Joseph was running away.  Folks told you:

 3          He ran past me.  I could have been shooting but I

 4   wasn't.  He got past me, and then Killa and Ski Box was yelling

 5   shoot him, shoot him.  So I started shooting.

 6          Folks told you.  Folks also told you that after this

 7   another member of the crew, a man he knew as String Bean, came

 8   out of the 321 building and started firing back.  Everybody

 9   ran.  You heard Folks took this .40-caliber gun and threw it in

10   the garbage, which is where the NYPD recovered it.

11          You also learned about the gun that Pierce had that

12   day, that 9-millimeter pistol.  You heard again and again about

13   Miranda having that 9-millimeter, and Folks heard it

14   directly --

15          MR. BECKER:  Objection.

16          THE COURT:  Overruled.

17          MR. FEE:  -- Folks heard it directly from Miranda

18   while both men were in prison.  Here's what Folks told you:

19          Q.  You mentioned that Pierce was using a silver and

20   black 9-millimeter.  After that event took place did you ever

21   have a conversation with anyone about the gun?

22          Folks says:

23          I spoke to PayDay.  PayDay said the person asked him

24   for the gun like he needed it.  He gave it to him.

25          Now Pemberton also learned about this same shooting on

Cbq1mer3                          Summation - Mr. Fee

1    the night it happened.  He was in an apartment with Folks,

2    Pierce, and Meregildo, and all three of those men talked about

3    what they did, and it interlocked perfectly with what Folks

4    told you as Pemberton told you on the stand.  They went to

5    shoot at 321, they said, Pierce had a 9-millimeter, Folks had a

6    .40, which he threw in the garbage.  Pemberton even remembered

7    that one of them was wearing a hoodie, a red hoodie.

8          Crocker also learned about this in prison from Pierce.

9    Here's what Pierce told Crocker:

10         "Q.  What did Ski Box say about his own role in that

11   attempt to retaliate?"

12         Crocker learned from Pierce:  He shot somebody and he

13   was going over to finish shooting, somebody came out the

14   building and started shooting back at him, and they was both

15   shooting at each other, Crocker said.

16         What, if anything --

17         "Q.  What, if anything, did Ski Box say about who he

18   was shooting at at 321?

19         "Somebody that -- people that had something to do with

20   T-Money's death.

21         "What, if anything, did Ski Box say about why he did

22   that?"

23         Crocker heard from Pierce:  "Because it looked like

24   they were celebrating.  They was drinking -- outside drinking

25   liquor, and it looked like they were celebrating... T-Money's

Cbq1mer3                    Summation - Mr. Fee

1    death."

2         Finally, you heard the 911 call.  I'm going to play

3    part of one.  Listen closely to what the caller's saying and

4    listen to how it corroborates what you heard from the

5    corroborating witnesses.

6         (Audio played)

7         MR. FEE:  Again, three guys, shooting at guys on

8    benches.  She even describes somebody wearing an orange shirt.

9         And ladies and gentlemen, again and again you see this

10   scheme, this pattern in this trial.  You learn about crimes

11   committed by these defendants -- drugs sold by Miranda, murders

12   committed by Pierce, Colon, or Meregildo -- and then you've

13   heard it from another cooperating witness with another slightly

14   different perspective, who heard it directly from one of these

15   defendants, and those witnesses' accounts have linked up with

16   the other witnesses' accounts in a way that demonstrates that

17   they are in fact telling you the truth.

18        And then you've seen other evidence -- forensic

19   evidence, autopsies, ballistics, cellphones, photographs,

20   Facebook posts, sometimes an outside witness like Dikeem Hill

21   or Brittany Brown or police officer who responded to a crime,

22   and each and every time you've seen this other evidence, this

23   evidence, what the cooperating witness told you, it is

24   absolutely corroborated in important details by what you

25   learned from these witnesses.  Every time.  It's no accident.

Cbq1mer3                         Summation – Mr. Fee

That's no mistake.  And of course it's not the result of some

incredibly convoluted conspiracy amongst the cooperators to

come up with a story.  That has happened because you've been

hearing the truth from these witnesses and from the other

evidence in this case.  And it has overwhelmingly revealed that

these defendants are exactly what the evidence shows them to

be.  They committed these crimes.

          Now the charges, briefly, relating to this shooting at

the 321 building, Meregildo and Pierce are both charged with

conspiracy to murder members of Luchie's crew.  Again, that's

called the 321 organization.  And the assault and attempted

murder of Tarean Joseph, that man who was shot.  They both face

a firearms charge related to the use of guns during this crime.

And Judge Pauley is going to explain the law to you again for

these charges, but at this point the evidence has absolutely

shown that Pierce and Meregildo are guilty of these crimes.

          You learned of another rivalry that this crew was

involved in, another battle that Colon and T-Money and others

fought with guns and bullets.  What I'm talking about is the

crew had a longstanding dispute with the Young Guns gang, or

the YGs, who lived at the Maria Lopez Houses in an apartment

complex just south of the Jackson and Melrose projects.  And

ladies and gentlemen, at this point, after all the evidence

you've seen and heard, there is really no longer any serious

dispute that there was an ongoing gang war between this crew

Cbq1mer3                          Summation - Mr. Fee

1    and the YGs of Maria Lopez, from at least 2010 through

2    September of 2011.  And there is also no serious dispute that

3    members of the crew frequently, very frequently, traveled to

4    places nearby the Maria Lopez Houses and shot at and tried to

5    kill YGs.  The evidence is overwhelming on those points.

6    Crocker, Pemberton, Folks, Parsons, Villafranco, each of these

7    men told you about shootings that Colon committed where they

8    shot at and tried to kill YGs or where he was helping others

9    who were going down to shoot at and try to kill YGs.  And you

10   learned that these shootings happened with really shocking

11   regularity during the summer of 2010 throughout 2011.

12           But the focus of this charge relates to what happened

13   to Mr. Jiang, on September 8th of 2011, near the corner of

14   East 151 and Morris Avenue.  And you remember this was the

15   night when Colon and Pemberton and three other crew members got

16   together to shoot at the YGs.  Now earlier that day you heard

17   from Pemberton that Colon and others had been threatened by a

18   group of YGs who had razor blades.  They came back to

19   Courtlandt, and Colon told Pemberton what happened.  Pemberton

20   sent Kevin Pinero, he told you -- and Pinero is another crew

21   member -- to get this gun, this 9-millimeter gun, from one of

22   the crew's nearby apartments, and once they had this gun, they

23   went to go get revenge, retaliate on the YGs who had confronted

24   them earlier in that day.  Pemberton gave you all the important

25   details.  Pemberton told you that when they got to Morris

1    Avenue, he sent SB -- and you heard that was Kevin Pinero's

2    nickname -- around the corner to see who was there.  And he

3    said he came back and said, there's a lot of them.  Get over

4    there.  Then Pemberton said, "Melly was in my ear telling me

5    shoot four and give him four.  I said, all right, I got you."

6          And Pemberton tells you what he did.  He went to the

7    corner, he saw them all at the corner, and he shot eight times.

8          Now there's really no serious dispute at this point

9    that Colon was present before, during, and after the time that

10   Pemberton shot at the YGs and hit Mr. Jiang, because no one can

11   seriously dispute that the surveillance videos you saw -- I'm

12   sure you recall them -- show what they show.

13         Here's just one still from one of those videos.

14         And you heard Pemberton testify in the front that's

15   Kevin Pinero, or SB, who's going to look around the corner;

16   then that's Hump, or Felipe Blanding, another crew member,

17   Pemberton told you; the back left in the white, that's

18   Pemberton; and right next to him is Colon.  And you saw a

19   number of these video clips from the night Mr. Jiang was shot,

20   and there's no doubt, based on these, that Colon was traveling

21   with these men and working with them that entire night.

22         Another still from one of these videos.  This is the

23   group running back after the shooting, and you see Aponte

24   trailing and the other three men up ahead.

25         And you heard about what happened to Mr. Jiang, that

Cbq1mer3                          Summation - Mr. Fee

1    he was working and working and working until what Colon and

2    Pemberton did while trying to get back at YGs took away the

3    ability for him to do work.

4           Now I briefly want to address a few arguments that I

5    expect defense counsel is going to raise on this point.

6           First, I think -- I expect Colon's attorney is going

7    to argue that Colon himself was an innocent bystander at the

8    shooting and that he was as surprised as anyone else when

9    Pemberton shot.  Now let's be clear.  This argument is based

10   solely on the speculation of Colon's attorney, and this

11   argument does not relate to the actual evidence in this case,

12   which makes it overwhelmingly clear that Colon was an active

13   participant in this conspiracy to murder YGs and in the

14   shooting of Mr. Jiang.  How do you know this?

15          First, Pemberton's testimony, which has been

16   corroborated over and over again, both on this incident and on

17   dozens of other points in this case.

18          Second reason you know, what else do you know about

19   Colon?  Again, look at his tattoos.

20              (Continued on next page)

21

22

23

24

25

1           MR. FEE:  That's his hand you heard, and it says YGK.

2    And you also heard what YGK stands for.  Young Gunnas Killas,

3    and a Facebook post in September 2011:  Man, I paved the way

4    for that.

5           Let me say this in a different way.  Melvin Colon has

6    a tattoo where he labeled himself a person who tries to murder

7    members of the YGs gang.  That's what this charge is about.

8    There is no mystery here, and all the other evidence confirms

9    it.  Colon is guilty.

10          Look what he wrote on Facebook.  August 2011, status

11   message:  Me getting robbed is like a YG N word coming through

12   Courtlandt.  It doesn't happen.

13          Another, this is a chat.  The author is Melly Mel

14   Balla which you heard is Colon.  Look at the date.  09-09-2011.

15   September 9, 2011.  The day after Mr. Jiang was shot.  Melvin

16   Colon said:  LOL.  On third the YGs tried to jump me and Walt

17   and Hump.  We got off direct LOL.  I pop it though but we did

18   our thang already, you know.

19          Then another.  Again, the day after:  Yeah, they was

20   deep but they expected N words to stay there LOL.  Dubb and all

21   them N words had blades word but we violated.

22          Let's compare what Colon wrote in those Facebook posts

23   from the day after the shooting of Jiang to what Pemberton told

24   you on the stand.  What happened earlier that day before they

25   went to shoot at the YGs.  Melly, Walt and Hump came to -- same

people Colon talked about.  They came to -- well, they ain't

come exactly to me, but they said that they almost got into it

with the YGs on Third Avenue.  Third.  Just like Colon said.

And they ran back to Courtlandt.  And Melly asked me where the

gun is at.  I said it's in Tay's house.  Then Pemberton was

asked:  What, if anything, did Melly say about the weapons that

the YGs had?  Pemberton says razors.

Now, these details may have seemed like small details

at the time.  But it shows just how hard Pemberton was working

to be 100 percent accurate, down to really the smallest

details, ladies and gentlemen.

What leaves absolutely no question that Colon was

actively involved in the shooting, and Pemberton was telling

the truth about what happened, is those 911 calls.  I'm not

going to play it again now.  But you'll recall on those calls

there are callers who describe a group of four or five men

running after firing a gun at 151 and Morris.  One of the

callers said that one of the men dropped the gun and picked it

back up just like Pemberton told you Colon did.  She described

the clothing that Pemberton and Colon had on that night, the

white T-shirt and the striped shirt.

Again, look what Pemberton told you happened after

they shot.  Who did you give the gun to?  To Melly.  That's

Colon.  What did you see Melly do with the gun?  Put it on his

waist and he tried to ride off on a bike, and it fell down his

1    leg.  Did you see the gun fall down to the ground?  Nah, I

2    heard it.

3          Just again, using your common sense.  This suggestion

4    that Melvin Colon had no idea what was going to happen that

5    night.  If someone had no idea that their buddy was going to

6    pull out a gun and start shooting and hit some innocent

7    bystander, how would they react?  They would scream, they would

8    run away, they'd get away from the guy, they'd go home, maybe

9    they'd call police.  That is the opposite of what Colon did.

10   Colon hung around.  He walked back with them.  He stayed with

11   the group.  He took the gun from the man who shot.  So you

12   should reject that argument very quickly, ladies and gentlemen.

13   Colon knew what was going on and he participated in the

14   planning.

15         You also know about multiple other occasions when

16   Colon was trying to shoot and kill YGs at Maria Lopez.  Folks

17   told you about another instance where Colon and Folks and

18   others went to shoot at Maria Lopez in April of 2011.  Folks

19   told you they went to 151 and Morris to shoot at YGs, and both

20   Folks and Colon were carrying a gun.  Folks said he had a .357

21   and Colon had a .380, and there Folks told you both men were

22   shooting at YGs when Colon passed in front and Folks accidently

23   shot his friend in the back.  Crocker told you about this as

24   well.  Colon said to Crocker we were shooting at YGs and Folks

25   shot me in the back.  Colon even showed Crocker the scars.  You

1    saw it in the photos there on Colon's back.

2         You know for certain that this instance when Colon and

3    Folks went to shoot and try to kill YGs happened just as these

4    witnesses told you, because you saw the physical evidence that

5    corroborated their testimony.  There the NYPD found shell

6    casings from a .380 gun at the same location where Folks said

7    this happened shortly after the shooting occurred.  They also

8    found nearby that same scene Colon's shirt.  You remember the

9    shirt, the bloody shirt, and it had on that shirt bullet holes

10   and dried bloodstains exactly where Colon was hurt, was shot.

11   You saw again that Colon himself talked about this on Facebook.

12   Where I got shot at dead be hurting, I need a back massage, he

13   said.

14        Briefly, the charges related to this.  First, Colon is

15   charged with participating in a conspiracy to murder members of

16   Maria Lopez crew, which is the name used for the YGs in this

17   indictment.  And that's done in aid of racketeering.  You heard

18   about numerous instances where Colon shot at or helped others

19   shoot at YGs.  I don't have time to go through all of them.  I

20   talked about two today.  You heard others from Parsons when he

21   went down in 2010 with Colon to shoot at YGs.  Finding Colon

22   guilty of any of those instances where he agreed with others

23   would be sufficient to convict on the conspiracy count.

24        Colon in this instance is also charged specifically

25   with the assault and the attempted murder of Jing Bao Jiang in

1    aid of racketeering.  For this charge I expect Judge Pauley is

2    going to instruct you on many things, one of them being that as

3    long as a defendant intended to murder somebody, or aided and

4    abetted somebody's murder, they can still be convicted of the

5    charge even if the shot ends up hitting somebody else.  It's

6    called transfer intent.  Judge Pauley will instruct you on

7    that.

8            Let's turn to the racketeering and the racketeering

9    conspiracy counts.  For count one, that's the substantive

10   racketeering count.  You simply have to find that Meregildo,

11   Colon and Pierce, those three defendants are charged in that

12   count, that they committed two predicate acts of racketeering.

13   There are multiple predicates acts for each defendant.  You

14   just have to decide that they committed two of them.

15           MR. BECKER:  Objection.

16           THE COURT:  Overruled.

17           MR. FEE:  One of the predicate acts charged is the

18   narcotics conspiracy, and we've already talked about the proof

19   on that count, and the murder conspiracies.  The murders and

20   assaults and attempted murders charged against Pierce,

21   Meregildo, and Colon are also predicate acts relating to those

22   defendants.

23           As you heard from Special Agent Dyer, that DEA agent.

24   There is really no serious dispute at this point that the drugs

25   contained in the crack sold by this crew traveled in interstate

CBQ3MER4                    Summation - Mr. Fee

commerce.  They came from outside the United States.  That's
one element and I don't think it should take you much time.

        Count two is the racketeering conspiracy, and for this
you have to find that Meregildo, Colon, Pierce, and Miranda
each agreed to participate in this racketeering enterprise.
The Courtlandt Avenue crew.  That they agreed that any member
of that group would commit two or more racketeering acts.
Judge Pauley will give you all those definitions.

        Now, I told you that Miranda is also charged in this
count.  You know he participated in this racketeering
conspiracy because of his role in the crew's drug business, his
sharing of his gun with members of this crew, and his deep and
frequent involvement in the crew's activities on Courtlandt
Avenue.

        As I said at the outset, the racketeering enterprise
here is not defined as narrowly as I expect some of these
defense lawyers may suggest.  You've heard this many times
during the trial, the suggestion that because someone is not
GFC, they're not in one of the gangs, that they cannot be a
member of the enterprise.  That is not the law, and that is not
the charge here.

        You are incredibly familiar after all these weeks with
how this crew worked on Courtlandt Avenue.  T-Money burst on
the drug scene of Courtlandt Avenue, and he used GFC gang
members as soldiers to seize and protect this drug territory.

1    And Miranda and Pierce, two older, more established drug

2    dealers, form alliances with T-Money and this GFC gang, and

3    they all did so with a common purpose, getting more money for

4    themselves by selling drugs.  And for some of these defendants,

5    by protecting their drug business and their territory with guns

6    and violence.  That's the enterprise here.  And the evidence of

7    these racketeering counts is almost all of the evidence you've

8    seen in this case, you now know the links and the ties between

9    these men and the ways they worked together to commit crimes.

10         Remember what Meregildo had on him when he was

11   arrested by the ATF.  He had photos stored in phones and memory

12   sticks.  He had photos with Colon, with other co-conspirators,

13   with Folks, with Bernard Folks, Aubrey Pemberton, other

14   pictures that aren't there with Earl Pierce.  Address books

15   that were found from Meregildo's residence with Pierce and

16   other OGFC members' names and numbers.  All of these were being

17   carried around by Meregildo.  I'm sorry.  Pierce's nickname Ski

18   was in one of Meregildo's phones.  The physical address book

19   had other names and numbers.

20         Some of these defendants made it plain their

21   association by what they put on their skin.  You saw the

22   tattoos of Colon and Meregildo.  They put each other's names on

23   their arms.  And then other defendants.  Again, Colon and

24   Meregildo with the identical MIP T-Money tattoo.  And this is

25   one of the photos Meregildo had:  Mac in peace T-Money.

1          All of this testimony that you've seen is corroborated

2     by other evidence as well.  You remember those two videos you

3     saw.  Colon rapping on that video where he said he was a YG

4     shooter.  You remember that.  And all the other evidence points

5     to the same.  Points to that being absolutely true.  That's a

6     still from the other video you saw showing Miranda with the

7     crew out on Courtlandt Avenue.  You heard this was on the date

8     T-Money died, and on that same day Miranda was supplying crack

9     to crew members.

10          The most remarkable evidence I submit on these

11     racketeering counts came from Detective Fox.  I'm not going to

12     repeat all of it.  You heard it relatively recently.  He was

13     the ballistics expert.  As you heard, there is really no way to

14     seriously challenge the accuracy of what Detective Fox did with

15     all those ballistics tests.  Let's just briefly review the

16     charts he showed you, summarizing what he found.

17          This is the first chart he showed you.  This relates

18     to Earl Pierce's .380 gun.  It's right in the center there.

19     Here, Detective Fox determined that this gun, the one that

20     Pierce you heard brought outside right after T-Money died,

21     T-Money was attempted to be killed, outside of 681 Courtlandt,

22     Detective Fox determined this gun was used to fire the bullets

23     found at the scene of Jason Correa's murder.  And that's on the

24     left.  And to fire the bullets that were found inside of

25     Jason's body during the autopsy.  Detective Fox also determined

CBQ3MER4                    Summation – Mr. Fee

1    that this same gun was used to kill Carrel Ogarro.

2           So that's Pierce's gun, used by T-Money to kill one of

3    the crew's drug rivals or someone who is believed to be working

4    with one of the crew's drug rivals, and then the gun was passed

5    among the crew's members ending up in Meregildo's hands only

6    five days later.  And that's, you know from all the evidence,

7    when Meregildo used it to shoot and kill Carrel Ogarro.

8           Recall hearing how this gun ended up in the

9    government's possession.  This gun was handed over to the NYPD

10   by another crew member, Hassen Brito, that 15-year-old crack

11   dealer and Pierce's friend.

12          The next slide.  This relates to the .40 caliber

13   pistol.  Right in the center there.  This was the gun that

14   Colon bragged about using to shoot Delquan.  Colon used the .40

15   caliber to kill Delquan Alston on August 27, 2010.  This gun

16   was passed around and among members of the crew until it

17   surfaced again in September of 2010.  That's when Pierce and

18   Meregildo and Folks had it when they were going to avenge

19   T-Money's death.  Folks had it that night he shot at Tarean

20   Joseph with it.  He told you.

21          Detective Fox found that the bullets from the scene of

22   the Tarean Joseph shooting came from this gun, just like the

23   bullets used at Delquan Alston's murder.

24          The final slide that Detective Fox showed you related

25   to this gun, the 9-millimeter.  It's silver.  It used to be

CBQ3MER4                          Summation - Mr. Fee

black and silver, but those fell off.  Detective Fox told you
that this gun was used on the night Jing Bao Jiang was shot by
Pemberton with Colon right by his side avenging the fight that
Colon had just gotten into earlier that day with YGs.

        And Fox told you this same 9-millimeter was used in
the murder of someone named William Shaw on September 21, 2011.
You heard testimony about this from Crocker, Pemberton as well.
Crocker told that you Kevin Pinero, also called SB, who you
heard about, shot and killed Shaw because Shaw had been telling
crew members that they couldn't sell drugs on Courtlandt
Avenue.  Pinero said he used this gun to shoot Shaw, and he was
there that day with Colon and other crew members.  You also
heard that the very next day, the NYPD stopped Pinero and they
seized from him both this 9-millimeter gun, and this second
.380 gun the day after the homicide.

        So, that's another couple of guns following a route
through multiple acts of violence done by this crew, and ending
up in the hands of the government.  Now, they're all here
before you.

        And I just want to highlight how remarkable this
evidence is, because you heard a lot of testimony and a lot of
evidence in this case.  But here, right here, sitting in front
of you, you have all the weapons -- not all, I'm sorry.  You
have weapons used in each and every act of violence in this
case, including the murder weapons.

1          You also have objective, forensic evidence putting

2     each of these weapons at the scene of those crimes used by

3     these crew members and some of these defendants to commit these

4     murders and attempted murders.  And none of these findings are

5     really in serious dispute at this point.  These are the murder

6     weapons, the attempted murder weapons, and they're right here

7     in this courtroom.

8          Second, this is really the most important point.  What

9     Detective Fox told you about his findings corroborates exactly

10    what you already learned from the cooperating witnesses in this

11    case.  The witnesses each told you what gun was used, how it

12    was used, when it was used, where it was used, who used it.

13    And what Detective Fox told you corroborates all of that

14    testimony without any distinction.  I've said it before, and

15    I'm going to repeat myself right now:  This is amazing

16    corroboration on the important details of the most important

17    charges in this case.

18         None of these cooperating witnesses who testified here

19    knew about Detective Fox's findings.  They had no idea what

20    Detective Fox would tell you on the stand.  None of them.

21    There is zero dispute about that.  That's exactly the type of

22    truly independent corroboration that should leave absolutely no

23    doubt in your minds that these witnesses were telling you the

24    truth about what happened out on Courtlandt Avenue.

25         Finally, what's other amazing evidence of Colon and

1   Pierce's participation in this enterprise apart from what

2   Detective Fox told you.  Well, what did those two men do while

3   they were incarcerated by the federal authorities?  They met

4   Maurice Hagen, a senior member of the Bloods gang, and they

5   asked him to take out former members of the crew who they

6   thought were going to testify against them at trial.

7           So let's be clear:  Even after they were arrested by

8   the federal government, Colon and Pierce were scheming to have

9   other prisoners harmed by members of their own crew who they

10  thought now posed a threat to the crew.

11          I briefly want to address just a couple of additional

12  arguments I expect you may hear.  One that I'm sure you will

13  hear is sometimes the details of witnesses differed in details

14  between one another, somehow indicates that they're not telling

15  you the truth.  That they're lying to you.

16          Well, ladies and gentlemen, you know from your own

17  common experience, from your own common sense that that is just

18  not how things work.  People remember events differently, they

19  recall different details, they have different perspectives.

20          One example.  If you go back to that day, seems like

21  months ago now, when Judge Pauley talked about a potential

22  weather issue on Monday.  He said there may be a hurricane.  If

23  you remember, Judge Pauley gave out a phone number for you to

24  call to find out if you needed to come to court.

25          Now, if I were to ask each of you at the time Judge

1    Pauley gave out that number, who was the court reporter --

2    we've had a couple.  If some of you said it was the lovely

3    woman with red hair, some of you might say it was a gentleman

4    who is bald with a gray suit on.  Some of you would say I have

5    no idea.  The fact that you don't know or that some of your

6    answers may differ, does that mean you're lying?  Does that

7    mean that Judge Pauley did not give out a number that day?  Of

8    course not.  That's just how the human brain works.

9         Finally, one more argument I expect they are going to

10   raise, and actually this is something about their approach,

11   these defense attorneys.  I expect they are going to talk at

12   great length about these cooperators and the kinds of people

13   they are and the crimes they've committed and what you should

14   think about them.  Ms. Heller is going to respond to many of

15   those arguments in her rebuttal.

16        I want to make one point.  These defendants and their

17   attorneys have no choice about what to do with these

18   cooperators.  Let me be clear.  They have no choice but to call

19   these cooperators liars.  Again, the government has the burden

20   at every stage of this case, but I want to make clear that you

21   can scrutinize these arguments using your own common sense.

22   These cooperators, just on the face of their testimony, even

23   apart from all the corroborating evidence, the ballistics

24   evidence, the forensics evidence, the autopsy evidence, more,

25   these cooperating witnesses make it absolutely clear that these

1   men committed the crimes they're charged with.  Joshua

2   Meregildo, T-Money's protege, a murderer and a drug dealer.

3   Colon, took control of that crew, guns and drugs.  A murderer.

4   Pierce, helped T-Money commit a murder and tried to commit a

5   second murder after T-Money died.  Drug dealer.  Nolbert

6   Miranda, prolific drug dealer and a man who possessed guns.

7   They have to call those cooperators liars.

8           These attorneys are skilled, they're excellent, but

9   they cannot confront this evidence straight on, ladies and

10  gentlemen.

11          Finally, I want to talk about one requirement that

12  you'll hear about often in the case law, and Judge Pauley will

13  instruct you on this.  It's for many of these racketeering

14  counts you'll have to find, as Judge Pauley will tell you, that

15  the defendants charged did something for the purpose of

16  maintaining or enhancing their position in the enterprise.  I

17  submit that it will be clear once Judge Pauley instructs you,

18  but these defendants, for many of the crimes they committed,

19  it's clear why they did it.  To be a good soldier in the

20  enterprise, to eliminate threats to the crew or to their

21  leader, and to keep their drug business humming along.  That's

22  all about the racketeering enterprise, the Courtlandt Avenue

23  crew in this case.

24          Before I sit down, before I finish, I want to say

25  something about the victims in this case.  You heard that some

of these victims used drugs or sold drugs or fake drugs.  And

of course you know that the law does not distinguish between

victims.  Everyone in this courtroom gets treated equally, and

deserves the respect and dignity that these victims were denied

out in the world by some of these defendants.

Carrel Ogarro had his faults, as you heard.  You also

heard about Jason Correa and Delquan Alston.  They were not

perfect.  But that does not mean a thing in this courtroom when

you weigh in on the guilt of these defendants.  There is a risk

in this case that we can all get bogged down in little

disagreements between attorneys or the details of irrelevant

issues like whether Maurice Hagen told his parole officer about

all his trips to McDonald's several years ago.

We can sometimes focus on these minor issues and lose

sight about what this case, at its core, at its essence, is all

about.  I ask you not to do that here.  I don't want you to

forget that these were men.  Not just names.  Not just victims.

Not just someone Melvin Colon mocks about shooting.  These were

men.  These were people who got sad, and happy, and loved, and

struggled.  Men with sisters and brothers and girlfriends,

fathers and mothers.  Chris Ogarro does not have a brother any

longer.  Iris Perez doesn't have a son.  Those are victims too.

So please scrutinize the evidence in this case

carefully and reach a verdict based only on what you saw and

heard in this courtroom.  But don't forget that this case at

1    its core is about these four defendants and the crimes they

2    committed only about 9 miles away from this courthouse in a

3    community where good people work hard.  Because right here and

4    right now, these four men sit before you responsible for so

5    much bad:  Drug dealing, violence, or murder.

6           And these defendants, these four defendants involved

7    themselves in those crimes knowing that it was wrong.  Knowing

8    that it would cause harm to people just trying to live their

9    lives.  These defendants did it anyway, because they wanted the

10   money and the power for themselves and for this crew.

11          Now, right here and now, I ask you to return the only

12   verdict consistent with everything you've seen and heard in

13   this case.  The only verdict consistent with your common sense.

14   That is finding these four defendants guilty of the crimes

15   charged.  Thank you.

16          THE COURT:  Members of the jury, we've concluded the

17   first of the closing arguments.  We're going to take a luncheon

18   recess now.  Your lunches are waiting for you in the jury room.

19   We're going to reconvene at 1 o'clock and begin to hear

20   summations on behalf of the defendants.

21          Keep an open mind, come to no conclusions.  Don't

22   discuss the case during the luncheon recess.  And we will

23   return to the courtroom and resume at 1 o'clock.  Please recess

24   the jury.

25          (Jury excused)

CBQ3MER4

1          THE COURT:  Are there any issues that counsel wish to

2    raise at this time?

3          MS. HELLER:  Your Honor, I do at some point before

4    Mr. Lee's summation want to address his demonstratives.  We can

5    do that after the break.

6          THE COURT:  Why don't we do it now.

7          MS. HELLER:  All right.  We were handed this morning

8    two pages.  One marked slide 41 and one marked slide 46.

9          THE COURT:  I now have them before me.

10          MS. HELLER:  Addressing slide 46 first, our objection

11    to this slide is that we believe it's simply an incorrect

12    statement of the law.  And the parties worked very hard all

13    together with the Court on the jury charge which sets forth the

14    elements of murder in aid of racketeering.  And the charge is

15    very clear and the law is very clear that a murder in aid of

16    racketeering, one of the elements is that it be committed

17    either to maintain or increase one's position in the

18    enterprise, or for pecuniary gain.  It's not doesn't have to be

19    both.

20          So, this slide is actually misleading on the law and I

21    think could lead to a lot of confusion for the jury if

22    Mr. Lee's allowed to show it.  Or to argue, frankly, that if

23    the murder wasn't committed for gain of money, it's not a

24    murder in aid of racketeering.  It's not a correct statement of

25    the law and the charge is clear on that.  Certainly the case

CBQ3MER4

1   law is clear on that.  We certainly object to that slide as

2   misleading and incorrect.

3            The second slide, slide 41, is a little closer to the

4   line.  Certainly if a murder was committed only for personal

5   reason then, yes, it's not a murder in aid of racketeering.

6   But if it's committed for a personal reason and for the other

7   reasons, then it could well be a murder in aid of racketeering.

8   And I think the evidence here showed certainly that the murder

9   was committed for T-Money.  And I expect Mr. Lee's going to

10  argue that the murder was actually committed because of Walter

11  Aponte.  It's still a fellow gang member.  So, I'm not clear on

12  what the personal reason really even is in the evidence.  But,

13  either way we think this slide is a little closer to the line

14  but could be misleading as well on the law.

15            THE COURT:  Mr. Lee?

16            MR. LEE:  Your Honor, I'll respond in the order that

17  Ms. Heller made her comments.  The slide that says murder not

18  committed for payment of money.  The government's one witness

19  as to the murder of Mr. Ogarro was Dev Parsons.  His testimony

20  was specific and Mr. Fee's summation was specific that payment

21  was -- money was offered to Dev Parsons and Mr. Meregildo for

22  the killing, the murder of Mr. Ogarro.  I want to argue to the

23  jury that there is evidence that the murder was not committed

24  for payment of money, and that this demonstrative piece of this

25  diagram is merely to enforce the -- to reinforce my statements

CBQ3MER4

1    to the jury when I'm making that statement.

2            The government is free, there is not a

3    misrepresentation of the law.  This is the government's theory.

4    And the government is free to rebut and point out to the jury

5    that there is multiple theories on multiple statutes that an

6    act can be charged pursuant to.

7            My argument is a fair statement, consistent with the

8    government's theory, and my statements to rebut and defend

9    against it.

10           Similarly, your Honor, as to the other slide, murder

11   committed for personal reason.  I have a lot of testimony to

12   show the jury that there are statements by Mr. Parsons himself

13   and other people testifying that a personal reason not related

14   to anything in connection with the charged enterprise, was the

15   purpose of fear by Mr. Ogarro -- by Mr. Aponte of Mr. Ogarro,

16   the victim.  Personal having nothing to do with it.

17           This is the defense theory, and it contradicts what

18   the government's theory is.  And it arises, this demonstrative

19   diagram arises out of the actual testimony of the government's

20   cooperating witness.  I'm just reinforcing when I cite the

21   government's witness what he says.  My argument that if it is

22   what he admitted it was, then it is a basis for their

23   deliberations and their decision that the elements have not

24   been met.  I think it's a fair piece of demonstrative evidence.

25   The government can utilize their testimony to rebut if they

CBQ3MER4

want.  Perhaps they're trying to save time having to rebut that

point.  But they have every opportunity to point out to the

jury what the elements are, and certainly, your Honor is going

to clearly instruct them on what it is and I think it's fair

comment, your Honor.

THE COURT:  All right.  Slide 46 is excluded and not

to be shown to the jury because it is not an accurate statement

of the law or the theories in the indictment.  With respect to

slide 41, the government's objection is overruled.

Anything further?

MR. LEE:  Your Honor, briefly, if I could alter slide

46 to have the arrow pointing and saying that it is just a not

guilty -- if I could just have one moment, your Honor.  That's

not what I meant to say.

Your Honor, I can alter slide 46 to address the

government's concern to include their objection that if it's a

murder not committed for payment of money, or to enhance or

maintain one's position in an enterprise, then it's not murder

in aid of racketeering.

THE COURT:  You can prepare such a slide and we'll

review it.  But I think that would be an accurate statement of

the law.

MR. LEE:  I can do that, your Honor.  I will try to do

that and give it to your Honor as soon as I can.

THE COURT:  All right.  And provide it to the

CBQ3MER4

1    government.  Anything further?

2              MR. DINNERSTEIN:  I just handed the government certain

3    PowerPoint presentations.  They're reviewing them at this time.

4              THE COURT:  We'll take it up a few minutes before

5    1 o'clock.

6              All right.  At this time the defendants can be

7    escorted from the courtroom.  We'll reconvene just before

8    1 o'clock.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cbq1mer5

                          AFTERNOON SESSION

                              1:02 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Good afternoon, everyone.

 5          Mr. Lee, you've handed up a revised slide 46.

 6          MR. LEE:  That's incorrect, your Honor.

 7          THE COURT:  It is.

 8          MR. LEE:  I apologize.  It's an "or" for an "and."  I

 9   was just fixing it and consulting with the government, and I

10   will have it fixed further.

11          MS. HELLER:  If the "ands" are changed to "ors," we

12   would not object.

13          MR. LEE:  I apologize, your Honor.

14          THE COURT:  All right.  So take another shot.

15          MR. LEE:  Yes, your Honor.  Thank you.

16          THE COURT:  All right.  Mr. Dinnerstein, are you ready

17   to proceed?

18          MR. DINNERSTEIN:  Yeah, I'm ready.  I did give the --

19   I presume the government doesn't have any concerns about my

20   PowerPoint?

21          MR. FEE:  Your Honor, we do have concerns related to

22   three of the slides that Mr. Dinnerstein handed us before.

23          THE COURT:  Could I have a copy of those slides?

24          MR. FEE:  You want our copy?  We only have the one

25   copy.

Cbq1mer5

1          Okay.  I can try to do it from memory, your Honor.

2     These are the three about which we have an objection.

3          And I'll just start with the slide that's titled SA

4     Janice Castillo.  The government's just -- some of that is

5     inaccurate, specifically --

6          THE COURT:  I'll tell you what.  For the ease of this,

7     can we publish this slide so we can all look at it?

8          MR. DINNERSTEIN:  Sure.

9          MR. FEE:  Elmo?

10          THE COURT:  Here.

11          MR. FEE:  That's great.

12          Quick point.  It's factually accurate up until "not a

13     murder in aid of racketeering."  Just -- it's the third bullet

14     point.  It's just not clear to the government if this is

15     supposed to be something that Janice Castillo testified to,

16     which she of course did not or would not have.  And it's --

17     actually the same point relates to "mere presence at a crime

18     scene not sufficient."  We're just not sure how this is going

19     to be presented.

20          MR. DINNERSTEIN:  Your Honor, it's going to be

21     argument.  That's why it's there.  It seems self-explanatory.

22     In terms of the search warrant affidavit, the Alston murder was

23     not part of the search warrant affidavit, so that's why that's

24     there.

25          Ms. -- Agent Castillo's testimony was that, referring

Cbq1mer5

1    to Alston, she indicated the mere presence at a crime scene not

2    sufficient.  So that's why it's there.

3              MR. FEE:  I'm not sure what --

4              THE COURT:  All right.  To the extent that the

5    government has an objection based just on the slide, it's

6    overruled.

7              MR. FEE:  Just briefly, your Honor, there's one

8    factual inaccuracy.  The search of 280 East 161, Janice

9    Castillo did testify about that.  That's Melvin Colon's

10   residence.  There were items recovered there.  There were no

11   guns.  She did mention what appeared to be prescription drugs

12   and letters were recovered there.  It's a minor point, your

13   Honor, but it is an inaccuracy.

14             MR. DINNERSTEIN:  I'll clarify that, your Honor, when

15   I use the slides.

16             THE COURT:  All right.  That's fine.

17             MR. FEE:  Just briefly, your Honor, the next slide --

18   I'm sorry -- that doesn't have the pink on it.

19             THE COURT:  It doesn't have what on it?

20             MR. FEE:  With the pink on it.

21             THE COURT:  Count Twelve?

22             MR. FEE:  Count Twelve, and it lists alternate

23   theories, or alternate theory.

24             THE COURT:  Right.

25             MR. FEE:  Perhaps we could just have a proffer from

Cbq1mer5

1      Mr. Dinnerstein.  We're not clear if he's listing --

2                 THE COURT:  Can we publish that one.

3                 Thank you.

4                 MR. FEE:  It's titled Five Elements of the Offense,

5      and then it lists things that are not elements of any offense

6      that I'm aware of.  They appear to be attempting to

7      characterize theories, but it's just -- it's not legally

8      correct.

9                 MR. DINNERSTEIN:  That's taken from the charge that

10     you plan on giving, your Honor.

11                Page 109 of the charge.

12                MR. FEE:  And my only point, your Honor -- my

13     colleague advises me -- she understands the law better -- it's

14     *Pinkerton*.  The problem here, from the government's view, is

15     that the title Government Alternate Theory and then Five

16     Elements of the Offense, I mean, it's talking about *Pinkerton*,

17     but we were just not clear on what exactly this is trying to

18     talk about.

19                THE COURT:  Well, I guess you'll be illumined during

20     Mr. Dinnerstein's summation, because it seems to track the

21     charge on *Pinkerton* liability at page 109.  So the government's

22     objection there is overruled.

23                MR. FEE:  Finally, briefly, the title of the first

24     page.

25                THE COURT:  Cooperators' Storytelling?

Cbq1mer5

1            MR. FEE:  Yes.  Storytelling is the objection, your

2       Honor.  It really goes beyond argument, to title a slide

3       Cooperators' Storytelling and then to list the names.

4            THE COURT:  All right.  That objection is overruled.

5            MR. FEE:  Thank you, your Honor.

6            THE COURT:  All right.  Mr. Dinnerstein, I remind you,

7       as I did Mr. Fee, you'll have two hours.  I'll give you a

8       ten-minute warning and then a one-minute.

9            MR. DINNERSTEIN:  Okay.  By my clock, Mr. Fee reached

10      the ten-minute warning.

11           THE COURT:  He literally -- he turned just on the cusp

12      of it, and had he not been concluding, I would have.  But

13      literally, he was about 30 seconds beyond.

14           MR. DINNERSTEIN:  I guess my watch was a little

15      fast --

16           THE COURT:  The ten-minute --

17           MR. DINNERSTEIN:  -- or maybe it just seemed to me

18      like more than two hours.

19           THE COURT:  But, you see, it is amazing that even when

20      the government thinks they need more time, they still can do it

21      in less, especially when they have a week to prepare for

22      closing arguments.

23           So let's bring in the jury.

24           (Jury present)

25           THE COURT:  Good afternoon, members of the jury.  We

Cbq1mer5                       Summation – Mr. Dinnerstein

1    will continue now with closing arguments.  I ask that you give

2    your undivided attention at this time to Mitchell Dinnerstein,

3    Esq., as he delivers his closing argument on behalf of the

4    defendant Melvin Colon.

5             MR. DINNERSTEIN:  Good afternoon.

6             THE JURORS:  Good afternoon.

7             MR. DINNERSTEIN:  Your role is the hardest one in this

8    courtroom.  We just heard a good deal from Mr. Fee about -- and

9    I couldn't even count the number of times he used words like

10   "absolutely true" and "reject the arguments of defense lawyers"

11   and "you should not worry" and "the evidence is overwhelming"

12   and "the truth is what the cooperators told you."

13            Those six people.  The government says they're just

14   truth tellers and you don't have to worry about it, it's really

15   easy.  It's not.  Your job, ladies and gentlemen, is to figure

16   out what the truth is.  Not because Mr. Fee says it, not

17   because I say it, or any of the other defense lawyers.  You

18   have the hardest job here because it's your job to figure out

19   what the truth is.

20            Now your job is even harder, because I only have to

21   speak about Melvin Colon, the three other lawyers are going to

22   speak about other defendants, the government gets a chance.

23   But your job is to deal with four separate trials with four

24   separate sets of evidence.

25            The judge is going to try to help you.  He's going to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    tell you what the law is.  He's going to tell you that these

2    folks, the government, has a very high standard of proof.  They

3    have to prove guilt beyond a reasonable doubt.  And that those

4    witnesses, those six people, are truth tellers, and you're

5    supposed to believe them and believe them beyond a reasonable

6    doubt.

7         Now Judge Pauley will also tell you, when he goes

8    through the charge, one of the -- frankly, a charge that I like

9    the best because it says all of us, everybody, the government,

10   Mr. Colon, the rest of the defendants, the defense counsel,

11   that we all stand equal, equal, before the bar of justice,

12   before the law.  Nobody gets a higher position.  Nobody is

13   better before the bar of justice because they work for the

14   government, because they're prosecutors, because they're police

15   officers, because they're special agents.  We all stand, in

16   this courtroom, equal.  It's a great thing about the American

17   system.

18        This case was, frankly, harder than most because we

19   had these interruptions that I'm sure affected each one of your

20   personal lives, the storm, and the promise that we made that we

21   broke.  We told you it was going to be a four-week trial.

22   We're now in the eighth week.  We counted on you to fulfill

23   your responsibility as jurors, to keep on trucking, to keep on

24   going forward.  And now we count on you even more.  It's not

25   because the government says it's all easy, it's all absolutely

Cbq1mer5                    Summation - Mr. Dinnerstein

1   true what those people said.  Because we ask you to fulfill

2   your oath, to take your responsibility -- and we already know

3   you've done this -- your responsibility as citizens very

4   seriously.  We ask you now to determine what are the facts in

5   this case and to do it fairly and as Judge Pauley tells you

6   what the law is.  You have an awesome, awesome responsibility.

7   But our system, frankly, doesn't work because of judges or

8   because of pretty buildings or because of prosecutors or

9   because of defense lawyers.  It works because of you and your

10  need to follow the oath and to actually do your job, to call it

11  the way you see it, not the way the government sees it, not the

12  way defense lawyers see it, the way you see it.

13          Now you've seen a lot of people in this courtroom, and

14  I hazard to guess that not too many of you have seen those

15  people in your real life.  The question you have to I believe

16  answer is, how do people like that behave when they're

17  cornered, when they're placed in a position where they're

18  looking at spending the rest of their lives in prison, and

19  where they are attempting to help one side so that it doesn't

20  happen, so that they can get out from under what is, frankly, a

21  pretty terrible situation that each one of them are in?

22          Now if you notice the sign, it says Cooperators'

23  Storytelling.  I don't call them witnesses.  Witnesses are

24  somebody who see and hear something and do not have, as these

25  folks have, a vested interest in saying one thing or another.

1    When somebody is here to please one side, to get that 5K

2    letter, to get that hope -- because that's all they got now --

3    of getting out of jail in their lifetime, that of course

4    impacts on whether or not what their testimony is from that

5    witness stand is truthful or not.  A witness is somebody who's

6    here, not necessarily because they want to be here, but because

7    they have something to say, and nobody's putting either money

8    in their pocket or the hope of getting out of jail in the near

9    future.

10              MR. FEE:  Objection.

11              THE COURT:  Overruled.

12              MR. DINNERSTEIN:  The government didn't say this word

13    once during his summation.  Those people -- I call them

14    storytellers -- only get their deal with the government if they

15    provide substantial assistance to the government.  Does that

16    have anything to do with telling the truth or telling lies?

17    The government can say as many times as it chooses, as they did

18    during their summation, these guys are truth tellers.  Does any

19    of that mean that they're truth tellers because the government

20    says it?  And what does it mean to provide substantial

21    assistance?  If you didn't see anything, if you don't know

22    anything, you can't provide substantial assistance to making

23    out a case against Melvin Colon.

24              I want to talk about somebody who's a witness and how

25    that witness is different from somebody who is somebody who has

Cbq1mer5                        Summation - Mr. Dinnerstein

1   a vested interest in the outcome of the case, somebody who

2   might be a storyteller, and that, frankly, is one of the things

3   you folks are going to have to figure out.  Dikeem Hill.

4   Mr. Fee mentioned him briefly during his opening statement.

5   I'm going to mention him because he's what a witness ought to

6   be about.  He was at his apartment in the housing projects,

7   Melrose, and he heard gunshots.  He went to the window, he saw

8   two people running.  And he told that to a police officer, not

9   months later, not after working out some sort of deal, but the

10  day of the shooting.  And he didn't even remember what date the

11  shooting was.  And you remember there was a stipulation where

12  we all agreed that Mr. Hill had a conversation with the police

13  officer, Police Officer Jones, on August the 27th, 2010,

14  which is the date that Alston was killed.  Now he didn't

15  fabricate it, he didn't exaggerate, he didn't find out what the

16  date was.  It didn't matter, because he was there to testify

17  about what he saw and what he heard.

18          What did he hear?  Because this tells us something

19  about Mr. Hill as a witness and some of those cooperating

20  storytellers.  Page 3838.

21          "Q.  And when you heard the gunshots, there were a

22  number of gunshots, right?

23          "A.  Yes.

24          "Q.  You, of course, were not counting the number of

25  gunshots, right?

1           "A.  No.  It's an estimate."

2           I think he said there were eight gunshots.

3           "Q.  Of course, the gunshots were fired one right

4      after another, isn't that correct?

5           "A.  Yes.

6           "Q.  Would it be fair to say they were fired rapidly,

7      one right after another?

8           "A.  Yes."

9           Now why is that important?  I'll tell you why.

10     Because Parsons tells us -- Parsons tells us, "Oh, we traded

11     the gun off from one to another.  We traded the gun off."  And

12     we know there was only one gun.  We know that there weren't

13     multiple guns on August 27th, 2010, because all the bullets

14     came from a .40-caliber gun.  All the shots were from a

15     .40-caliber gun.  And we know that that .40-caliber gun was

16     fired, based on what Mr. Hill tells us, rapidly.  Now I don't

17     know how long it takes to transfer a gun from one person to

18     another, but certainly if somebody was listening and wanted to

19     remember carefully what he heard, he would not say rapidly if

20     the gun is being transferred back and forth.

21          So now we have a question -- Mr. Fee talks about

22     corroboration.  Oh, Mr. Parsons' testimony is corroborated by

23     all these things.  Where?  It's not corroborated.  Actually,

24     it's challenged.  Mr. Hill says shots rapidly, Parsons says

25     we're transferring the gun from one to another.  There's

Cbq1mer5                          Summation - Mr. Dinnerstein

1    hesitation between the shootings, between the shots being

2    fired.

3              MR. FEE:  Objection.

4              THE COURT:  Overruled.

5              MR. DINNERSTEIN:  So you learn a lot about those six

6    people.  You learn a lot about those six people by what other

7    people say, the other witnesses.  And this one, we can call

8    them witnesses, because they are witnesses.  They're doing the

9    best they can in terms of telling us what they remember

10   happening.  And these are the witnesses that only refer to

11   Mr. Colon's case.  There's other witnesses that refer to other

12   people.

13             There's six police officers.  Detective Jupiter,

14   McLean, Valdez, Ingoglio, Sergeant Duggal, and Detective Fox.

15   There's the two civilian witnesses.  Mr. Hill, who we've

16   already heard about; Dr. Prial, who's the medical examiner

17   regarding the Alston murder; Shannon Chance, who works for

18   Facebook and flew in from California; and the two special

19   agents, Castillo and Collins.

20             So let's first talk about the murder of Alston on

21   August 27th, 2010.  Detective Jupiter, she's the crime scene

22   unit detective.  She only testified for a short time.  But what

23   she did was she recovered bullets -- cartridges, not bullets,

24   cartridges -- from in front of the location where Alston was

25   killed.  And she recovered six shell casings.  And she believed

1    that the six shell casings -- and we now know that this is

2    actually true -- that the six shell casings came from the same

3    weapon, that there was only one weapon.  And we know that

4    because Detective Fox.  Detective Fox is on the list.  He's the

5    last of the New York City police officers.  And he tells us --

6    he tells us that they come from the same gun, that there's only

7    one gun used.

8            And then the other person that's relevant here is

9    Dr. Prial.  She's the medical examiner who actually performed

10   what we call an autopsy examination.  And we know -- and I'm

11   just going to show the -- this is the body report that she did

12   on a body, and she puts numbers 1, number 2, and number 3.

13   Because she says -- and there's no reason to doubt it -- that

14   Mr. Alston was shot three times and that there were six shots

15   fired.

16           Now --

17           MR. FEE:  Objection.

18           MR. DINNERSTEIN:  -- that's what we know.

19           MR. FEE:  Objection to six shots fired.

20           THE COURT:  Overruled.

21           MR. DINNERSTEIN:  We know that there were six shell

22   casings at the scene and there were three shots that actually

23   struck Mr. Alston.  One in the back of the head and two in the

24   front.

25           Now Parsons is their star witness.  And the government

Cbq1mer5                    Summation - Mr. Dinnerstein

1    called Parsons, whose testimony as to this particular point is,

2    "Oh, I'm not the shooter, although I do admit I shot four or

3    five times.  Melvin is the shooter."  And the question then

4    is -- and it's not certain, but it's -- what's the truth, what

5    is the truth about Parsons' testimony about this significant

6    issue?  So the issue for you to first decide is, who is

7    Parsons?  Could we see --

8            Now this is Mr. Parsons not in a courtroom.  This is

9    where he says, "Courtlandt niggas talkin about I'm tellin on

10   them.  I don't call it tellin.  I call it lookin out for DEV."

11           That's not in a courtroom where he's putting on a

12   show, it's not in a courtroom where he wants to be a center of

13   attention.  That's just bragging to his friends about what he's

14   doing.

15           Now Mr. Fee says, absolutely true.  This is a guy who

16   you're supposed to believe.  Question for you, the harder one,

17   without any bones to pick, does that make sense?

18           We also know something else about who Parsons is

19   because he tells us.

20           Page 2567.  He acknowledges that he tells people what

21   they want to hear.  Has nothing to do with whether or not it's

22   the truth.  But he tells people what they want to hear.

23           "Q.  Well, you say on the street you told people what

24   you thought they wanted to hear.

25           "A.  Yes.

Cbq1mer5                    Summation - Mr. Dinnerstein

1          "Q.  Is that correct?

2          "A.  Yes.

3          "So you would make up stories --

4          "A.  Yes.

5          "Q.  -- on the street, is that correct?

6          "A.  Yes.

7          "Q.  You would say anything that you thought they

8    wanted to hear --

9          "A.  Yes.

10         "-- is that correct, sir?

11         "A.  Yes.

12         "Even if it wasn't the truth, right?

13         "A.  Yes."

14         And it goes on.

15         "Q.  Did you make up stories when you thought it would

16   be useful for you, sir?

17         "A.  Yes."

18         Substantial assistance.  Telling a story in this

19   courtroom that would be useful for him.

20         The judge is going to tell you -- Judge Pauley is

21   going to tell you that you have to believe government

22   witnesses, the government case beyond a reasonable doubt.

23         Now Parsons tells us he was involved in four separate

24   shootings from the middle of July to the end of August.  Now we

25   also know that Melly was not around in the middle of July, that

Cbq1mer5                          Summation - Mr. Dinnerstein

1   there was a stipulation that indicated that he was incarcerated

2   until August 1st of 2010.  So we know that also.

3        The first shooting that we know about that Parsons was

4   involved with is Mr. Ogarro.  This is the shooting that

5   occurred, I think it's July 31st of 2010.

6        This is a picture of Mr. Ogarro.  And we know from

7   Mr. Parsons that he shot him in the head.  He shot him in the

8   head while he was lying on the ground.  Parsons shot him in the

9   head.  And the government does this thing like, "Oh, why would

10  he say that?  Why would he say that if it wasn't the truth?"

11  He's into bravado.  He's into showing off.  He's into bragging

12  about how many people he goes out and shoots and hurts.  He's

13  into being the center of attention.  What a shocking thing for

14  him to say.  "I want to be the center of attention.  I want all

15  of you people to be looking at me.  I want -- I want everybody

16  to know that I'm the main man."

17       Now what does he say?

18       "Q.  And there was a time that Mr. Ogarro had been

19  shot and was lying on the ground, is that correct?

20       "A.  Yes.

21       "And you believed he was dead, is that correct?

22       "A.  I don't know.

23       "Q.  So you went up to him and you shot him more,

24  right?

25       "A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          "Q.  Tell us what you did when you went up to him

2     while he was lying on the ground.

3          "A.  I stood over him and started firing.

4          "Q.  How far away were you when you started firing?

5          "I was standing right over him."

6          And then I asked that he take a look at Government

7     Exhibit 200, which is the shot -- this is Mr. Ogarro's body and

8     the number of bullets that were put into him, one Mr. Parsons

9     said he did in the middle of his forehead.  I said can we have

10    a look at Government's Exhibit 200A and --

11         "Q.  Now one of the bullets you put right into his

12    head, isn't that correct, sir?

13         "A.  Yes.

14         "Q.  And the bullet was down into him, is that right?

15         "A.  I don't know.

16         "Q.  And you were standing above him when you shot him

17    right in the head, is that correct?

18         "A.  Yes."

19         That's the government's star witness.  This is the one

20    you're supposed to be absolutely sure that he's a truth teller.

21         But, you know, the government decided not to talk

22    about the other shooting that Parsons did in the wild summer of

23    2010.  I'll talk about it a little bit.  He goes off sometime,

24    he doesn't remember when, he goes off to the Maria Lopez crew

25    because he's having some -- or houses because he's having some

1    rift with some guy named TA, who he, frankly, can't even

2    remember what the rift is about.  He doesn't even know why he

3    has this rift with TA.  Now government said something about

4    being in YG and not being able to sell in the Courtlandt Avenue

5    housing projects.  That's just flat out wrong, because Parsons

6    tells us he's a drug dealer, he sells in Courtlandt, and before

7    he shot TA, he was a member of YG.  So there isn't necessarily

8    this -- these lines that are drawn between one group and

9    another group.  It just doesn't work quite that way.  It's more

10   amorphous than that.  Somebody can be, you know, in whatever

11   GFC is and whatever it was and whatever it became while Melvin

12   is sitting in prison, and YGs, who some of the -- some are --

13   they're the same members.  They're the same people.  So it

14   isn't accurate for Mr. Fee to get up here and say, oh, these

15   are different people, different gangs.  This guy, Parsons,

16   tells us he's in GFC, he's in something called GFM, which is I

17   guess a Harlem group, and he's in YG, all at the same time.

18   And we know that Parsons shoots people that have nothing to do

19   with racketeering, with an enterprise.  He just does it because

20   he wants to.  He's that sort of guy.  And we know that because

21   he tells us.

22            This -- by the way, here's a picture of TA.

23            He tells us why he goes over there.

24            "Q.  We had problems before.  Who did you have

25   problems with?

1           "A.   Me and TA, we had problems before.

2           "Q.   What was the nature of the problem you had with

3     TA?

4           "A.   Huh?

5           "Q.   What was the nature of the problem you had with

6     TA before?

7           "A.   I don't even remember."

8           He shoots a guy in the stomach, he doesn't even

9     remember what the issue is about.

10          "Q.   Was it because he took a bell?

11          "A.   No.

12          "Q.   Was it because -- it's your testimony now, sir,

13    that you had a problem with TA but you can't remember, is that

14    correct?"

15          I'm kind of flabbergasted.  You can't remember why you

16    shot somebody?

17          "A.   Yes.

18          "Q.   Was it a personal problem or was it a problem

19    with YGs?

20          "A.   It was personal.

21          "Q.   So there was some personal matter with TA, is

22    that correct?

23          "A.   Yes."

24          Well, he goes on.

25          This has to do with -- the reason he shot him was

1   because he punched him, so TA -- of course Parsons brings a gun

2   over there just in case, but -- but TA punches him and he

3   decides he has to shoot him.

4           "Q.  What did he do?"  Talking about TA.

5           "A.  He punched me in my face.

6           "Q.  He pushed you?

7           "A.  No.  He punched me.

8           "Q.  And you decided to shoot him?

9           "A.  Yes.

10          "You decided to shoot him in the chest, right?

11          "A.  Yes.

12          "Q.  What was the reason you decided to shoot him in

13  the chest?

14          "A.  Because he punched me.

15          "Q.  Did you hope to hurt him?

16          "A.  Yes.

17          "Q.  What did you hope to do?

18          "A.  Kill him.

19          "Q.  That's because he punched you, you were going to

20  kill him, right?

21          "A.  Yeah."

22          Star witness.

23          And then that wasn't enough that he just shot TA

24  because he punched him.  He had a gun with lots of bullets.  So

25  he emptied the gun.

Cbq1mer5                          Summation - Mr. Dinnerstein

1            2549.

2            "At that point, after you shot TA, you then emptied

3     that gun, is that correct?

4            "A.  Yes.

5            "Q.  You shot everybody, you just shot randomly in the

6     neighborhood, is that correct?

7            "A.  Everybody that was with him.

8            "Q.  What?

9            "Everybody that was with him."

10           Mr. Parsons doesn't need help shooting people.  He

11    shoots people.  He takes guns and he shoots them, and he

12    doesn't need a crowd.  He doesn't need Melly or anybody else to

13    shoot people.  He does it on his own.

14           And what does he do then?  Well, he goes back home, he

15    takes his gun, he fills it up with bullets, and this guy, White

16    Mike he's called, White Mike goes over from the Maria Lopez

17    housing, across the street, really, it's not very far, over to

18    Jackson and Melrose, and he's talking to somebody, and it's

19    like he's talking to find out what the heck happened.  He

20    doesn't come with a crew.  He doesn't come with a gang.  He

21    comes by himself.

22           And what does Parsons do?  What does he do?  He shoots

23    him.  This is Parsons' testimony.

24           "Because they were arguing and you heard your name,

25    you then shot them, is that correct?"  I think it should be

Cbq1mer5                        Summation - Mr. Dinnerstein

1   shot him, because he only shot one person.

2              "A.   Yes.

3              "Q.   Basically that's all that happens, right?

4              "A.   Yes.

5              "Q.   You just pulled out the gun and shot him.

6              "A.   Yes.

7              "You shot him right in the head, right?

8              "A.   Yes.

9              "What was your hope when you shot him in the head?

10             "A.   For him to die.

11             "Q.   What?

12             "For him to die.

13             "That you would kill him, right?

14             "Yeah.

15             "Because you shoot somebody in the head, you expect

16  that the person's going to die, is that correct?

17             "Yes."

18             Wow.  But what else is significant about that?

19  Parsons shoots him in the back of the head.  He shoots White

20  Mike in the back of the head.  Ogarro he shoots in the front of

21  the head.  He shoots him while he's on the ground and right

22  into the head.  And we know that whatever number of days it is,

23  whatever period of time is between the shooting of White Mike

24  and TA, and the shooting of Black -- we know how Alston also

25  gets shot, in the back of the head, back right side of the

Cbq1mer5                        Summation - Mr. Dinnerstein

1    head, just like White Mike.  Parsons seems to like to shoot

2    people in the back of the head.

3           So now we're up to the Alston shooting.  And we know

4    the date that happens.  August 27th, 2010.  And we know some

5    of the things from some of those witnesses.  We know, for

6    instance, that there was only one gun.  We know that there were

7    six shots that were fired.  We know that three of those six

8    shots hit Black, and we know that Parsons tells us that he's

9    involved in -- that he shoots four or five times.  That's what

10   he tells us on the witness stand, that he does at least -- he

11   says four or five shots.  We know the man's only hit three

12   times, and we also know that Parsons at this point, in his wild

13   summer of 2010, we know has already been involved in four

14   shootings.

15          Now the first question you have to decide is whether

16   or not the shooting of Alston is done as an enterprise act.

17   This is Count Eight of the indictment.  And there's three

18   elements of this count:

19          1.  There existed an enterprise called the Courtlandt

20   Avenue Crew engaged in racketeering activity.

21          Now that's something for you to decide, and I think a

22   lot of the other lawyers are going to talk about this, and I'm

23   not going to spend a lot of time talking about whether there is

24   such a thing as a Courtlandt Avenue Crew.  Nobody ever called

25   it that.  Nobody ever figured out who the members were.  But

Cbq1mer5                           Summation - Mr. Dinnerstein

1    the government says, this is it.  It's the Courtlandt Avenue

2    Crew.  Some of the guys were in GFC, some of them weren't.

3    Some of them I guess could also be in the Courtlandt Avenue

4    Crew and also in the YGs, like Parsons, at least for some point

5    in time.  But I don't know.  Does it exist?  I know that a lot

6    of the other lawyers are going to talk about that, so I'm not

7    going to use my time talking about it.

8           Melvin Colon -- second element -- murdered or aided

9    and abetted the murder of Delquan Alston.

10           So the government now has kind of two different

11    theories at this point, because either he -- Melvin could have

12    been the one, the trigger person -- I think there's lots of

13    question as to whether or not Parsons is actually the trigger

14    person and shot all the time.  Or that somehow he aided and

15    abetted the murder of Mr. Alston.

16           And then the third count, this idea of gaining

17    entrance to and increasing your position in the racketeering

18    really turns -- comes back to the first charge.  And then you

19    have to accept the idea that the shooting of Alston somehow was

20    going to enhance his position in this racketeering crew,

21    whether or not such a thing actually exists.

22           (Continued on next page)

23

24

25

1          MR. DINNERSTEIN:  Parsons tells us that the reason he

2    and Melly shoot Alston is because he's directed to do so by

3    T-Money.  These are questions that Ms. Heller asked when

4    Parsons was on the stand:

5    "Q.  Mr. Parsons, when we left off yesterday, you were talking

6    about a conversation in the chicken spot, do you remember?

7    "A.  Yes.

8    "Q.  What was the result of the conversation in the chicken

9    spot?

10   "A.  We was talking about Black.

11   "Q.  Just to summarize, what was the final results when you

12   left the chicken spot, what had you be been asked to do?

13   "A.  We agreed to the conversation that we was talking about.

14   "Q.  What did you agree to do?

15   "A.  That he told us he wanted to us get rid of him."

16          Okay, "he" being T-Money.  "Him" being Blacks or

17   Alston.

18   "Q.  Can you use names?

19   "A.  It was me, Melly and T-Money in the chicken spot.

20   "Q.  What had the three of you agreed to do?

21   "A.  He told us what to do and we agreed to do it.  We agreed

22   to killing Blacks."

23          Well, this is crazy.  This isn't what happened.  It is

24   impossible to believe that that is what happened.  When Mr. Fee

25   says, oh, it's just common sense, it's not common sense.

1    Because we know in August of 2010 that T-Money was upset over

2    the violence that Parsons was perpetrating.  He was upset that

3    Parsons was shooting people.  And we know that because Parsons

4    tell us that.

5    "Q.  After this shooting" now we are talking about the White

6    Mike shooting "you had a conversation with T-Money, isn't that

7    correct?

8    "A.  Yes.

9    "Q.  And he was telling you that all these shootings that are

10   occurring in the Melrose Houses are affecting business, is that

11   correct?

12   "A.  Yes.

13   "Q.  And that what's going on is because all those shootings,

14   the cops were around, is that correct?

15   "A.  Yes.

16   "Q.  And he told you to get out of town, right?

17   "A.  Yes.

18   "Q.  And he told you to get out of town because you were hot,

19   right?

20   "A.  Yes.

21   "Q.  You were telling people that you were shooting people,

22   right?

23   "A.  I probably told some people that.

24   "Q.  Actually, you told people because you were kind of proud

25   of the idea you were killing people, isn't that correct, sir?

1    "A.  I probably did tell them when I was drunk.

2    "Q.  Did you tell them you were proud that you were shooting at

3    people?

4    "A.  No.

5    "Q.  Did you tell them -- did you think by shooting people that

6    would make you the center of attention?

7    "A.  Yes."  We get that theme again.

8    "Q.  You liked being the center of attention, right?

9    "A.  At that time I did.

10   "Q.  You liked by shooting people you get to become the center

11   of attention, isn't that right?

12   "A.  Yes.

13   "Q.  T-Money said stop shooting people because the cops are

14   around and it's hurting business, isn't that correct?

15   "A.  I don't remember him saying that.

16   "Q.  Well, T-Money was concerned that there was so much

17   violence going on in the Melrose and Jackson Houses, right?

18   "A.  Yes.

19   "Q.  And he was concerned that there were all these shootings,

20   right?

21   "A.  Yes."

22          Why would T-Money ask Parsons to shoot Alston?  He's

23   not a player.  I mean, you can kind of understand why Ogarro

24   got shot, because he's involved with a rival drug gang,

25   supposedly.  You can kind of understand why Correa got shot,

1   because he's involved with a rival drug group.  But Blacks?

2   Who's he?  He's just some guy who sells crack.  Maybe bad

3   crack.  But that's not a reason to shoot somebody.  You tell

4   him to stop doing it.  But you don't kill him over that.

5           I submit that the shooting of Alston, the shooting of

6   Black, was an independent act by this sociopath Parsons for

7   whatever reason.  We know that first because what the

8   government is trying to sell here violates our common sense

9   that somehow this has something to do with business and

10  therefore part of this enterprise.

11          But because Villafranco tells us what happens.  He

12  tells us that he had received a gun at some point prior to

13  August 27, from Dev Parsons and Akon.  It was the two of them.

14  Melly had nothing to do with this gun being at this guy's

15  house.  And on August 27, Dev comes back to get the gun.  And

16  he says that Dev comes to his house at 3 or 4 o'clock in the

17  morning on August the 27th, and he says to him -- this is

18  Villafranco being on the stand:

19  "Q.  Tell us about what happened that day.

20  "A.  Devin Parsons came to my house about three or four in the

21  morning.  I was asleep.  He knocking on the door, on my door

22  and I opened the door and he asked for the gun.

23  "Q.  Do you remember how he asked for the gun?

24  "A.  Let me get that.  And then he says let me get that joint.

25  "Q.  What did you know -- what was your understanding of the

1    word "joint"?

2    "A.  Gun."

3           Now we know that Devin when he comes to the house is

4    angry.  And because right after that, I asked Villafranco this:

5    "Q.  What was his demeanor like at the time?

6    "A.  Like, like he was rushing.  Like he was angry.

7    "Q.  Was Dev with anyone at that time?

8    "A.  No, he was not."

9           So we know that Dev was angry.  We also know from

10   Villafranco something that we all know anyway.  That Parsons is

11   a crazy, selfish, wild, violent person.  There is no question

12   about that.  Now, we also know that Melly never tells

13   Villafranco anything about the shooting.  He never makes any

14   admissions.  He never says, oh, I did it.  But we know what

15   Parsons tells Villafranco.  3524.

16   "Q.  Did you give Dev the gun?

17   "A.  Yes, I did.

18   "Q.  Was Dev with anyone else at the time?

19   "A.  No, he was by hisself.

20   "Q.  Once you gave the gun to Dev, where did he put it?

21   "A.  He put it on his waist."

22          So this idea that Dev who testifies, oh, I can't put

23   the gun in my waist because it would fall out, we know from

24   Villafranco that wasn't true.

25   "Q.  Did you have a conversation with Dev about what had

1    happened at that time?"  This is now after the shooting.

2    "A.  After we left the apartment, we was walking on Courtlandt

3    by the chicken spot, and he had told me that him and Melly had

4    killed Black.

5    "Q.  Do you remember the words he used to describe that?

6    "A.  He said that he flocked Black.

7    "Q.  What's your understanding of the term flocked?

8    "A.  He killed him."

9         He didn't say Melly killed him.  He said he, Dev,

10    killed him.  There is something else to be said about this

11    because we know that Parsons is a liar, and lies to people all

12    the time when it serves his purpose.  He tells us that.  We

13    know from Defendant's Exhibit 6 that he's out to help himself

14    here.  That's what he tells us.  And you're now supposed to

15    believe it's supposed to be absolutely certain, like the

16    government tells you, that Melvin was involved in that

17    shooting.  That he participated in that shooting.  That he

18    either shot, or at least if they can't prove that, that he

19    somehow aided and abetted the murder of Blacks.  Because

20    Castillo says so.  Excuse me, because Parsons says so.

21         We know also that Parsons admits to taking four or

22    five shots.  There is only three shots in Blacks, and we know

23    also that his signature shooting is in the back of the head.

24    That's how he shot White Mike, and that's how he shot Black.

25    We know that there is only one gun and that gun is an

1   automatic.  And we know that an automatic gets to be shot

2   rapidly, and we know that the shots were fired because both

3   Hill and Villafranco tell us rapidly.

4        I want to say one thing about an argument that the

5   government made about the height, the relative heights of

6   people.  Now, this shooting occurred two years ago.  August of

7   2010.  More than two years ago.  Melvin was 18 then.  Now he's

8   20.  Kids grow.  So to suggest that he's the same height in

9   2012 when Castillo says, oh, he's 6 feet tall and, therefore,

10  the conclusion is he was 6 feet tall in 2010, we don't know

11  that.  And we also don't know that when somebody is urinating

12  as Blacks is supposed to do, especially when you are a little

13  bit tipsy, whether or not you're standing as Mr. Fee said

14  upright.  Maybe he's not standing totally upright.  Maybe he's

15  leaning a little bit.  Dr. Prial can't tell us how exactly that

16  person was standing.

17       So the idea that the shooting occurred by Melly

18  because two years later he's a different height than he was in

19  2010, is just trying too hard.  Because it doesn't prove

20  anything.

21       I want to talk a little bit about Crocker at this

22  point.  Because Crocker, if you remember, he is an early, early

23  cooperator.  He actually is talked to by the government on the

24  date of his arrest on September 27, 2011.  And the government

25  is very anxious to have him as a cooperator.  This was the

1    questioning of him regarding his initial discussion of him

2    being a cooperator:

3    "Q.  When you got arrested on September 27, you immediately had

4    a conversation with the government agents, is that correct?

5    "A.  Right.

6    "Q.  That was on the same day that everybody else was arrested,

7    right?

8    "A.  Right.

9    "Q.  You had a lawyer at that time, right?

10   "A.  Yeah, I had a lawyer

11   "Q.  You had Mr. Quijano, right?

12   "A.  Right.

13   "Q. He was representing you from September 27, right?

14   "A.  Right.

15   "Q.  You were not arraigned with -- you did not see the judge

16   with everybody else, isn't that correct?

17   "A.  Correct.

18   "Q.  You saw the judge separately, right?

19   "A.  Right.

20   "Q.  You on that date had a conversation about cooperating,

21   right?

22   "A.  Right.

23   "Q.  And that was the first date that you were arrested along

24   with everyone else, right?

25   "A.  Right."

1              Why is that significant?  Because Crocker knows he's

2    going to be a cooperator and he decides to cooperate very early

3    on in the game.  He's cooperating by October or November of

4    2011.  He is cooperating at that point and he is going to

5    participate in the government's case and he understands that he

6    has to provide the government with substantial assistance.

7    That's what this is all about.  He knows he's in big trouble,

8    he's being prosecuted in a federal courtroom.  He knows he is

9    charged with all sorts of horrible things, and he knows that if

10   he cooperates, he's got to be able to tell the government

11   something that's going to help him and give him this 5K letter

12   and this substantial assistance.

13             We also know he's a little different from the other

14   people because Crocker was the fellow who was in jail in 2010,

15   at Rikers Island.  And when he was in jail, he knew that they

16   were already interested in him because they came to talk to

17   him.  And he knows that and he tells us that.  He tells us that

18   he gets recruited from Rikers Island, they talked to him then,

19   this is April of 2010, he speaks with a Detective Harris, Agent

20   Castillo tells us that she talks to him at that point, and that

21   there is discussion about whether or not Crocker, who is also

22   known as 14, is going to come and cooperate with the

23   government.  He says no.

24             But in September of 2011 he knows he is being

25   arrested, he knows he's being charged with very serious crimes,

1    and he changes his mind.  And he knows at that point that he

2    better have something to give the government that would be

3    substantial assistance in this case.  So what does he tell

4    them?  He tells them, because he doesn't know, he's never told

5    anything about the shooting until he finds out that the

6    government is interested in charging Melly with the Alston

7    killing.  And what Crocker tells us is this.  This is direct

8    examination by whichever lawyer it was who was questioning

9    Mr. Crocker at this time:

10   "Q.  Did you ever speak to Melly about the murder of Black?

11   "A.  Yes.

12   "Q.  When did you speak to Melly about this?

13   "A.  I spoke to him when we got arrested in MDC."  By that

14   time, Crocker already knows he's going to cooperate.

15   "Q.  After your arrest by federal authorities?

16   "A.  Yes."  Then he goes on.

17   "Q.  What did Melly say at that time about the murder of Black?

18   "A.  He was saying the same thing Dev told me in the -- in

19   the -- and the reason why he had the gun behind his head so

20   long, because he was about to catch his first murder, and when

21   he shot him in the head, Black turned around and looked at him

22   in the eyes.  And it was -- and it was scary that he shot him

23   again."

24           This actually is something Mr. Fee put up there on the

25   wall.  But it didn't happen that way.  It couldn't have

1    happened that way.  Because of what Hill and Villafranco tells

2    us.  Because they say the shots are rapid.  Crocker now tells

3    us the shots couldn't be that rapid.  Because the fellow had an

4    opportunity to turn around and got shot some more, and then we

5    still don't know about those three other shots because we know

6    those occurred because the shell casings are there on the

7    ground.

8          What we know is that Crocker needs to get his 5K

9    letter, he needs to get substantial assistance, and the truth

10   is not the issue here.  The issue is how can he be helpful to

11   the government so that he can be on their team.  So that he can

12   get help from them.  He tells a really good story about the

13   shooting.  He needs to.  He needs to make it convincing.  So it

14   is the first murder and the turn around and the being scared

15   and all that sort of stuff.  But Hill and Villafranco tell us

16   that's not what happened.  Shots were rapid.  Crocker has a

17   long story between shots.  Can't be so.

18          Let's see Castillo.  Janice Castillo is a special

19   agent for Alcohol, Tobacco & Firearm.  I want to talk about

20   three things that she testifies about which indicates

21   substantial problems with the government's case.

22          First, a search warrant.  Now, it says there was a

23   search warrant affidavit in March of 2011 at 2253 Haviland

24   Avenue which is Joshua Meregildo.  She doesn't -- and you

25   remember the affidavit is something that she needs to fill out

1   because she needs the judge to sign it.  And she needs to put

2   the details of why she needs that search warrant into that

3   particular house.  And she tells you she wants to make sure

4   that it's thorough.  The affidavit ought to be thorough and it

5   ought to have a lot of information on it so that the judge is

6   going to sign the affidavit.

7           Now, at that point in March of 2011, there were three

8   cooperators, Aponte, Villafranco and Parsons.  And there was

9   Crocker who they had already spoken to over at the Rikers

10  Island.  And supposedly, Parsons and Villafranco are aware of

11  the Alston killing.  Parsons was involved and gave the story

12  about why they killed him and claims that Melly was involved in

13  the killing also.  It wasn't put in that affidavit.  It wasn't

14  put in that affidavit because, I submit, at that time, what the

15  government believed, what Castillo believed, was that Parsons

16  committed the shooting for his own reasons.  The reason he

17  killed Blacks had nothing to do with an enterprise, had nothing

18  to do with T-Money or anything like that.  He did it because he

19  felt like it.  What does Castillo say?

20  "Q.  You mentioned the homicide of Correa, is that correct?

21  "A.  Yes.

22  "Q.  You mentioned the homicide of Ogarro, isn't that correct?"

23  That's talking about what she put into the affidavit.

24  "A.  Yes.

25  "Q.  Because those were murders in aid of racketeering, isn't

1    that correct?

2    "A.  Yes.

3    "Q.  And you also mentioned that Terry Harrison was murdered,

4    isn't that correct?"  Because by that time Harrison was

5    murdered in September of 2010.

6    "A.  Yes.

7    "Q.  Did you mention the murder of Delquan Alston in that

8    affidavit?

9    "A.  No.

10   "Q.  Now you had spoken to the cooperating witnesses, isn't

11   that correct?

12   "A.  Yes.

13   "Q.  And you wanted this affidavit to be complete as possible,

14   isn't that correct?

15   "A.  Yes."

16           So, we now know that in March of 2011, when they got

17   the search warrant affidavit, they neglected to mention the

18   murder of Blacks, the murder of Alston.  They mentioned Ogarro,

19   they mentioned Correa, but Blacks they don't mention.

20           And then comes to the second point of Agent Castillo's

21   testimony.  They conduct a search of 280 East 161st Street,

22   apartment 6U where Ms. Keon lives along with Melvin.  Why did

23   they do that?  Because the great cooperators say, oh, that's

24   where all the drugs are, that's where all the guns are.  All

25   you have to do is walk into Melly's apartment and you're going

1    to find all sorts of guns and drugs.

2            Now, Melly got arrested.  He wasn't at that apartment.

3    He was at a guy named Dante Barber's apartment at 321 East

4    156th Street I think.  There were numerous people who were also

5    there.  Lots of them were not even arrested.  There were adults

6    that were there, there was a person by the name of Vic.  He was

7    there.  There was a person by the name of David Cooper, he was

8    there.  There was somebody by the name of Aponte, who was also

9    by the way one of the cooperators early on in this case.  There

10   was a lot of talk about him but we didn't get to see him.  And

11   they find in that apartment a small amount of crack cocaine in

12   a glass case, and they find one gun.  Whose gun is it?  We

13   don't know.  We know it was found in Dante Barber's bedroom.

14   The government doesn't have the chutzpah I guess to stand up

15   here and say, oh, that gun belonged to Melly.  Because nobody

16   knows.  Nobody knows whose gun that actually was.  We don't

17   know.

18           But what we do know is right after that search, right

19   after the arrest of Melly and those other people who were

20   arrested and the people who were not arrested like Aponte, that

21   Castillo goes to 280 East 161st Street and he meets Melly's

22   mother there.  And he tells Melly's mother what's going on.

23   Your son's being arrested on a federal charge.  And she acts

24   the way we all would act.  She's upset.  She's crying.  And

25   Castillo isn't there just to provide information to Melly's

1    mom.  He's there -- she's there to search the apartment.  And

2    she has a couple of other agents with her.  Because the

3    cooperators say, oh, you are going to find a lot of guns and

4    drugs there.  That's where the stash is.  And she doesn't even

5    have a search warrant.  Not exactly sure why she doesn't get a

6    search warrant, but she doesn't have a search warrant.  She

7    asks her mom, can we search?  Would you let us search without a

8    search warrant?  Would you give us consent to search the house?

9    Search the room?  Search the apartment?  Search the place that

10   Melly sleeps?  Sure.  Search away.  See what you find.

11           And what do they find?  They find a couple of letters

12   that they take, although we never know anything about those

13   letters.  It isn't talked about.  We find a medicine bottle.

14   And what don't we find?  We don't find guns, and we don't find

15   drugs.

16           So, again, an opportunity to corroborate what the

17   cooperators tell us, no corroboration.  The words of those six

18   people that we saw at the beginning, no corroboration.

19           Finally, Agent Castillo tells us that just being

20   merely present at a crime scene is not enough to be guilty.  So

21   the fact that if you believe that Melly was present when

22   Parsons shot that guy, when Parsons shot Alston, doesn't make

23   him guilty unless he is either the murderer, or he's aiding and

24   abetting.

25           And what I submit we know about the murder is that

1   Parsons gets the gun, is angry, goes out, shoots somebody,

2   shoots Alston, and then returns the gun.  And Melly, who is

3   standing there at that time, runs with him.  That's what we

4   know.  Mere presence is not enough.  And Castillo tells us

5   that.  Not just will Judge Pauley tell us that.  But when

6   Castillo is talking about Aponte, who you remember was present

7   when Pemberton shot that Chinese delivery man, he's asked

8   questions by Mr. Lee, actually, whether or not Aponte is guilty

9   of being involved in that Pemberton shooting.  And what does

10  Agent Castillo say?

11  "Q.  Did you see Mr. Aponte on the bicycle riding there right

12  at the time of the shooting?

13  "A.  Yes."  Then he goes on to say:

14  "Q.  But he was involved."  Talking about Aponte.  And Agent

15  Castillo's answer was he was present.

16          There is difference, and the law says and Judge Pauley

17  will tell us that being present is different from being

18  involved.

19          So, how then, still talking about the August 27

20  incident, can Melly be held responsible for the conduct of

21  Parsons?  At best, he was present.  Not going to challenge what

22  Villafranco says about that.  But there is certainly no

23  evidence, certainly no evidence beyond a reasonable doubt that

24  he can be held responsible for Parsons' murder of Alston in the

25  back of the head.

1            Let's now talk about a few of the other counts.

2    Assault and attempted murder in aid of racketeering of

3    Mr. Jiang.  That's an incident that happened September 8 of

4    2011, about a year after a lot of these other incidents

5    happened.  The government has in this case, we'll talk about

6    both of them because I think they're asking you to do an

7    either/or sort of thing.  They have two theories.  And we can

8    go to the next slide.  One that he somehow aided and abetted

9    the shooting of Mr. Jiang, and there is another one and we'll

10   talk about it a little bit that's a little more complicated,

11   it's called co-conspirator liability.

12           We know what happened on September 8, the government

13   cooperator, Aubrey Pemberton, decides to shoot in the Maria

14   Lopez housing area and that he hits Mr. Jiang.  At the

15   beginning we know that that happened because Police Officer

16   Ingoglio, he's one of the officers, he's the one who was on the

17   evidence collection team.  He found shell casings just like

18   they found shell casings when Detective Jupiter found shell

19   casings on August 27.  Ingoglio also found shell casings.  We

20   learned from Detective Fox, the other government witness, the

21   ballistics expert, that the shell casings all come from one

22   gun.  And we know who shot that one gun.  Pemberton.

23           So the only issue really is, is whether or not

24   Pemberton and Melly had this conversation where Melly says, oh,

25   I'll shoot four times, you shoot four times.  And then

1    Pemberton gets too excited so he shoots all eight times.

2            Well, to accept that, as to count 12, this count, the

3    government has to convince you that that conversation actually

4    happened.  And there is only one person who could tell you

5    whether or not that happened based upon the evidence in this

6    courtroom, and that's Pemberton.  And I submit at this point,

7    we know what Pemberton is interested in.  He's interested in

8    getting from the government a 5K letter, and he knows the only

9    way he gets such a letter is to provide them with substantial

10   assistance.  So he has a very large incentive in demonizing

11   Melly, in saying a bad thing about him.  He doesn't get his 5K

12   letter unless he does that.

13           So let's go to the second theory.  I guess the

14   government may have problems with this idea of whether or not

15   you're going to believe Pemberton to the point of thinking that

16   he aided and abetted the shooting.  This theory is called

17   co-conspirator liability theory.  Lots of big words.  And there

18   is five elements to this offense and the judge is going to tell

19   you this.  First, he's going to tell you that someone assaulted

20   or attempted to murder Jing Bao Jiang.  And Mr. Fee actually

21   correctly said that you can transfer the intent.  If you intend

22   to shoot one person but you actually shoot someone else, that

23   transferred intent is properly within the elements of the

24   particular count.  Two, three and four all deal with being

25   either a member of a conspiracy, we'll talk about that a little

CBQ3MER6                    Summation - Mr. Dinnerstein

1    bit later, or whether or not this shooting was in aid of

2    racketeering in some sort of manner.

3             But the fifth theory, the fifth element of this

4    particular count talks about Melvin Colon could reasonably have

5    foreseen that one or more of the co-conspirators, in this case

6    Pemberton, might commit the assault or attempted murder.  Okay.

7    So they're hedging their bets on the aided and abetted stuff,

8    and they are saying all we have to do is prove it was

9    reasonably foreseeable.  Well, that only presupposes that

10   Mr. Colon, that Melvin, knew what Pemberton was going to do.

11   And then, remember Aponte?  Because Aponte's present on

12   September the 8th too.  Is Aponte guilty under this theory?  I

13   guess not for Agent Castillo's purposes.  Not for the

14   government purposes.

15            MR. FEE:  Objection, your Honor.  Facts not in

16   evidence.

17            THE COURT:  Overruled.

18            MR. DINNERSTEIN:  How then can it be reasonably

19   foreseeable when the evidence that Melly knew that Pemberton

20   was going to be such a lunatic at about 7:30, 8 o'clock at

21   night on September 8 that he was going to go out and pull out a

22   gun and shoot randomly at people.

23            Now, let's go to PowerPoint 7, the next one.  Go to

24   the next one.  This is count 11 of the indictment.  Boy, you

25   guys have a hard job putting all this stuff together.  I just

1  have to talk about Melvin Colon.  Okay.  The judge is going to

2  tell you what conspiracy is.  Okay.

3       And why is it one, one, one?  Okay.  It should be one,

4  two, three.  Okay.

5       THE COURT:  Scrivener's error.

6       MR. DINNERSTEIN:  The second one, Melvin Colon

7  conspired to murder members of the Maria Lopez crew from August

8  of 2010 to September of 2011.  That's about 13 months.  Well,

9  I'm not going to talk too much about that, but during that

10 13-month period of time, some of that period of time, based on

11 the stipulation, Melvin Colon wasn't even around.  But that's

12 neither here nor there.

13      What we, and this is something I have a lot of

14 question about, whether or not what Mr. Fee said was right that

15 there is no serious dispute that Mr. Colon went to the Maria

16 Lopez housing projects on a fairly regular basis.  That's what

17 Crocker says, once or twice a week, and that they shoot up the

18 place.  I have a serious question as to whether or not that in

19 fact is true.

20      We know about two shootings.  We know that Pemberton

21 shooting when he shot Mr. Jiang, count 12 of the indictment.

22 And we know that at one time, Folks shot Melly in the back.  So

23 we know that there were two shootings that occurred in the

24 Maria Lopez housing.  Do we know if there is lots of them?

25 Because the government cooperators tell us that they go over

CBQ3MER6                    Summation - Mr. Dinnerstein

there all the time and they shoot the place up?  Actually, I
think we know precisely the opposite.  That those guys are
making up stuff to help themselves.  And we know that because
all we have to do is listen to the words of the police officers
who tell us that when shots are fired, they conduct an
investigation.  When there is a radio run from those good
people who live in this community, when there is a call saying
there are shots being fired at the Maria Lopez Houses, police
are going to conduct an investigation.  It's going to happen
every time.  It will happen on Park Avenue in Manhattan.  And
it will happen on Park Avenue in the Bronx.

When there is a report, when someone calls the police
and you heard some of those radio runs of shots being fired,
the police conduct an investigation.

And we know Police Officer Valdez, and he's the one
who investigated when Folks shot Melly in the back, April 26,
2011, that he received a radio run of shots being fired, he
went to investigate, he found cartridges.  Not from two guns.
Not from 10 guns.  But from one gun.  And we know who had that
one gun.  Folks.  Not Melly.

They can try to demonize Melly and say, oh, he shot
too.  But then Police Officer Valdez, a competent and good cop,
would have found him.  But he didn't.

And then I spoke a little bit about this before, the
September 8 shooting where Mr. Jiang was shot.  They found

1   shell casings from one gun.  And we know who did that shooting.

2   Pemberton.  And then there is Police Officer Duggal, and Melly

3   wasn't even there, but she's talking about an incident where I

4   guess Mr. Joseph was shot, Lincoln Hospital, September 13,

5   2010, a year before.  She didn't know anybody was shot.  But

6   there was a report of shots fired and she went to conduct an

7   investigation.  That's what the police do.

8           And then there's Officer McLean.  Sergeant McLean.

9   She was present, she was the first officer at the scene on the

10  August 27, 2010, shooting where Alston was killed.  She went

11  there not because she knew about anybody being shot or killed.

12  She went there because shots were fired.  Shots fired, police

13  investigation.  That's what happens every time.

14          Crocker tells us once or twice a week they go over and

15  shoot up that particular housing complex.  Folks tells us,

16  Pemberton tells us, Parsons tells us.  Oh, we know, by the way,

17  there's two other shootings at Maria -- one other shooting at

18  Maria Lopez.  We knows Parsons goes over there because he has a

19  beef with TA and he shoots him.  It's not part of any

20  enterprise.  That's just some wild thing this kid decides to

21  do.

22          So I have a serious dispute whether or not people from

23  Jackson Melrose, Melly Colon, went over there on a regular

24  basis and shot the place up.  There is no evidence in this

25  courtroom about that, other than the storytellers who are

1    looking to get out from under, get their 5K letter, provide

2    substantial assistance.

3            So that gets us –– I'm getting there.  Hagen.

4    Mr. Johnny-come-lately.  One of the things you have to wonder

5    about, what the heck is he doing in this case.  They got five

6    cooperators.  It's not enough?  They have to bring in

7    Mr. big-time Bloods guy in from Newburgh?  Because there is no

8    way that we can or anybody can corroborate anything this guy

9    says.  He's just saying it.  He doesn't tape record anything.

10   There is nobody else who hears except for the other maybe

11   cooperators.  Who knows.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. DINNERSTEIN:  I don't know why they brought him to

2     court.  November 9th, two, three weeks ago, after the storm,

3     they cut a deal with him, where he gets -- where the deal says,

4     in his cooperation agreement, 55-year minimum sentence, but

5     maybe now he can get a couple of years.

6          MR. FEE:  Objection, your Honor.  Mischaracterizing

7     the evidence.

8          THE COURT:  Sustained.

9          MR. DINNERSTEIN:  He shows up to testify on Veterans

10    Day, two days after he gets his cooperation agreement, I guess

11    to fix the case.

12         Now you can -- maybe the government will say, well,

13    you can ignore all those other cooperators.  You can believe

14    him.  He's older, he's a little savvier, a little smarter.

15    Does that make him truthful?  Don't think so.  Remember what

16    his nickname is?  Vision.  And he tells you how he got the

17    nickname.  It's worth talking about.

18         I asked him this question:

19         "Your nickname is Vision?

20         "A.  Yes.

21         "Q.  How did you get such a nickname?

22         "A.  The guy -- actually, it was a joke at first.  I

23    was in jail and we used to talk about numerous things that

24    would go in the street, and I was around a bunch of older guys

25    and they used to pick on me all the time and say, There's not

Cbq1mer7                          Summation - Mr. Dinnerstein

1    too much you haven't seen yet.  I'm going to start calling you

2    Vision.  And it stuck."

3         That's not what "vision" means.  "Vision" doesn't mean

4    you can see in the past.  "Vision" means you can see in the

5    future.  That's what "vision" means.  You have a good

6    imagination.  "Something seen in a dream, trance, or ecstasy;

7    especially: a supernatural appearance that conveys a

8    revelation."

9         "A thought, concept, or object formed by the

10   imagination."

11        There's a book written by Edith Wharton, I don't know

12   if you know it, The Age of Innocence.  "Look not at visions but

13   at realities."  I'll tell you what his vision is.  He's in a --

14   he's in a desert.  He's parched, he's thirsty, he's dying.  He

15   sees what he believes is water, his salvation.  He's going to

16   be okay.  He's going to go to that water and he's going to

17   drink.  He gets closer, it's only a mirage.  There isn't any

18   water.  The vision that he saw, his imagination saw an oasis,

19   but it wasn't real.  It wasn't there.  There's water at this

20   table.  And he needs to tell the story.  He's going to go after

21   the guys from Newburgh.  "But let me make the story better.

22   I'll go after Melly."  He wants to provide substantial

23   assistance.

24        It is easy to get information in prison.  He tells you

25   how easy it is.  People go over their cases.  We call it

Cbq1mer7                     Summation - Mr. Dinnerstein

1   discovery.  It makes perfectly good sense, because people who

2   are going to go to trial look at the evidence against them.

3   But it's not a private space.  It's a public space.  He sits

4   there by the microwave and he hears what these people are

5   saying.  He understands, because he is smart, that what he has

6   to do is he has to demonize Melly.  He has to talk about how

7   he's joking about the evidence.  You don't have to be a rocket

8   scientist to figure out that's what's important.

9           We know that there isn't a way in hell that there's

10  any evidence in this courtroom that corroborates a word of what

11  Hagen says.  We know that Hagen can stand behind the table

12  there Melly and the co-defendants are working at or whomever is

13  there and listen to what's going on.  He can use his

14  imagination.  He's smart enough to know what to say when he

15  sits down and talks to the prosecutors.  He has a vision.  His

16  vision is to get a 5K letter and to hopefully get himself out

17  of jail.

18          Now we know also that Hagen is somebody good at

19  observing.  And it's a very -- seems like a point that he may

20  have actually put past people.  Mr. Miedel asked Hagen, when

21  given an opportunity -- but it tells us something about who

22  Hagen is and his ability to make observations.

23          He's talking about a guy named Akon, which is a

24  nickname for Folks, okay?  Folks.  Okay.  And he says -- these

25  are questions Mr. Miedel is asking.

1          "Q.  She also asked you whether you were ever housed

2      with a guy named Akon, right?"  She being Ms. Heller.

3          "A.  Yes.

4          "Q.  You said you had not been housed or together with

5      a guy named Akon, right?

6          "A.  Yes.

7          "But in fact you spent time with Akon in a bullpen

8      once, correct?

9          "A.  Yeah.  Somebody I presume to be him, yes."

10         How he knows that, who knows.

11         "Q.  Somebody that you knew him to be him, right?

12         "A.  No.  I never talked to him."

13         He knows cooperators aren't supposed to talk to one

14     another.

15         "I never had any conversation with him.  I just

16     presumed that was him because of the GFC tattoo he had on his

17     arm."

18         What does that say about Hagen?  He is perceptive.

19     He's going to put that in the back of his brain and try to

20     figure out if there's a place that he can use that.  So when he

21     comes to court, he's asked questions about Akon, says, oh,

22     yeah, I made observations about him.  I presumed that this was

23     connected to these other guys.

24         Tone.  When Hagen testified in this courtroom, he was

25     trying to impress you.  His demeanor was calm, he was relaxed.

Cbq1mer7                        Summation - Mr. Dinnerstein

He was not going to be somebody who was going to suggest a

different side of him.  He tells us stories that probably

aren't true.  He gets into some sort of altercation with his

girlfriend on the street and he didn't do anything wrong.  It

was just this overreaction on the part of the police.  Well,

who knows.  I would probably accept the cop over him.

And he spends a lot of time minimizing his own

criminal conduct.  He's the leader of the Bloods but, you know,

he's just trying to keep order.

And we know that he's capable of lying.  Remember,

he's the one that the FBI agents came over to his house and --

I think November, and they had a conversation about some murder

that occurred in Newburgh, and he looked them right in the face

and spoke calmly, he said just the way he speaks -- spoke in

this courtroom, and he lied to them.  Then he had this

conversation with this US attorney named Maimin, did the same

thing.  He lied to him.

So that's the government's storyteller.

And there's one more witness -- there's a couple more

people that I want to talk about.

Special Agent Collins.

Now the government says, well, you don't have to

believe any of the cooperators.  All you have to do is believe

those Facebook entries, those tattoos, those pictures, the

videotape.  3,089 pages on Facebook.  Why kids have these

Cbq1mer7                    Summation - Mr. Dinnerstein

1  enormous Facebook accounts, I don't know.  That's what

2  Ms. Chance -- she's the one from Facebook -- tells us.  And the

3  government shows a few pages and says, See?  See?  See?  He's

4  guilty.  He's guilty.  He's guilty.

5          What's Facebook?  It's social networking.  It is a

6  place that kids seem to be on all over the place, and it is a

7  place where kids use it for bravado, for exaggeration.  It's

8  theater.  Proof beyond a reasonable doubt because of some

9  Facebook pictures?  Really?  Is that really enough?  We've been

10 here eight weeks, and what they come up with is a few Facebook

11 pictures and say find him guilty because of that?  Kids acting

12 jerky is not a substitute for evidence in a federal courthouse.

13         You have to look at where Melly comes from -- a hard,

14 difficult neighborhood.  Try to figure out how to be yourself

15 in that place.  He certainly was in jail.  I'm sure he deserved

16 it.  He was in jail when T-Money started getting -- recruiting

17 kids to be drug dealers in the neighborhood.  When Correa and

18 Ogarro were shot and killed, Melly was in jail.  When Devin

19 shot TA and White Mike, no one's suggesting that Melly was

20 involved.

21         And if you look at those Facebook entries that the

22 government put up there, it also has something above the

23 Facebook entry which says, "Falsehoods.  Deleted."  I don't

24 know what that means.  But when they sit there and they glorify

25 and -- these Facebook entries being admissions of guilt, think

Cbq1mer7                    Summation - Mr. Dinnerstein

1    about that.  Facebook is fantasy.  It is a fantasy world that

2    beats the real world to live.  It doesn't prove drug dealing,

3    it doesn't prove criminal activity.

4            And then there's Rob Young, the basketball coach.  He

5    played basketball in a church group, Melly did, when he was

6    younger, through 2007.  It's true.  The government will

7    probably tell you in their rebuttal summation, he wasn't with

8    them every day, he wasn't with them after 2007, actually.  What

9    he can tell you, though, and what he does -- he comes to this

10   courtroom and he tells you from his perspective, Melly was a

11   good kid, a good basketball player, and a captain of the team,

12   along with two other kids, including his.  I don't know if the

13   government's going to try to spin that in a negative light,

14   like somehow if you're the captain of the team, you're the

15   captain of a gang.  I don't know.  Or I don't know if they're

16   going to say, gee, when he points one finger up, he's really

17   pointing a gun.  Give him a break.  His team won the

18   championship.  He was excited.  Don't make everything in this

19   kid's life ugly.  Don't demonize him over everything.

20           Now I'm done.  I wasn't two hours ago.  Before I sit

21   down, though, I want to just say one more thing.  I can sit

22   down now.  All these guys, they get to argue.  Ms. Heller, she

23   gets to argue.  And while all this is going on, I'm just

24   sitting there saying, "Holy cow --" probably saying something

25   else, but -- "Holy cow, I wish I could respond to that

1    argument, I wish I could -- I had another chance to talk to

2    you."  I have something to say about whatever argument they

3    make.  I don't get that chance.  So I ask you that when you do

4    deliberate in this case, when you sit there in the jury room

5    and you say, well, Mr. Dinnerstein didn't say that and

6    Mr. Dinnerstein didn't say that, one of you -- hopefully all of

7    you, but at least somebody says, let's think about what

8    Mr. Dinnerstein would have said.  Be my surrogate.  Be Melly's

9    surrogate.

10            The government's case is based upon people that

11    can't -- that you wouldn't take anything -- you wouldn't

12    believe them if they told you that the sky was blue.  You'd

13    have to check it out yourself.  You certainly wouldn't buy a

14    used car from those guys.  And here in federal court, the

15    government sits there and they say, it's absolutely true what

16    these guys say.  Well, thank god they don't decide.  Thank god

17    in our system, you decide.

18            Thank you.

19            THE COURT:  Members of the jury, we're going to take a

20    short recess and then we will hear Mr. Lee's closing argument

21    on behalf of Mr. Meregildo.  Keep an open mind, don't discuss

22    the case.

23            Please recess the jury.

24            THE CLERK:  Come to order.  Jury exiting.

25            (Jury excused)

Cbq1mer7

```
 1                  (In open court; jury not present)
 2                  THE COURT:  Are there any matters that counsel would
 3       like to raise?
 4                  All right.  We'll take a -- yes, Mr. Lee?
 5                  MR. LEE:  Your Honor, I'm going to provide the
 6       government and you that extra demonstrative.
 7                  THE COURT:  Slide 46?
 8                  MR. LEE:  Yes, your Honor.
 9                  THE COURT:  The second revision?
10                  MR. LEE:  Yes.  And --
11                  THE COURT:  Okay.  Also, I don't know that it's going
12       to come up again during your summation, but if the sun comes
13       around into the podium and you just want to move the podium one
14       way or the other, you go right ahead.
15                  MR. LEE:  Thank you very much, your Honor.
16                  THE COURT:  All right.
17                  MR. FEE:  I'm sorry.  Very small point.  If possible,
18       when counsel's going through, if they could -- if they have the
19       transcript cite ready when they're reading from something.  We
20       don't want to interrupt, of course, to ask for it, but if they
21       have it and they can just point us to it, it would help the
22       government.
23                  THE COURT:  I think in every instance except one, he
24       gave the page number.
25                  MR. FEE:  It was several, but again, your Honor, we
```

Cbq1mer7

1     wouldn't interrupt, of course.

2              THE COURT:  I recall one.  All right.

3              MR. LEE:  And in my slides, the transcript page is

4     noted, so the government can make notation as they see the

5     slide.  I may not say the page.

6              MR. FEE:  That's fine.  Thank you.

7              THE COURT:  All right.  The defendants can be escorted

8     from the courtroom.  We're going to take about a 20-minute

9     recess.

10             (Recess)

11             (In open court; jury not present)

12             THE COURT:  All right.  Any issues?

13             MR. LEE:  Your Honor, most respectfully, on the screen

14    is the revised, and I believe the government has no objection

15    and it's subject to your Honor's approval, of course.

16             THE COURT:  Any objection from the government?

17             MS. HELLER:  Not anymore, your Honor.

18             THE COURT:  Slide 46 as amended is suitable for you to

19    show to the jury, Mr. Lee.

20             MR. LEE:  Thank you very much, your Honor.

21             THE COURT:  All right.  Let's bring in the jury.

22             THE COURT:  And once again, Mr. Lee, you'll have up to

23    two hours for your closing and subject to the same rules I've

24    laid out for other counsel.

25             MR. LEE:  Thank you, your Honor.

Cbq1mer7                          Summation - Mr. Lee

1          (Jury present)

2          THE COURT:  Members of the jury, at this time I ask

3    that you give your undivided attention to Winston Lee, Esq., as

4    he delivers his closing argument on behalf of the defendant

5    Joshua Meregildo.

6          MR. LEE:  Good afternoon, everyone.

7          THE JURORS:  Good afternoon.

8          MR. LEE:  I beg you, please listen carefully.  It's

9    that time in the afternoon when it may be difficult, but I

10   think we can get through it.  I think if you do what I'm sure

11   you can do, which is work hard, carefully examine the evidence,

12   I think you'll reach the right result.  But it won't be easy,

13   as I go through the evidence, because ladies and gentlemen, I'm

14   not going to talk about and cast aspersions about people being

15   liars or not, because I don't have to do that.  The exhibits,

16   the evidence will do that.  I don't have to do that.

17         Now let's start and focus on the charges against

18   Joshua Meregildo.

19         Now, ladies and gentlemen, when you begin to

20   deliberate, if it hasn't, it's going to occur to you that the

21   government's entire case against Joshua Meregildo is based upon

22   three -- three acts of criminal conduct by Mr. Meregildo.  Only

23   three.

24         And if we could see slide 1, those are the three

25   charges upon which this case is based upon.

1            1.  The very, very specific act that Mr. Meregildo

2    participated in the shooting and killing of Carrel Ogarro on

3    July 31, 2010.  That's one of the charges upon which the

4    government has charged Mr. Meregildo under various theories of

5    criminal liability.

6            2.  The second charge is that he participated in the

7    shooting of members of the 321 organization on

8    September 13th, 2010, in the vicinity of 321 153rd Street,

9    Bronx, New York.  That's the second one.

10            And finally, that he was a member of a drug

11    conspiracy.

12            In deliberating about Mr. Meregildo, those are the

13    three acts you will have to decide whether the government has

14    proved the case beyond a reasonable doubt.

15            Now as I said to you, I'm not here necessarily to call

16    someone a liar.  You can decide that for yourself.  What I'm

17    here is to show you and discuss with you what the evidence

18    shows and what the lack of evidence is in this case.

19            So now first, if we could put up slide number 3.

20            This is an important slide.  It relates to the murder

21    of Carrel Ogarro.  Now what I'm going to do, ladies and

22    gentlemen, I'm going to describe to you what the one and only

23    witness to Carrel Ogarro's murder testified to while he was

24    using Government Exhibit 243 to describe what happened.  And at

25    the end, you're going to realize, based on the exhibits that

1    I'll take you through, that in order to help himself, Devin

2    Parsons did not tell you the truth about what happened during

3    the crime, that moment, those moments when Carrel Ogarro was

4    shot and killed there.

5          Now let's just go through it.  This is what he said.

6    And I'll read to you the actual testimony of Mr. Parsons as to

7    what I'm summarizing now.  What he says, during his testimony,

8    he was given the pointer and he said right there, ladies and

9    gentlemen, right there, a little bit to the left, that's where

10   Joshua Meregildo and I, Devin Parsons, first had a brief few

11   words with the victim, Carrel Ogarro, on that evening.  That's

12   what he said, and we'll see it in the transcript.  You don't

13   have to take my word for it.

14         And then you know what he said, ladies and gentlemen?

15   After, after, after, after, after that conversation is

16   finished, he turns around and he walks away.  With his back,

17   Mr. Ogarro walks away with his back to where Devin Parsons and

18   Joshua Meregildo are standing.  And then Devin Parsons

19   testified that's when Joshua Meregildo fires the first shot

20   into the back of the victim.  Into the back.  Devin Parsons

21   never said, in any of his testimony -- you can go through the

22   thousands of pages -- that Mr. Ogarro was never shot in the

23   front left torso.

24         Not only that, he says -- and we'll see it -- he says

25   that Mr. Meregildo had a .380-caliber handgun, and he shot

three shots and that Mr. Devin Parsons emptied his .22
revolver, six shots.  That's nine shots, ladies and gentlemen.

          And you know what he says happened?  He says this.
It's very significant.  He says, if you follow the pointer,
that Ogarro is going that way, to the right, to the right,
ladies and gentlemen, and he says toward Park Avenue.  That's
very significant.  We'll see when I show you diagrams.  He says
Ogarro runs to the right toward Park Avenue.

          Now -- and then you know what he said happens?  He
said this.  He said Meregildo shoots, hits Ogarro in the back,
Meregildo shoots a second shot, and then Parsons shoots his
first shot.  And then Meregildo shoots a third shot, but you
know what Meregildo does, ladies and gentlemen?  He runs.  But
you know which direction he runs in, ladies and gentlemen?  He
runs back in the opposite direction of where Ogarro's running,
to the right, and he runs down this path.  That's what Parsons
told us.  That's what Parsons told us.

          And he also tells us that no shots were ever missed.
No one ever missed.  He says he shot and emptied his six
bullets into Mr. Ogarro.  And he never mentions that
Mr. Meregildo misses with his three shots.  Okay?

          Now -- and then he says Mr. Meregildo runs back toward
Park Avenue.  Not only that.  He says Mr. Meregildo runs
immediately, he shoots a third shot immediately, he doesn't
stick around, he doesn't stick around to pick up shell casings,

1  he doesn't stick around doing anything.  Immediately, after the

2  third shot, he runs back and that Mr. Parsons says that he ran

3  up and he killed Mr. Ogarro by standing over him.

4           Now that I've summarized it, I'm going to show you

5  from the transcripts, ladies and gentlemen.  I'm going to show

6  you that he said that.  And we can go to slide 2.

7           Ladies and gentlemen, this is what he said:

8           What gun was Killa using, Mr. Parsons?

9           A .380.

10          And what about you?

11          I had a 22.

12          And how many shots did Killa fire in?

13          You see I outline and in bold in three.  That's

14 significant, ladies and gentlemen.  Pay attention.  Put on your

15 hats, ladies and gentlemen, because we're going to look at

16 these exhibits.  The exhibits are going to expose Mr. Parsons'

17 lies, not me.

18          Now he said:

19          Did you see all three shots fired?

20          I heard all three shots fired.

21          And how many shots did you fire?

22          Six.

23          Now where did you hit Mr. Carrel on his body?

24          I shot him twice in his head and like the rest was in

25 his body.

1             And what about Killa?  Did you see where on his body

2      he shot him?

3             I just seen him, like, the main shot was, like, in his

4      lower back.

5             Back, ladies and gentlemen.  Ogarro's back was always,

6      always to them.  And how do we know that?  We'll look at the

7      testimony that I'm going to show you now.  But just look at the

8      last sentence that's there, also.  It's going to become

9      significant:

10            And where was Walter, Walter Aponte, during all of

11     this?

12            He was just holding the back door open.

13            Did Walter ever hold a gun, one of the guns?

14            No.

15            Now, ladies and gentlemen, now we're going to look at

16     slide number 4.  And we'll see, it begins -- this is a

17     clarification of the positioning of the people when the

18     shooting occurs.  And this is on direct examination by Ms. Nola

19     Heller.  And she refers Mr. Parsons to the Government

20     Exhibit 243 that I just showed you the photo.  Remember?  And

21     this is what he says.  Look at the testimony:

22            If we can go back to 243.

23            That photo I just showed you, the place where the

24     first encounter occurred, does this exhibit help you describe

25     where everybody was when the shooting started?

1              We were on the side, a little bit over on the left

2      side.

3              Remember I showed you that, a little bit on the left

4      of the photo?

5              And who is "we"?

6              Me and Killa.

7              So you were on the photograph, indicating the left

8      side of the photograph.

9              Yes.

10             Where was Carrel Ogarro when the shooting started?

11             When the shooting started, he came -- he came from

12     this way and he stopped right here.

13             And where was he when that conversation happened,

14     those few words that were exchanged?

15             Ladies and gentlemen, look at that next line.  I've

16     outlined it, I've underlined it for you.

17             We already had the conversation.  We already had our

18     conversation.  We finished.  And when we -- when he, Mr. Carrel

19     Ogarro, walked away, walked away, he got right there and then,

20     after he walked away, then we started shooting him.

21             I don't know what transcript Mr. Fee has been reading,

22     but I'm showing you the transcript.

23             The previous transcript, if you want to make a

24     notation, it's page 2319.  If you want testimony read back, you

25     can have it read back.  You don't have to take my word for it.

1            And there's other testimony.  Page 2323.  I even asked

2    you to write it down because you're going to have to, you know,

3    want to take a look at this.  But there's even more, ladies and

4    gentlemen.  After he says, we already had the conversation and

5    when he walked away, he got right there and we started

6    shooting.

7            Now when you started shooting, if you look at the

8    exhibit, where did you see Carrel go?

9            He tried to run.  He tried to run back this way.

10           See that?  Towards Park Avenue.  That's going to be

11   significant, ladies and gentlemen.  Towards Park Avenue, the

12   right side of the picture.  That's what happened.

13           But there's another transcript you need to look at,

14   and that's slide number 5.

15           This is the testimony of Devin Parsons about what

16   happened during those moments when Carrel Ogarro was shot.  Not

17   by Meregildo, you'll find out soon.

18           What does he say?  This is questioning.  It says:

19           Mr. Parsons, I want you to think back about the time

20   that the shooting of Mr. Ogarro occurred, okay?

21           Yes.

22           He lies.  You know what he says?  He says -- and he's

23   questioned:

24           And you stated that at some point in time you and

25   Mr. Meregildo were beside Mr. Ogarro, correct?

1          Yes.

2          Look at that, ladies and gentlemen.

3          You stated you're sure, you said that you saw Josh

4   Meregildo fire that first shot, fire a .380 and hit Ogarro in

5   the lower back?

6          Yes.

7          MR. FEE:  Objection, your Honor.  The first shot?  I

8   don't see that.

9          MR. LEE:  Your Honor, ladies and gentlemen --

10         THE COURT:  Sustained.

11         MR. LEE:  -- you'll see that it's the first shot that

12  he meant, because Mr. Fee didn't let me finish.  Okay?  Because

13  look, ladies and gentlemen.  The next question:

14         You saw Mr. Meregildo fire a second shot before you

15  fired your first shot?

16         As I summarized to you.

17         Correct.

18         Remember, Mr. Meregildo -- Mr. Parsons said he fired

19  three shots.  Here, look at the testimony:

20         You said you saw Mr. Meregildo fire a .380 and hit

21  Ogarro in the lower back.

22         Yes.

23         You saw Meregildo fire a second shot before you fired

24  your first shot, correct?

25         Yes.

1          Look at the next line, ladies and gentlemen:

2          Then, at some point, you say, Meregildo fired a third

3     shot?

4          I don't know what Mr. Fee's math is like, but that

5     sounds like three shots that Parsons is lying to us about.  The

6     first shot in the lower back, the second shot, and the third

7     shot.  It says:

8          Then at some point you say that Mr. Meregildo fires a

9     third shot and then starts running, right?

10          Yes.

11          Now it continues.

12          Mr. Ogarro, how far had he, meaning Carrel Ogarro, the

13    victim, been running down the path?

14          Well, he was probably the same distance you and I are.

15          And what I described for the record -- and you'll look

16    at it on the screen -- the podium was here, and I said from the

17    podium near the end of the jury box down to the witness stand.

18    That's how far Mr. Ogarro ran.  Mr. Meregildo ran that way,

19    after his third shot.  We've seen that in the testimony.

20          And it says, after he describes how far:

21          And he got that far?

22          Yes.

23          And then Devin Parsons says:

24          Then after that you say Meregildo, after firing that

25    third shot, ran away?

1              Yes.

2              Well, Mr. Parsons, in that transcript, he was running

3      with his back to you.  Mr. Ogarro was running with his back to

4      him.

5              So he went down on his stomach, is that correct?

6              Yes.

7              Now, ladies and gentlemen, Mr. Fee has stressed that

8      there was a .380 bullet that went into Mr. Ogarro's chest from

9      the front.  Big difference between what Mr. Parsons lied to us

10     and what really occurred, and I'll show you, not because I say

11     so, but from the evidence.

12             Now -- and one last thing as a notation to take me,

13     but -- so Ogarro is always -- always has his back at the time

14     of the shooting to Parsons and to Meregildo, according to

15     Parsons.

16             Now as we said before, according to Ogarro, no one

17     ever shot Mr. -- according to Mr. Parsons, nobody ever shot the

18     victim in the front of the body at all.  He never testified

19     anywhere that he ever saw Meregildo or anyone shoot Mr. Ogarro,

20     the victim, in the front of the body.  You just saw he said in

21     the back.  Only in the back.  And only as Ogarro was walking

22     away or running away down the path towards Park Avenue.

23             Now -- and then just to stress, Meregildo after

24     shooting runs in the opposite direction, perhaps he chases him

25     for a third shot, but immediately after that third shot, he

1    runs in the opposite direction.  And Mr. Ogarro runs down the

2    path that way.

3              Now let's show slide number 6, ladies and gentlemen.

4    This is extremely important.  I'm going to refer to it

5    continually during my statements to you.  I ask you to stay

6    with me and pay attention and it will all become clear.  This

7    is a chart created by Detective Rashida Jupiter.  She's the

8    crime scene unit detective who arrived on the scene.  She did a

9    diagram of what happened when she got on the scene.  Now you

10   can see on that diagram, when I just showed you that

11   photograph, ladies and gentlemen, that Mr. Parsons used, that

12   photo of the area where the conversation occurred, you can see

13   that is at cone number 4.  Do you see that?  Do you know why,

14   ladies and gentlemen?  Do you know why cone number 4 is right

15   where the conversation occurred?  Because he said at that point

16   Mr. Ogarro ran to the right of the photograph toward Park

17   Avenue.  What that photograph shows us, ladies and gentlemen,

18   the photograph is going this way, in this direction, and you

19   see Mr. Parsons says he started walking away.  That's when,

20   after he turned his back, we started shooting and he ran toward

21   Park Avenue.  That's cone 4.  You see the various cones -- 3,

22   2, 1.  Those were put there at the crime scene by Detective

23   Jupiter when she arrived there.  And you see from her key, you

24   see from the key what each of those cones means, and soon I

25   will show you the significance of those cones.  But you can see

Cbq1mer7                          Summation - Mr. Lee

1    the placement of cone 4 and 3, ladies and gentlemen.  Do you

2    see cone 3 further down the path toward Park Avenue?  Do you

3    see that?  That shows what's going to be on the next

4    photograph.

5            If we could show slide 7.

6            Now you see it, ladies and gentlemen.  Cone 4, cone 3,

7    going down toward Park Avenue.  That's the placement, and right

8    there is where the conversation occurred and Ogarro runs down

9    towards Park Avenue, in the direction of Park Avenue.  And you

10   notice, ladies and gentlemen, cone 3 is further down the path

11   towards Park Avenue, which is the direction that Parsons says

12   Ogarro ran towards.

13           Now let's go back to slide 6 again.

14           Now we know -- we know what this means.  We know that

15   slide -- cone 4 is there, 3 is there, and that's the direction

16   that Ogarro ran as he was being shot.

17           And when you go back, look at the slides yourself.

18   Your job is the hard job.  All of you are going to go back

19   there and look at these exhibits and examine them.  I'm just

20   here to help you, to the best of my ability, but certainly

21   Ms. Stafford and I, and Josh Meregildo, we can't do what 12

22   intelligent, fair-minded people can do.

23           Now, ladies and gentlemen, the significance of this

24   exhibit -- cone number 2.  You see that?  That, according to

25   the key, ladies and gentlemen, that is where one, only one, not

Cbq1mer7                          Summation - Mr. Lee

1    three, the one, the .380 shell casing was recovered.  It's

2    found and recovered, down the path, in the direction that

3    Ogarro ran, opposite the direction where Meregildo ran.  That

4    direction, Ogarro running, with his back, Meregildo always

5    facing his back, but there's a shot to Ogarro's front chest

6    from a .380-caliber, which is supposedly the gun that Meregildo

7    was holding.

8              Now let's look at slide number 8.

9              There's cone number 2.  That's where the one .380

10   shell casing is recovered, and if you notice, and we go back

11   onto slide number 6 again, we see cone 2, down the way.  That's

12   where, ladies and gentlemen, the one shot from a .380 was

13   fired, into the front of Ogarro, by someone.  Can't tell you

14   who it was.  According to Parsons, Meregildo is behind Ogarro

15   here.  Ogarro is running and Meregildo shoots.  But we have one

16   shot to the front of Ogarro, down there by cone number 2.

17             Now, ladies and gentlemen, now we've established that

18   a .380 shell casing, only one, was recovered by cone 2, far

19   away from where Meregildo supposedly was when he had that

20   conversation with Ogarro and when Ogarro turned his back and

21   started walking or running away, and Parsons says Meregildo

22   shot him in the back, with the .380.

23             Well, let's look now, ladies -- I told you that the

24   crime scene unit, the ballistics and the autopsy reports are

25   going to show and expose Mr. Parsons' lies, okay?  The autopsy

1   report will show that one gunshot wound, gunshot A, a

2   .380-caliber bullet, went into the front of Ogarro's body on

3   the left torso.  But Mr. Parsons says the only thing that ever

4   happened was shots were fired at Ogarro's back.

5               MR. FEE:  Objection.  Not in evidence.

6               THE COURT:  Overruled.

7               MR. LEE:  Now, ladies and gentlemen, let's look at

8   slide 9.

9               This slide is a diagram, Government Exhibit 200A.  And

10  you can see on that diagram circled in red is the wound I'm

11  talking about.  That's a wound, wound A.  And let's look at the

12  testimony of Dr. Ely while she's explaining that diagram,

13  ladies and gentlemen.  And that's at slide 9-1.

14              First, the court states:

15              While the doctor is drawing, the record should reflect

16  that Government Exhibit 200A is being published to the jury and

17  everyone in the courtroom.  And I assume, Doctor, that when you

18  refer to gunshot wound A, the A that you're drawing is going to

19  correspond to the A on Government Exhibit 200A?

20              Yes.

21              Now could we just see slide 9 again for a moment.  And

22  that's the wound she's talking about, wound A to the front

23  chest.

24              Now let's go back to slide 9.1 again.

25              Now you see what I highlighted.  The question is --

1    now her answer is this:

2              Bullet A enters Mr. Ogarro's body on his left chest.

3              And then she describes how it travels.  But

4    continuing, the question is asked:

5              What could you notice, if anything, about the

6    direction that the bullet entered the body?

7              Front side of his body to the back side.

8              Front to back, ladies and gentlemen.  Not back to

9    front.

10             How does Mr. Meregildo -- if we go back to slide 6

11   just for a moment, slide 6, how does Meregildo get down there

12   to that one shell casing where the shell casing is found, and

13   fire a shot into the front of Ogarro's body, that he starts

14   here, fires all three shots, according to Parsons, while

15   Ogarro's back is to him --

16             MR. FEE:  Objection, not in evidence.

17             THE COURT:  Overruled.

18             MR. LEE:  How does that happen?  Did he fly there on

19   wings?  It's impossible.

20             Ladies and gentlemen, let's continue just looking at

21   the transcript.

22             Now was any bullet recovered from Mr. Ogarro from

23   wound A?

24             Yes.

25             And can you describe that bullet?

Cbq1mer7                          Summation - Mr. Lee

1          The bullet that was removed from his body was a gray

2     metal bullet.

3          She describes it.

4          Now, ladies and gentlemen, let's look further at the

5     autopsy report.

6          Now at slide number 10, this is her report.  And you

7     can see, down in the bottom, in connection with wound A, the

8     direction this bullet traveled is front to back.  Do you recall

9     the testimony I just showed you, ladies and gentlemen?  The

10    testimony of Mr. Parsons who said, we were with Carrel Ogarro

11    after the conversation started, he turned, he walked away, and

12    that's when Mr. Meregildo shot him in the back.  And

13    Mr. Meregildo shot again, and then I shot my shot, and

14    eventually, Mr. Ogarro went down.

15         How does the one .380 go into the front chest of

16    Mr. Ogarro?  But how do we know it's the .380 that went into

17    the front chest, ladies and gentlemen?  We're going to see it

18    in the evidence.  We're going to see it.

19         Now first, I should stress, that autopsy report

20    establishes -- and you can read it yourself, Government

21    Exhibit 200 -- seven shots to Mr. Ogarro's body.  Not -- that's

22    six from Mr. Parsons, six shots, and the one from somebody down

23    by cone A who shot Mr. Ogarro in the foot.  Mr. Parsons told us

24    that Meregildo shot three shots and he shot six.  That's nine.

25    That's not seven.  He doesn't miss and Mr. Meregildo, according

Cbq1mer7                         Summation - Mr. Lee

1    to him, doesn't miss.  The numbers don't add up.

2              MR. FEE:  Objection.  Not in evidence as well.

3              THE COURT:  Overruled.

4              MR. LEE:  Now, ladies and gentlemen, what happened to

5    the bullets that were removed from Ogarro's body?  Let's see

6    slide number 11.

7              This is a photo, ladies and gentlemen, Government

8    Exhibit 220 -- 255A -- 225A.  Excuse me.  These are the

9    ballistics evidence recovered from Mr. Ogarro's body.  Envelope

10   number 1, that's the envelope, the .380-caliber bullet that was

11   removed from Mr. Ogarro's front left torso.  1.1, 1.2, 1.3,

12   those are fragments recovered from other parts of Mr. Ogarro's

13   body.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. LEE:  How do we know this?  Let's look at slide

2     11.1.  What Dr. Ely testified on direct.

3     "Q.  Doctor, what happened to the ballistics evidence.  The

4     bullets the fragments that you recovered from Mr. Ogarro's

5     body?

6     "A.  I removed all of the ballistics evidence and I

7     individually placed those pieces of ballistics into envelopes

8     that were labeled as to the particular wound in his body."

9          She took the envelopes and she labeled as she removed

10    the bullets where the .380 came from.  She wrote down torso.

11    She wrote down on each envelope which part of the body those

12    fragments came from.

13         Ladies and gentlemen, how do we know that the .380,

14    this bullet that was removed from gunshot wound A, entered the

15    front of Ogarro's body, how do we know it is a .380 caliber

16    bullet?  First of all, we know that only one shell casing was

17    recovered at the scene.

18         If we looked at slide 14, we see again, this shows

19    envelope number one, the envelope containing .380.  Ladies and

20    gentlemen, it's right here.  You can look at it.  And Officer

21    Jonathan Fox testified to it.  That .380 bullet which he

22    identified as an expert was recovered from the torso.  The

23    front torso of Mr. Ogarro.  Again, he identified that wound A,

24    in the front chest of Mr. Ogarro, was a .380 caliber.  Removed

25    from the front chest, ladies and gentlemen.  Mr. Ogarro was

shot in the front but only one shot from a .380 caliber gun,

and it was down the path by cone number two. Far away from

where Meregildo is alleged to have ever been. Completely

contrary to what Parsons has told you.

          Now, we also know from Detective Fox that the other

bullets that were in Ogarro's body came from a different gun, a

second gun. They didn't come from a .380. How do we know

that? We can look at slide 16. This is Jonathan Fox

testifying. He says: Now, am I correct that based on your

analysis of item of the four bullet fragments item 1, 1.1, 1.2,

1.3, those four envelopes we just saw, were you able to

conclude sufficiently that the .380 caliber bullet in item

number one was fired from a different firearm than the

fragments contained in 1.1, 1.2 and 1.3? That's correct. This

shows that these gunshot wounds did not come from the .380.

But from a different gun. The .22 that Devin Parsons was

firing that night.

          Now, how do we know that? And we just looked at 16.1.

If we want to examine that evidence, the envelopes will say it

right on there, envelope one, with a .380 caliber bullet was

from the torso, the other bullets were from the forearm, wrist

and head.

          Ladies and gentlemen, how do we know, I keep on saying

there was only one shot fired from a .380 caliber that evening.

Not three. How do I know that? I tell you how we know that,

1    ladies and gentlemen.  Because Detective Jonathan Fox testified

2    that every time -- this is the gun allegedly used.  Every time

3    a semi-automatic gun is fired, it ejects a shell casing.  Do

4    you remember he testified to that?  And I'll show you.  He said

5    every time out of this hole here, you shoot a shot, a shell

6    comes out, and that's the way a semi-automatic gun works.  Not

7    the .22 revolver that Devin Parsons used.  That retains the

8    shell casings inside the cylinder that you see loaded in the

9    pistols.  But in a semi-automatic, every time you shoot, a

10   shell casing comes out.

11        We don't have three shell casings at the scene of the

12   murder, ladies and gentlemen.  We only have one.  And as we

13   showed on Government Exhibit 6, it's all the way down in slide

14   number six.  It is all the way down by cone number two, the one

15   shell casing.

16        We can look at slide number 17.

17        I correct -- this is the questioning of Detective Fox

18   the ballistics expert.  Am I correct that every time a

19   semi-automatic handgun such as the one shown in Government

20   Exhibit 275, every time that gun is fired a shell casing is

21   ejected?  Correct?  That's the way it works.  Yes.

22        You can examine the one shell casing yourself and you

23   know what you will see on the envelope, ladies and gentlemen?

24   It will say that it was recovered at the ramp down by cone two.

25        But, ladies and gentlemen, how do we know, how are we

1    certain there was only one shell casing at the scene?  Because,

2    the police arrived immediately.  I'll show you the testimony.

3    Within 60 seconds they arrive on the scene, there is no time

4    for anybody to pick up shell casings, to remove shell casings,

5    to change the crime scene at all.  You have testimony that the

6    police arrived immediately, the crime scene was secured, and

7    nothing was moved or removed or rearranged in any manner.

8    There is absolutely no time for anyone to alter that crime

9    scene, and that crime scene speaks the truth and it reveals

10    Mr. Parsons' untruth and lie.

11            Let's look at slide 19.  You'll recall Officer Guzman.

12    She's the first responder to the scene.  She said that she was

13    at her police station P.S.A. 7 and she heard shots fired.  She

14    immediately went there.  How long did it take you to arrive

15    there after you heard those shots at the scene of the Ogarro

16    murder?  60 seconds.

17            According to Parsons, Meregildo runs immediately back,

18    he runs up, when I asked him questions.  Not that he walked up.

19    He ran up to Mr. Ogarro and finished him off with the full six

20    shots, the remaining five shots from this gun and he ran.

21            We know that Sergeant Persaud and Officer Guzman told

22    us when they went there, they saw no one, they secured the

23    area, and then we know from Detective Jupiter, the person who

24    did that diagram, she assures us that that crime scene was

25    secured and no one touched anything and was never altered and

1    only one shell casing was recovered.

2              This is her being questioned:  When you arrived there,

3    was the crime scene secured?  I know there was at least one,

4    meaning law enforcement detectives, that was safeguarding the

5    location.  It was an open large area.  I couldn't tell you how

6    many officers were there.  Safeguarding.  It was safeguarded

7    and you recovered only one shell casing?  Correct.  Do you know

8    whether or not that shell casing was touched or moved in any

9    manner by any law enforcement personnel?  When I got there, no

10   one touched it.

11             Can we see slide six again.  Right there.  You saw the

12   picture of it, that's where the shell was found.  Nobody

13   touched it.  And how do we know that where that shell is

14   located, how do we know that that establishes where the person

15   who shot Carrel Ogarro, where he was located when he shot that

16   one .380 caliber shot into Ogarro's chest?  We know it based on

17   testimony from law enforcement experts.  We know that they say

18   that the shells are recovered where the shooter was located.

19             Let's look at slide number 21.  This is the testimony

20   of an Evidence Collection Team member.  His name is Officer

21   Ingoglio.  He is a responder to another scene.  This is what he

22   says in describing how the location of the shell, when you find

23   it, indicates where the person was when he shot the shot.  This

24   is what he said.  Officer, would you please hand me the shell

25   casings and the voucher as well.  Thank you.  Officer Ingoglio,

based on your experience as an Evidence Collection Team member,

what did it mean that shell casings were found at that

location?  Well, somebody had fired a firearm from that

location.  And typically, do you find shell casings near where

the shooter is located or near where the bullets landed?  From

where the shooter was shooting.  We know from Detective

Jonathan Fox, he said that when you shoot a .380, the shell

casing goes to the side.

         Ladies and gentlemen, what does all this show?  It

shows that first, we saw the testimony of Parsons.  I showed it

to you, Ogarro and Meregildo, according to him, and Meregildo

is not even there.  The conversation had ended.  And Ogarro had

already turned around and started walking away toward Park

Avenue and that's when they started shooting.  I showed you

that.  Parsons never says that Ogarro was shot in the front.

But we see from the autopsy from the ballistics there is a .380

recovered from his front left chest.  He never says anyone is

shot in the front by anybody.  And all the shots he describes

are in the back of Ogarro.  And now we know based on everything

that I've shown you there is only one shot fired from a .380

gun, because only one .380 shell casing was recovered.  And

that .380 shell casing was found down by cone two, down by cone

two.  Down, far down the path towards Park Avenue.

         The location where the .380 shell casing was recovered

establishes where the shooter was when he shot Ogarro in the

1   front with his gun.  We know based on the number of shots there

2   was only one shot.

3           Ladies and gentlemen, there is no fingerprints on this

4   gun, no matter how much they tried or even DNA establishing who

5   held that gun.  That evidence would be irrefutable.  I wouldn't

6   be here standing here talking to you.  What we have is Parsons

7   telling you a story that's refuted by the exhibits and by the

8   evidence.

9           Ladies and gentlemen, Parsons' testimony about William

10  Aponte is troubling.  He says that William Aponte was just

11  holding the door and was at the scene.  One thing we do know

12  based on Parsons' testimony, Aponte was there.  He was there,

13  and somebody -- show slide six.  Somebody intercepted Ogarro

14  down by cone two and shot him in the front with the .380.

15  According to Parsons, it is impossible that Meregildo did that.

16          I don't know if you can ingest everything I've said,

17  but I hope that as conscientious, fair-minded jurors you'll

18  consider what I said, you'll go back there and you'll examine

19  the evidence and look at it the way I've looked at it.  Because

20  that's your job.  That's your job.  And as Mr. Dinnerstein

21  said, the hard part starts now.  Because I'm just trying my

22  best to assist you.  But you're going to have to look at the

23  evidence and say does it actually refute what Mr. Parsons has

24  told us.

25          And he says Aponte was just there holding the door,

1    but you know what we know about Mr. Aponte, we know that he is

2    a cooperator.  And we know that for Mr. Parsons to testified

3    against him, cooperator, is impossible.  Cooperators plead

4    guilty and the government doesn't need Parsons to testify

5    against a cooperator.  He needs to testify against somebody at

6    trial.  Somebody that he can help and provide information

7    about.

8            Ladies and gentlemen, there is another lie, a

9    significant lie that Mr. Parsons told.  He told a lie about

10   what happened before and during the murder.  And how do we know

11   that?  Just look at the testimony.  It will establish this,

12   ladies and gentlemen, Walter Aponte and Devin Parsons were

13   together all that evening.  Before, during, and after the

14   Ogarro murder.  We'll see later on that Mr. Parsons earlier

15   said things about Aponte that is totally different and

16   contradicting, contradictory to his testimony here that all

17   Aponte did was hold the door.  That's all Aponte did, according

18   to his trial testimony here.  He says he never held a gun in

19   his hand and he just held the door.  And we'll find that's not

20   the case and you can't forget the fact that now his testimony

21   here is saying Meregildo was involved, and Aponte did nothing.

22   And Aponte is the cooperator.  Aponte is the one that if he

23   were to give testimony to it wouldn't help him, would it?  The

24   government doesn't need him for that.  He's got to have

25   something to trade.  He's got to testify against somebody who

1    is here, claiming he did it.

2            Let's just talk about Parsons.  He lied to us, ladies

3    and gentlemen.  I'll show you the transcripts.  It's not me.

4    The transcripts expose Mr. Parsons' lie.  You know what he

5    said?  It's been a while but you have to remember what he said

6    was he had earlier been in the basketball court, hanging

7    around, and he says that he went home with Brittany Brown.  And

8    he was home, and Meregildo called him, Meregildo calls him and

9    says come murder somebody with me.  He called him while he was

10   back at his apartment with Brittany Brown.  We'll see, we'll

11   see Devin Parsons' lie on slide number .22.  How did it begin,

12   Mr. Parsons?  I was in my house with a girl named Bree.  And

13   Killa called me and to come to Jacksons.

14           That's what he says.  But you know what?  That's not

15   what happened, ladies and gentlemen.  If you follow me.  What

16   happened was Devin Parsons and Walter Aponte stayed outside,

17   outside, and they went, they got guns and they committed the

18   murder.  And the lie is shown in Brittany Brown's testimony.

19   Brittany contradicts Parsons and testifies that Devin Parsons

20   did not go back to his apartment, and that Aponte and Devins

21   stayed at the basketball court and were together before and

22   during the murder.

23           Let's look at slide number 23.  This is Brittany Brown

24   testifying contrary to Mr. Parsons saying he went home, he was

25   in his apartment, having nothing to do with the planning or

CBQ3MER8                    Summation - Mr. Lee

anything to do with the murder of Ogarro, and Killa called him.
This is what she says.  What were you doing that evening?  This
is Brittany Brown testifying.  I was outside in Courtlandt in
the park.  Can you name some of the people you were with?  I
was with Walter Aponte and Devin Parsons.  Not Meregildo there.
And then what happens?  Well, did there come a time when you
left the park?  Yes.  What time was that?  It was about
2 o'clock in the morning.  And where did you go when you left?
I went to Devin's house.  Did you go to Devin's house alone or
with anybody?  I went alone.  Who did you leave in the park?
Everybody.  I left Devin and Walt down there at the park.

        What happens is that Parsons wakes her up by calling
her the morning after Ogarro was murdered.  Brittany Brown
contradicts Parsons and says that Parsons called her.  This is
what happens.  Brittany Brown says she went back without
Parsons, Parsons stayed at the basketball court and stayed out
with Aponte and did the murder.  What did she say?  She said
what woke you up, if anything?  This is slide 24.  My phone was
ringing constantly.  And who was calling you on your phone?
Devin.

        In other words, ladies and gentlemen, Devin Parsons
never went back with her.  He stayed out with Aponte, and he
lied to you when he said he went back to the apartment and
Killa called him to come out.  She says she left them in the
park and he wakes her in the morning.

CBQ3MER8                        Summation - Mr. Lee

1           And what time does he wake her?  If you look at slide

2   25, it could be anywhere seven to eight in the morning.  She's

3   asked this.  So you left Devin Parsons and you go back to where

4   he had been living and you go to sleep, correct?  Yes.  Now you

5   don't have an exact recollection back on now the morning when

6   you woke up, right?  You know it was morning time, right?  Yes.

7   And you think could it have been somewhere between seven and

8   eight in the morning?  It was very early.  When you say very

9   early, that includes you think seven and eight in the morning,

10  right?  Yes.

11          Ladies and gentlemen, he's saying he went home with

12  Brittany Brown, had nothing to do with anything, and then Killa

13  calls him.  She contradicts him and says I left them out there.

14  Walter Aponte and Devin Parsons together and I didn't hear from

15  them until the morning time when he woke me up with a phone

16  call.

17          What is Devin Parsons hiding from us?  What is he

18  trying to hide as far as not only his involvement, but Walter

19  Aponte's involvement?

20          Ladies and gentlemen, there is even a more significant

21  lie.  If you can follow me, I know it's late.  But, the most --

22  one of the most significant lies is the circumstances of Devin

23  Parsons and Aponte obtaining the guns to do the murder of

24  Ogarro.  What Parsons told us was that he, if you look at the

25  testimony, Parsons says that Devin Parsons went to Pemberton's

1    apartment with Meregildo and Aponte, and got one gun.  One gun.

2    He says that Meregildo had a .380 and we needed another gun so

3    all three of us, Aponte, Meregildo, and Parsons went to

4    Pemberton's apartment to get an additional gun.

5            We know that that's not true.  What happened was, and

6    you'll see it in the transcript in a moment, what happened is

7    that Aponte went into Pemberton's apartment, came back with two

8    guns.  Two guns.  One for him and one for Devin Parsons.  There

9    was only two guns at the scene.  If Meregildo has a gun, and if

10   Devin Parsons wants another, second gun there, is no need for

11   two guns if Aponte is not going to hold a gun.  If Aponte gets

12   two guns, there's three guns.  There was no need to ask for

13   two, except if what the truth is Meregildo wasn't there, and

14   they were just asking -- Aponte was asking for two guns for him

15   and Parsons.

16           Let's look at the testimony.  And that's at slide 27.

17   This is Pemberton testifying, ladies and gentlemen.  And he os

18   testifying about what happened the evening before Ogarro was

19   murdered.  Do you recall the day that Carrel was killed?  Yeah.

20   What happened after you fell asleep?  Somebody woke me up.  Do

21   you remember who you woke up -- who woke you up, Mr. Pemberton?

22   Walter Aponte.  Not Devin Parson, not Joshua Meregildo.  Walter

23   Aponte goes into his bedroom and what does he do, according to

24   Mr. Pemberton?  Well, what happens after Walt woke you up?  He

25   told me to give him a gun.  What did you do?  I gave him it.

1   Well, Mr. Pemberton, what, if anything, did you do, what did

2   Walt say about why he wanted the gun?  He didn't.  Okay.  So

3   what happened after you gave a gun to Walt?  I tried to go back

4   to sleep.  Did you go back to sleep?  I tried but he woke me

5   back up.  What happened when he woke you up a second time?  He

6   asked me for another gun.  A second gun.

7           Devin Parsons says he went and got one gun and

8   Pemberton says Aponte came into my bedroom and he asked for

9   two.  And did you give him a gun?  Yeah.

10          Parsons is shown to be a liar.  Not because I'm just

11  asserting that he's a liar.  The testimony shows that what

12  happened is that Aponte went in there to get two guns for him

13  and Parsons, Meregildo wasn't ever seen in this apartment.

14  Pemberton says that evening, he never says he saw Meregildo

15  there.  No one has testified that Meregildo was in Pemberton's

16  apartment to retrieve a gun to go murder Carrel Ogarro.

17          Even more so, ladies and gentlemen, look to slide 28.

18  We see as just more conclusive proof that Pemberton asks Aponte

19  for the two guns back.  We see it at slide 28.  Mr. Pemberton,

20  after Walt took those guns from under your bed and you gave

21  them those guns from under your bed, were the guns returned to

22  you that same day?  No.  At any point did you need to get the

23  guns back?  I asked for them.  You asked who?  Walter Aponte,

24  ladies and gentlemen.  That's page 1442.  You can see it at the

25  bottom.  You want to make a notation, make the notation.  And

1    later on if you want transcripts read back to you, it will be

2    very easy.  You can see that, you can just ask and you can see

3    for yourself and you can look at it carefully.

4            Ladies and gentlemen, Devin Parsons and Aponte were

5    together before, during, and after the murder.  They were there

6    before, contrary to Devin Parsons' assertion that he went back

7    home with Brittany.  She says I went home alone and he called

8    me about 8 o'clock, 7 o'clock in the morning after the murder.

9    And we know that they were together before the murder, because

10   Pemberton says that Aponte came into the room, and got two

11   guns.

12           Ladies and gentlemen, I'll just quickly, just if

13   you'll look carefully, the inconsistencies and contradictions

14   of Mr. Parsons, his deceit is so apparent in the record.  Do

15   you remember Mr. Parsons saying that he called Brittany to come

16   to the house and he gave her the guns so that she could take

17   them out of the apartment and take them away?  He called her.

18   But and he says that he put the guns in her purse.  A female

19   purse.  Let's look at that.  That's slide 30.

20           What happened when she arrived?  Mr. Parsons answers,

21   I was still cleaning off the guns.  And I put the guns in her

22   bag.  And we, me and her walked out the building.

23           Ladies and gentlemen, he even testifies further, he

24   elaborates his lie and he describes it as a purse at slide 31.

25   He says, Mr. Parsons, I want you to think about being inside

1    the apartment of Walter Aponte after the shooting of Ogarro.

2    Did you testify yesterday that you placed a gun or guns inside

3    the purse of Bree?  Yes.  Was it a female purse or was it a

4    man's purse?

5           Ladies and gentlemen, Brittany Brown completely

6    contradicts Devin Parsons.  We can see that at slide 32.  She

7    testifies she came over, and she said what happened.  She was

8    asked what happened with the first thing that happened when you

9    got inside the room.  I asked Devin what happened.  And he was

10   just like adamant, he was adamant.  Then what happened.  He

11   asked me to carry a sneaker box.

12          Where is the female purse?  Ladies and gentlemen,

13   there is a big difference between a sneaker box, him asking

14   Brittany Brown to take guns out in a sneaker box and the female

15   purse.  Is there any way to mistake a sneaker box inside a

16   shopping bag and a female purse?  Why is Devin Parsons lying to

17   us?

18          Well, we know that he's here trying to help himself.

19   He's trying to avoid a life sentence and he's trying to help

20   provide assistance to the government.

21          Devin Parsons while he was in that room, he never

22   revealed what was in the sneaker box and he never revealed what

23   happened with Ogarro prior to being in that room.  A sneaker

24   box was never opened, ladies and gentlemen.  We'll see that in

25   slide 33 when Brittany Brown testifies.  When she goes into

1   that room, she answers the questions and you see it in bolded.

2   While you were all there, the box was never -- and she answers.

3   No, the box was never opened, ever.  And while you were all

4   there in that room, when you asked Mr. Parsons about what was

5   in that bag, he refused to answer you, correct?  Correct.

6           No one in that apartment at that time, other than

7   Aponte, and other than Parsons, knew about what happened to

8   Ogarro and knew what was in that sneaker box.  It was never

9   opened.  Nothing was ever discussed.  Brittany Brown was in

10  that apartment she testified, I don't know, five minutes?

11  Devin Parsons says they were in there one minute.  She comes in

12  and she leaves.  Who she saw, if she saw, who would know

13  anything about what had happened when Parsons, who we already

14  know is a proven liar, and Aponte trying to hide something.  No

15  one would know what happened.  You could have walked into that

16  apartment for any reason and been there and not have known

17  about the Ogarro murder occurring previously that late evening.

18  You would not have even know known that murder weapons were in

19  a sneaker box.  It was never spoken about, it was never opened.

20          Ladies and gentlemen, finally, we do have a glimmer,

21  we learn the reasons why Parsons is lying and we learn that

22  Ogarro was killed by Parsons and Aponte because of a personal

23  problem.  Personal problem between Ogarro and Aponte, and not,

24  not because Parsons and Meregildo were offered money by

25  T-Money.  No.  It was a personal dispute between Aponte and

1    Ogarro and we learn it from Devin Parsons' mouth himself.  How

2    do we know it?  He says it.  Let's look at slide 34.  She's

3    back with Dev Parsons and she has another conversation with Dev

4    Parsons.  And what she says was, do you see underlined that

5    there had been some sort of a problem between Aponte and

6    someone else.  Is that true?  Yes.  Did you understand that

7    someone else who had been killed to be the person who had been

8    shot?  Yes.

9            Devin Parsons says to Brittany Brown that there had

10   been some sort of a problem between Aponte and someone else.

11   Do you understand that someone else to be the person who had

12   been shot?  Yes.

13           He admits it again at slide number 36.  Brittany Brown

14   is testifying about what Devin Parsons told her.  He did say

15   clearly that there was a personal problem between Mr. Aponte

16   and this person who got shot, right?  Yes.  And did he say that

17   Mr. Aponte, Walter Aponte at some point in time after having

18   this personal problem with the person who was shot, he had a

19   gun in his hand, right?  Yes.

20           What we have is Brittany Brown relating to us what

21   Devin Parsons told her.  Completely contrary to what he

22   testified here at trial.  Walter Aponte just held the door and

23   he never held a gun in his hand that evening in connection with

24   the murder of Ogarro.  And there Brittany Brown tells you he

25   told her Aponte had the gun in his hand.

1          But there's more.  Let's look at slide 36.  Now she's

2     asked again about her conversation with Devin Parsons.  At page

3     2738.  You can see every page underneath noted if you want to

4     make a notation.  So, you understood that based upon what you

5     heard from Mr. Parsons that Walter Aponte had the gun in his

6     hand and intended to shoot the person who died that day, right?

7     Yes.  Yes.

8          He told her that Aponte had a gun in his hand and was

9     intending to shoot Ogarro.  What did he tell you here?  Aponte

10    holds a door open?  He never has a gun in his hand?  Devin

11    Parson's statements to Brittany totally contradicts his trial

12    testimony, and we know it now that he's not only lied about

13    what Joshua Meregildo did, but he concealed what Walter Aponte

14    did the night of the murder.

15         Now, when we hear also just briefly that there is

16    problems between Aponte and Ogarro from other people.  Even

17    Pemberton at slide 37.  Mr. Aponte said to you, Mr. Pemberton,

18    Mr. Aponte said that he was scared of people in his building,

19    right?  Correct?  Correct.  And his building, the address is

20    300, correct, it's 300?  Correct.  And Mr. Ogarro, the person

21    who was killed, he lives at 300, doesn't he?  Correct.

22         And Devin Parsons himself admits at a time early on,

23    after the murder, before it becomes in his interest to say

24    something different and change his story, he admits that there

25    was a personal problem between Ogarro and Aponte.  We look at

1    slide 38.  This is Devin Parsons' own words.  You told Capo

2    that you killed Ogarro for Aponte, right?  Yes, I probably did

3    tell him.  This is him admitting, Devin Parsons admitting

4    before he's arrested by the federal authorities and has a

5    reason to lie, to have a reason to change his story from Aponte

6    and Ogarro having a problem and Ogarro being killed because of

7    that problem, he changes his story and says now, T-Money paid

8    me and Meregildo to kill Ogarro.  This is his statement about

9    what he said before he met these people.  These people who have

10   his life in his hands and want him to provide information.

11          Before he met them, Ogarro was killed for personal

12   reasons, a personal problem between Aponte and Ogarro.  After

13   he meets these people, no, that wasn't the truth.  I was

14   telling a story.  Telling people whatever they want.  T-Money

15   paid me.

16          That's the change and we'll find out why it is a

17   significant change that he now will give the government what

18   they need to obtain a conviction against Mr. Meregildo.  If he

19   tells them it was for a personal reason, Mr. Meregildo is not

20   guilty.  These personal reasons, if you commit a murder for a

21   personal reason, it is not something that's an element of the

22   charges against Mr. Meregildo.  It has to be for money or the

23   gain or to maintain a position in the enterprise.  If he can't

24   give them that, it totally will not help them.

25          Let's look at slide 39.  He again states in his own

words before he had a reason to lie.  Before.  Is it a fact

before you were arrested by the federal authorities, you were

telling people, including Capo, that Ogarro was killed because

of personal problems between Mr. Ogarro and Aponte, that's a

fact, right?  I did say that.  For personal reasons, right?

Yes.

          Killing Ogarro for a personal reason will not make

Joshua Meregildo guilty of murder in aid of racketeering.  It

won't make him guilty of the RICO charge because it's not done

in connection with any drug business, any criminal enterprise.

It's done for a personal reason.  And that's why he changes his

story after he meets his lawyers, after he decides to

cooperate.  And now he has something valuable to give them.  It

was done for money.  And that will make Joshua Meregildo

guilty.  If it's personal reasons, Joshua Meregildo is not

guilty.

          And you know, as I said, Parsons has to give up

Meregildo because Aponte is already cooperating.  And

testifying against Aponte is just not going to help.  And

Parsons only denies what he clearly stated that it was for

personal reasons only after he's arrested by the federal

authorities, and only after he needs to give information to

help, to help them make the case against Meregildo.  That's why

Parsons' story changes from Aponte holding the gun and

intending to shoot, as he told Brittany, to later on, just

1    holding the door and saying Meregildo did the shooting.

2            How do we know Aponte's cooperating?  Because Agent

3    Castillo told us.  If we look at slide number 40.  Castillo is

4    answering the question.  And also Aponte, when did he begin to

5    cooperate?  He began cooperating around November 2010.

6            Ladies and gentlemen, we'll never know what the actual

7    personal problem was between Aponte and between Ogarro.  We're

8    certainly never going to know what happened the night Ogarro

9    was murdered.  Why?  There is only one witness here, ladies and

10   gentlemen.  Did you notice that?  Devin Parsons.  And we know

11   Devin Parsons can't be trusted or relied upon.  And frankly,

12   we'll never know because a cooperating witness, Mr. Walter

13   Aponte, was never here.  The cooperating witness never appeared

14   and testified.

15           We do know that Ogarro was killed for a personal

16   reason and not in connection with the affairs or activities of

17   this so-called enterprise that the government gave a name to.

18           Ladies and gentlemen, if that murder of Ogarro as

19   Parsons himself at his own mouth said committed for personal

20   reasons, it is not a racketeering activity.  It is not guilty.

21   Because you have to commit the murder in connection with the

22   affairs of the racketeering enterprise, and you'll understand

23   that clearly when Judge Pauley explains to you the law.  If

24   it's done, it has to be done to further your position, to

25   increase your position from money from the enterprise, not for

1    a personal reason that has nothing to do with the enterprise.

2            Now, ladies and gentlemen, another element that the

3    government must prove against Joshua Meregildo is that he

4    committed a murder for payment of money.  That would make

5    Joshua Meregildo guilty --

6            MR. FEE:  Objection.  Misstatement of the law.

7            THE COURT:  Sustained.

8            MR. LEE:  Ladies and gentlemen, Parsons needs to say

9    he was paid by T-Money in order to provide useful, substantial

10   assistance to the government and to help prove their case and

11   establish an element of the charge against Mr. Meregildo.  But

12   that lie is further exposed.  Ladies and gentlemen, T-Money

13   never offered to pay money to anyone to commit acts of

14   violence.  Payment of money is a necessary element and that's

15   why Parsons --

16           MR. FEE:  Objection.  Misstatement of law.

17           THE COURT:  Sustained.

18           MR. LEE:  Let's just look at the testimony, look at

19   the evidence that shows that that never occurred.

20           Now, it's only after Devin Parsons is arrested, speaks

21   to his attorney, decides to provide information and to

22   cooperate, all of a sudden, the story changes again.

23           (Continued on next page)

24

25

1          MR. LEE:  Now it's that he's being paid by T-Money to

2     commit the murder.  But no one, no one except Parsons says that

3     T-Money ever offered money.  Dev Parsons is the only one, after

4     he's arrested and decides to cooperate, and tried to help the

5     government, who says that.

6          Let's just look at -- out of his own words.  Let's

7     look at slide 42.

8          Now Devin Parsons himself admits, admits, at

9     page 2919, that he never told anyone until after he was

10    arrested on federal charges, that he was offered money.  The

11    question:

12         Am I correct that before you were arrested by the

13    federal authorities, you did not tell anyone that T-Money had

14    offered to pay you or paid you money to kill Ogarro, is that

15    correct?

16         Yes.  I didn't tell anybody.

17         Isn't it a fact that the first time that you told

18    anybody that T-Money offered you money and paid you money to

19    kill Ogarro was to the federal prosecutors after, after you had

20    been arrested on federal charges?

21         And ladies and gentlemen, there's no coincidence that

22    not one cooperator, upon being asked the questions, ever heard

23    anything about or said T-Money would pay any money to anybody

24    to commit acts of violence.

25         Let's look at slide 43.

1          This is Bernard Folks.  He admits to doing shootings,
2     and he says he was never offered money by T-Money for anybody.
3     Mr. Folks is asked this question:
4          Did T-Money ever pay you to go shoot somebody, the
5     Maria Lopez crew?  Did he ever do that?
6          And this is what he said, very clearly:
7          No.  I ain't even heard about him paying anybody to go
8     do anything.
9          But Devin Parsons all of a sudden is the only one who
10    gets paid by T-Money, providing the necessary element to find
11    Mr. Meregildo guilty.
12          MR. FEE:  Objection.  Misstatement of law.
13          MR. LEE:  Now it's no --
14          THE COURT:  Hold on.  Hold on.
15          Overruled.
16          MR. LEE:  We hear from Aubrey Pemberton, who did so
17    many shootings, he was never paid anything.
18          Look at slide 44.
19          Did T-Money -- so when you're shooting at these people
20    that you've described, did T-Money ever pay you to shoot at
21    anybody?  Pay you money?
22          No.
23          Did he ever even offer you money to shoot at people?
24          No.
25          The only one getting paid is Devin Parsons, the person

1    who came here trying to help himself.  The only one in this

2    tightly knit organization.  These people who are together, have

3    understandings and agreements and protocols, no one else is

4    getting paid except him.  How can we explain that?

5         In fact, Meregildo was never paid by him, even

6    according to Devin Parsons.  Devin Parsons was asked, at slide

7    45:

8         Did T-Money ever pay you what he promised he would pay

9    you for the murder?

10        He gave me about 3,000, a little over 3,000.

11        Do you know whether he paid Killa?

12        No.

13        Why would he pay -- why would T-Money pay Parsons and

14   not Meregildo?  I thought they were both offered to commit this

15   murder of Ogarro?

16        Parsons' explanation as to why he did not tell anybody

17   that T-Money had paid him is ridiculous.  Do you remember he

18   said:

19        I guess -- it wasn't the truth.  I was just telling

20   people whatever I wanted to because T-Money would not want me

21   to tell people that he offered me money.  'Cause T-Money didn't

22   want to make it known.

23        If you recall the testimony, T-Money was openly --

24   T-Money was openly admitting to people that he killed Jason

25   Correa.  He wasn't afraid of letting anybody know that he

Cbq1mer9                        Summation - Mr. Lee

1    killed Jason Correa.  He was telling people.  Status, it

2    maintained his stature, it makes people respect him and fear

3    him.  And you heard testimony from so many people that T-Money

4    put out orders, publicly, you see any rival gang members, you

5    come and you shoot them.  He's issuing orders in public to

6    shoot to kill rival gang members.  But all of a sudden, when it

7    comes to Devin Parsons, as to why it's not true that it was a

8    personal reason is because T-Money wouldn't want me to tell

9    people.  Does that ring true?

10           And then you have Mr. Fee telling you that Carrel

11   Ogarro is a threat to T-Money's organization and that's why he

12   was killed.  That's absurd.  Ogarro -- first of all, I don't

13   mean anything by it, but he was addicted to angel dust.  He was

14   a dust head, ladies and gentlemen.  You hear he's sitting

15   around with his head bowed down, acting weird, walking around,

16   but he never sold or had anything to do, according to the

17   government, with T-Money's organization.  He wasn't part of it.

18   He wasn't selling for it.  He knew nothing about it.  He was

19   not in a position to provide any information whatsoever about

20   an organization he had nothing to do with.  How can he provide

21   information about something he was not a part of?  He doesn't

22   know the inner workings of it.  He was absolutely no threat.

23   And if you remember carefully, about Chris Ogarro, the brother

24   of Mr. Ogarro, his testimony about Carrel Ogarro, he said this.

25   You know, Carrel Ogarro had moved away from the neighborhood.

1    He only came back to the neighborhood two days before he was

2    killed.  What kind of a threat -- he wasn't even in the

3    neighborhood.  He came into the neighborhood two days, and he

4    was killed.  But according to the government, that's why he was

5    killed, because he was viewed as a threat, this dust head who

6    sits on a park bench with his head bowed, walking around under

7    the effect of dust, as his brother told you.  He is a threat to

8    T-Money, and he's going to pay $5,000 to have this person

9    killed?  Would he have been better off paying $5,000 to have

10   heads of organizations like Luchie or O killed?  He's going to

11   pay $5,000 to have this minor dust head killed?  Does that make

12   sense?

13          What we know -- slide 46 -- that Parsons is going to

14   give them what they want.  If you focus on the top, ladies and

15   gentlemen, what does it say?  If a murder is not committed for

16   payment of money or for purposes of gaining entrance to or

17   maintaining or increasing position in the CAC enterprise.  What

18   that means is -- I want you to focus on the top.  If you don't

19   commit a murder for payment of money or any of the other

20   purposes there, but I'm focusing on the money aspect that

21   Mr. Parsons is trying to give the government in his testimony

22   to help them, if you don't say necessarily that the person

23   committed murder, it's not a murder in aid of racketeering.

24   Not guilty if the money was not offered, only -- not only, but

25   you see that as a necessary element, that Parsons all of a

1    sudden prior --

2              MR. FEE:  Objection.

3              THE COURT:  Sustained.

4              MR. LEE:  And it changed, ladies and gentlemen.  You

5    noted the story changed from just personal reasons to payment

6    of money.

7              Now, ladies and gentlemen, to conclude, frankly,

8    Mr. Meregildo and I, we have no choice.  Mr. Meregildo,

9    Ms. Stafford and I have no choice, but we do.  We do trust you.

10   As long as you do your job, look carefully at what I said,

11   you'll reach the right resolution.

12             But let's look at what I stressed to you as -- excuse

13   me one moment -- the shooting, the conspiracy to murder people

14   at 321.  That's the second charge that I told you.  One of the

15   three.  Ladies and gentlemen, that charge, the essence of it is

16   conspiracy to murder and participation by Mr. Meregildo in the

17   murder and assault of 321 members.  Well, ladies and gentlemen,

18   again, there's only one witness against Mr. Meregildo as to

19   that shooting of members of the 321 organization, and that's

20   Bernard Folks.  Ladies and gentlemen, one witness.  But even --

21   even if you believe that one witness, ladies and gentlemen, it

22   fails to establish that Meregildo was part of a plan, part of a

23   conspiracy to murder people or that he intended to be a part of

24   that shooting, if it occurred, in front of 321, or that he

25   intended to help or assist anybody.  And we'll see why.  The

1   reason why is, when you listen to the testimony, as I'm going

2   to cite to you, it will become clear that at the time of the

3   shooting, Joshua Meregildo never held a gun.  Joshua Meregildo

4   never shot a gun.  He was barely at the scene of the shooting

5   when it erupted and started.  He never agreed or attended --

6   intended to shoot anyone or to help or anyone be a part of it.

7           How do we know that there was no plan, no conspiracy?

8   Well, first of all, Mr. Crocker had testified that at all these

9   different shootings, once, twice a week, in 2010 -- we know

10  that Mr. Meregildo was arrested in March 2011, but before he

11  was arrested, on un -- different charges that are not for your

12  consideration here, he was arrested for those, we know that

13  Anthony Crocker says Meregildo is a person who never, never was

14  involved in any of these shootings, once or twice a week, going

15  down to the Maria Lopez crew to shoot at those people.  No

16  coincidence that he's not charged in that count.  Even though

17  it includes time when he's not in jail.  And this is what

18  Mr. Crocker said in slide number 47.

19          Joshua Meregildo, have you ever observed him to

20  possess any firearm, ever?

21          No.  No.

22          Never.

23          No.

24          Have you ever observed Meregildo possess and shoot a

25  firearm at anybody?

1          No.

2          And all these incidents in 2010, weekly, twice weekly

3     shootings, going down to Maria Lopez in 2010, no one ever told

4     you that Joshua Meregildo was involved in any of these

5     shootings at YG or Maria Lopez members, correct?

6          Correct.

7          Ladies and gentlemen, Meregildo is supposed to be a

8     major member of this conspiracy, a major member of this

9     so-called enterprise, and not even once, when this organization

10    is going down to shoot at rival crews, he's not involved.  He's

11    not involved.  He's not charged in a conspiracy to go shoot

12    people at these crews, but he's supposed to be a main player, a

13    member of this conspiracy.

14         Ladies and gentlemen, what we do know is, there's a

15    lot of random acts of shooting, seemingly all the time, and

16    what we learned about this shooting at 321, this is one of

17    those unpredicted -- unpredictable, spontaneous, random

18    shootings, these incidents that occurred.  But Meregildo was

19    there but did absolutely nothing.  And the testimony shows it

20    from the one witness who was there and testified.

21         First of all, Devin Parsons said that Pierce called

22    him to get a gun.  And we look at slide 40 and he's asked:

23         How did it begin?

24         I was at my house, I was on the computer, Ski Box

25    called me, told me to bring the gun to him.

1          Now we know that Meregildo was never in possession of

2     a gun that evening when 321 members were shot, before, during,

3     or after the shooting.  And how do we know that?  Look at slide

4     number 49.

5          Bernard Folks, who was there:

6          And at that point, Mr. Meregildo, when you first met

7     with him, did he not take possession of a gun, correct?

8          Correct.

9          And now we have the testimony from Mr. Folks himself

10    that the whole thing was a spontaneous, unexpected occurrence,

11    that not only did Mr. Folks not even expect or know what

12    happened, because there was no plan, Mr. Pierce didn't

13    apparently plan it, and Mr. Meregildo certainly didn't.  But

14    Mr. Folks himself says, and we see at page 50:

15         Mr. Folks, you had no idea there was going to be

16    anyone in front of 321 at that time when you got out of the

17    car?

18         I didn't know.

19         And am I correct, you did not know that anyone was

20    going to be in front of 321; is that correct?

21         Yes.

22         So he just happened to see people in front of 321?

23         Yes.

24         Do you recall saying nothing was planned?  Nothing was

25    planned for anything to happen?

1           Yes.  Something like that.

2           And you weren't interested in having any sort of

3   problems with anyone connected to 321 because you lived there,

4   right?

5           Yes.

6           Again, at slide 51, he says:

7           It wasn't nothing planned.

8           Where's the conspiracy, the agreement?  It just was a

9   random, spontaneous thing.  He said there was nothing planned.

10  It was all in the heat of the moment.

11          Again, he's asked again at slide 52:

12          You went there, speaking about there, you went there

13  to shoot people, right?

14          No.

15          You went there with a gun?

16          I was living there.

17          That's why he went there.

18          Now, ladies and gentlemen, if someone else -- as you

19  heard testimony, whether it's true as alleged that Mr. Pierce

20  flew off the handle, went crazy seeing people in front of 321,

21  and started shooting, Mr. Meregildo wasn't even on the scene at

22  that time, and I'll show you shortly why.

23          It was a totally unexpected occurrence, and how do we

24  know that?  Because there was testimony that Meregildo had

25  barely stepped out of the cab when the shooting started in

Cbq1mer9                          Summation - Mr. Lee

1    front of 321.  And we'll show you slide 53:

2             And you said that he, meaning Meregildo, had just

3    gotten out onto the sidewalk, which is where the cab dropped

4    you off, right?

5             Yes.

6             So he, meaning Meregildo, was just leaving the cab,

7    right?

8             Yes.

9             Ladies and gentlemen, we can see at government -- at

10   slide 54, Meregildo, we see that -- the testimony was right on

11   the left of that tree is where the shell casings were recovered

12   where the shooting occurred.  That's the 321 shooting.

13            Now if you look at slide 55, you'll see -- you see

14   321, that front that we just saw, but you see where the street

15   is, East 153rd, where Meregildo just stepped off of?  You see

16   how far away that is from where the shooting occurred?

17   Meregildo was just getting out of the cab when the shooting

18   started, when the spontaneous, unplanned shooting occurred.

19            Now, ladies and gentlemen, how can Meregildo be

20   responsible for what other people do when the other people did

21   not even know it was going to happen?  So the law requires you

22   have to know that something is going to happen to be guilty of

23   conspiracy, to have agreed or be a part of a plan, and you have

24   to have intended to help.  Merely being present, as Meregildo

25   was, mere presence is not guilt.

1          Now -- and finally, ladies and gentlemen, it doesn't

2    make sense, the government's theory.  They say there was a plan

3    to go have this shootout at the people of 321.  Why would

4    Meregildo go to a shootout unarmed?  To be shot at?  Why would

5    he go there unarmed?  Folks says he was armed but he didn't

6    know there was a plan.  Pierce allegedly was armed.  But

7    Meregildo shows up and he's part of this plan.  He's going

8    there for the shootout at the "OK Corral" with the 321 members

9    and he doesn't bring a gun to the shootout?  Does that make

10   sense?

11         Now, ladies and gentlemen --

12         Your Honor, could I have a warning as to the time,

13   please?

14         THE COURT:  Yes.  You have 28 minutes.

15         MR. LEE:  Thank you, your Honor.

16         Ladies and gentlemen, finally -- and this is the most

17   disturbing charge of all against Mr. Meregildo, the most

18   disturbing of all, the drug conspiracy charge.  Ladies and

19   gentlemen, I want somebody to place here one shred of evidence,

20   one shred that Meregildo was involved in a conspiracy to sell

21   drugs.  It's no coincidence we have contradictory testimony,

22   uncorroborated stories from cooperators that Meregildo didn't

23   sell drugs, and I'll show you.

24         Slide 56.  Bernard Folks is being questioned.  And he

25   says, if you see the bold:

1          I said every day or every day I would be with them,

2    everybody else while they were selling.

3          Do you know what happens, ladies and gentlemen?

4    Bernard Folks, who was there every day, when he's asked, if you

5    go back and read the testimony, and he names all the people

6    that were on the street, on that strip, he doesn't say

7    Meregildo was there selling.

8          But there's more.  Slide 57.  Again, Bernard Folks is

9    asked this:

10         Did you ever see Meregildo, Joshua Meregildo, sell for

11   T-Money?

12         No.  I ain't see Meregildo deal any drugs.

13         Anywhere.

14         And then we see Devin Parsons, at slide 58, and he's

15   asked:

16         And during what hours would you and others be selling

17   crack cocaine?

18         24 hours.

19         How many days a week?

20         Every day.

21         Now if you read his testimony, he does not say that he

22   saw Meregildo selling out on that strip.  Ladies and gentlemen,

23   if he's a member of this conspiracy, he's not selling at the

24   location where members of the conspiracy sell, at their

25   marketplace, at their strip, at their turf?  He's not selling

Cbq1mer9                    Summation - Mr. Lee

1    there?  Not once?  Not once?  And the conspiracy, where

2    everybody else said they were there every day, they never see

3    Meregildo.

4          And again, at slide 59.  Devin Parsons again says this

5    about crack in particular:

6          Did you ever see Meregildo sell crack?

7          No.

8          Crack cocaine?

9          Never.

10          Not once in a while; never.  Now what's very

11    disturbing here, ladies and gentlemen, is that -- and then you

12    even have Aubrey Pemberton, at slide 60.  You see every day

13    he's out there, never once does he say that he saw Meregildo

14    out there.

15          And then -- and at slide 61, again, Crocker, Anthony

16    Crocker, asked:

17          And again, you said you never saw once Joshua

18    Meregildo selling to anybody on that strip, correct?

19          Right.

20          Now, ladies and gentlemen, there is testimony that is

21    contradicted, and I just want to give you one example to show

22    you where the witnesses clearly contradict themselves.

23          First of all, look at slide 62, and follow me on this.

24    Anthony Crocker says, we was --

25          Carlos Villafranco testified:

1          We was in my girlfriend's house and Killa was chopping

2     up crack cocaine on a plate.

3          And who was present in the apartment?

4          Akon.

5          That's Bernard Folks.  But Bernard Folks himself, the

6     person who Villafranco says was there, completely contradicts

7     it, and we see it on slide 63.  Bernard Folks himself is asked:

8          Did you ever see anyone from GFC bag up crack?

9          No.

10         Didn't we just see the slide where Villafranco said he

11    sees Meregildo bagging up crack?

12         And even further, we know from before -- we can show

13    slide 57 again.

14         Folks, the one who supposedly is right there when

15    Villafranco says that Meregildo is bagging up crack:

16         I ain't seen Meregildo deal any drugs.

17         And even Parsons himself contradicts Carlos

18    Villafranco.  At slide 59, Parsons says, in response to this

19    question:

20         Did you ever see Joshua Meregildo sell crack?

21         No.

22         Crack cocaine?

23         Never.

24         Ladies and gentlemen, any possible corroboration that

25    Meregildo sold would have been possible but doesn't exist here.

Cbq1mer9                          Summation - Mr. Lee

1    And how do we know that?  The government is arguing somehow

2    that Meregildo is a supplier to other members of GFC.  A

3    supplier.  But supplier is someone who has supplies.  Stash,

4    accounts, ledgers, and has packaging material, drug

5    paraphernalia.  It's in his residence.  If he's not selling on

6    the strip, if he's a supplier, where's Meregildo's supplies?

7            Now, ladies and gentlemen, very disturbing.  First of

8    all, how do we know that that's true?  Look at the -- look at

9    slide 865.  Agent Collins himself tells us, when he's

10   questioned:

11           Based on your experience, Agent Collins, and -- in

12   applying for search warrants, it's the case that drug

13   traffickers commonly keep drug paraphernalia connected with the

14   packaging and distribution of controlled substances in their

15   residences?

16           Yes.

17           Well, what happens is, Agent Castillo shows up at

18   Joshua Meregildo's residence, shows up at the other residence

19   where he's sleeping, and she finds not one scintilla of

20   evidence.  The person who's supposed to be the supplier, ladies

21   and gentlemen.  They turn the apartment upside down.  Ladies

22   and gentlemen, they found nothing.  No guns anywhere.  They

23   expected a gun inside a speaker.  We never even saw the

24   speaker.  No drugs anywhere.  Not one gram of crack, not one

25   leaf of marijuana.  Where is the supply of drugs that he's

1    supposedly supplying to other people?  And no drug

2    paraphernalia.  No ledgers, no account balances, not one Ziploc

3    bag, no scales.

4            Ladies and gentlemen, when I say no evidence, I mean

5    no evidence of criminal acts.  The government wants to flash up

6    photos of my client with his tattoos that he wants to be a

7    member of something, and he wants to flash up photos of him

8    with people signing, but not in one of those photos is

9    Mr. Meregildo committing a criminal act.  They want you to

10   convict guilt by association because he's with other people,

11   he's in the picture?  Can you show me one photo -- and there is

12   none -- one photo of Mr. Meregildo holding drugs?  Can you show

13   me one photo of Meregildo holding a gun?  Can you show me one

14   Facebook account, one Facebook posting by Meregildo about

15   committing acts of violence, or drug selling?  No controlled

16   buys against him, no undercover buys directed against him, like

17   other people who are co-defendants in this case, like Agent

18   Castillo told us.  No surveillance video of Meregildo selling

19   drugs.  No surveillance video of him holding guns, like

20   Pemberton, holding a gun, running away from the shooting.

21   Parsons said he saw a photo of himself holding a gun at the

22   commission of a crime.  Not one photo.

23           And they make a big deal of showing this gun, ladies

24   and gentlemen.  The gun points to the murder.  The gun does not

25   point to Meregildo, because there's no fingerprint evidence,

Cbq1mer9                        Summation - Mr. Lee

1    there's no DNA.

2              There's no audiotapes of him discussing drugs.  Just

3    the story of cooperators.

4              Now these cooperators, ladies and gentlemen,

5    ultimately, in closing, ultimately, the government's case rests

6    on cooperators, the government's case against Meregildo.  And

7    ladies and gentlemen, these are people -- they've admitted to

8    you that they lie when it serves their purposes.  Just remember

9    the testimony.  These people even said that they would plead

10   guilty to committing a crime they did not even commit if it's

11   going to get them out of jail early.  They intentionally lied

12   at their proffers if at the time they thought that it would be

13   in their best interests and help them.  Aubrey Pemberton pled

14   guilty to a robbery he did not commit.  Parsons lied at his

15   proffer that he was involved in the Alston murder because he

16   thought at the time that was the way to go.  Villafranco lied

17   at his proffer about his girlfriend being there and seeing

18   something.  They thought at the time that's the way, the

19   easiest way to get out of trouble.  Now, now that they're here,

20   facing life, 70, 60 years, they've decided, with their plea

21   agreements, what they'll do is, the easiest way is to help the

22   government, get their 5K letters, and avoid their life

23   sentences.

24             It's easy, ladies and gentlemen, just to come in here

25   and say anything if your testimony is uncorroborated.

Cbq1mer9                          Summation - Mr. Lee

1             Now just briefly about corroboration, very disturbing.

2    You saw an instance where corroboration is important.  You know

3    when that was?  Anthony Crocker misidentified somebody.  You

4    know, he's arrested and he says to himself, well, they want me

5    to give information about T-Money's murder.  They want me to

6    provide information.  I'm going to help them.  I'm going to get

7    them off my back, I'm going to throw the suspicion off of me

8    because people are saying I'm involved with it.  But you know

9    what he does?  After seeing a person for ten seconds, with a

10   hood covering his face come up to T-Money and shoot him, he is

11   shown a photo array, six photos, placed in front of him by the

12   police.  Six.  Obviously one of those six or some of those six

13   are suspects, and he knows that.  They didn't show him a

14   hundred photos.  Six.  To pick somebody out.  And you know what

15   he does?  He picks somebody out based on ten seconds of viewing

16   that person with a hood covering his face.  And you know what?

17   If there was no corroboration, if there was no way to

18   investigate his words, that person he identified, just like

19   Joshua Meregildo, could have been laying in his bed one morning

20   and awoken and arrested for murder, based on him fingering him.

21            But you know what happened?  There was corroboration,

22   and the corroboration refuted him and revealed his lies.  The

23   corroboration showed that that person was in jail.  Ironically,

24   fortunately for that person, he was in jail, or else he might

25   have been sitting here charged with murder.

1           Even worse, it's not going to stop Villafranco.  He's

2      going to give what he has to give if it's going to help him.

3      And when they take him back and they say, you made a mistake,

4      they show him another six, and you know what he does?  He

5      identifies somebody.  I don't even want to think what happened

6      to that other person they identified, where he is, what he's

7      facing, based on ten seconds covered with a hood.  That's what

8      happened.

9           Ladies and gentlemen, if you're -- let me ask you this

10     question, and I'm close to the end.  If these cooperators, if

11     they're willing to lie and say they did something, commit a

12     crime that they didn't even commit, can you imagine they'd go

13     before a judge, they tell the lawyer, they say, I committed a

14     crime, and they didn't do it?  They lie, because it's going to

15     help them.  It's going to get them out of jail.  If you're

16     going to lie and say about yourself that you did something you

17     didn't even do, how easy is it then to lie about somebody else,

18     just somebody else to save yourself, to say they did the crime?

19     Are you going to say you yourself did a crime to avoid jail or

20     get out sooner?  How easy is it to say somebody else did it and

21     save yourself from a life sentence, or 60 to 70 years?  They

22     have no choice.  They have no choice but to do what they're

23     doing.

24          Ladies and gentlemen, Mr. Fee makes a big -- a point

25     about these horrible crimes that are being charged here.  Yes,

Cbq1mer9                          Summation - Mr. Lee

1   they are the most horrible crimes.  Murder, shootings, drug

2   selling.  Now what's worse than these crimes?  I'll tell you

3   what's worse.  Being wrongly convicted for them.  And even

4   worse than that, the person who lies and wrongly convicts you

5   gets out free.  That's the most horrible injustice of all.

6          Thank you.

7          THE COURT:  Members of the jury, we're going to

8   conclude now for this afternoon.  Tomorrow morning we will hear

9   the closing arguments from Mr. Miedel, followed by a short

10  luncheon recess, then we'll hear closing argument by

11  Mr. Becker, and then we'll take a short recess, and then we

12  will hear a brief rebuttal from the government.

13         I suspect that tomorrow we'll be concluding earlier in

14  the afternoon than today, but we'll see how it all goes, and

15  then I'll give you my instructions on the law on Wednesday

16  morning.  If there's sufficient time tomorrow, I may deliver

17  some or all of my instructions to you.  But I suspect that

18  we're going to be wrapping up in mid to late afternoon

19  tomorrow.

20         So keep an open mind, come to no conclusions, and

21  don't discuss the case.

22         Once again, tomorrow, to facilitate things, lunch will

23  be provided to you, so you can plan on that, and you won't have

24  to go out and face the stormy weather.  They're predicting some

25  rain, possibly some snow tomorrow.  I'm not going to make any

Cbq1mer9

1   further predictions about weather in this case.  But leave some

2   extra time to get here so that we can start promptly.

3          Have a safe trip home and a good evening.

4          Please recess the jury.

5          THE CLERK:  Come to order.  Jury exiting.

6          (Jury excused)

7          THE COURT:  All right.  Are there any issues that

8   counsel wish to raise?

9          MS. HELLER:  Your Honor, one issue from us, having to

10  do with timing.  First, if it pleases the court, at least by my

11  watch, Mr. Fee began his summation at 10:20 a.m. and ended at

12  12:08 p.m., so we would respectfully ask to use those 12

13  minutes in our rebuttal because it was unused time.  We'd very

14  much like to use it.

15         THE COURT:  Application denied.  Get used to living

16  within limits that are fixed by the court.  It's not a bank.

17         MR. DINNERSTEIN:  Your Honor, you left it somewhat up

18  in the air that you might charge tomorrow.  I made a 5:30

19  appointment tomorrow.  Am I going to be able to make it?

20         THE COURT:  I seriously, seriously doubt that I'm

21  going to even start the charge, and if I did start the charge,

22  I'd still send the jury home by around 5:00.

23         MR. DINNERSTEIN:  Okay.  That's fine.  Thank you,

24  Judge.

25         THE COURT:  Anything further?

Cbq1mer9

```
 1          Last week we left open the question of whether there
 2     was going to be a stipulation involving Mr. Miranda's medical
 3     admission.  What's the story?
 4          MR. BECKER:  Your Honor, in light of the court's
 5     ruling, I'm not going to be seeking to introduce hospital
 6     records, given the limited nature of what I'm permitted to
 7     introduce, so there will be no stip.
 8          THE COURT:  All right.  Very well.
 9          Now am I correct that Mr. Miedel will be proceeding
10     first tomorrow?
11          MR. MIEDEL:  Yes.
12          THE COURT:  Okay.  All right.  Anything else?
13          MR. FEE:  Your Honor, there has been a lot of
14     communication by defense counsel -- and we appreciate that --
15     about proposed exhibit lists.  If they could just get us any
16     further revisions they have.  I think they've all been accurate
17     and agreed upon.  I don't know if your Honor intends to hand
18     this over -- I guess it would be Wednesday, the exhibit list.
19          THE COURT:  It will go to the jury room right after I
20     charge them.
21          MR. FEE:  Then we have another night, but if they can
22     get it to us, so we can incorporate it.
23          THE COURT:  If there are any other knits on the
24     charge, any typos, that kind of thing, please send an e-mail to
25     my deputy so we can incorporate them, because I've got to have
```

Cbq1mer9

1    the charge printed, and there's no sense making 20 copies of

2    something that has an error in it.

3            MR. DINNERSTEIN:  I guess I'd like to know if the

4    government agrees with me as to those two pages, page 90 and

5    109.

6            MR. FEE:  Your Honor, embarrassingly, we didn't look

7    during lunch.  We were too excited about my summation,

8    probably, but we will look.  It sounds completely appropriate.

9    We'll look tonight, we'll send an e-mail, copying Mr. Gosnell.

10           THE COURT:  All right.  Anything else?

11           MR. FEE:  Not from the government.

12           THE COURT:  Very well.  The defendants can be escorted

13   from the courtroom.

14           (Defendants excused)

15           THE COURT:  All right.  I'll see you tomorrow morning

16   about 9:45.  Have a good evening.

17           THE CLERK:  All rise.

18           (Adjourned to November 27, 2012, at 9:45 a.m.)

19

20

21

22

23

24

25